**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

| | |
|---|---|
| ANDREW JAMES McGONIGLE, individually and on behalf of all others similarly situated,<br>*Plaintiff,*<br>v.<br>SHOPPERSCHOICE.COM, L.L.C. d/b/a BBQGUYS.COM,<br>*Defendant.* | **CIVIL ACTION NO.**<br>**25-cv-00152-SDD-RLB** |

# MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

Plaintiff Andrew James McGonigle moves to certify a class of persons who received text messages from Defendant Shopperschoice.com, L.L.C. d/b/a BBQGuys.com ("BBQGuys" or "Defendant") without consent—in violation of the Telephone Consumer Protection Act's National Do Not Call Registry provision, 47 U.S.C. § 227(c)(5) ("TCPA"). This case presents a straightforward application of Rule 23 to a standardized, automated telemarketing campaign that implicated the TCPA in the same way for every class member. BBQGuys sends marketing text messages at scale through a single third-party platform, Attentive Mobile, Inc., using a uniform "opt-in" procedure and a static database of telephone numbers—without ever screening those numbers against the National Do Not Call Registry, and without any mechanism, until after this suit was filed, for determining whether a number had been reassigned to a new, non-consenting subscriber, like Mr. McGonigle. As a result, Plaintiff Andrew McGonigle and thousands of other individuals received repeated marketing text messages despite having numbers on the National Do Not Call Registry and despite never having consented to receive BBQGuys' marketing messages.

Because Plaintiff's claims arise from the same uniform course of conduct, rely on the same legal theory, and can be proven with common evidence applicable to all class members, this case is ideally suited for class treatment. Rule 23's requirements are readily satisfied, and class certification should be granted.

# I. FACTS

## A. BBQGuys Operates a Centralized, Automated Text Marketing Program Through a Single Third-Party Platform.

BBQGuys is a retailer that sells outdoor kitchen grills, patio supplies, and related products, largely online, through the website BBQGuys.com. *See* Exhibit A, Deposition of Christina Starkweather ("Starkweather Dep.") at 7:2–9. BBQGuys' corporate representative, Christina Starkweather, is BBQGuys' Senior Director of Performance Marketing and oversees the manager responsible for BBQGuys' SMS marketing program. *Id.* at 6:24–7:1, 9:10–17, 10:19–25. Since 2020, BBQGuys has sent all of its marketing text messages through a single outbound platform provided by a third-party vendor, Attentive Mobile, Inc., and has never used any other text messaging platform to send promotional messages. *Id.* at 12:14–15, 13:1–2, 21:17–20 ("Since 2020, has Barbecue Guys used any text messaging platform other than Attentive to send promotional messages. A: No, it's been Attentive.").

BBQGuys sends promotional text messages to its subscriber list "at least a message a week" on average, with the volume and content of individual campaigns determined by BBQGuys' SMS manager and programmed centrally into the Attentive platform. *Id.* at 18:6–7, 20:14–21:13. Enrollment in the program follows a single, standardized procedure applicable to every subscriber: a consumer who visits BBQGuys.com is shown a pop-up prompting the consumer to sign up for email and, on a separate screen, to opt in to SMS; after the consumer opts in on the website. *Id.* at 13:21–14:6. There is no other way to enroll in BBQGuys' SMS program, *id.* at 14:7–9, and once

a number is enrolled, BBQGuys does not periodically reaffirm that the same person who completed the double opt-in remains the person using that number: "The double opt-in is our process. We don't periodically reaffirm." *Id.* at 14:13–21. BBQGuys maintains standardized, machine-generated records for every text message sent through Attentive, including a unique message identifier, a unique subscriber/company identifier, the sending and destination phone numbers, a UTC timestamp, whether the message was inbound or outbound, the message content, and a delivery status field (e.g., "Delivered" or "Failed"). *Id.* at 26:1–25, 38:9–25, 39:6–11, 40:16–41:20.

### B. BBQGuys Relies Solely on Its One-Time "Opt-In" as Consent and Has Never Screened Its Text Messaging Database Against the National Do Not Call Registry.

BBQGuys' corporate representative confirmed that BBQGuys treats the original opt-in—no matter how old, and without regard to whether the person who currently uses the number is the same person who opted in—as its only "consent" to send marketing texts, and that BBQGuys has never checked its texting database against the National Do Not Call Registry:

> *"Q: Did Barbecue Guys do anything to scrub it's list of promotional text message recipients against the National Do Not Call Registry? A: Because we had a double opt-in, that was our consent process."*
>
> *"Q: Does Barbecue Guys – has Barbecue Guys, since 2020, ever had a subscription to the National Do Not Call Registry? A: Not to my knowledge."*
>
> *"Q: Has Barbecue Guys, guys ever performed a scrub, whether one time or recurring, against the National Do Not Call Registry? … A: So post-litigation, as I mentioned, when we started using the RND, but again, otherwise, because we had consent from the phone numbers, we weren't doing additional scrub to the DNC."*

*Id.* at 21:21–25, 22:3–6, 22:7–16; *see also id.* at 22:21–25 (confirming that the only scrub BBQGuys has ever run against its promotional SMS database is the Reassigned Numbers Database scrub described below, and that BBQGuys has never separately scrubbed against the DNC Registry). BBQGuys' sworn discovery responses confirm the same uniform practice: in response to an interrogatory asking what efforts BBQGuys made to confirm that Plaintiff's telephone number was not on the National Do Not Call Registry, BBQGuys did not identify any such effort and instead responded only that it "received consent via a voluntary opt-in for marketing text messages from the owner of telephone number 804-238-5410." Def.'s Suppl. Obj. & Resps. to Pl.'s First Set of Interrogs., Resp. to Interrog. No. 8. BBQGuys likewise has not identified any document reflecting a National Do Not Call Registry subscription or check for any number in its texting database. *Id.*, Resp. to Req. for Produc. No. 24.

### C. BBQGuys Did Not Begin Checking Numbers Against the Reassigned Numbers Database Until After This Lawsuit Was Filed—and Then Found Roughly Ten Thousand Reassigned Numbers in Its Database.

Before this action was filed, BBQGuys made no attempt to determine whether the numbers in its texting database had been reassigned to new subscribers. Ms. Starkweather confirmed that BBQGuys began checking numbers against the FCC's Reassigned Numbers Database ("RND") only "shortly after – after we were made aware of complaint"—that is, after Plaintiff's pre-suit letter and this lawsuit. Starkweather Dep. at 15:11–15. Before that point, BBQGuys' position was simply that "if we had the opt-in for the phone number, that was consent to message the phone number." *Id.* at 15:5–8. BBQGuys now performs a monthly recurring RND check pursuant to an agreement entered into after litigation began, *id.* at 15:16–25, 16:3–6, but the one-time historical lookup BBQGuys performed of its existing database identified approximately ten thousand

telephone numbers that had been reassigned and were removed from BBQGuys' promotional SMS database as a result:

> *"Q: Do you have any knowledge of the number of telephone numbers that were purged from the system as a result of the scrub? A: I believe it was around ten thousand, but I don't – I can't speak specifically."*

*Id.* at 17:6–10; *see also id.* at 16:8–13 (confirming that, "as a result of that lookup, there was a number of SMS numbers that were removed" from BBQGuys' promotional database). Before that one-time scrub, BBQGuys' own witness could not confirm that anyone at the company had ever attempted to identify which numbers in its database had been reassigned. *Id.*

### D. BBQGuys' Own Records Confirm That Plaintiff's Number Had Been Reassigned to Him After a Different Person's 2020 Opt-In.

Plaintiff McGonigle was assigned telephone number (804) 238-XXXX in August 2024 and confirmed the registration of that number with the National Do Not Call Registry on August 5, 2024. Compl. ¶¶ 8–11. He never provided that telephone number to BBQGuys and never consented to receive marketing text messages from BBQGuys. *Id.* ¶¶ 17–18. Despite this, BBQGuys sent Plaintiff at least eight marketing text messages between September and October 2024, more than thirty days after his number was registered on the DNC Registry. *Id.* ¶¶ 12–14. BBQGuys' own vendor, Attentive, and BBQGuys' own in-house counsel confirmed that the telephone number had originally been opted in by a different person years earlier: Attentive's records show that "the user" associated with the number opted in to BBQGuys' SMS program on September 8, 2020, and BBQGuys' in-house Senior Counsel likewise advised Plaintiff's pre-suit counsel that "the phone number appears to be associated with a different person than your client," explaining that if Plaintiff "received this phone number from the carrier since" the 2020 opt-in, "that would explain

why they are receiving the messages." Correspondence of Chase Shelton, Senior Counsel, BBQGuys (Oct. 17, 2024), *See* Exhibit B at 1. BBQGuys, however, had no process in place at that time—or at the time it sent the messages at issue—to catch that reassignment before continuing to text Plaintiff's number. Starkweather Dep. at 14:20–21, 15:5–8. BBQGuys likewise has no record of Plaintiff ever making a purchase from, or otherwise inquiring about products from, BBQGuys. *Id.* at 55:1–9 ("Q: Does Barbecue Guys have any records of Mr. McGonigle making any purchases from Barbecue Guys? A: I'm not aware of any record. Q: Does Barbecue Guys have any records of Mr. McGonigle inquiring about Barbecue Guys products? A: No record I'm aware of."). *See also* McGonigle Decl. ¶4-7 (attesting under oath to these facts, including that he did not provide his telephone number to BBQGuys, never consented to receive its text messages, registered his number on the DNC Registry on August 5, 2024, and received the text messages described above).

### E. BBQGuys' Own Business Records, Analyzed Using a Standardized and Repeatable Methodology, Enable Class-Wide Identification of Class Members.

BBQGuys maintains its texting, opt-in, opt-out, and reassignment data within Attentive's platform in standardized, exportable form. In response to discovery, BBQGuys produced its outbound message and deliverability records, Def.'s Suppl. Obj. & Resps. to Pl.'s First Set of Interrogs., Resp. to Interrog. No. 9 (referring Plaintiff to "the outbound message text message records at BBQGUYS00060 and the deliverability records at BBQGUYS00063–0110"), as well as a consolidated file of "the opt-in and opt-out information for all numbers in Defendant's texting program," BBQGuys' Suppl. Obj. & Resps. to Pl.'s Second Written Disc. Reqs., Resp. to Req. for Produc. No. 1 (BBQGUYS00062).

Plaintiff's retained expert, Aaron Woolfson, analyzed these Call Detail Records ("CDRs")—produced by BBQGuys in the files "BBQGUYS00059.csv" and "BBQGUYS00060.csv"—together with the FTC's National Do Not Call Registry database and

the FCC's Reassigned Number Database ("RND"), using a standardized SQL-based methodology to determine whether there is a reliable, repeatable method for identifying, from BBQGuys' own records, the text messages sent to telephone numbers that (a) were texted two or more times in a twelve-month period after being reassigned, and (b) were registered on the DNC Registry for more than thirty days before each text. Woolfson Decl. ¶¶ 2, 25–29. Mr. Woolfson has over twenty-five years of experience developing and analyzing telephone systems and large-scale databases, has been qualified as an expert on this precise topic in numerous federal and state courts, and has had his methodology for identifying TCPA class members expressly credited by courts granting class certification in other cases. *Id.* ¶¶ 8–24.

Mr. Woolfson's methodology proceeded in a series of mechanical, objective steps applied to BBQGuys' own records. He began with the CDRs, which contained 44,466,716 text messages sent between October 24, 2020 and August 27, 2025, and excluded 1,113,082 messages that were not sent to properly formatted, TCPA-eligible telephone numbers or that were duplicative, leaving 43,353,634 messages. *Id.* ¶¶ 31–32. He then tagged each remaining message with National DNC Registry data and excluded any message not sent to a number that had been registered on the DNC Registry for more than thirty days before the text (and not sent within 365 days of another such text), leaving 27,731,279 messages sent to 281,471 unique telephone numbers. *Id.* ¶ 33. He next tagged each of those numbers with RND status data to identify potentially reassigned numbers, narrowing the set to 1,470,996 messages sent to 13,865 unique potentially reassigned numbers, of which 5,781 unique numbers—having received 828,111 messages—showed a transition from "disconnected" to "active" status on the RND between the first and last text message sent to that number. *Id.* ¶ 34. Applying RND status data a second time to isolate only messages sent *after* the date each number was reassigned, Mr. Woolfson excluded 512,791 messages sent before

reassignment, and then excluded a further 79 messages not sent within 365 days of another qualifying message. *Id.* ¶¶ 35–36.

The result of this fully mechanical, reproducible process is a final, defined universe of **5,626 unique telephone numbers** that together received **315,241 text messages** satisfying all three class criteria: sent after the telephone number was reassigned, sent more than thirty days after the number was registered on the DNC Registry, and sent within 365 days of another qualifying message to the same number. *Id.* ¶ 36. Mr. Woolfson has produced an output of the qualifying text messages (Exhibit 8 to his declaration) and an output reflecting the quantity of qualifying text messages sent to each telephone number (Exhibit 9 to his declaration). *Id.* ¶ 37. It is Mr. Woolfson's opinion that this same methodology reliably identifies which text messages in BBQGuys' own records were sent to reassigned, DNC-registered telephone numbers, and can further be used to identify or exclude messages based on additional objective criteria maintained in BBQGuys' own records—for example, whether a given number sent an inbound text message to BBQGuys after being reassigned. *Id.* ¶¶ 38–39.

BBQGuys' own discovery responses confirm both the existence of this analysis and BBQGuys' own ability to test it against its records. BBQGuys' discovery responses repeatedly reference "Exhibit 9" to Mr. Woolfson's report and confirm that BBQGuys was able to cross-reference those numbers against its own opt-in data, billing records, shipping records, and account records. *See, e.g.,* BBQGuys' Suppl. Obj. & Resps. to Pl.'s Second Written Disc. Reqs., Gen. Obj. to the Woolfson Exhibits ("Plaintiff's Discovery Requests require Defendant to produce information and materials relating to the phone numbers listed Exhibit 9 to the Expert Report of Aaron Woolfson."). BBQGuys' own responses acknowledge that "[a]lignment of Exhibit 9 numbers to the opt-in or opt-out dates is well within Plaintiff's capacity to perform based on

present data," and that BBQGuys itself was able to produce audit-style investigation results for a sample of those numbers. *Id.*, Resp. to Req. for Produc. No. 1. BBQGuys also produced account and purchase information tied to the Exhibit 9 numbers at BBQGUYS00111–0500, cross-referencing each number against BBQGuys' own billing, shipping, and account records. *Id.*, Resp. to Req. for Produc. No. 2.

As a real-world illustration of how precisely BBQGuys' own records track this data on a per-number basis, BBQGuys' discovery responses describe a single telephone number identified in Mr. Woolfson's analysis (Exhibit 8) that received 355 text messages; BBQGuys' own Attentive records show that the subscriber associated with that number first opted in four days after the RND was released on November 5, 2021, that BBQGuys itself removed the number from texting on December 9, 2024 after identifying it as reassigned, and that the number was later re-opted-in on February 19, 2025—with at least 54 of the 355 messages sent after that second opt-in. *Id.,* Gen. Obj. to the Woolfson Exhibits. This level of granular, date-stamped, per-number detail—recorded automatically by BBQGuys' own vendor in the ordinary course—confirms that class membership here turns entirely on objective data fields (telephone number, opt-in date, RND status, DNC registration date, and message count and dates), not on any individualized inquiry, testimony, or credibility determination.

## II. APPLICABLE LAW

### A. The TCPA.

Plaintiff seeks to certify a class under 47 U.S.C. § 227(c), which provides a private right of action to any consumer who receives two or more "telephone solicitations" within a twelve-month period to a residential line or a cell phone number used for residential purposes that was registered on the National Do Not Call Registry more than 30 days before the calls. 47 C.F.R. §§

64.1200(c)(2), (e); *see* 47 C.F.R. § 64.1200(f)(14) ("[T]elephone solicitation means the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person"). In 2003, the Federal Communications Commission ruled that telephone numbers placed on the DNC Registry are presumed to be residential. *In Re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 18 F.C.C. Rcd. 14014, 14039 (2003). Text messages are "calls" for purposes of the TCPA's do-not-call provisions. *See Alvarez v. Fiesta Nissan, Inc.*, No. 7:25-CV-00343, 2026 U.S. Dist. LEXIS 14155, at *16-17 (S.D. Tex. Jan. 26, 2026) ("[B]oth the original text and the context support reading § 227(c)'s cause of action to include text messages within its prohibition on violative 'telephone calls' to persons on the National Do-Not-Call List."); *see also Duran v. La Boom Disco, Inc.*, 955 F.3d 279, 280 n.4 (2d Cir. 2020) ("It is undisputed that '[a] text message to a cellular telephone . . . qualifies as a 'call' within the compass of [the TCPA].'") (internal citation omitted); *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 954 (9th Cir. 2009) (explaining that a text message is a "call" as defined by the TCPA).

Because residential status can be established on a class-wide basis directly from each number's registration on the National Do Not Call Registry itself, this case does not present the proof gap that has defeated certification in other National Do Not Call Registry cases. Here, by contrast, Plaintiff's expert has applied the DNC Registry's own registration data—not a third-party commercial database—directly to BBQGuys' own text messaging records to identify, on a number-by-number basis, every telephone number that was registered on the DNC Registry for more than thirty days before the texts at issue. Woolfson Decl. ¶¶ 33, 36.

A defendant can raise prior express written consent as an affirmative defense to a National Do Not Call Registry claim. 47 C.F.R. §§ 64.1200(c)(2)(i)–(iii), (f)(5). "Prior express consent is

an affirmative defense for which the defendant bears the burden of proof." *Lardner v. Diversified Consultants Inc.*, 17 F. Supp. 3d 1215, 1224 (S.D. Fla. 2014) (quotation omitted); *see also Murphy v. DCI Biologicals Orlando, LLC*, 797 F.3d 1302, 1304–05 (11th Cir. 2015). The TCPA imposes up to $500 in statutory damages per National Do Not Call Registry violation and provides for treble damages if the defendant acted "willfully or knowingly." 47 U.S.C. § 227(c)(5).

## III. THE CLASS

The Plaintiff seeks to certify the following class:

> **National Do Not Call Registry Class:** All persons throughout the United States (1) who did not provide their telephone number to Defendant Shopperschoice.com, L.L.C. d/b/a BBQGuys.com; (2) to whom Defendant caused to be delivered through Attentive, more than one text message within a 12-month period, promoting Defendant's goods or services; (3) where the person's telephone number had been registered with the National Do Not Call Registry; and (4) within four years preceding the date of the Complaint in this action and through the date of class certification.

"The existence of an ascertainable class of persons to be represented by the proposed class representative is an implied prerequisite of Federal Rule of Civil Procedure 23." *See John v. Nat'l Sec. Fire & Cas. Co.*, 501 F.3d 443, 445 (5th Cir. 2007).

The district court "need not know the identity of each class member before certification[,]" but it needs to "be able to identify class members at some stage of the proceeding." *Seeligson v. Devon Energy Prod. Co., L.P.*, 753 F. App'x 225, 230 (5th Cir. 2018) (unpublished per curiam) (quoting *Frey v. First Nat'l Bank Sw.*, 602 F. App'x 164, 168 (5th Cir. 2015) (unpublished per curiam)). The ascertainability standard is less burdensome in this circuit than in others, which require that the class be readily ascertainable at certification. *See id.* at 230 (discussing the Third Circuit's requirements).

"The order defining the class should avoid subjective standards (e.g., a plaintiff's state of mind) or terms that depend on resolution of the merits (e.g., persons who were discriminated

against)." *Plaza 22, LLC v. Waste Mgmt. of La.*, LLC, No. CIV.A. 13-618-SDD, 2015 U.S. Dist. LEXIS 30405, 2015 WL 1120320, at *3 (M.D. La. Mar. 12, 2015) (quoting Manual For Complex Litigation § 21.222 at *1 (4th ed. 2004)). Furthermore, "[T]he possibility that some [claimants] may fail to prevail on their individual claims will not defeat class membership' on the basis of the ascertainability requirement." *In re Deepwater Horizon*, 739 F.3d 790, 821 (5th Cir. 2014) (quoting *In re Rodriguez*, 695 F.3d 360, 370 (5th Cir. 2012)); *see also McKeage v. TMBC*, LLC, 847 F.3d 992, 999 (8th Cir. 2017) (holding that manual review does not preclude ascertainability).

District courts within the Fifth Circuit have applied this same standard to refuse to strike National Do Not Call Registry classes defined in materially the same way as the class proposed here, and have squarely rejected the argument that such a class is impermissibly fail-safe. *See Siringi v. Parkway Fam. Mazda/Kia*, 349 F.R.D. 641 (S.D. Tex. 2023) (rejecting fail-safe challenge to a § 227(c) National Do Not Call class defined as all persons whose telephone numbers the defendant called two or more times in a twelve-month period while the number was on the National Do Not Call Registry, and holding that "the § 227(c) class definition is limited to persons who received calls to numbers that were on the National Do Not Call Registry, but that does not make the class fail-safe"); *id.* ("even if [the] proposed classes are fail-safe, this would not preclude certification because the classes are 'linked' by a 'common complaint'—unwanted telephone calls" from the defendant).

Here, the proposed class is defined based exclusively on objective criteria: the type of telephone number texted (a National Do Not Call Registry–registered number that never belonged to a BBQGuys subscriber or customer), and the number and timeframe of the text messages sent to it (two or more within a twelve-month period, more than thirty days after DNC registration). As

demonstrated above, BBQGuys' own Attentive records—opt-in dates, opt-out dates, message timestamps, and delivery status for every number in its texting database—combined with the DNC Registry's own registration data, allow this criteria to be applied mechanically and objectively to identify class members. Applying exactly that criteria to BBQGuys' own CDRs, Plaintiff's expert Aaron Woolfson has already identified a final, defined population of 5,626 unique telephone numbers that received 315,241 qualifying text messages. Woolfson Decl. ¶ 36. Courts have accepted this same aggregate-analysis methodology in other TCPA cases. *See, e.g., Moore v. Club Exploria, LLC*, No. 19 C 2504, 2023 U.S. Dist. LEXIS 144183, at *15 (N.D. Ill. Aug. 17, 2023) (certifying class and relying on the analysis of Plaintiff's same expert in this case, Mr. Woolfson, to identify class members that received TCPA-violative calls to their cellular telephone numbers).

This Court's denial of class certification in *Carroll v. SGS Auto. Servs., Inc.* is readily distinguishable. In that case, after the plaintiff's own expert (Anya Verkhovskaya) was excluded as unreliable, the *only* remaining evidence of ascertainability was the defendant's raw call logs—records that, critically, did not even identify Carroll himself as a recipient, let alone any other class member. *Carroll v. SGS Auto. Servs.*, No. 16-537-SDD-RLB, 2021 U.S. Dist. LEXIS 116338, at *1 (M.D. La. June 22, 2021). *Carroll* asked the Court to simply assume the logs were reliable for identifying class members; the Court declined to do so, holding that a district court must "find," not merely assume, the facts favoring certification, and that "[a] proposed class that identifies phone numbers and not people does not comport with the requirements of Rule 23." *Id.* at *3–4. This case presents none of those defects. Plaintiff's expert, Mr. Woolfson, has not been excluded, and his methodology is not a black box asserted on faith—it is a fully mechanical, reproducible, step-by-step cross-reference of BBQGuys' own Attentive records against the DNC Registry's and RND's own data, disclosed in granular detail in his declaration. *See* Woolfson Decl. ¶¶ 31–37. Nor

is there any doubt that the named Plaintiff himself is properly within the class. BBQGuys' own records confirm that McGonigle's number received the texts at issue and that it had been reassigned after a different subscriber's 2020 opt-in, a fact BBQGuys' own in-house counsel admitted before suit was filed.

## IV. ARGUMENT

"Class certification is normal in litigation under [the TCPA], because the main questions … are common to all recipients." *Ira Holtzman, C.P.A., & Assocs. Ltd. v. Turza*, 728 F.3d 682, 684 (7th Cir. 2013); *accord Bennett v. GoDaddy.com LLC*, No. CV-16-03908-PHX-ROS, 2019 U.S. Dist. LEXIS 59766, at *35 (D. Ariz. Mar. 15, 2019) ("Countless courts have certified classes under the TCPA"). The Fourth Circuit has explained why:

> *"Given the remedial purpose of the TCPA, it is no surprise that its cause of action would be conducive to class-wide disposition. In enacting the law, Congress sought to deter an activity that, while pernicious and disruptive, does not trigger extensive liability in any single case. Since few individuals would have an incentive to bring suit, no matter how frustrated they were with the intrusion on their privacy, the TCPA opted for a model that allows for resolution of issues without extensive individual complications."*

*Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 656 (4th Cir. 2019). Indeed, "[t]he private right of action in § 227(c)(5) offers many advantages for class-wide adjudication. It requires a plaintiff to initially show two things: a number on the Do-Not-Call registry, and two calls made to that number in a year." *Id.* And "[t]he problems that so often plague class actions under Rule 23(b)(3) are wholly absent from this scheme. The liability determinations involve no questions of individual reliance . . . no complicated contractual obligations . . . and no theories of probabilistic injury." *Id.*

Federal courts have repeatedly certified National Do Not Call Registry and TCPA classes, including in cases like this one that turn on a defendant's failure to detect that the number it was texting no longer belonged to the person who originally consented. *See, e.g., Krakauer v. Dish Network L.L.C.*, 311 F.R.D. 384 (M.D.N.C. 2015), *aff'd*, 925 F.3d 643 (4th Cir. 2019) (certifying National DNC class); *Mantha v. QuoteWizard.com, LLC*, 347 F.R.D. 376 (D. Mass. 2024) (same); *Elliot v. Humana Inc.*, No. 3:22-cv-00329-RGL, 2025 U.S. Dist. LEXIS 67759 (W.D. Ky. Apr. 9, 2025) (certifying "wrong number" TCPA class); *Samson v. United Healthcare Servs.*, No. 2:19-cv-00175, 2023 U.S. Dist. LEXIS 184664 (W.D. Wash. Oct. 13, 2023) (same); *Head v. Citibank, N.A.*, 340 F.R.D. 145 (D. Ariz. 2022) (same); *Wesley v. Snap Fin. LLC*, 339 F.R.D. 277 (D. Utah 2021) (same); *Knapper v. Cox Commc'ns, Inc.*, 329 F.R.D. 238 (D. Ariz. 2019) (same); *Reyes v. BCA Fin. Servs.*, No. 16-24077-CIV-Goodman, 2018 U.S. Dist. LEXIS 106449 (S.D. Fla. June 26, 2018) (same), *decertified per agreement of the parties*, 2020 U.S. Dist. LEXIS 65772 (S.D. Fla. Mar. 18, 2020); *Lavigne v. First Cmty. Bankshares, Inc.*, No. 1:15-cv-00934-WJ/LF, 2018 U.S. Dist. LEXIS 94055 (D.N.M. June 5, 2018) (same); *West v. Cal. Servs. Bureau, Inc.*, 323 F.R.D. 295 (N.D. Cal. 2017) (same); *Johnson v. Navient Sols., Inc.*, 315 F.R.D. 501 (S.D. Ind. 2016) (same); *accord Brown v. DirecTV, LLC*, 562 F. Supp. 3d 590 (C.D. Cal. 2021) (denying motion to decertify "wrong number" TCPA class); *McMillion v. Rash Curtis & Assocs.*, No. 16-CV-03396-YGR, 2017 U.S. Dist. LEXIS 144403 (N.D. Cal. Sept. 6, 2017) (certifying "non-debtor" TCPA classes over objection).

A class should be certified if it satisfies the four requirements of Rule 23(a) and at least one subsection of Rule 23(b). *See* Fed. R. Civ. P. 23; *Amchem Prods., Inc. v. Windso*r, 521 U.S. 591, 613-14 (1997);

. Plaintiff's proposed class meets all of the Rule 23 requirements and should be certified.

**A. Numerosity.**

The first requirement of Rule 23(a) is that "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1); *see also Siringi v. Parkway Family Mazda/Kia*, 349 F.R.D. 641, 643 (S.D. Tex. 2023); *Castro v. Collecto, Inc.*, 256 F.R.D. 534, 540 (W.D. Tex. 2009). Numerosity is not a close question here. Applying his standardized methodology to the full universe of BBQGuys' own CDRs, Plaintiff's expert Aaron Woolfson identified a final population of 5,626 unique telephone numbers that received a total of 315,241 text messages meeting all three class criteria—registered on the DNC Registry for more than thirty days, sent after the number was reassigned, and sent within 365 days of another qualifying message. Woolfson Decl. ¶ 36. That figure is independently corroborated by BBQGuys' own corporate representative, who testified that a single, one-time scrub of BBQGuys' promotional texting database against the Reassigned Numbers Database identified approximately ten thousand telephone numbers that had been reassigned and were removed from the database as a result. Starkweather Dep. at 17:6–10.

**B. Commonality.**

The commonality requirement under Rule 23(a) "requires the plaintiff to demonstrate that the class members 'have suffered the same injury.'" *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (cleaned up). The "claims must depend upon a common contention" that is "capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* "The test for commonality is not demanding." *James v. City of Dall.*, 254 F.3d 551, 570 (5th Cir. 2001); *see also Forbush v. J.C. Penney Co.*, 994 F.2d 1101, 1106 (5th Cir. 1993) ("The threshold of 'commonality' is not high.") (citations omitted). "All that is required for each class is that there is one common question

of law or fact: 'The interests and claims of the various plaintiffs need not be identical. Rather, the commonality test is met when there is at least one issue whose resolution will affect all or a significant number of the putative class members.'" *Castro*, 256 F.R.D. at 537 (quoting *James*, 254 F.3d at 570).

The common questions to be determined in this action include:

- Did BBQGuys send text messages to National Do Not Call Registry–registered telephone numbers that never belonged to a BBQGuys subscriber or customer?
- Do text messages constitute "calls" under the TCPA's National Do Not Call Registry provision?
- Did BBQGuys have consent to send the text messages at issue?
- Were class members injured?
- Should class members recover statutory damages on a per-violation basis?
- Were the TCPA violations "willful" or "knowing," entitling class members to treble damages under the TCPA?

*See, e.g., Cordoba v. DIRECTV, LLC*, 320 F.R.D. 582, 600 (N.D. Ga. 2017), *rev'd in part on other grounds* (certifying National Do Not Call Registry class and finding commonality satisfied by the question of "whether all of the calls at issue for the NDNC class were made to telephone numbers on the NDNC registry"); *Knapper*, 329 F.R.D. at 242 ("[A]ll putative class members allegedly suffered the same injury—a receipt of at least one phone call by Defendant in violation of the TCPA. Thus, whether each class member suffered the same injury is also a 'common contention.' . . . Therefore, commonality is satisfied."); *Meyer v. Bebe Stores, Inc.*, No. 14-CV-00267-YGR, 2016 U.S. Dist. LEXIS 188999, at *19 (N.D. Cal. Aug. 22, 2016) ("Thus, the question of whether damages will be awarded—and whether they will be trebled—is a common question."); *Mantha v. QuoteWizard.com, LLC*, 347 F.R.D. 376 (D. Mass. 2024) (commonality satisfied where all class members "suffered the same injury and advance claims based on the same contention: that

[defendant] violated § 227(c)(5) of the TCPA when it sent each putative Class member two or more telemarketing texts to numbers registered on the NDNCR in a twelve-month period”).

These legal and factual questions are shared by every class member and will be resolved based on (1) BBQGuys’ own texting, opt-in, and opt-out records; (2) BBQGuys’ own sworn deposition testimony and discovery responses regarding its marketing program and its lack of any process to screen numbers against the National Do Not Call Registry; and (3) expert analysis applying that data on a class-wide basis. Moreover, should Plaintiff ultimately succeed in this action, he and the proposed class members will be entitled to identical statutory damages on a per-violation basis.

**C. Typicality.**

Typicality is satisfied where the claims are based on the same legal theory. *See Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997). "The test of typicality, like that of commonality, is not demanding." *In re Seitel, Inc. Sec. Litig.*, 245 F.R.D. 263, 270 (S.D. Tex. 2007). Here, Plaintiff McGonigle and the class members’ claims arise from the same legal theory: each of their National Do Not Call Registry–registered telephone numbers was texted by BBQGuys, through the same centralized Attentive platform, at least two times in a one-year period, using the same double opt-in “consent” procedure and without any screening against the DNC Registry, and each of them is entitled to the same statutory damages. *See C-Mart, Inc. v. Metro. Life Ins. Co.*, 299 F.R.D. 679, 690 (S.D. Fla. 2014) (“Defendants’ conduct violated TCPA through the same process as to all class members and typicality is satisfied.”).

Plaintiff McGonigle’s claims are typical because they arise from BBQGuys’ uniform, centralized texting practices. Like every class member, Mr. McGonigle received multiple marketing text messages sent through BBQGuys’ standardized Attentive platform to a National

Do Not Call Registry–registered number that BBQGuys had no relationship with him under. His injury—receipt of unsolicited marketing texts without consent, after his number had been reassigned to him—results from the same systemic practice that applies equally to the entire class: BBQGuys' reliance on a stale opt-in with no DNC screening and, until after this suit was filed, no reassignment screening. *See Daugherty v. Credit Bureau Servs. Ass'n*, No. 4:23-cv-01728, 2025 U.S. Dist. LEXIS 35852, at *6 (S.D. Tex. Feb. 24, 2025) (certifying TCPA settlement class) (citing *Palm Beach Golf Ctr.-Boca, Inc. v. Sarris*, 311 F.R.D. 688, 696 (S.D. Fla. 2015) ("[T]he proposed class representative satisfies the typicality requirements because [p]laintiff, like each of the class members, was purportedly sent the same fax and each class member's claim is based on the same legal theory and same set of facts as [p]laintiff's claim.")).

**D. Adequacy.**

Rule 23(a)(4) requires that the class representative can fairly and adequately protect and represent the interests of the class. "While the burden in a class certification motion is on the Plaintiffs, the adequacy of the putative representatives and of Plaintiffs' counsel is presumed in the absence of specific proof to the contrary." *Feder v. Elec. Data Sys. Corp.*, 429 F.3d 125, 129-130 (5th Cir. 2005). Named plaintiffs are generally qualified if they "possess a sufficient level of knowledge and understanding to be capable of 'controlling' or 'prosecuting' the litigation." *Id.* "At the certification stage, inquiry into a proposed representative's qualifications is not especially stringent." *Sos v. State Farm Mut. Auto. Ins. Co.*, No. 6:17-cv-890-Orl-40LRH, 2019 U.S. Dist. LEXIS 139680, at *13 (M.D. Fla. May 2, 2019).

Plaintiff McGonigle has no antagonistic or conflicting interest with the members of the proposed class. His claim—that BBQGuys sent unsolicited, unconsented-to marketing text messages to his National Do Not Call Registry–registered number—is identical in kind to every

class member's claim, and he seeks the same statutory relief available to every other class member. McGonigle Decl. ¶¶ 11, 12 (attesting that he has no interest antagonistic to the class, understands his duties as class representative, has been and will remain involved in the prosecution of this action, including responding to discovery and, if necessary, appearing for trial, and is committed to pursuing the claims of the class as vigorously as his own).

Plaintiff's counsel, Anthony I. Paronich of Paronich Law, P.C. and Avi Kaufman of Kaufman P.A., seeks appointment as class counsel and, on information and belief, has experience litigating TCPA and other consumer-protection class actions. Paronich Decl. ¶ __ (attesting to counsel's TCPA and consumer class action experience, prior appointments as class counsel, the resources available to prosecute this action, and the time and expense already invested in investigating and litigating Plaintiff's and the class's claims); Kaufman Decl. ¶ __ (same).

**E. Predominance.**

Rule 23(b)(3) requires "that the questions of law or fact common to class members predominate over any questions affecting only individual members[.]" Fed. R. Civ. P. 23(b)(3). Where common questions "predominate," a class action can achieve economies of time, effort, and expense as compared to separate lawsuits, permit adjudication of disputes that cannot be economically litigated individually, and avoid inconsistent outcomes, because the same issue can be adjudicated the same way for the entire class. Fed. R. Civ. P. 23(b)(3), advisory committee's note (1966).

Rule 23(b)(3)'s predominance requirement is readily met because the common evidence demonstrates that BBQGuys sent marketing text messages to National Do Not Call Registry–registered numbers, without consent, and that class members were injured in the same way as a result. *See Amchem*, 521 U.S. at 625. "To put it another way, whether a particular defendant is

liable is not an *individual* issue among class members. The same applies to defendants' argument that the Court would have to determine whether any defenses apply; they have not persuasively argued that defenses can or would vary among class members." *Birchmeier v. Caribbean Cruise Line, Inc.*, 302 F.R.D. 240, 253 (N.D. Ill. 2014) (emphasis in original); *accord Siringi v. Parkway Fam. Mazda/Kia*, 349 F.R.D. 641 (S.D. Tex. 2023) ("individual issues material to resolving 'one or more affirmative defenses' do not usually defeat class certification under Rule 23(b)(3), at least where 'common issues otherwise predominate.'"). Given as much, "the predominant issue common to all class members is whether [BBQGuys] used…unsolicited [messages] . . . in violation of the TCPA[,] [and] any individualized factual questions are predominated by the common question of Defendant's general TCPA liability." *Cortes v. Nat'l Credit Adjusters, L.L.C.*, No. 2:16-cv-00823-MCE-EFB, 2020 U.S. Dist. LEXIS 118200, at *13 (E.D. Cal. July 6, 2020); *see Palm Beach Golf Ctr.-Boca, Inc.*, 311 F.R.D. at 699 (explaining that "[t]he facts necessary to establish liability [under the TCPA] relate to Defendant's common course of conduct and the transmissions of the [communications]," and finding that "common issues predominate over any individual issues that may arise").

As the Fourth Circuit has recognized, "[t]he liability determinations involve no questions of individual reliance . . . no complicated contractual obligations . . . and no theories of probabilistic injury" in a National Do Not Call Registry case such as this one. *Krakauer*, 925 F.3d at 656. To demonstrate which text messages were sent to National Do Not Call Registry registered numbers and otherwise represent TCPA-violative texts, Plaintiff will rely on his expert Mr. Woolfson's aggregate, SQL-based analysis of BBQGuys' own marketing text records, which has already identified the final population of 5,626 unique telephone numbers and 315,241 qualifying text messages at issue—the same records BBQGuys itself has already used to cross-reference numbers

within Mr. Woolfson's Exhibit 9 against its own billing, shipping, and account data. Woolfson Decl. ¶¶ 30–37. This aggregate evidence will allow Plaintiff to establish BBQGuys' TCPA violations on a class-wide basis, without individualized inquiries. *See Moore v. Club Exploria, LLC*, No. 19 C 2504, 2023 U.S. Dist. LEXIS 144183, at *15 (N.D. Ill. Aug. 17, 2023) (accepting Mr. Woolfson's aggregate methodology to certify a TCPA class).

The second predominant question for all class members is whether text messages constitute "calls" under the TCPA's National Do Not Call Registry provision. To demonstrate the TCPA's applicability to text messages for all class members, Plaintiff will rely on common legal argument and precedent applicable to every class member alike. *See Duran*, 955 F.3d at 280 n.4; *Satterfield*, 569 F.3d at 954.

The third predominant question for class members is consent. Plaintiff will demonstrate the absence of consent relying on BBQGuys' own testimony regarding the single, uniform manner in which it purports to obtain consent to text the telephone numbers in its database—the double opt-in described above—and BBQGuys' undisputed admission that it applied that same uniform, one-size-fits-all procedure to every number in its database without regard to reassignment or DNC registration, coupled with expert analysis identifying, on a number-by-number basis, which numbers in BBQGuys' own records reflect an original opt-in followed by reassignment and continued texting without a fresh opt-in. *See, e.g., Manno v. Healthcare Revenue Recovery Grp., LLC*, 289 F.R.D. 674, 689 (S.D. Fla. 2013) ("Common questions of law and fact predominate here because, as explained above, any persons who may have been subject to an individualized consent defense were excluded during numerosity discovery.").

And the fourth predominant question for all class members is standing. Plaintiff will rely on his expert's analysis to identify text messages that were sent without consent, and Fifth Circuit

law establishes that the receipt of unsolicited text messages constitutes a concrete Article III injury. In *Cranor v. 5 Star Nutrition, L.L.C.*, 998 F.3d 686, 690 (5th Cir. 2021), the Fifth Circuit held that an unsolicited text advertisement causes a "cognizable injury in fact," explaining that "the text of the TCPA shows Congress determined that nuisance arising out of unsolicited telemarketing constitutes a cognizable injury." The court further emphasized that the plaintiff's injury was "exactly the one Congress sought to remediate in enacting the Act." *Id.* at 690. Accordingly, whether class members suffered a concrete injury does not require individualized proof; receipt of the unsolicited texts identified through common evidence supplies the injury recognized in *Cranor*.

Other potential issues—such as "difficult damage calculations" and "individual determinations of who the telephone user was"—do not otherwise preclude a finding of predominance. *See Johnson*, 315 F.R.D. at 502 (certifying a "wrong-number" TCPA class, and rejecting the defendant's contention that individual issues would "overwhelm the litigation and destroy the required commonality of facts").

**F. Superiority.**

Rule 23(b)(3)'s second prong requires a finding that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). "In general, litigating TCPA claims as part of a class action is superior to litigating them in successive individual lawsuits." *Daugherty*, 2025 U.S. Dist. LEXIS 35852, at *11 (S.D. Tex. Feb. 24, 2025) (citing *Knapper*, 329 F.R.D. at 247).

Here, because of "the large number of claims, along with the relatively small statutory damages, the desirability of adjudicating these claims consistently, and the probability that individual members would not have a great interest in controlling the prosecution of these claims, all indicate that a class action would be … superior …." *Kron v. Grand Bahama Cruise Line, LLC*,

328 F.R.D. 694, 702 (S.D. Fla. 2018). Indeed, the relatively small statutory damage award of $500 per violation under 47 U.S.C. § 227(c)(5) means individual class members have little financial incentive to bring their own suits. *See Krakauer v. Dish Network L.L.C.*, 311 F.R.D. 384 (M.D.N.C. 2015); *Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643 (4th Cir. 2019); *Mantha v. QuoteWizard.com, LLC*, 347 F.R.D. 376 (D. Mass. 2024). Because "few individuals would have an incentive to bring suit, no matter how frustrated they were with the intrusion on their privacy, the TCPA opted for a model that allows for resolution of issues without extensive individual complications." *Krakauer*, 925 F.3d at 656. And resolving these claims in a single forum provides "flexibility, control, and consistency that would not exist with individual litigation." *Mantha*, 347 F.R.D. 376.

## V. CONCLUSION

Plaintiff respectfully requests that this Court certify the class; appoint him as class representative and Anthony I. Paronich of Paronich Law, P.C. and Avi Kaufman of Kaufman P.A. as class counsel; and establish a deadline for submitting a proposed notice plan.

Dated: August 31, 2026

Respectfully submitted,

*/s/ Anthony I. Paronich*
Anthony I. Paronich
PARONICH LAW, P.C.
350 Lincoln Street, Suite 2400
Hingham, MA 02043
(508) 221-1510
anthony@paronichlaw.com
*Counsel for Plaintiff and the Proposed Class*