UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| ANDREW JAMES MCGONIGLE<br><br>v.<br><br>SHOPPERSCHOICE.COM, LLC d/b/a BBQGUYS.COM | CIVIL ACTION<br><br>NO. 3:25-CV-00152-SDD-RLB |

**MEMORANDUM IN SUPPORT OF MOTION IN LIMINE TO EXCLUDE THE EXPERT REPORT AND TESTIMONY OF AARON WOOLFSON**

**TABLE OF CONTENTS**


Table of Authorities ..... i

I. Introduction ..... 1

II. Factual Background ..... 2

A. Woolfson's History as an Expert Witness ..... 2

B. The Evolution of Woolfson's Methodology ..... 3

C. Woolfson's Proposed Opinion ..... 5

III. Admissibility of Expert Opinions ..... 7

IV. Argument ..... 9

A. Woolfson is Not Qualified to Opine on Whether His Method is Reliable ..... 9

B. Woolfson's Private, Undisclosed, and Self-Generated Database is Irrelevant ..... 12

C. Woolfson's Methodology Does Not Rely Upon Sufficient Facts or Data ..... 13

D. Woolfson's Opinion is Not the Result of Independent Professional Judgment ..... 16

E. Woolfson's Use of the Reassigned Number Database is Unreliable and Unlawful ..... 19

1. The Reassigned Number Database is Unreliable for Woolfson's Purposes ..... 19

2. Woolfson's Use of the Reassigned Number Database for Litigation is Unlawful .....22

F. Woolfson's Methodology Violates the Privacy Interests that the TCPA was Enacted to Protect ..........23

V. Conclusion ..........25

**Attached Exhibits**

Exhibit 1: Deposition of Aaron Woolfson (Aug. 13, 2026) ....................2–6, 11, 13–17, 20, 21, 24

Exhibit 2: Curriculum Vitae of Aaron Woolfson ..........2, 4

Exhibit 3: *Rojas, et al. v. Marko Zaninovich, Inc., et al*, No. 1:09-00705, ECF No. 158 (E.D. Cal. Sept. 19, 2011) ..........3, 17

Exhibit 4: "Declaration of Expert Aaron Woolfson" in *Van Elzen v. Advisors Ignite USA LLC, et al.*, No. 1:22-00859 (E.D. Wis.)..........4, 15

Exhibit 5: Exhibit 14 to the Deposition of Aaron Woolfson, Reply Comments of TelSwitch, Inc. and exhibits, W.C. Docket Nos. 26-49, 20-67, 13-97, 07-243, FEDERAL COMMUNICATIONS COMMISSION (Jul. 6, 2026) (*available at* https://www.fcc.gov/ecfs/document/26109987506/1) ..4, 24

Exhibit 6: Exhibit 13 to the Deposition of Aaron Woolfson, Letter dated August 22, 2023 ....4, 24

Exhibit 7: Declaration of Expert Aaron Woolfson (Apr. 28, 2026) ....................5, 7, 13, 18, 20, 21

Exhibit 8: "Declaration of Expert Aaron Woolfson" in *Saladino, et al. v. Mad City Home Improvement, LLC d/b/a Mad City Windows & Baths*, No. 0:24-cv-01419 (D. Minn. Jan. 20, 2026) ..........5

Exhibit 9: "Declaration of Expert Aaron Woolfson" in *Summerton v. Goldco Direct, LLC*, No. 3:23-cv-00238 (W.D.Wis. Mar. 31, 2025)..........5, 18

Exhibit 10: Expert Report of Madelyn Moran (Jun. 15, 2026)..........6, 17, 18, 20–22

Exhibit 11: Exhibit 4 to the Deposition of Aaron Woolfson, "Q&A for Telemarketers & Sellers About the DNC Provisions in the TSR", FEDERAL TRADE COMMISSION (available at https://www.ftc.gov/business-guidance/resources/qa-telemarketers-sellers-about-dnc-provisions-tsr-0)..........15

Exhibit 12: Deposition of Andrew James McGonigle (Jul. 2, 2026)..........18

Exhibit 13: Excerpts from Exhibit 9 to the Declaration of Expert Aaron Woolfson..........4, 18

Exhibit 14: Excerpt from BBQGUYS000062.csv ..........18

Exhibit 15: Second Report and Order, *In the Matter of Advanced Methods to Target and Eliminate Unlawful Robocalls*, FCC 18-177, CG Docket No. 17-59 (FCC Dec. 13, 2018)..............19, 20, 22

Exhibit 16: Exhibit 10 to the Deposition of Aaron Woolfson, Declaration of Beth Sprague (May 24, 2023).

Exhibit 17: Exhibit 11 to the Deposition of Aaron Woolfson, Declaration of Scott Rice (April 21, 2023) ..........20

Exhibit 18: Affidavit of Aaron Woolfson in *Jackson v. Regions Bank*, no. 1:19-cv-01019, 2020 WL 3507607 (S.D.Ind. Mar. 6, 2020)..........2

Exhibit 19: Motion to Exclude the Report of Jeffrey Hansen in *Keyes v. Ocwen Loan Servicing, LLC*, No. 2:17-11492, 2018 WL 11315323 (E.D. Mich. May 30, 2018) ..........2

Exhibit 20: Memorandum Opinion and Order, *Davis v. Capital One, N.A.*, No. 1:22-cv-00903 (E.D.Va. Oct. 20, 2023).......... 22

[Remainder of page intentionally left blank]

# TABLE OF AUTHORITIES

**Cases**

*Facebook, Inc. v. Duguid, et al.*, 592 U.S. 395, 141 S.Ct. 1163 (2021) ........................................3

*Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146, 118 S.Ct. 512 (1997) ..............................................9

*Conroy v. Vilsack*, 707 F.3d 1163 (10th Cir. 2013)............................................................................9

*Guillory v. Domtar Indust. Inc.*, 95 F.3d 1320, 1331 (5th Cir. 1996)..............................................9

*In re: Taxiotere (Docetaxel) Products Liability Litigation*, 26 F.4th 256 (5th Cir. 2022) ............16

*Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347 (5th Cir. 2007) ................................................9

*Moore v. Ashland Chem. Inc.*, 151 F.3d 269 (5th Cir. 1998) .......................................................14

*Tanner v. Westbrook*, 174 F.3d 542 (5th Cir. 1999) ...........................................................................10

*U.S. v. Brown*, 871 F.3d 352 (5th Cir. 2017) ..................................................................................8, 9

*U.S. v. Valencia*, 600 F.3d 389 (5th Cir. 2010)......................................................................................7

*Van Winkle v. Rogers*, 82 F.4th 370 (5th Cir. 2023)..........................................................................9

*Williams v. BP Exploration & Prod., Inc.*, 143 F.4th 593 (5th Cir. 2025) ..............................9, 14

*Wilson v. Woods*, 163 F.3d 935 (5th Cir. 1999).............................................................................9, 10

*Carroll v. SGS Automotive Services, Inc.*, No. 16-537-SDD-RLB, 2020 WL 7024477 (M.D. La. Nov. 30, 2020) ..........................................................................................................................8, 22

*Carroll v. SGS Automotive Services, Inc.*, No. 16-537-SDD-RLB, 2020 WL 5761082 (M.D. La. Sept. 28, 2020) ...........................................................................................................................2

*Dueker v. CSRT Expedited Inc.*, No. 2:18-08751, 2020 WL 7222095 (C.D. Cal. Dec. 7, 2020)....3

*Garybo v. Bros*, No. 1:15-01487, 2020 WL 999762 (E.D. Cal. Mar. 2, 2020) .............................3

*Luster v. Green Tree Servicing, LLC*, No. 1:14-01763, 2018 WL 11486314 (N.D. Ga. Sept. 5, 2018) ..................................................................................................................................................2

*MacNair v. Chubb European Grp., SE*, No. 2:23-00761, 2024 WL 4332666 (E.D. La. Sept. 27, 2024) ..................................................................................................................................................8

*Martin v. Nat. Interstate Ins. Co.*, No. 24-1645, 2025 WL 1442567 (E.D. La. May 20, 2025)......8

*McClellan v. I-Flow Corp.*, 710 F.Supp.2d 1092 (D.Oreg. 2010)................................................17

*Mosier v. Firstsource Sol. USA LLC*, No. 3:23-cv-1343, 2025 WL 959530 (N.D. Ohio Mar. 31, 2025) ....................4

*Prohaska v. Sofamor, S.N.C.*, 138 F.Supp.2d 422, 437 (W.D.N.Y. 2001) ....................17, 19

*Rushing v. Yeargain*, No. 19-653, 2022 WL 4545612 (M.D. La. Jun. 10, 2022) ....................8

*Steward v. Family Dollar, Inc.*, No. 23-314, 2025 WL 2787898 (M.D. La. Sept. 11, 2025)..........8

*Thibodeaux v. State Farm Fire & Cas. Co.*, No. 2:25-cv-00427, 2026 WL 2364677 (W.D.La. Aug. 14, 2026) ....................8

**Statutes**

FED. R. CIV. PROC. 26 ....................14

47 U.S.C. § 227....................4, 12, 13

CAL. CIV. CODE § 1798.100, *et seq.*....................11, 23

**Regulations**

16 C.F.R. § 310, *et seq.*....................14, 15

LA. SEN. B. 386 (2026)....................23

**Secondary Sources**

"National Do Not Call Registry Data Book for Fiscal Year 2025", FEDERAL TRADE COMMISSION (Dec. 2025) (available at https://www.ftc.gov/reports/national-do-not-call-registry-data-book-fiscal-year-2025) ....................11

"Terms of Use Notice", REASSIGNED NUMBERS DATABASE (last updated Apr. 1, 2021) (https://www.reassigned.us/terms)....................22

Automated Telephone Consumer Protection Act, S. Rep. No. 102-178 (Oct. 8, 1991) (*available at* https://www.govinfo.gov/content/pkg/SERIALSET-14050_00_00-012-0178-0000/pdf/SERIALSET-14050_00_00-012-0178-0000.pdf)....................23

[Remainder of page intentionally left blank]

Defendant, ShoppersChoice.com, L.L.C. d/b/a BBQGuys.com ("BBQGuys"), submits this memorandum in support of its *Motion in Limine to Exclude the Expert Report and Testimony of Aaron Woolfson*.

## I. INTRODUCTION.

Federal Rule of Evidence 702 permits expert opinion testimony when specialized knowledge from a learned professional would aid the trier of fact's evaluation of a dispute. Rule 702 is not designed for advocacy masquerading as science; consequently, courts must ensure that an expert's opinion aligns with applicable professional standards outside of the courtroom and has a reliable basis in the scholarship of that discipline. Where an expert's opinion is not grounded in specialized knowledge or the expert serves as a mere conduit for counsel's arguments, the opinion fails to meet Rule 702's goal. An expert whose opinions would further be rejected by their peers or who applies a methodology that has never been used outside of litigation presents the paradigm case that Rule 702 was designed to exclude.

Plaintiff Andrew James McGonigle ("Plaintiff") offers Aaron Woolfson as an expert to support class certification.[1] Yet, Woolfson's opinion is a textbook example of testimony that Rule 702 was specifically crafted to reject. His methodology was created entirely for litigation. He cannot confirm the accuracy of the data upon which his methodology depends, performs no post-processing validation, and readily admits to instances where his method produces inaccurate results. He admits that he has never invited third party audit of his methods or underlying datasets. The evolution of his methodology over his fifteen-year career as an expert witness does not reflect refinement to increase reliability, but instead targeted efforts to preserve his primary revenue source. Routine data governance principles are treated by Woolfson as academic exercises rather

[1] *See* ECF No. 88, Memorandum of Points and Authorities in Support of Plaintiff's Motion for Class Certification, pp. 6–8.

than, in many instances, legal obligations for businesses collecting personal information.[2] Plaintiff urges this Court to accept Woolfson's unlawful data usage as qualified expert testimony, while simultaneously condemning BBQGuys' alleged data use lapses.

The conclusion is clear: Woolfson's approach is not an independent methodology derived from professional experience. It is a litigation-driven data-sorting exercise designed by Plaintiff's counsel where Woolfson's involvement is solely to wrap counsel's method in an outward appearance of "expertise."

## II. FACTUAL BACKGROUND.

### A. Woolfson's History as an Expert Witness.

Woolfson's expert work, through his company TelSwitch, Inc. ("TelSwitch"), began in or around 2007 and became his primary source of revenue beginning in 2011.[3] Woolfson was frequently retained in Telephone Consumer Protection Act ("TCPA") litigation to opine about the functionality of certain dialing equipment.[4] Woolfson's past experience operating a telecommunications company made him well-suited to opine on whether the dialing technology used to make calls constituted an "automated telephone dialing system" ("ATDS") under the TCPA.[5] Where Woolfson was retained to evaluate databases for TCPA class member identification, it was consistently in a rebuttal context where he critiqued the plaintiffs' experts' methodology but did not offer any alternative method.[6]

---

[2] Exhibit 1**:** Deposition of Aaron Woolfson, 276:12–281:24 (Aug. 13, 2026).
[3] Exhibit 1, 84:19–85:9.
[4] *See, e.g.*, *Luster v. Green Tree Servicing, LLC*, No. 1:14-01763, 2018 WL 11486314 (N.D. Ga. Sept. 5, 2018). *See also*, Exhibit 18: Affidavit of Aaron Woolfson in *Jackson v. Regions Bank*, no. 1:19-cv-01019, 2020 WL 3507607 (S.D.Ind. Mar. 6, 2020); Exhibit 19: Motion to Exclude the Report of Jeffrey Hansen in *Keyes v. Ocwen Loan Servicing, LLC*, No. 2:17-11492, 2018 WL 11315323 (E.D. Mich. May 30, 2018).
[5] Exhibit 2: Curriculum Vitae of Aaron Woolfson.
[6] In fact, Woolfson's prior appearance before this Court in *Carroll v. SGS Automotive Services, Inc.* involved such discrediting of methods used by a plaintiff's expert to identify potential class members. No. 16-537, 2020 WL 5761082 (M.D. La. Sept. 28, 2020).

The need for ATDS experts materially changed after the Supreme Court's April 2021 decision in *Facebook, Inc. v. Duguid, et al.* There, the Supreme Court held that actionable ATDS devices under the TCPA must be able to produce or store a telephone number using a random or sequential number generator.[7] Before *Facebook*, plaintiffs broadly interpreted ATDS to file suit against entities using automated communication technologies. In response to *Facebook*, ATDS-based claims largely stopped. In turn, demand for ATDS experts evaporated.

This cratering demand was a problem for Woolfson. He had pivoted TelSwitch's business ten years earlier to focus on expert witness work (to the exclusion of non-litigation work). This culminated in 2018 with TelSwitch's divestment of its telecommunications licenses, products, and services to further Woolfson's litigation focus.[8] For Woolfson to continue expert witness work consistently after *Facebook*, his testimony needed to adapt.

**B. <u>The Evolution of Woolfson's Methodology</u>.**

Before *Facebook*, Woolfson was hired by defendants to rebut TCPA plaintiffs' methodologies without offering his own methods, which had less rigorous verification demands. Woolfson has database creation experience in employment wage and hour cases before 2021, but Woolfson's expertise was routinely challenged and excluded on multiple occasions.[9] Those

---

[7] *Facebook, Inc. v. Duguid, et al.*, 592 U.S. 395, 395–97, 141 S.Ct. 1163, 1164–65 (2021).
[8] Exhibit 1, 125:21–127:16.
[9] Federal courts routinely excluded his testimony under Rule 702 for reliability and methodology formation problems—namely that Woolfson did not provide testimony based on independently developed and validated practices and instead applied attorney-driven criteria. <u>Exhibit 3</u>: *Rojas, et al. v. Zaninovich, Inc., et al*, No. 1:09-00705, p. 5 (E.D. Cal. Sept. 19, 2011) ("Woolfson admitted that he was unaware of the issues raised in this litigation and explained that he merely responded to a series of questions posed to him by Plaintiffs' lawyers; in essence, he tallied various data as requested by attorneys.") (p. 14, n. 10: "Though his CV details his professional experience, it appears that little of the work he has done related to searching databases and reporting tallies for categories of data. It appears this type of experience has been gained over the last two-and-a-half years through forensic work with attorneys."). *See also Dueker v. CSRT Expedited Inc.*, No. 2:18-08751, 2020 WL 7222095 (C.D. Cal. Dec. 7, 2020) (excluding Woolfson because his methodology is not peer reviewed and is unnecessarily difficult "if not impossible" to test or replicate, fails to explain critical assumptions or data anomalies, and failed to use all available information at the time he analyzed the data); *Garybo v. Bros*, No. 1:15-01487, 2020 WL 999762 (E.D. Cal. Mar. 2, 2020) (Woolfson failed to present proper evidence related to the calculation of damages.).

matters also fundamentally differ from TCPA cases because the relevant source data is solely defendants' production. For TCPA, Woolfson processes and relies on data from the defendants ***and*** data from non-parties. The TCPA data sets also differ depending on the claims.

Beginning in or around 2021, Woolfson offered opinions on whether telephone numbers had been ported within fifteen days or less of a pre-recorded telephone call, an essential consideration in claims under TCPA section 227(b)(1)(A)(iii) (but not in the section 227(c) claim made by Plaintiff here).[10] For those opinions, Woolfson relied on Tel-Lingua, LLC's historical database of numbering assignments, historical Local-Routing-Number assignments, and historical number portability change records.[11] Woolfson would send Tel-Lingua the relevant phone numbers, and Tel-Lingua would provide verifiable records of "isWireless" and "isPorted" data for the telephone numbers.[12]

In 2023, TelSwitch became a reseller of iconectiv data, giving TelSwitch access to Wireless Do Not Call ("WDNC") data that Woolfson then used in subsequent expert reports to bolster the isWireless data values.[13] That reseller status was short-lived. In March 2026, iconectiv and the North American Portability Management LLC (NAPM) found TelSwitch's litigation use of the WDNC data to be an impermissible use, and iconectiv terminated TelSwitch's account.[14] Tel-Lingua, which receives data from iconectiv, also terminated TelSwitch.[15] TelSwitch previously used DNC.com to access the Federal Trade Commission's ("FTC") National Do Not Call Registry ("FTC DNC"), but DNC.com terminated TelSwitch's access several years ago because DNC.com

---

[10] *See Mosier v. Firstsource Sol. USA LLC*, No. 3:23-cv-1343, 2025 WL 959530, p. *3 (N.D. Ohio Mar. 31, 2025).
[11] *See, e.g.*, Exhibit 4: "Declaration of Expert Aaron Woolfson" in *Van Elzen v. Advisors Ignite USA LLC, et al.*, No. 1:22-00859 (E.D. Wis.).
[12] *Id.*
[13] Exhibit 2, p. 5.
[14] Exhibit 5: Exhibit 14 to the Deposition of Aaron Woolfson, Reply Comments of TelSwitch, Inc. and exhibits, W.C. Docket Nos. 26-49, 20-67, 13-97, 07-243, FEDERAL COMMUNICATIONS COMMISSION, pp. 44–51 (Jul. 6, 2026) (available at https://www.fcc.gov/ecfs/document/26109987506/1).
[15] Exhibit 6: Exhibit 13 to the Deposition of Aaron Woolfson, Letter dated August 22, 2023; Exhibit 1, 262:14–265:25.

objected to TelSwitch's litigation use of the FTC DNC.[16] These terminations leave Woolfson with limited data to support current and future expert testimony.

**C. Woolfson's Proposed Opinion.**

Plaintiff offers Woolfson as an expert to opine that "by using records of the texts sent on or on behalf of Defendant, there is a reliable method to identify which text messages were sent to telephone numbers that (a) were messaged two (2) or more times in a twelve (12) month period after being reassigned and (b) were registered on the [FTC DNC] list for more than thirty (30) days before the date of each of the texts."[17] Records Woolfson considered were: (1) the Complaint; (2) BBQGUYS00059.csv, comprising text messages to McGonigle after he acquired the Telephone Number; (3) BBQGUYS00060.csv, comprising records of all text messages sent by BBQGuys during the claim period; (4) the FTC DNC; and (5) the Federal Communication Commission's ("FCC") Reassigned Number Database ("RND").[18]

Before Woolfson's deposition, there was no reason to think that Woolfson's reference to the "FTC DNC Database" in his Declaration was anything other than the FTC DNC. In reality, Woolfson does not query the FTC DNC, but instead a private, internal database maintained by Woolfson himself.[19] Woolfson testified that every day, since October 10, 2020, he downloads the

---

[16] Exhibit 1, 139:1–18 ("Q. So they terminated because of your expert witness work? A. Correct.").

[17] Exhibit 7: Declaration of Expert Aaron Woolfson, para. 3 (Apr. 28, 2026). Woolfson also opined that "there is a reliable method to identify text messages with other particular criteria based on additional types of information in the [Call Detail Records], including whether they were sent on a date after an inbound text message from the telephone number to which the text message was sent, and/or other records maintained by or on behalf of Defendant." *Id.* at para. 4. However, Woolfson offers no methodology or performance of such methodology in his report because he did not consider any inbound text message records or other BBQGuys records beyond the .csv files. *See,* Section IV.C.

[18] *Id.* at para. 25.

[19] Woolfson's failure to timely disclose the Woolfson DNC is peculiar because Woolfson has previously submitted declarations that clearly identify his own databases rather than the FTC DNC directly. *See* Exhibit 8: "Declaration of Expert Aaron Woolfson", *Saladino, et al. v. Mad City Home Improvement, LLC d/b/a Mad City Windows & Baths,* No. 0:24-cv-01419 (D. Minn. Jan. 20, 2026) ("I use a database called *isDNC*, which contains FTC's DNC lists going back nearly 10 years."); Exhibit 9: "Declaration of Expert Aaron Woolfson", *Summerton v. Goldco Direct, LLC,* No. 3:23-cv-00238 (W.D.Wis. Mar. 31, 2025) (identifying the daily DNC lists published by the FTC as an available database instead of the FTC DNC itself).

FTC DNC's daily listing of all numbers currently registered with the FTC DNC.[20] Woolfson then saves the file with an associated identifier for the download date and organizes the files into one or more relational databases.[21] Woolfson used this database ("Woolfson DNC"), ***not the FTC DNC***, to evaluate the phone numbers in BBQGuys' records. For each number in BBQGuys' records, Woolfson would search the Woolfson DNC to determine which files contained the queried number and the download date of that file.[22] Woolfson would then identify the earliest dated file as the registration date with the FTC DNC, and whether the number had been registered for at least 30 days before the first message was sent.[23] Woolfson "construct[ed] all SQL statements [himself]" but did not produce any SQL queries he used for review or validation.[24] Woolfson ***only queried the Woolfson DNC*** to produce his opinion and report. Woolfson further does not validate his results against the FTC DNC.[25] Rather, he believes the Woolfson DNC is consistent with the FTC DNC because it is populated with FTC DNC-provided data.[26] Woolfson's methodology resulted in 27,731,279 text messages that had been sent to 281,471 telephone numbers, where the first text message was sent 31 or more days after the date each number first appeared in the Woolfson DNC.

Woolfson then ran the 281,471 phone numbers against the RND. Despite its name, the RND does not identify whether a number has been reassigned, but instead whether a number has been disconnected after a particular date (e.g., the date a caller received consent).[27] The RND then

---

[20] Exhibit 1, 32:22–34:13, 65:19–66:3.
[21] Exhibit 1, 110:12–114:13 ("Q: If we were using Excel . . . this would be as if Column A had a listing of all the phone numbers and then the sheet was named that particular day? A: That's a great analogy.").
[22] Exhibit 1, 62:21–63:25, 114:12–115:16.
[23] *Id.* at 206:13–209:21.
[24] *See* Exhibit 10: Expert Report of Madelyn Moran, para. 45 (Jun. 15, 2026).
[25] Exhibit 1, 209:22–210:9, 220:15–221:6, 222:16.
[26] Exhibit 1, 151:10–153:7.
[27] Exhibit 10, para. 28. Exhibit 16: Exhibit 10 to the Deposition of Aaron Woolfson, Declaration of Beth Sprague, para. 10 (May 24, 2023).

returns a response of either "YES", "NO", or "no data" to identify whether the number had been disconnected since the date provided by the caller. A "YES" result means that the queried number is contained in the RND and has been permanently disconnected on or after the date queried.[28] A "NO" result means that either: (1) the queried number is in the RND but has not been permanently disconnected after the date queried, or (2) the number is not in the database and the date provided is after January 27, 2021.[29] For each number, Woolfson queries the RND using the date of the first text message and the date of the last message. If the RND returns different responses for the first and last message dates (*e.g.*, "YES" then "NO"), Woolfson included the number in his final count.

In total, Woolfson identifies 315,241 text messages to 5,626 telephone numbers that were purportedly sent: (a) after the number was reassigned; (b) at least 31 days after "the number was registered on the DNC", and (c) within 365 days of another text message.[30] Woolfson's methodology only identifies telephone numbers. It does not identify any additional information about any subscriber(s).

## III. <u>ADMISSIBILITY OF EXPERT OPINIONS</u>.

Federal Rule of Evidence 702 permits opinion testimony from experts qualified by "knowledge, skill, experience, training, or education" if: (a) the expert's specialized knowledge will help the trier of fact to understand the evidence or to determine disputed fact; "(b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods . . ."[31] The proponent of the expert's testimony must prove admissibility by a

[28] Exhibit 16, para. 11.
[29] Exhibit 16, para. 12.
[30] Exhibit 7, para. 36.
[31] *U.S. v. Valencia*, 600 F.3d 389, 424 (5th Cir. 2010).

preponderance of evidence.[32] "[W]here an expert's testimony is critical to class certification. . . the district court must perform a full *Daubert* analysis before certifying the class."[33]

Courts first determine whether a witness qualifies as an expert, which can be through work experience.[34] When an expert relies solely on experience, the expert must explain how their experience supports the conclusions reached, why that experience is sufficient, and how that experience is reliably applied to the facts. The trial court's gatekeeping function requires more than "taking the expert's word for it." The expert must employ the same intellectual rigor that the expert would use in a non-litigation context. The expert's qualifying experience must also relate to the issues and evidence before the court.[35] Expert testimony fits when the underlying reasoning can be properly applied to the facts in issue.[36] The testimony must also be based on sufficient facts or data. Experts need not review all documents in the case; rather, the "question is whether the expert considered enough information to make the proffered opinion reliable."[37] Where an expert's sources hold little weight, a jury should not be permitted to receive that opinion. The Court's gatekeeper role requires extraction of evidence "tainted by farce or fiction."[38]

Rule 703 allows an expert to base his opinion on facts the expert has been made aware of or personally observed. If the underlying facts are inadmissible, the expert testimony can still be admissible if other experts in the field rely upon those kinds of facts. Though Rule 703 is primarily directed towards hearsay-based opinions, inquiry into the facts or data underlying the expert's

---

[32] *Thibodeaux v. State Farm Fire & Cas. Co.*, No. 2:25-cv-00427, 2026 WL 2364677 (W.D.La. Aug. 14, 2026) (Slip Copy) (citing *Mathis v. Exxon Corp.*, 302 F.3d 448, 459–60) (5th Cir. 2022)).
[33] *Carroll v. SGS Automotive Services, Inc.*, No. 16-537-SDD-RLB, 2020 WL 7024477, *2 (M.D.La. Nov. 30, 2020). *See also* ECF No. 88, *Memorandum in Support of Plaintiff's Motion for Class Certification*, pp. 6–8.
[34] *U.S. v. Brown*, 871 F.3d 352, 357 (5th Cir. 2017).
[35] *Steward v. Family Dollar, Inc.*, No. 23-314, 2025 WL 2787898, at *8 (M.D. La. Sept. 11, 2025) (Slip Copy).
[36] *Martin v. Nat. Interstate Ins. Co.*, No. 24-1645, 2025 WL 1442567, at *3 (E.D. La. May 20, 2025) (quoting *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 592–93 (1993)).
[37] *Rushing v. Yeargain*, No. 19-653, 2022 WL 4545612, at *11 (M.D. La. Jun. 10, 2022) (citation omitted).
[38] *MacNair v. Chubb European Grp., SE*, No. 2:23-00761, 2024 WL 4332666, at *3 (E.D. La. Sept. 27, 2024).

testimony is not limited to admissibility.[39] "[N]othing in Rule 703 requires a court to admit an opinion based on facts that are indisputably wrong."[40] Courts also exclude testimony where the expert was "oblivious" to key facts, making the opinion "not possibly [resting] on a reliable foundation."[41]

There must be "objective, independent validation of the expert's methodology."[42] Rule 702 reliability "applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, the link between the facts and the conclusion, et alia."[43] Expert testimony "must be reliable at each and every step or else it is inadmissible."[44]

## IV. ARGUMENT.

### A. Woolfson is Not Qualified to Opine on Whether His Method is Reliable.

Cursory inquiry into Woolfson's prior matters shows that his expertise primarily lies in the technical aspects of telephone equipment. Expertise in the operation of dialing systems does not by extension grant him expertise on the reliability of database analysis.[45]

The Fifth Circuit's opinion in *Wilson v. Woods* is instructive.[46] There, the Fifth Circuit evaluated an accident reconstruction expert's exclusion where the expert previously testified as an expert in the cause and origin of fires.[47] The Fifth Circuit affirmed the district court's exclusion of the witness on the basis that: (1) he had not conducted studies or experiments in the field of accident reconstruction; (2) he did not collect data from the accident scene or examine any

---

[39] *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146, 118 S.Ct. 512 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data by only the *ipse dixit* of the expert.").
[40] *Guillory v. Domtar Indust. Inc.*, 95 F.3d 1320, 1331 (5th Cir. 1996) (citation omitted)).
[41] *See also Conroy v. Vilsack*, 707 F.3d 1163, 1170 (10th Cir. 2013).
[42] *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998) (en banc).
[43] *Williams v. BP Exploration & Prod., Inc.*, 143 F.4th 593, 598 (5th Cir. 2025).
[44] *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 355 (5th Cir. 2007).
[45] *See Van Winkle v. Rogers*, 82 F.4th 370, 379–380 (5th Cir. 2023).
[46] 163 F.3d 935 (5th Cir. 1999).
[47] *Id.* at 938.

mechanical parts involved in the accident; (3) he based his calculations on publicly accessible data from the National Highway Transportation Safety Administration, and (4) he was unable to show how his training as a mechanical engineer gave him experience in the field of accident reconstruction distinguishable from training received by any other mechanical engineers.[48] Also relevant was the: (a) lack of professorial rank in the college classes he taught; (b) lack of experience teaching any accident reconstruction course; (c) lack of certification in accident reconstruction; and (d) prior refusal of at least one court to qualify him as an expert due to lack of training, experience, and qualifications.[49]

The lapses noted in *Wilson* reflect a persistent theme with experts seeking qualification based on experience alone: without degrees or other traditional indicia of academic accomplishment from a college, university, or other accrediting body, there must still be some recognition from a neutral party that the witness meets the required knowledge, skill, or training to constitute expertise. It is not enough for an expert to be ***familiar*** with a field. The witness must specifically possess ***expertise*** in the field.[50]

The *Wilson* expert had genuine expertise in fire origins but not accident reconstruction. Similarly, Woolfson has genuine expertise in telephone equipment but not in analyzing the reliability of SQL databases. Woolfson's methodology has been developed and solely used for the purposes of litigation, not independent study and review. Though Woolfson is capable of creating a relational database and querying the database with SQL commands, nothing in his report, CV, or testimony show how that familiarity translates into actual expertise in the reliability of database

---

[48] *Id.*
[49] *Id.* at 937.
[50] *See Tanner v. Westbrook*, 174 F.3d 542, 547–48 (5th Cir. 1999) (overruled on other grounds).

analysis. Woolfson has also been excluded by multiple courts for not possessing any credentials in the offered field.[51]

Woolfson's qualification deficiencies extend beyond his credential gaps into clear lack of knowledge or understanding of fundamental data governance principles that are routine for database administrators. As of December 2025, the FTC DNC included over 258 million active registrations, meaning that Woolfson is downloading on a daily basis hundreds of millions of phone number records to populate the Woolfson DNC.[52] When asked about data minimization—a fundamental data governance and compliance topic meaning collecting and retaining the minimum amount of data required to perform a task—Woolfson had never heard of the term.[53] Woolfson is similarly uninformed about the data privacy laws that impact TelSwitch, such as the California Consumer Privacy Act ("CCPA").[54] Woolfson's lack of awareness of laws impacting TelSwitch reflect a fundamental lack of understanding in foundational data governance principles regulating the collection of personal information—including phone numbers. A witness that collects hundreds of millions of records of personal information daily while being unaware of foundational standards governing that activity does not possess the knowledge, skill, experience, or training required by Rule 702(a). Considering Woolfson's qualification lapses and the governance lapses outside of litigation, Woolfson is not qualified to opine on the reliability of database analytics methodology.

---

[51] *See* n. 9, *supra*.

[52] "National Do Not Call Registry Data Book for Fiscal Year 2025", FEDERAL TRADE COMMISSION (Dec. 2025) (available at https://www.ftc.gov/reports/national-do-not-call-registry-data-book-fiscal-year-2025).

[53] Exhibit 1, 166:3–14.

[54] TelSwitch collects over 258 million records of personal information daily, subjecting TelSwitch to the CCPA. The CCPA requires that all applicable businesses post a privacy notice on their website. CAL. CIV. CODE § 1798.130. TelSwitch does not have and has never had Privacy Policy on its website. Exhibit 1, 277:8–278:14.

**B. <u>Woolfson's Private, Undisclosed, and Self-Generated Database is Irrelevant</u>.**

Woolfson's methodology fails at its threshold step of legal relevance. Under Rule 702, expert testimony must be relevant to the claims at issue, meaning the testimony must tend to make a fact of consequence more or less probable than it would be without the testimony. Woolfson's opinion does neither because he does not use the FTC DNC to match numbers in the BBQGuys records. Instead, his entire opinion depends on a private, unaudited database of his own creation, the Woolfson DNC. Because the Woolfson DNC is not the FTC DNC, and because the statute requires registration on the FTC DNC, Woolfson's opinion is legally irrelevant to Plaintiff's claim. The Court can and should exclude his testimony on this basis alone.

Plaintiff's sole claim is violation of TCPA Section 227(c), concerning unauthorized calls to a number on the FTC DNC to persons whose phone number "had been registered with the National Do Not Call Registry for at least thirty days before [BBQGuys] delivered, or caused to be delivered, at least two of the voice messages or text messages within the 12 month period."[55] The statute does not ask whether a number appears in Aaron Woolfson's personal database. It asks whether a number was registered on the FTC DNC. These are not the same questions. The Woolfson DNC is an unauthorized derivative work assembled by one person, from daily downloads, stored on his own systems, never independently audited, and accessible to no one outside TelSwitch. It is not the FTC DNC, and a match in the Woolfson DNC does not establish that a number was registered on the FTC DNC at any particular time.

As discussed in Section II.C, Woolfson performed no validation of his results against the actual FTC DNC. He cannot determine when exactly a number was registered on the FTC DNC, instead only when a number first appeared in his daily download files. He stopped cross-checking

---

[55] First Amended Complaint, ECF No. 42, para. 27.

the Woolfson DNC against the FTC DNC years ago.[56] Without that validation or the use of any auditable, testable FTC DNC data from an authorized party, Woolfson's opinion offers no probative value on the key question Section 227(c) poses. This is not a dispute about the rigor of Woolfson's SQL queries or the size of his dataset. The defect is foundational because his entire methodology rests on a substitute for the database required by the statute, and no amount of indexing, processing, filtering, or analysis of the wrong database can transform it into the correct one. Under Rule 702, the opinion is irrelevant, and thus inadmissible.

### C. <u>Woolfson's Methodology Does Not Rely Upon Sufficient Facts or Data</u>.

Even if the Court were to treat the Woolfson DNC as a permissible proxy for the FTC DNC, Woolfson's methodology still fails under Rule 702. For the Court to accept the Woolfson DNC's reliability, it must first make several assumptions: (1) Woolfson did, in fact, download the FTC DNC full number listing every single day it was available; (2) each file was downloaded and saved successfully and accurately indexed within Woolfson's DNC; (3) the SQL commands Woolfson uses completely and accurately capture all associated records; (4) at no time have any relevant files been modified or deleted by any person; and (5) at no time have any relevant files or database relations been corrupted or otherwise made unusable. Woolfson describes a multi-step filtering process, but the actual queries implementing the process have neither been disclosed nor verified by an independent party.[57] Rather, the only support for the Woolfson DNC's reliability is Woolfson himself.[58]

The Fifth Circuit evaluates opinion reliability on: (1) whether the theory or technique can be or has been tested; (2) whether the theory or technique has been peer reviewed and published;

---

[56] Exhibit 1, 209:22–210:9, 220:15–221:6, 222:16.
[57] *See, generally* Exhibit 7.
[58] *See* Exhibit 1, 225:1–226:7.

(3) the known or potential error rate; and (4) whether the theory or technique is generally accepted in the relevant community.[59] The Woolfson DNC has never been audited by a third party and is only accessible by TelSwitch personnel.[60] Woolfson also stopped validating his database ***years ago*** since he had not previously found errors.[61] Woolfson could not identify any error rate for the Woolfson DNC or his filtering methods.[62] Plainly, the only bridge between the Woolfson DNC output and Woolfson's opinion that a number was actually on the FTC DNC is Woolfson's belief that the Woolfson DNC mirrors the FTC DNC. That is the *ipse dixit* of the expert, and precisely what the Court must refuse under Rule 702.[63]

The Woolfson DNC is also not relied upon by any person in Woolfson's field nor would they rely on it.[64] The Woolfson DNC is not publicly available, so no other expert could use it. Woolfson also did not clearly disclose his use of the Woolfson DNC in his report or offer access to permit validation testing. Even if his database were available outside of TelSwitch, no other expert would rely upon it in this context because Woolfson's use of the FTC DNC daily files is unlawful under the Telemarketing Sales Rule ("TSR").[65] The FTC DNC is available for compliance purposes to: (i) "sellers" (persons who, in connection with a telemarketing transaction, provides, offers to provide, or arranges for others to provide goods or services to the customer in exchange for consideration), (ii) "telemarketers" (persons who, in connection with telemarketing, initiates or receives telephone calls to or from a customer or donor), (iii) service providers acting

[59] *Williams v. BP Exploration & Prod., Inc.*, 143 F.4th 593, 597–98 (5th Cir. 2025).
[60] Exhibit 1, 22:6–10, 151:10–154:13.
[61] Exhibit 1, 209:22–210:9, 220:15–221:6, 222:16.
[62] Exhibit 1, 224:8–12.
[63] *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 276 (5th Cir. 1998) (en banc).
[64] BBQGuys did not learn about the Woolfson DNC until the deposition 1 day before the expert discovery deadline, giving BBQGuys no meaningful opportunity to conduct additional discovery about the database. Woolfson's failure to include the Woolfson DNC in his report violates Federal Rule of Civil Procedure 26(a)(2)'s disclosure requirements for expert reports.
[65] 16 C.F.R. § 310, *et seq.*

on behalf of a seller or telemarketer, and (iv) law enforcement.[66] Sellers and telemarketers, themselves or through their service providers, can access up to 5 area codes through the FTC DNC at no charge.[67] For additional area codes, the annual fee is $82 per area code, up to a maximum of $22,626.[68] Woolfson, who is not a seller or a telemarketer, claims that TelSwitch is permitted to access the FTC DNC as an "exempt organization" because he does not make telephone calls.[69]

Woolfson is wrong. "Exempt organizations", which can access ***all area codes for $0***,[70] are solely organizations that are not required to access the FTC DNC because they are either a non-profit or an organization that only makes calls that are exempt from TCPA regulation.[71] Persons accessing the FTC DNC are required to "certify, under penalty of law, that the person is accessing the registry solely to comply with the [TSR] or to otherwise prevent telephone calls to telephone numbers on the registry."[72] The FTC's online references reinforce that the registry "may not be used for any purpose other than preventing telemarketing calls to the telephone numbers on the registry" and that other uses could be subject "to legal action."[73] TelSwitch is not a non-profit and does not make calls, so it has no lawful basis to access the FTC DNC. And yet, Woolfson certifies on a daily basis that TelSwitch is an exempt organization that is accessing the FTC DNC in compliance with the TSR's use restrictions.[74]

---

[66] *Id.* at §§ 310.2(ee), (hh), 310.8(e).
[67] *Id.* at § 310.8(c).
[68] *Id.*
[69] Exhibit 1, 40:4–9 ("As far as I'm aware, [an exempt party is] somebody who does not make any calls and is only using the data for auditing or for purposes of informing like a trier of fact.")
[70] 16 C.F.R. § 310.8(c).
[71] These categories include informational messages, surveys or polls, campaign communications, business-to-business calls, solicitations for charitable contributions, calls to consumers who have an established business relationship, and calls made to consumers who have consented to the calls. 16 C.F.R. § 310.6. *See also* Exhibit 11, Exhibit 4 to the Deposition of Aaron Woolfson, "Q&A for Telemarketers & Sellers About the DNC Provisions in the TSR", FEDERAL TRADE COMMISSION, pp. 3–5 (available at https://www.ftc.gov/business-guidance/resources/qa-telemarketers-sellers-about-dnc-provisions-tsr-0).
[72] 16 C.F.R. § 310.8(e).
[73] Exhibit 11, p. 6.
[74] Exhibit 1, 36:24–37:20.

Responsible professionals in Woolfson's field would not use data that they are not allowed to use for the purpose of evaluating calls that have already been made (versus preventing telemarketing calls), nor would they create an unauthorized derivative work of the FTC DNC that they provide for a fee (in the form of an expert's hourly rate) using data they obtained for free. This Court should reject any opinion formed based on this unauthorized use.

**D. Woolfson's Opinion is Not the Result of Independent Professional Judgment.**

Rule 702 and *Daubert* require Woolfson to independently validate the basis for his methodology and any assumptions made to ensure the opinion is based upon accepted criteria in his field, rather than "readymade" litigation fodder.[75] Instead, Woolfson's deposition testimony confirms that his methodology and the data considered is largely, if not wholly, dictated by Plaintiff's counsel.

Woolfson's testimony about his retention identifies a series of steps to execute, given to him by McGonigle's counsel: "I was asked to identify two or more calls or texts within 30 days. And also to identify those telephone numbers that had been reassigned or were on the reassigned database between the beginning of texting or calling and the end of texting or calling. . . [T]his is what I was objectively asked to do."[76] At no point does Woolfson identify any steps he took to validate the reliability or relatedness of the tasks he was asked to perform. Nor does he demonstrate any understanding of the purpose behind the RND analysis. The RND has been available since 2021, but Woolfson did not use the RND in his methodology until 2024—the same year that named plaintiff Andrew McGonigle began filing TCPA suits against BBQGuys and nearly forty other defendants across the country—relying on a failure to obtain consent from a telephone subscriber

[75] *In re: Taxiotere (Docetaxel) Products Liability Litigation*, 26 F.4th 256, 268 (5th Cir. 2022).
[76] Exhibit 1, 55:22–56:15.

after reassignment.[77] Woolfson did not recall any attorney asking him about use of the RND in litigation, but does recall "somebody saying . . . hey, run RND on this."[78] When discussing that the RND is not mentioned in the class definition of the [Complaint], Woolfson testified "I don't know why I was asked to do that. That's something that. . . I was asked to do. . . I'm aware it's not within the class definition."[79] Woolfson's execution of steps instructed by Plaintiff's counsel with no professional understanding as to why he was asked to conduct such analysis is the hallmark of expert testimony created for the purpose of litigation and should be excluded.[80]

Woolfson never requested to see any records beyond what counsel provided because he did not understand why the RND analysis mattered. The intended use of the RND is apparent from Plaintiff's briefing.[81] Plaintiff offers Woolfson's filtering to argue that any number that was reassigned represents a class member because, like McGonigle, the current subscriber is not the person who consented to BBQGuys' messages. Because Woolfson did not understand why he was asked to use the RND, he could not independently verify that he received sufficient data to provide opinions associated with the RND. Had Woolfson understood or known this purpose, he would (or should) have requested to see: (1) BBQGUYS000061–62, showing the consent records for each number in BBQGuys' records and records of inbound texts received by BBQGuys;[82] and (2) BBQGUYS000111–0500 reflecting evidence of an ongoing business relationship with BBQGuys and the associated subscriber. Ironically, Woolfson specifically identified in his Declaration that

---

[77] Exhibit 1, 240:17–23.
[78] Exhibit 1, 242: 5–25.
[79] Exhibit 1, 67:1–12.
[80] ***McClellan v. I-Flow Corp.***, 710 F.Supp.2d 1092 (D.Oreg. 2010) (holding an expert's testimony irreparably tainted by litigation bias and by counsel's involvement in the study underlying his opinion); ***Prohaska v. Sofamor, S.N.C.***, 138 F.Supp.2d 422, 437 (W.D.N.Y. 2001) (criticizing "litigation-driven expertise" where expert "relied upon the plaintiff's attorney to provide him with the relevant scientific literature"). *See also* Exhibit 3, where Woolfson's method of "tall[ying] various data as requested by the attorneys" was previously excluded nearly 15 years ago.
[81] Memorandum in Support of Plaintiff's Motion for Class Certification, ECF No. 88, pp. 6–8.
[82] *See* Exhibit 10, paras. 42, 54 (noting that Woolfson did not consider the available inbound text records).

if BBQGuys did produce any inbound texting data or records of purchases, he would be able to exclude those numbers from his count, but he did not request that data from counsel.[83] He also testified in his deposition that he would exclude any numbers where the subscriber made a purchase from BBQGuys or added an item to their cart after clinking a message link.[84]

The unreliability of Woolfson's methodology is made plain in his reporting on the number of text messages sent to Andrew McGonigle's number. The Complaint alleges McGonigle received 8 text messages that violated the TCPA, and McGonigle later reduced that number in his deposition to either 5, 6, or 7.[85] Woolfson's method overstates the text messages to McGonigle by over 300%, attributing 33 messages to McGonigle.[86] These excessive and unfounded results are precisely the types of errors that occur when an expert does not understand his analytical task or review available data. The fact that Woolfson did not check his results against the one number that could be validated (McGonigle's) shows an utter lack of diligence. Other messages that were sent to recipients who consented to the messages were also counted by Woolfson.[87]

Plaintiff's counsel's failure to provide those records to Woolfson, combined with Woolfson's lack of knowledge as to why such records are critical to his opinion, reflects a methodology created only for litigation and maximizing putative class size regardless of reliability. Though retaining counsel may define the questions for an expert to address, when an expert

[83] Exhibit 7, p. 10 at n. 10.
[84] Exhibit 1, 229:6–230:6.
[85] Exhibit 12, Deposition of Andrew James McGonigle, 162:8–165:9.
[86] Exhibit 10, para. 86; Exhibit 13: Excerpts from Exhibit 9 to the Declaration of Expert Aaron Woolfson, p. 1.
[87] The telephone number (850) 509-XXXX ("Top Number") is the number Woolfson identified as receiving the largest number of text messages, 355. Exhibit 13, p. 2. The Top Number began receiving text messages on or around September 9, 2021, after sending an inbound text consenting to messages.[87] BBQGuys sent marketing messages to the Top Number until the number was removed in or around December 9, 2024 from BBQGuys' text marketing list. Less than 3 months later, the Top Number re-consented to receive messages, and BBQGuys again began sending messages. Exhibit 14: Excerpt from BBQGUYS000062. Woolfson's method, which only considers the range from the first message date (September 9, 2021) to the last message date (March 26, 2025), did not consider the multiple consents provided or when precisely the number was reassigned.

executes analytical steps without understanding their purpose or independently evaluating whether the data provided is sufficient to produce a reliable result, the expert has ceded his professional judgment to counsel. When that occurs, his testimony becomes "nothing more than the opinions of [plaintiff's] attorneys dressed up and submitted as the testimony of an 'expert.'"[88]

### E. Woolfson's Use of the Reassigned Number Database is Unreliable and Unlawful.

Independent of the attorney-direction problem, Woolfson's RND-based opinions fail on their own terms because the RND is unreliable for his purposes, and his use of the RND for litigation is unlawful.

#### 1. The Reassigned Number Database is Unreliable for Woolfson's Purposes.

To understand why the RND is unreliable, the Court must first understand how the RND operates and why it operates in this way. The FCC ordered the creation of the RND to address the three-fold problems created by reassigned numbers: (1) the previous subscriber of a reassigned number is deprived of expected calls; (2) the new subscriber is subject to unwanted calls; and (3) the caller is exposed to potential TCPA liability.[89] The FCC also established a minimum ageing period for disconnected numbers of 45 days, allowing time for the number to be added to the database, reducing the RND querying frequency.[90]

The limited data return of "YES", "NO", and "no data" discussed in Section II.C was purposeful. The FCC was concerned that the RND could be misused, so the "YES", "NO", "no data" responses were to prevent "use [of] the data in a manner that is competitively sensitive" or use that "undermines privacy or security."[91] The FCC rejected asks for additional subscriber

---

[88] *Prohaska v. Sofamor, S.N.C.*, 138 F.Supp.2d 422, 437 (W.D.N.Y. 2001).
[89] Exhibit 15: Second Report and Order, *In the Matter of Advanced Methods to Target and Eliminate Unlawful Robocalls*, FCC 18-177, CG Docket No. 17-59, 12024–25 (FCC Dec. 13, 2018).
[90] *Id.* at 12030–31.
[91] *Id.* at 12034.

information because such information "would go well beyond our specific goal or enabling callers to determine whether a number has been reassigned prior to placing a call to the number" and would introduce "unnecessary security and privacy risks."[92]

As discussed, queries to the database can only confirm whether a number was ***disconnected*** after the queried date and ***not*** whether the number has been reassigned to a new subscriber.[93] The RND also does not identify whether a number may have been reassigned multiple times over time. It is for this reason that other telecommunications professionals attest that queries run in hindsight and return a result of "YES" are inherently ambiguous and indefinite as to the actual date of disconnection.[94] The only way to identify an actual date of disconnection for a particular number is to run daily, real-time queries for the applicable phone numbers, which Woolfson does not do.[95]

Going further, by Woolfson's own admission, the RND itself is not reliable. Woolfson testified "[I]f I put in numbers that have never been disconnected -- my own – I'll get a yes for all dates even though my number has not been disconnected or reassigned before the start of that RND."[96] If the RND produces false positives on numbers Woolfson ***knows*** have never been disconnected, no results derived from it can be assumed accurate without independent verification that Woolfson has never performed.

Woolfson's RND methodology is the hindsight-based review rejected by others in his field.[97] For each phone number, Woolfson queries the RND using the date the first text message was sent and the date of the last message.[98] If the RND returns different responses for the first and

---

[92] Exhibit 15, 12038.
[93] Exhibit 1, 196:22–197:4; Exhibit 10, paras. 47, 51.
[94] Exhibit 17: Affidavit of Scott Rice, para. 15 (Apr. 21, 2023). *See also* Exhibit 10, paras. 29–31, 48–51.
[95] Exhibit 17, paras. 12–16.
[96] Exhibit 1, 202:8–17.
[97] *See* Exhibit 17, para. 15. *See also* Exhibit 10, paras. 29–31, 48–51.
[98] Exhibit 7, para. 34.

last message dates, Woolfson included the number in his final count.[99] Though his Declaration says that he "tagged each of the text messages to [*sic*.] with information from the RND, including the status of each of the telephone numbers on the RND updates closest in date before and closest in date after the dates of ***each*** of the text messages,"[100] Woolfson contradicted that statement in his deposition:

> Q. . . [Do] you do any, like, additional filter to try and figure out when the disconnection happened?
>
> **A. I do, occasionally, is what's called an iterative -- an iterative process to go back month by month by month . . . and put the dates in as of the 16th of each month. But in a case like this, where I'm just looking for one or more calls during reassigned, I don't.**
>
> Q. Okay. So as long as there was a change from date No. 1 to date No. 2, it was included in the dataset without any further filtering or –
>
> **A. That's right.** [101]

Even if Woolfson has done the additional filtering described, he does not identify the dates he contends each number was "reassigned." Without that information, it is not possible for BBQGuys' expert to review and validate his results, were she permitted to use the RND for this purpose.[102] Woolfson cannot determine the exact date that any number was reassigned—if at all—without also evaluating deliverability data, which he did not receive. His method also does not account for the 45-day minimum before a disconnected number can be reassigned, or that the 45-day period would constitute time when the disconnected number is still attributed to the former subscriber.[103] He has only identified the range in dates where a number may have been reassigned at some point. These

---

[99] Exhibit 1, 215:13–217:22.
[100] Exhibit 7, para. 35.
[101] Exhibit 1, 219:1–15.
[102] Exhibit 10, para. 51.
[103] *Id.* at para. 52.

gaps further show that Woolfson does not understand why counsel instructed him to use the RND, and his use is wholly unreliable.[104]

**2. Woolfson's Use of the Reassigned Number Database for Litigation is Unlawful.**

Like the FTC DNC, the FCC limits access to the RND. The RND is available "only to callers who agree in writing that the caller (and any agent acting on behalf of the caller) will use the database solely to determine whether a number has been permanently disconnected . . . ***for the purpose of making lawful calls or sending lawful texts.***"[105] For any other purpose, the user must obtain a waiver from the FCC.[106] The FCC likened this requirement for the RND to the FTC DNC, where federal regulation allows access only for compliance purposes.[107]

Neither McGonigle, his counsel, nor Woolfson are eligible to access the RND.[108] As neither a caller nor caller agent, Woolfson's access for litigation purposes can only be authorized through a waiver. No records indicate that Woolfson or TelSwitch applied for or have been granted any waiver.[109] Consequently, the entirety of Woolfson's opinion is based on the impermissible use of restricted data and should be excluded.

This Court has previously excluded expert methods incorporating databases that "may be generally reliable" but were "expressly designated by the creator of the database as unsuitable for [the expert's] purpose" in *Carroll v. SGS Automotive Services, Inc.*[110] There, Carroll's expert

[104] *See* Exhibit 20: Memorandum Opinion and Order, *Davis v. Capital One, N.A.*, No. 1:22-cv-00903, pp. 11–19 (E.D.Va. Oct. 20, 2023).
[105] Exhibit 15, 12034 at n. 69, 12066.
[106] *Id.* at n. 68. These restrictions are further reflected in the RND Terms of Use, which limits access to Service Providers, Callers, authorized Agents, the Toll-Free Number Administrator, and persons granted FCC waivers — none of which describe Woolfson or TelSwitch. "Terms of Use Notice", REASSIGNED NUMBERS DATABASE (last updated Apr. 1, 2021) (https://www.reassigned.us/terms).
[107] *See* Exhibit 15, 12034.
[108] *See* Exhibit 10, paras. 121–132.
[109] *See* Exhibit 10, para. 87.
[110] No. 16-537-SDD-RLB, 2020 WL 7024477 (M.D.La. Nov. 30, 2020). Perhaps ironically, Woolfson was the defense expert in this matter, but his testimony was excluded as untimely.

proposed using a LexisNexis database to search phone numbers to identify names and other information for potential TCPA class members.[111] As the database could, in certain instances, return multiple results, this Court characterized her report as "running routine searches in LexisNexis and then, somehow, deciding who among the results is a potential plaintiff" and deemed it neither "expert" or reliable.[112] Carroll's expert's opinion also has questionable value because the proposed class definition does not require the use of the expert's methodology.[113]

Much like *Carroll*, Woolfson uses a database that he knows to be unreliable and that other professionals caution against for "hindsight" analysis. His usage of the RND is not just unsuitable, but it violates federal regulation, as well as the terms and conditions of access. Further, Plaintiff's class definition does not require use of the RND.[114] For these reasons, there is just as much merit, if not more, in excluding Woolfson here as there was in excluding the *Carroll* expert.

### F. <u>Woolfson's Methodology Violates the Privacy Interests that the TCPA was Enacted to Protect</u>.

Perhaps the most compelling reason to exclude Woolfson's testimony is that his methodology is antithetical to the statute Plaintiff seeks to enforce. The TCPA was enacted to protect "the privacy interests of residential telephone subscribers."[115] The FTC DNC exists because Congress found mass collection and commercial use of residential telephone numbers without consent constituted a privacy invasion. At least twenty-three states, including Louisiana and TelSwitch's domicile California, also have current or pending laws regulating the commercial use of personal information, including telephone numbers.[116]

---

[111] *Id.* at *4.
[112] *Id.* at *7.
[113] *Id.*
[114] First Amended Complaint, ECF No. 42, para. 27.
[115] Automated Telephone Consumer Protection Act, S. Rep. No. 102-178 (Oct. 8, 1991) (*available at* https://www.govinfo.gov/content/pkg/SERIALSET-14050_00_00-012-0178-0000/pdf/SERIALSET-14050_00_00-012-0178-0000.pdf).
[116] CAL. CIV. CODE § 1798.100, *et seq.*; LA. SEN. B. 386 (2026).

Woolfson's methodology is wholly dependent on invading the privacy interests protected by the TCPA and state law. Woolfson has collected billions of consumer numbers from a limited-purpose government registry to create a derivative work of the FTC DNC, and that collection was done without consumer knowledge, stored without reasonable governance practices, is retained indefinitely, and is monetized through expert fees in litigation. He accesses the FTC DNC data by certifying daily, under penalty of law, that his use is solely for telemarketing compliance. It is not. It is for monetizing litigation through expert fees.

Woolfson did not create the Woolfson DNC to enhance his expert opinions. It was done because multiple industry professionals told Woolfson that his practices violate federal regulations and cut off his access to their data. DNC.com stopped running FTC DNC audit trails for Woolfson at least seven years ago, disagreeing with his use of FTC DNC data for litigation.[117] With that resource gone, Woolfson began daily downloads in 2020 to build the Woolfson DNC. Woolfson's expert opinions also previously relied on WDNC data for wireless number and subscriber information. Iconectiv, the FCC's federally appointed Local Number Portability Administrator ("LNPA") and manager of the Number Portability Administration Center, terminated his access to WDNC data in March 2026 after he refused to stop using it for TCPA litigation, even after North American Portability Management LLC ("NAPM"), an industry consortium managing LNPA contracts, told him his use was improper.[118] NAPM counsel explicitly stated that "[a]pplicable law explicitly prohibits TelSwitch and Mr. Paronich from accessing or using WDNC data for TCPA litigation purposes" and that the FCC's permitted use limitations were intentional.[119] Tel-Lingua, which receives some of its data from iconectiv, likewise terminated Woolfson's access.[120]

---

[117] Exhibit 1, 139:2–18.
[118] Exhibit 5, pp. 44–46.
[119] Exhibit 5, pp. 48, 51.
[120] Exhibit 1, pp. 262:14–267:21; Exhibit 6.

Despite these repudiations from at least four sophisticated telecommunications entities, Woolfson remains committed to using whatever data he can obtain. He recognizes no entity's authority, other than the FCC itself, to dictate how telecommunications data may be used. His misuse of the FTC DNC daily download, creation of the Woolfson DNC, and his newly begun misuse of the RND are not one-offs. They are routine. And absent a direct order from the FCC or other governing body, Woolfson will not stop.

The irony of Plaintiff's position is difficult to overstate. Plaintiff seeks to hold BBQGuys liable for failing to respect consumer consent under the TCPA—yet Plaintiff's own retained expert disregards those same privacy interests on an industrial scale, collecting hundreds of millions of records daily from the FTC DNC, without consent, for a purpose federal regulation prohibits. The very expert retained by Plaintiff to vindicate consumer privacy has built his methodology on violating that privacy. Federal regulations cannot be reasonably enforced through their own violation, and a methodology based upon such violation cannot possibly constitute "reliable principles and methods" under Rule 702. This Court should not permit a methodology that requires disregarding the federal regulations and individual privacy interests of more than 258 million people for the purpose of vindicating the rights of McGonigle or the proposed class of 5,626 telephone subscribers.

## V. CONCLUSION.

WHEREFORE, for the foregoing reasons, this Court should find that the testimony and Declaration of Aaron Woolfson fail to meet the requirements of Federal Rule of Evidence 702 and exclude Woolfson's testimony and Declaration from evidence in this matter.

Respectfully submitted,

*/s/Jessica C. Engler*

Karli Glascock Johnson (#26304), T.A.
karli.johnson@keanmiller.com
Katilyn M. Hollowell (#37729)
katie.hollowell@keanmiller.com
**KEAN MILLER LLP**
400 Convention Street, Suite 700
P. O. Box 3513 (70821-3513)
Baton Rouge, Louisiana 70802
Telephone: (225) 387-0999

R. Devin Ricci (#34724)
devin.ricci@keanmiller.com
Jessica C. Engler (#35120)
jessica.engler@keanmiller.com
Jeff Gelpi (#37130)
jeff.gelpi@keanmiller.com
**KEAN MILLER LLP**
909 Poydras Street, Suite 3600
New Orleans, Louisiana 70112
Telephone: (504) 585-3050

***Attorneys for ShoppersChoice.com, L.L.C. d/b/a BBQGuys.com***

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document has been electronically filed with the Clerk of Court using the CM/ECF system this 14th day of September, 2026. Notice of this filing will be sent to all counsel of record by operation of the court's electronic filing system and/or U.S. Mail.

*/s/ Jessica C. EnglerJessica C. Engler*
Jessica C. Engler