UNITED STATES DISTRICT COURT

IN AND FOR THE MIDDLE DISTRICT OF LOUISIANA

---oOo---

| | |
|---|---|
| ANDREW JAMES MCGONIGLE, on behalf of himself and others similarly situated, | : |
| Plaintiffs, | : |
| vs. | : No. 3:25-cv-00152-SDD-RLB |
| SHOPPERSCHOICE.COM, L.L.C. d/b/a BBQGuys.com, | : |
| Defendants. | : |

REMOTE DEPOSITION OF AARON WOOLFSON

August 13, 2026

Job No. 1586838

Stenographically reported by:
LAURA AXELSEN, CSR NO. 6173
RMR, CCRR, CRR, CRC

UNITED STATES DISTRICT COURT
IN AND FOR THE MIDDLE DISTRICT OF LOUISIANA
---oOo---

ANDREW JAMES MCGONIGLE, on :
behalf of himself and others :
similarly situated, :
:
Plaintiffs, :
:
vs. : No. 3:25-cv-00152-SDD-RLB
:
SHOPPERSCHOICE.COM, L.L.C. d/b/a :
BBQGuys.com, :
:
:
Defendants. :
______________________________ :

BE IT REMEMBERED THAT, pursuant to notice and on Thursday, August 13, 2026, at 10:20 A.M.thereof , with all participants being present via Zoom videoconference, before me, LAURA AXELSEN, a Certified Shorthand Reporter, remotely appeared

AARON WOOLFSON

Called as a witness by the defendant.

---oOo---



APPEARANCES

FOR THEPLAINTIFF :

PARONICH LAW
BY: ALEX JILIZIAN, ESQ.
350 Lincoln Street, Suite 2400
Hingham, Massachusetts 02043
anthony@paronichlaw.com

FOR THE DEFENDANTS:

KEAN MILLER LLP
BY: JESSICA C. ENGLER, ESQ
BankPlus Tower
909 Poydras St., Suite 3600
New Orleans, Louisiana 70112

---oOo---



INDEX


| | PAGE |
|---|---|
| EXAMINATION BY MS. ENGLER | 6 |
| EXAMINATION BY MR. JILIZIAN | 283 |


---oOo---

INDEX OF EXHIBITS


| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Handwritten Document | 10 |
| Exhibit 2 | Notice of Deposition | 11 |
| Exhibit 3 | Wine bottle drawing and photo | 42 |
| Exhibit 4 | Q&A for Telemarketers and Sellers About DNC Provisions in TSR | 52 |
| Exhibit 5 | Declaration of Expert Aaron Woolfson | 52 |
| Exhibit 6 | Bringing Life Into Life's Digital Fingerprints | 94 |
| Exhibit 7 | From Hours to Minutes: TelSwitch, Inc. Revolutionizes Legal Data Analysis with SunremeRAIDTM by Graid Technology | 163 |
| Exhibit 8 | National Do Not Call Registry FAQs | 185 |
| Exhibit 9 | Email dated May 4, 2020, to Elaine Smith from Ryan Thurman | 189 |
| Exhibit 10 | Declaration of Beth Sprague | 195 |
| Exhibit 11 | Declaration of Scott Rice | 200 |
| Exhibit 12 | DECLARATION OF PLAINTIFF'S EXPERT AARON WOOLFSON IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR RECONSIDERATION | 255 |
| Exhibit 13 | Letter dated August 22, 2023, to Aaron Woolfson from Andrew W. Mangold | 263 |
| Exhibit 14 | Reply Comments of TelSwitch Inc. | 268 |




---oOo---



MAGNA LEGAL SERVICES

Page 6

THE REPORTER: My name is Laura Axelsen, I am California CSR License No. 6173.

AARON WOOLFSON
having been duly sworn/affirmed
under penalty of perjury
testified as follows:
EXAMINATION BY MS. ENGLER

MS. ENGLER: Q. Well, could you go ahead and just state your full name for the record?
A. It's Aaron Woolfson. Is it better if I point this way or if I point you for the court reporter? I just want to make sure that I'm --
The speaker's right here so --
THE REPORTER: (Clarification.)
THE WITNESS: Okay. Thank you. My name is Aaron Woolfson. It's A-a-r-o-n. Last name is W-o-o-l-f-s-o-n.
MS. ENGLER: Q. Okay. And what's your current address?
A. Residential or business?
Q. Let's start with residential?
A. 16 Matisse Court -- like the artist -- Pleasant Hill, California, 94523.
Q. And business?
A. 1937 Oak Park Boulevard, suite D, Pleasant

Page 7

Hill California, 94523.
Q. And what is your current occupation?
A. I'm the founder of TelSwitch, Inc.
Q. Okay. And is founder your job do it title our do you use another title?
A. I am a data strategist, but I typically just call myself founder.
Q. Okay. Okay. And you understand that you've retained as an expert in this litigation?
A. Yes.
Q. Okay. I mean, obviously, I think that I've heard you say when you were coming in this is your hundredth deposition ever; is that right?
A. No. It's getting close. It's -- this is my 89th deposition today.
Q. Okay. So you've done this before. You know the rules. You know how this works. So I'm not going to go and run through ever single little instruction because you -- you know what to do. The only thing is that because we have our court reporter who is, you know, remote due to some miscommunications as she was totally down to come and join us in person. So -- but didn't work out this time.
A. Ah, we would have loved to have her here. She would have enjoyed the fruit spread. For the record,

Page 8

let it known that the fruit -- fruit spread here is the pretty impressive. It's the best I've seen as a law firm.
Q. Yeah, but we have her on -- have her remote, there's probably going to be a slight, tiny bit of lag. And so she asked that I specifically, you know, reinforce with everybody it's really important that we try not to talk over each other with her being remote and us being in person.
Like I said, you know -- you know the rules so, but the only thing I'm just going to ask you to confirm is there's nothing preventing you from being able to give, like, honest testimony and truthful testimony today?
A. No, nothing.
Q. Okay. And there's probably going to be some times that I ask a question that may not be clear. If you need me to rephrase or you need me to restate it -- I'm probably going to ask a bad question at some point. Just let me know, and, you know, we'll see about rephrasing. But can we agree that if you answer the question that you understood it?
A. Yes.
Q. Okay. Now I see you brought some notes with you. What exact -- when exactly were those notes

Page 9

prepared?
A. I wrote them down this morning.
Q. Okay. What are they?
A. It's that the quantity of depositions that I have given. It's the date that I was -- around when I was first asked to be engaged in this matter and the quantity of hours and the amount that I billed in this case.
Q. Okay. Can we go ahead and enter that -- those notes as an exhibit?
A. Sure.
Q. I'll give them right back to you.
A. No. That's okay. You can have them. I don't need them. I just use them for my own reference to make sure that I'm able to give you the answers without having to call up my staff or go on a break.
Q. Always love an expert that's prepared so thank you for doing that.
MR. JILIZIAN: And before we do that, I'll just state -- it's not an objection, but I'll state, you know, we -- we do assert privilege to the extent it does have any attorney-client communications on there, but I believe it would not. So just wanted to state that on the record.
MS. ENGLER: Do you want to look at it before



MAGNA LEGAL SERVICES

he hands it -- before I look at it?
MR. JILIZIAN: I could take a look at. Yeah. Sure.
MS. ENGLER: Because if there's anything, I'd rather we go ahead and, you know, if we're going to have to contest anything being privileged, that we, you know, at least produce in part what is not.
MR. JILIZIAN: Yeah. This should be fine.
MS. ENGLER: Okay. So we'll go ahead and mark the witness's handwritten notes taken this morning as Exhibit 1.
(EXHIBIT 1 WAS MARKED FOR IDENTIFICATION.)
MS. ENGLER: Q. And because I also didn't have my exhibit stickers, so we're going to have to go with handwritten today.
A. I just -- I want to know what time I wrote on the margins there so that I can re --
Q. I'm giving it right back to you.
A. Oh, I don't want to write anything new on it now that it's been entered into evidence. So just a moment. 9:45. Thank you.
Q. Sure thing. Time tracking?
A. Something I -- for 20 years have said that I need to get better at. So yes.
Q. I feel your pain. How much time do you think



you spent on this matter --
A. I'm gong to --
Q. -- to date?
A. -- I'm going to need to see my --
Q. Yeah.
A. -- notes on that one. I had spent, according to my logged time, 21.68 hours from bookend to bookend.
Q. Okay.
A. Not including today.
Q. Okay. Put these here in case you need to access it again. I want you to take a quick look at this document. Have you seen that before?
A. Yes. That's what I'm -- was noticed to me and why I'm here today.
Q. Okay. So your Notice of Deposition?
A. Yes.
MS. ENGLER: We'll go ahead and enter the Notice of Deposition as Exhibit 2.
(EXHIBIT 2 WAS MARKED FOR IDENTIFICATION.)
MS. ENGLER: Q. So in addition to taking your notes this morning, what did you do to prepare for today's deposition?
THE WITNESS: I read my declaration on the train coming in.
MS. ENGLER: Q. Did you read just your



declaration or any of the attachments to your declaration?
A. I just read my declaration.
Q. Okay. Was there any other documents that you reviewed?
A. No.
Q. Did you meet with anybody or talk about the deposition beforehand?
A. No.
Q. So no meetings with counsel?
A. No. I mean, I told my wife I was going into the city for a deposition. That was the extent of anyone else I talked to about it.
Q. And I bet she hears that a lot?
A. Yeah.
Q. How many have you had this year so far?
A. I don't know this year. I mean, like I said earlier, it's my 89th deposition, and I want to say 5 or six this year. They've been slowing down. People aren't taking them as much, but I like depositions. I think it's important part of the -- important part of the process.
Q. Why do you say that?
A. Well, I think that especially in-person, I think that there's a lot of dialogue that's not possible



over Zoom.
Q. Uh-huh.
A. I think that there's a level of -- sort of like the -- the pauses and the cadence that don't necessarily reflect on the record I think are still important for the attorneys to be able to capture. I think it also is indicative of how somebody is going to be at trial. So on and so forth. I always like depositions and prefer them in person. And occasionally, if there's an opportunity to attend an opposing expert's deposition, I will -- will do that. I like most of the opposing experts. Actually, I like all the opposing experts in TCPA and most of them in the wage-and-hour space. So I just think it's a good -- good practice and it's -- it's an opportunity I don't normally get to get -- to get together.
Q. Uh-huh.
A. And, uhm, most of my clients are those who have taken my deposition at one point or another --
Q. Uh-huh.
A. -- at this point. I used to be a defense expert in TCPA until my deposition was taken. And I just got along really well with opposing counsel and eventually I started working on cases for him. So --
Q. Would that be counsel in this matter?



MAGNA LEGAL SERVICES

A. No. That would be Avi Kaufman, K-a-u-f-m-a-n.
Q. Okay. Just for -- just for the -- just so you know, Avi Kaufman and Anthony Paronich are both enrolled a counsel in this matter.
A. Oh, I don't remember Avi being on the caption.
Q. Yeah. And I don't believe he probably was at the time that you may have looked at it --
A. Oh, okay.
Q. -- or -- or at least on the petition since I -- I do recall your expert report does reference that you have seen the petition. But Avi is now involved. Other counsel in this matter is obviously Alex over here and also Dana Oliver.
A. Yes.
Q. So if I make a reference to plaintiff's counsel, can we agree it means either one or all of those folks?
A. Yeah. I didn't know that Avi was involved.
Q. Uh-huh.
A. So I guess, you know, see that I know now.
Q. There you go. There you go.
A. Yeah. He was the first person who I started working for on the plaintiff side.
Q. Do you recall when that was?
A. It was -- I think it was before COVID. It was



probably six or seven years.
Q. Okay. So -- so in the before times?
A. Yeah, that COVID era just distorts everything.
Q. And we still had to do laundry at the same time.
A. This is true.
Q. Okay. So since you didn't know that Avi was on this matter, which is totally fine, it -- has Anthony or another of the attorneys been your primary contact?
A. Anthony Paronich.
Q. Okay. Fine.
A. And for the court's reference, I think -- well, she knows how to spell that because it's on the caption. So --
Q. Yeah, and we can provide certainly the court reporter, if the court reporter has any, like, terms or anything or a names that she needs some help with spelling, both sides will have the opportunity to send over the list. I know usually in these type of cases SQL and being pronounced "sequel" is often something that has to get corrected, so --
A. Sounds like you've read at least one of my transcripts.
Q. Or just had a deposition where somebody talked about SQL servers and worked with that. So rate for



your expert work is 440 per hour for non-depositions, right?
A. Yes.
Q. Okay. And then for depositions and trial it's 675?
A. Yes.
Q. Okay. Do you have any other kind of, you know, is there any other kind of fees that come -- other than just hourly fees?
A. Well, yeah, some -- apologize, I didn't mean to talk over you.
Q. I had a delay. Just said with your work was what I said?
A. Every time I talk over someone in a deposition, I put a mark down and then I go and donate money to charity afterwards. So interrupting is good for the charity but bad for me. How about that?
Q. Got it. Got it. So -- but back to your, I guess, the comp question, aside from just the hourly rates, is there any other kind of fee structure or costs that are passed along?
A. Yes.
Q. Okay.
A. There is a database fee that we get charged from the Reassigned Number Database, or RND, and that's



a pass-through.
Q. Okay. And generally, like, how is that cost worked out? Is it a per-record pull or --
A. I usually get a -- an allocation of inquiries per month, and then it's a take or pay.
Q. What does that mean?
A. It means that if I run a million records through an RND database or 700,000 records, I'll typically pay a million records, and that will be the pass-through, unless I'm able to pro-rata allocate it to a different -- to the different cases on which I'm working.
Q. Okay.
A. So if there's four in -- cases, they each run a quarter million records, then that -- say that $2,000 or whatever it is.
Q. Uh-huh.
A. Will be divided into those four cases. And each case will pay $500.
Q. Okay.
A. So it makes more affordable, and it allows me to have a higher aggregate commitment usage to the Reassigned Number Database.
Q. So just to make sure I understand, and apologies if this is incredibly simplistic, if, you



MAGNA LEGAL SERVICES

know, you've got four cases, and each one has, you know, 250,000 records, then you would put them -- basically -- then you could just go ahead and get a million and then put the four together?
A. No, we're -- we're not aggregating the actual records. We keep the records and the -- the actual processing separate.
Q. Okay.
A. From a cost efficiency standpoint, we just get billed on the number of records. Our providers don't care which cases they're for.
Q. Okay. I guess, then, the question I have is let's say you've got two datasets of half a million records each. Do you do any kind of, you know, compare before to try and eliminate duplicates?
A. No.
Q. Okay. Is there a reason why? It seems like it might be more cost-efficient if it turns out there's duplicates at least?
A. We would never do that. You imagine I'm -- I do work for both plaintiffs and defendants. And so you can imagine the sorts of problems that would arise, especially taking competing duplicate, you know, competing datasets.
Q. Uh-huh.



A. Not -- not the same companies, but I think it would be -- it's important to partition each one of those out and each project is considered its own project.
Q. Okay. So if you had two datasets of half a million each, you're going to get a million records allocation check. If you had, in those two separate datasets, the exact same number appearing, you would still just run it -- like, you would run the 500 and then the other 500 regardless of the duplication?
A. That's right. And if I saw -- I mean, if I saw that, it would be -- I mean, I think part of it would be concerning, just because why would there be two different companies making calls the same groups of population of numbers? I understand it's a hypothetical, but I do not look at it that way at all. I -- everything is distinct and separate.
Q. Okay. I mean, I guess, you know, to continue the hypothetical -- and I understand what you mean about two companies going and messaging distinct categories of folks -- what if we had -- and apologies, it's just makeup is what comes up in my head a lot of times with this is Sephora and Ulta would presumably have similar customer bases?
A. Yeah. It's -- I don't look at it that way.



Q. Okay.
A. It would be in poor taste, but it would also be, I think, from a data purist standpoint --
Q. Uh-huh.
A. -- not allowed.
Q. Okay.
A. Shouldn't be done.
Q. Okay. So just so I understand your process as you've kind of laid it out, and please correct me if I'm -- I'm wrong, because I'm never myself done an RND pull. I don't even know if I'm allowed. And the -- and so for -- so you have two datasets. You have a million record allocation. You would -- do you run, like, you know, all of the numbers together or you did first -- run the first 500,000. Get your results. Then run your second 500,000. Get your results?
A. The latter.
Q. Okay. So you run them separately through the RND and get your results.
A. And then distinctly.
Q. And distinctly?
A. And they're maintained in different databases.
Q. Okay.
A. So that there's not even a cross population of data. It's all separate.



Q. How are they stored in different databases?
A. A SQL database allows for -- so a SQL server allows for different databases and distinct databases and so they are partitioned from one another and are generally not connected to one another in any way.
Q. Okay. And are you the one that set up the structure and as to how they're all kept separate?
A. I am.
Q. Okay. And how would -- with that in mind, taking company A company B's records -- you said they're stored in separate databases. Can you add a little bit more color about what you mean to that?
A. Yes. Imagine that your law firm is contracted with Google for Gmail, and opposing law firm uses Gmail.
Q. Uh-huh.
A. But you don't get each other's emails and you don't have access to one another's emails.
Q. Uh-huh.
A. So that's how those databases are framed up.
Q. Okay. So they're segmented from each other?
A. Partitioned.
Q. Partitioned. Okay. That's a better word for it?
A. I think so.
Q. Okay.



MAGNA LEGAL SERVICES

Page 22

A. It's all just linguistic preference, but I -- I consider it a database partition.
Q. Okay. Now taking your Google example, the thing also with Google is it's not just necessarily a data repository. People have access to their Gmail accounts. Does anybody other than you have access to these databases you've referenced?
A. My employees.
Q. Okay. And how many employees do you have?
A. I have five employees.
Q. Okay. And who are those folks?
A. Eric Olson, O-l-s-o-n, and the other one is Sam Boyle, B-o-y-l-e.
Q. What does Eric Olson do?
A. Eric Olson is a data strategist.
Q. Okay.
A. And he's more structuring the data and putting it into the database servers from its original source files.
Q. So that would basically -- if I remember reading in your report and everything correctly, that would be taking the data as it's provided to you, and then doing whatever kind of, you know, structuring or modifications needed in order to put it in a format where you can run the analysis you're doing?

Page 23

A. Yes. And it's -- it's not really modifications. It's really something called database -- or data normalization. A really good example of that is say that you have an Excel spreadsheet, and you can format a date/time field. It's date or time or date/time.
Q. Uh-huh.
A. And I will occasionally see where the Excel sheet is showing something. It's just the date or just the time, but it's really date and time. So those are the types of -- performative type of activities that those two individuals will do is make sure that all the data comes in as a meaningful incorporation of all of the types of data, not just what has been curated on that particular output.
Q. Okay. And then I think I missed the first name of second employee. Boyles?
A. Sam Boyle.
Q. Sam Boyle. And is he also a data strategist?
A. Yes.
Q. Okay. And does he have the same role as Eric Olson?
A. Yeah.
Q. Any different responsibilities between the two of them?

Page 24

A. Well, Eric has a -- a new child. No, Sam has a new child. So I mean, from a -- from a standpoint of being more available, Eric is more available. They basically do the same thing.
Q. Okay. Understood. And congratulations to Sam.
A. Thanks. I'll -- I'll forward that on.
Q. When did Eric get hired?
A. I don't recall. Sometime in the -- two or three years ago.
Q. Okay.
A. And the same for Sam.
Q. I think you said you have five employees so who is No. 3?
A. No. 3 is me. I'm a --
Q. Fair.
A. -- employee. No. 4 is my wife. She is -- helps with the books and -- and other types of administrative processes. And then I have Jennifer who works -- who is my office manager and my billings manager.
Q. Does Jennifer have a last name?
A. Schofield, S-c-h-o-f-i-e-l-d.
Q. And the office manager, how does her role differ from your wife's role?

Page 25

A. Well, she's not my wife.
Q. Well, professionally. Professionally.
A. Jennifer does all the QuickBooks. And is --
Q. Okay.
A. -- involved in the day to day -- in the operations. Ivana is more of a help when we need extra help around the office in big projects.
Q. So ad hoc support?
A. Ad hoc support.
Q. And now we've talked about Eric and Sam and Jennifer as employees. Are they direct employees, like W-2, or are they contractors?
A. Sam and Eric elected to be 1099ed.
Q. Okay.
A. Everyone else is W-2.
Q. Got it.
A. But that's their preference. It wasn't our decision. It was just something they wanted to do for their particular tax situations.
Q. And you said everybody else is W-2. Does that include yourself?
A. Yes.
Q. All right.
A. And I myself -- I'm -- I'm salary, and I am not actually even incentivized by the outcoming cases


MAGNA LEGAL SERVICES

Page 26

and my hourly rate is not -- or my salary is not dependent upon how much time I put in cases either.

Q. Okay.

A. So --

Q. Who then owns TelSwitch?

A. I do.

Q. Do you take any kind of draws from profits or strictly salary?

A. Strictly salary. And I'll be really candid is that my salary is less than my employees. I just have a pretty low cost of living.

Q. When you talk about your salary, are you talking about services outside of litigation and expert witness work or including litigation and litigation and expert witness work?

A. I don't understand the question. I'm sorry.

Q. Yeah. That probably was a poorly phrased one when you're talking about your salary and what -- and what you get paid for from TelSwitch, is that for just, like, litigation and expert witness work or is it for services outside of litigation and expert witness work?

A. You know, it really is quite variable. I do database consulting. I do some manufacture of equipment for SAIC and -- and FAN and FAA contractor and some other projects that I continue to maintain, but have not

Page 27

had to do any work for them in a while. So it really depends. Most of our revenue comes from expert work.

Q. Okay.

A. And most of our net income goes out to charity.

Q. What charities?

A. American Friend Service Committee. Scatter Good Friends School. Beds for kids. Public radio stations. Like, there's a radio station at a high school in Seattle called Hey NHC, which high school station I really like, and KMVR [sic], which is a radio station in Grass Valley.

Q. Uh-huh.

A. So I -- I use the company as a vehicle to more or less raise money for charity. I don't think I've ever been asked that before, but now my clients know.

Q. Well -- well, I guess I'm curious because, obviously, this litigation is TCPA, and then you've done also some wage-and-hour and labor and employment kind of work. And so I didn't know if maybe any of your, you know, charitable concerns were anything related to do with privacy or, you know, employee, you know, fairness?

A. No.

Q. Okay. No ACLU or anything like that?

A. I don't think so. I mean, maybe I personally

Page 28

gave them a hundred dollars or something in the last five years, but I don't think we as companies have given anything to ACLU or NCLC or any of the usual suspects.

Q. Usual suspects. I was, like, trying to think of what was that? The -- yeah. The Electronic Frontier Foundation?

A. None.

Q. None of that. Okay.

A. No.

Q. Okay.

A. We stay clear of any -- I -- I feel like any perception of conflict.

Q. Okay. So that's --

A. We just don't go anywhere near that.

Q. Got it. So there's a concern that donations could be seen as, you know, a bias?

A. Yeah. I mean, I -- I think that's important to be very transparent and very neutral in what I do, especially because I have a lot of defense clients and I don't want to be mistaken as having any particular objective. I don't.

Q. Got it.

A. And even to the point I'll just say this -- without, you know, I don't think there's a question pending necessarily. But my reports, if defendants hire

Page 29

me or plaintiffs hire me, are generally the same reports or are the same reports regardless. I just don't have any -- I don't have any -- I don't care who wins, who loses. TelSwitch is just a vehicle for me to try to do better in this world.

Q. All right. What does better in this world look like for you? Is it through the charitable donations or through your work itself?

A. Uhm, going to have to ask again because I spoke over you. I'm sorry.

Q. It's okay. You said that, you know, you're trying to you know do some good or put some good into this world and I asked what does that look like for you? Is it just through the charity contributions or is it in your professional work as well trying to make the world a better place?

A. Well, I feel like I can have more of an impact in -- in giving money the charities --

Q. Uh-huh.

A. -- by what I do because the measurement of what I get paid per hour is certainly more than what a lot of people do, and so I can really amplify those efforts. So, like, Beds for Kids gives stable housing for individuals who are children who are coming out of precarious spaces and make sure that they have



MAGNA LEGAL SERVICES

furniture, a bed, safe housing. Things like that I think are really important. People who are not able to advocate necessarily for themselves because they're kids.
Q. Uh-huh.
A. But they still need that -- they still need someone.
Q. Uh-huh. Absolutely.
A. So let me use myself as a vehicle for that.
Q. Absolutely. Now we -- now talking about the cost side of things, we did talk about, you know, in addition to your fees, there are also some pass-through costs. And you mentioned, of course, the RND and we talked about how that works.
A. The mentioned which? The star and D?
Q. RND.
A. Oh, RND.
Q. Reassigned Number Database. Apologies. It's that New Orleans accent a little bit, so please tell me if I need to be a little bit more articulate. Are there any other costs, other than costs associated with the RND, that get passed along to counsel?
A. If we use the databases that are provided by the North American Numbering Plan Administrator and -- for identifying wireless or wire line numbers, those



costs get passed on as a pass-through as well, but other than that, no.
Q. Okay. What is the cost associated with the North American -- I'm sorry. I think I missed the other -- what you said. Is it NAPL? Is that right?
A. NANPA.
Q. A-N-A-P-A. Okay. I butchered that. What are the costs associated with, like, basically pulling data concerning wired or a wireless?
A. Typically that cost is two and a half cents per telephone number.
Q. And for these costs, like the NANPA and the RND, do you add any kind of percentage on top of it or is it a straight cost?
A. Straight cost. No percentage. And we have a third database, which is the National Do Not Call.
Q. Uh-huh.
A. We do not charge for that.
Q. You don't charge for the Do Not Call?
A. We do not charge for it.
Q. Why not?
A. We just don't do it because it -- I mean, from a personal standpoint, I think it needs to be made available to anyone and everyone for no -- at no cost. I don't have to pay for it. So I don't mark up



something, and I make it available to my clients who are non-calling parties or exempt organizations. I am -- I make it available for use, or for our use in our processes, but we do not charge for that.
I don't think that answered your question for why not, but we just don't. I don't really have a good answer for why we don't, but we just don't.
Q. Okay. Now, you mentioned making it available for non-calling parties or exempt parties. What do you mean -- well, we'll take non-calling parties first. What do you mean by that?
A. We are required to not use our relationship with the Federal Trade Commission in order to obtain information that would ordinarily have to be paid for by calling parties. So anything that is made available to us for free for the use of analysis and informing the trier of fact, then we don't charge for that.
Q. How are you obtaining the RND? Is it -- is there like a portal access? I -- I guess I'm trying to understand since you receive the data for free --
A. From the DNC.
Q. -- from the DNC, who is providing the DNC data?
A. The Federal Trade Commission Director.
Q. And how exactly do you go about getting that



data?
A. The mechanics of it?
Q. Yeah. I'm -- I'm -- I haven't done this myself. So I'm trying to understand the process?
A. And I'm happy to show anyone how to do it because I think it's an integral part of having good information with which to make good decisions, right?
Q. Sure.
A. So it doesn't matter if it's plaintiff, defendant, opposing counsel, opposing expert. I'm happy to show anyone. I have a -- a website or I go to a website every day between midnight eastern and 6:00 a.m. Sometimes it's a little bit later. And the entirety of that day's file is available for download, and just in that day's window. So it requires every day to go and get that file. It is not an automatic process. I don't know of any way to automate that process now that the Federal Trade Commission has required a -- a two form authentication -- two factor authentication. Two FA I think it's called.
Q. Okay. Do you recall what website?
A. Donotcall.gov. I actually think the full website is telemarketing.donotcall.gov or maybe it's a donotcall.telemarketing.gov. One of those two.
Q. Okay.



MAGNA LEGAL SERVICES

A. Am I speaking slowly enough for the benefit of the transcriptionist?
THE REPORTER: (Clarification.)
THE WITNESS: Okay. Thank you.
MS. ENGLER: Q. So you go to the website?
A. Never been told that before -- to speed it up before. Usually it slow down.
Q. So you go to the website every day in the morning and obtain the entirety of that day's file. Is the file the entire, like, record of Do Not Call?
A. Yes.
Q. So every single record?
A. Every single record, every single day.
Q. And do you have to, like, have any kind of log-in or account?
A. Yes.
Q. Okay. What kind of account?
A. I go in under the TelSwitch subscriber account number.
Q. Okay.
A. I don't know how to describe it any other way.
Q. What -- what is a subscriber account number?
A. It is a identifier that allows me to go in to get a file that's been assigned to me by the Federal Trade Commission.



Q. Okay. And so the subscriber account number -- you said it belongs to TelSwitch?
A. Yes.
Q. Okay. So doesn't belong to you personally?
A. I'm the point of contact on it, so I never thought about it either way.
Q. Okay. So they have to, like, designate a point of contact as part of the -- getting a subscriber account number?
A. Yes.
Q. Okay. Is there a difference between -- you know what, scratch that.
Can anyone get a subscriber account number?
A. As far as I'm aware.
Q. So if I wanted to go get one I could?
A. Be happy to help you -- tell you how to do it if you're interested. Sure.
Q. What kind of information would I have to provide if I wanted to get the subscriber account number?
A. I don't know any more. It's been so long since we've subscribed. We've had our SAN for over 10 years. I don't remember what information we originally provided.
Q. Well, you anticipated my question because that



was exactly what I was going to ask you is --
A. Copy of your -- of your exam. No I'm just kidding.
Q. I know. These -- these data guys. So you've had it since -- for over 10 years now?
A. Yeah. So just -- these -- I don't know if you -- you're familiar with Jan Kostyun, but these are the precise questions that I was just asked in a exam -- cross exam that I believe he prepared for one --
Q. Oh, no kidding.
A. -- of his clients maybe three weeks ago. So I just -- yeah, I mean, this is the exact framework that he provided to one of his other clients.
Q. Hmm?
A. So I'm -- I -- yes.
Q. Hmm. Okay. Interesting.
A. Uh-huh.
Q. Uhm, so has your -- have you -- has your subscriber account number or the account associated with it ever lapsed?
A. No.
Q. Okay. So you were telling me what I would need to do. You don't remember the type of information I would need to provide at this time. Is there any kind of certifications or attestations I would need to make



in order to get a subscriber account number?
A. I don't recall anymore. We did have to do an attestation.
Q. Uh-huh.
A. And we sign it every day. It says that we are electronically signing.
Q. Sure.
A. It says we are a -- an exempt organization that does not make calls.
Q. Okay. Now, that was something that we would -- had started to talk about that you're accessing based on non-calling parties and exempt organizations. Are those the same thing?
A. I'm not a lawyer. So I can't make a legal conclusion, but I am what I consider to be an exempt organization as a non-calling entity, someone who does not use the data in any form to make calls. And I'm not providing the original list. Like, I don't provide the original list to anybody, certainly nobody who -- people who don't have subscriber account numbers.
Q. If someone did have a subscriber account number, would you provide the original list?
A. I think that if Jan Kostyun -- I've had this discussion with Jan Kostyun, K-o-s-t-y-u-n -- before and offered the lists to him if he does, in fact, have a



MAGNA LEGAL SERVICES

subscriber account number, which I believe he does. I would check with the help desk at the Federal Trade Commission there's a -- quite a contact I have there. I would ask them. But I'd be happy to.

Q. So as long as one has a subscriber account number, you would share the list?

A. If they had a subscriber account number and the -- the help desk at the FTC said that was okay, I would do it. Sure.

Q. Have you ever asked the help desk at the FTC whether sharing the list with someone that has a subscriber account number is okay?

A. It's never come up.

Q. Okay. How much do you call the help desk at the FTC?

A. Well, it's an email.

Q. Or --

A. Usually it's on holidays to wish them happy holidays, to thank them for the reliability. There was a change that they implemented recently that made it -- the downloads much faster. We contacted them to just tell them thanks. I think we've had one phone call with them when the website was down or was not providing a file. It was providing blank files. I'm usually the first person that reaches out to them just because I'm



so familiar with their systems, and so I consider it a -- a good working relationship.

Q. And I bet it's not too often they get calls of people happy and telling them thank you?

A. You know, we try to send them Christmas -- like a Christmas packet that we send to -- we send it to Jan Kostyun and opposing -- opposing counsel and everyone else, too. But we tried to send them something and they said thank you, but they're spread out all over the country and it would be difficult for them to coordinate.

Q. What kind of Christmas package do y'all usually provide that you wanted to send to them?

A. I have one here to bring to Southern California during a break. I'll show you.

Q. Okay.

A. It's the one time I have it -- it was a bottle of wine.

Q. Okay.

A. And made by Lacewing Wineries in Washington, and it was called Bad Data.

Q. I'm definitely going to need to see this on the break. That's -- that's -- that's funny. And probably take a picture of it and attach it to it record so we can remember it.



A. It's really good wine. I wish I had more of it. If I knew, I would have bought some for you. For you too. Got some.

Q. So what's the criteria to be considered an exempt party?

A. As far as I'm aware, it's somebody who does not make any calls and is only using the data for auditing or for purposes of informing like a trier of fact.

Q. Okay.

A. There's nothing that I'm aware of that would bar our use of the data from being able to be used to inform a trier of fact in, say, a federal proceeding.

Q. Okay. So your understanding of an exempt party is a person who is not making calls?

A. Right.

Q. Okay. And that's the primary criteria? And -- or was there any other criteria? I'm just trying to make sure I understand your testimony.

A. Yeah. I don't know of any other criteria. We can look at it during a break. You can go on, see what I make an attestation to if you'd like. Happy to -- I'm happy to indulge if you like.

Q. Oh, I'm just trying to understand what the -- what the process is. I think that one was on me. I



think I spoke over you, so you can deduct one unless you feel like giving to charity.

A. I'm sure I'll speak over you later. So we'll just keep it there.

Q. Okay. If somebody wanted to find out information -- like, if I -- in addition to, of course, your help, wanted to go and learn more about getting a subscriber account number, where would you recommend that I look?

A. Federal Trade Commission.

Q. Federal Trade Commission? Okay.

A. I'm going to need a break just to use the restroom.

MS. ENGLER: Oh, absolutely. Yeah. We can go off the record.

(The deposition was in recess from 11:08 to 11:18.)

MS. ENGLER: Q. All right. We're back on the record. And so we talked a little bit about the gifts that you send out. And you wanted to send to the FTC, but, obviously, just the one bottle of wine would be difficult to do?

A. Right? Yeah, I mean, I -- we send gifts to -- to everyone. I mean we send them to all of our partners and all of the people we rely upon.



MAGNA LEGAL SERVICES

Q. Okay. So it would -- because we couldn't do the wine, no -- any other kind of gifts or something?
A. No.
Q. Okay.
MR. JILIZIAN: Sorry to interrupt. I'm just going to put this away just for the -- the picture of me having a wine bottle. You know --
MS. ENGLER: Q. That's fair. That's very fair?
A. -- keep it under here.
Q. All good. All good, or if it's easier to put on the credenza so -- so you don't accidentally kick it, then, you know, that works.
MR. JILIZIAN: Oh, wonderful. Yeah, let's -- let's do that.
THE WITNESS: Can you imagine dropping a bottle of wine on this thing?
MR. JILIZIAN: Oh, yeah.
THE WITNESS: The record should note that the bottle of wine is not open.
MS. ENGLER: Q. Thank you. And we'll attach picture of the wine as Exhibit 3 just for completeness.
(EXHIBIT 3 WAS MARKED FOR IDENTIFICATION.)
MS. ENGLER: Q. Okay. When we first -- when we first went off the record, we were talking about



getting a subscriber account number and up giving me some tips about what I could do if I wanted to go and get a subscriber account number. Have you ever, you know, consulted with a company and helped them get a subscriber account number?
A. No.
Q. So you never applied for a subscriber account number on another company's behalf?
A. I don't think so. Years ago -- I take that back. Years ago, there was a collection agency and a call center in Reno, Nevada that I had applied for their own subscriber account number.
Q. Since they were a call --
A. Or helped them years ago.
Q. Do you -- you don't have an idea about how long that would have been?
A. Maybe 15 years ago or something.
Q. Got it. Do they -- are -- now, you said you got your subscriber account number and you're an exempt party. They're a call center. Would they have a different kind of subscriber account number or they're treated all the same?
A. I believe they're treated all the same. And if you have a subscribership to less than a certain quantity of area codes, I think that they don't charge



either.
Q. Okay.
A. And I don't recall what that point of delineation is, but I believe the call center was only making calls into Nevada and California.
Q. So you said they have certain area codes that you get at no charge. What do you mean by that?
A. I think if it's five or less or maybe 10 or less.
Q. Okay. Okay. So but as exempt organization, you get all of the area codes for free?
A. We do.
Q. Okay.
A. And, hence, we do not charge our clients because I don't know if there's a rule, but, to me, it feels like if one gets something for free, then it doesn't make sense to charge your clients for that. We're not giving them the lists.
Q. Sure.
A. But we're processing data the summation of which it goes into reports or gets provided to a trier of fact.
Q. Okay. You said earlier that if we wanted to know more information, go to the FTC.
A. Yeah. I -- that, or I think compliance point



has a good program where they assist people in learning about Do Not Call. I think DNC.com has a good program for that, but I don't know where they are now post-merger with some other company.
Q. Wait. So DNC.com? Who would have -- who owns DNC.com?
A. Ron -- oh, are you talking about the new --
Q. I thought you were talking about DNC.com that there was a merger?
A. Yes.
Q. Okay.
A. It merged into another company. It's based in -- I want to say Florida or Texas. I don't recall now which one.
Q. Okay.
A. It was just very recent.
Q. Okay. Do you know what company that is?
A. No.
Q. Okay. I'm going to show you what I'm marking as Exhibit 4. That's from the FTC website Q and A for telemarketers and sellers about the DNC?
A. Right.
Q. Have you ever seen this before?
MR. JILIZIAN: Sorry. Excuse me do you have another copy of that or --



MAGNA LEGAL SERVICES

MS. ENGLER: Yeah, you can take that. I don't need this second copy, so you can take this one.
MR. JILIZIAN: Thank you.
MS. ENGLER: Q. How often would you say -- when do you -- scratch that.
When would you say is the last time you may have looked at that FAQ?
A. It's been a while. It was also shown to me in my last deposition two weeks ago.
Q. Okay. I promise I didn't steal their script.
A. There's a -- I mean, it's just -- perfectly aligns with timing and cadence and the line of questioning. So it's -- it's -- I saw this a few weeks ago.
Q. Okay. But as far as independently accessed it, when would you say that you last accessed it on your own volition?
A. I don't recall.
Q. Okay. How often would you say that you review the FTC Q & As or other FAQs and helpful materials relating to the DNC?
A. Well, most of this is for telemarketers and sellers.
Q. Okay.
A. So this doesn't relate mostly to exempt



organizations.
Q. Okay.
A. So I don't really have a reason to read these because I'm not a telemarketer. It says right in the title Q and A for telemarketers and sellers.
Q. Uh-huh.
A. I'm not doing either one.
Q. So you're not a telemarketer?
A. No.
Q. Okay. And you're not a seller?
A. No.
Q. Okay.
A. Was there an Exhibit 3?
Q. Yeah. It's a picture of the wine.
A. Okay. Well, I'm just going to then put this for benefit.
Q. Okay. Thank you.
A. Exhibit 3.
Q. Now, obviously, this is a pretty dense document in terms of amount of information that's in it, and like you said, not necessarily -- thank you -- not necessarily does everything apply or be relevant to you and your work. But if there was any part of your testimony where you testified that -- like, concerning an FTC standard or a, you know, or any kind of



testimony -- you know what? That's -- that's -- let's just start that one over.
If in your testimony today there was anything that you stated about the FTC's operation of the Do Not Call List and allowing use by exempt organizations, telemarketers and sellers and that -- like, and your testimony directly contradicts what's in this Exhibit 4, what -- should we defer to what's in this Exhibit 4 rather than your testimony?
A. I -- that's a legal conclusion. I mean, I don't have any real opinion about what's in here because this is for telemarketers and sellers.
Q. Would you consider the FTC to be a more authoritative source concerning the use of the DNC and telemarketing roles?
MR. JILIZIAN: I'll object to the form.
THE WITNESS: Yeah. I think if anybody is saying that the National DNC cannot be used for the purpose of which the National DNC was intended, I think that's in poor form, personally. But, I don't have -- I don't speak for the Federal Trade Commission. I know that I've been downloading it for a long time. Nobody has ever said that the National Do Not Call List cannot be used to identify numbers -- to identify and confirm that a number is or is not on the National Do Not Call



List. And that -- it's the same service speaking to what DNC.com has or offers or what Compliance Point offers. These organizations do the precise same thing, except they sell it as a service and I don't.
MR. JILIZIAN: Sorry. On that last one, I'll also say objection foundation as well.
MS. ENGLER: Q. Okay. I -- I think you might have misunderstood what I was asking or maybe I just didn't very clearly ask it again.
A. I probably misunderstood. So --
Q. So, you know, you're here obviously as an expert witness who can offer opinions and testimony that has, you know, a little bit more authority on subjects -- certain subjects that are within your area of expertise, correct?
A. Yeah, I mean, I -- I think I'm an expert at data and the way that telephone networks work and the way that telephones convey calls.
Q. Uh-huh.
A. I'm an expert in how data can be used to --
Q. Uh-huh.
A. -- be joined with other data in order to draw out fact patterns that can be assistive, whether that's assistive to the plaintiff or defendant doesn't really matter to me.



MAGNA LEGAL SERVICES

Q. Uh-huh.
A. The trier of fact is entitled to those opinions and the DNC is just one of those tools that I use. I don't consider myself an authority on the intent of what the FTC has in -- in -- intended for use of this.
Q. Uh-huh.
A. But I've never been challenged or had any authority that's been shown to me that would indicate that I cannot use this data in the manner that I'm using it.
Q. Okay. But so you're not an expert in the federal regulations concerning, you know, use of telephones and telecommunications, correct?
A. I am not. I do not have a doctorate of jurisprudence, which would entitle me to draw a legal conclusion. That's correct.
Q. Okay. So you're not offering any kind of legal opinions today?
A. None.
Q. Okay. And --
A. Nor am I ever.
Q. Nor are you ever. Got it. Loud and clear.
A. Yeah, there's a point of delineation where I understand -- I think the judge in Lester v. Wells



Fargo, in order of denying motion to exclude, stated very clearly that I understand the point of delineation between bringing a fact into law.
Q. Uh-huh.
A. And I respect -- that was -- incidentally, that was -- Lester v. Wells Fargo was venued in Western District or Eastern District of Louisiana.
Q. Okay.
A. So -- and I was working on behalf of defendants as well. So I'm careful not to draw myself into what is legal or not. It's just data to me. It's where my expertise is.
Q. Is the FTC an expert on their regulations?
MR. JILIZIAN: Object to foundation on that one.
THE WITNESS: I hope so.
MS. ENGLER: Q. Do you think -- do you believe that the FTC is an authority on the subject areas that it regulates?
A. Yes.
MR. JILIZIAN: Objection; foundation.
THE WITNESS: Yeah. I respect the FTC. The FTC sent me a letter. And I don't mean an agent for the FTC. I don't mean someone who calls themselves an FTC Administrator who doesn't work for the FTC. If the FTC



itself said stop using this data, I'd stop. So until that happens, though, I don't see any -- I don't have any guidance that says I can't use the data.
MS. ENGLER: Q. Okay. I understand what you're -- what you're conveying in terms of data usage. Right now, we're just talking about your -- your expertise and where the lines are. So let's go and talk about what you are the expert in for sure. Just to confirm, you know, what you laid out of expertise, let's just go ahead and introduce and mark your report.
(EXHIBIT 4 WAS MARKED FOR IDENTIFICATION.)
MS. ENGLER: We'll mark as Exhibit 5 a copy of your declaration.
THE WITNESS: I'd like to thank you on behalf of Avery corporation and -- probably happy that people buy binders to put paper in. So --
MR. JILIZIAN: I'll just object to the -- the phrasing before that. It just -- there was a lot of stuff on the record and it did not sound like a question was pending, so I'll just object to form.
MS. ENGLER: Okay.
(EXHIBIT 5 WAS MARKED FOR IDENTIFICATION.)
MS. ENGLER: Q. I've just handed you a document. Do you recognize it?
MR. JILIZIAN: Do you have another copy?



MS. ENGLER: Unfortunately, we only have two.
MR. JILIZIAN: Okay. I'll just -- I'll just state for the record -- I'm not trying to be mean, but I'll just state for the record that it's not -- we're going to have to share a copy here for -- at least this one for Exhibit 5.
MS. ENGLER: I can see about -- I can ask Karen if they can print another one for you.
MR. JILIZIAN: We -- I mean we -- we can share right here. I'll just -- it's -- I'm not going to, you know, halt the deposition or make us delay for this but --
MS. ENGLER: Yeah. No. I'll send a -- I'll send an email to Karen. So if you can just bear with me for a few minutes --
MR. JILIZIAN: Okay.
MS. ENGLER: -- and then I'll -- then Karen can bring in a second copy.
MR. JILIZIAN: Okay.
MS. ENGLER: And then --
MR. JILIZIAN: So did -- did you want to go off the record for a second here or did you want to --
MS. ENGLER: I mean, we can keep going. I wasn't going to dig into the report too much. It's more just about putting it on the -- in as an exhibit first.



MAGNA LEGAL SERVICES

MR. JILIZIAN: Okay. Yeah. Yeah. I'm not going to call us to have to, you know, stop till I get a copy. You know, I just -- I just want to state for the record that -- that we don't have it and that we can proceed. I mean, that's fine with me.
MS. ENGLER: Q. Yep. As long as, then, once you have it, you can then confirm --
MR. JILIZIAN: Okay.
MS. ENGLER: -- that you have yourself a copy?
MR. JILIZIAN: Will do, yeah.
MS. ENGLER: Q. Okay. And if you could at least look through it after your counsel's done. Make sure it's, you know, your full report.
MR. JILIZIAN: All right. Did you want to review it?
THE WITNESS: I'm fine. I'm familiar with it.
MS. ENGLER: Q. Okay. We'll go ahead and mark your report as Exhibit 5. You know, before I actually go into this, you know, we -- we've talked about you're here today as an expert and you have been retained on the plaintiff's side on behalf of Mr. Andrew McGonigle; is that correct?
A. Yes.
Q. Okay. Have you ever met Mr. McGonigle?
A. No.



Q. Have you ever spoken to him?
A. No.
Q. Have you ever communicated with him directly in any form?
A. No.
Q. Okay. Did you read his deposition?
A. I don't think so.
Q. Do you recall if you got a copy of his deposition?
A. No.
Q. Okay. Did you read any responses to the written discovery requests that -- that plaintiffs provided to BBQGuys?
A. No.
Q. So any information you would have about Mr. McGonigle would have come through counsel.
A. I don't have any information on Mr. McGonigle.
Q. Okay. So you're not offering any kind of testimony about Mr. McGonigle himself?
A. No. If he was in this room I wouldn't even know who he was.
Q. Okay. Do you know -- are you aware of what claims Mr. McGonigle is making in the petition?
A. Only insofar as I am aware of what I was asked to do specifically within my report, that items that I



outlined that were objectively conducted as part of my analysis.
Q. What were you asked to do?
A. Well, I was asked to identify two or more calls or texts within 30 days. And also to identify those telephone numbers that had been reassigned or were on the reassigned database between the beginning of the texting or calling and the ending of the texting or calling. And when I say texting or calling, I'm not -- I'm being very deliberate with the words because I understand there's some unsettled -- I'm not trying to imply that texting is calling or calling is texting --
Q. Sure.
A. -- or whatever. I'm just saying this is what I was objectively asked to do.
Q. And we can just make a stipulation on the record that if you say call, that it can, for the purpose of the deposition, mean text or message or something. Just, you know, help prevent you from repeating yourself. If it's something where it's -- makes -- it's very specific as to whether or not it was a text message versus a voice message, you'll go ahead and just say so?
A. I will and thank you. Yeah.
Q. Okay.



A. I definitely appreciate that. Because I'm not trying to draw a legal conclusion here.
Q. Okay. Noted. No legal conclusions concerning calls versus texts. Got it. Okay. So you're not -- so since you've never gotten any information about Mr. McGonigle, you also wouldn't be offering an opinion about how he uses his cellular phone, do you?
A. No opinion.
Q. Okay. Before this litigation, have you ever heard of BBQGuys before or ShoppersChoice.com?
A. No.
Q. Obviously, I'm here on behalf of BBQGuys. I think I mentioned earlier today. If I didn't apologies for the late identification. So -- but no -- never seen any advertising that you can think of? Okay.
A. No.
Q. Okay. So -- let's see. I know we're waiting on that extra copy, but I'd like you to take a look Paragraph 2 talking about your expertise and what you were asked to do.
A. Okay.
Q. I believe it says I've been asked to opine whether there's a reliable method to identify those text messages within the call detail records. So what are the call detail records referring to?



MAGNA LEGAL SERVICES

A. Those are the files that contained the text messages that were provided by -- I guess through some discovery process.
Q. Okay. And that were text messaged two or more times in a 12-month period?
A. 365 days, but yes.
Q. Okay. After being reassigned. Is that what you were talking about with the -- in between the date of the first message and the date of the last message?
A. Right. Yeah. So there's two parts of this analysis. One is numbers that have been texted two or more times with 365 days --
Q. Uh-huh.
A. -- of being on the National Do Not Call List for more than 30 days.
Q. Uh-huh.
A. And then there was a -- a subset where I looked at the quantity of numbers that had been reassigned.
Q. Okay. And then -- and so that -- that is again where it's -- scratch that.
So after -- of course, after being reassigned and then, I believe that's just what you said, that were registered on the National Do Not Call Registry for more than 30 days before the date of each of the texts. So I



know one of the documents that you had put that you reviewed in preparing this report was the petition. Is that correct?
A. The complaint?
Q. Or the complaint? Yes.
A. Yes.
Q. Okay. And are you familiar that this is being brought as potentially a class action?
A. Yes.
Q. Okay. Are you familiar with the -- what the definition of the class is that's been established?
A. The proposed putative class, I believe, reading that -- I did read that. But I'm not a lawyer, so I don't -- you know, sometimes what I'm asked to do is -- it may be at axiom with exactly what that definition is or it may be slightly different. I just follow the requests of the attorneys.
Q. Okay. And so you would also agree then that what you were asked to produce may only, like, factor into a portion of the class definition?
MR. JILIZIAN: Objection; foundation. Form.
THE WITNESS: I -- that's interesting. I don't -- I've never thought about it. I mean, there may be additional things that I'm asked to do or there may be additional -- additional constrictions of the class.



MS. ENGLER: Q. Uh-huh.
A. I basically create a database that's able to -- that could be used to answer any questions that could be contemplated or advanced by a trier of fact. That's really what my objective is. And these are the things that I was asked specifically to --
Q. Uh-huh?
A. -- opine about or proffer an opinion on. But sometimes there is a divergence there.
Q. Uh-huh.
A. And, you know, sometimes part of the class doesn't survive, but it still doesn't change the efficacy of my analysis. So that's really what I was asked to do is to create declaration in support of a class certification. But also to create a database that could be used at trial that would require little to no modification, even -- even if things change. That the course of litigation, in order to still achieve being able to give an answer to the trier of fact or jurist or whoever asks.
Q. But I guess going back to the class definition, I think from your testimony you would agree with me that, in addition to what you've produced and what -- in -- in addition to what you were asked to do, there may be other factors or limitations for the



class itself beyond just what you've done?
A. Sure. Yeah. I'm willing to say that.
Q. Okay.
A. And -- and I think that is part of the -- the methodology that I've developed over 10, 15 years is being able to create structures that can be assistive to the parties in the case. When or that's plaintiffs or defendants, I don't -- I know you're taking my deposition, but database that I put together should be just as helpful to the defendants.
Q. Uh-huh.
A. As the plaintiffs.
Q. Okay.
A. And I hope it is, right? Because I'm a business owner. I don't necessarily --
Q. Uh-huh.
A. -- you know, I understand. I've been in litigation before, and so hopefully my database is just as helpful to everyone.
Q. Okay. So -- so taking that I think what you are here to provide expert testimony on is I think I've narrowed it down to kind of four things. And you tell me if I'm correct. You are providing expertise on whether a number that was in the call detail records has been registered with the Do Not Call List.

A. For more than 30 days.
Q. Okay.
A. As of the date of that call.
Q. Well, I'm trying to break it down so that we can be is there specific.
A. Right.
Q. So you --
A. I don't -- I mean.
Q. So let's just -- let's just take it step by step.
A. Okay.
Q. So you get the call detail records and you have the knowledge and expertise to access the Do Not Call Registry and determine whether the phone number is on the registry. We'll deal with the date later.
A. Yes.
Q. Okay. For the numbers that are on the DNC, you are able to pull the date of that registration?
A. No.
MR. JILIZIAN: Objection.
MS. ENGLER: Q. Okay. So you can't identify how long a number has been on the DNC?
A. The DNC List predates my downloading of the files. So what my role is in this job is to identify those numbers that have been on the DNC List for at



least 30 days and that I can do. I don't know what date they're registered.
Q. Okay. So you -- you might have to explain that to me because I'm -- what do you mean that the download, like, or the download predates the date of -- I'm sorry. What exactly did you say about that?
A. I can indulge you if I may. Let's say that you -- I'm just saying ubiquitously you. I'm --
Q. Sure?
A. -- not meaning you personally. I would hope you're on the DNC List. But the number could have been registered, say, in 2008, 2007. I don't have the complete list going back that far.
Q. Okay.
A. So the way that I overcome that is instead of looking at the date of registration -- I don't know what the date of registration is --
Q. Uh-huh.
A. -- I look at the list to see if the number was on the Do Not Call List for more than 30 days as of the date of that call because even though you signed up in 2017, 2016 --
Q. Uh-huh.
A. -- if a call is made today, you may not be on that list anymore.



Q. Uh-huh.
A. So I need to see really factually that you were on the list for 30 days as of today's date --
Q. Okay.
A. -- if the call was made today.
Q. So when you're doing this daily download of the DNC that you've talked about, are you retaining the full list for just every single day so that you can determine how many days a number has been on the Do Not Call List?
A. Yes.
Q. Okay.
A. And there are hundreds of billions of records that database. It's a gigantic --
Q. I bet.
A. -- database. But I'm happy to show you at a break what the actually looks like, the mechanics of it. Because I don't think anyone -- like, what's a billion records. Right? Think of an Excel sheet.
Q. Uh-huh.
A. An Excel sheet has a limitation of a million rows. So think of a thousand Excel sheets --
Q. Uh-huh.
A. -- and that's a billion rows, right?
Q. Uh-huh.



A. So think of -- now multiply that per 5 billion, that would be 5,000 Excel sheets with a million rows, right? So the scale of -- the scale of data retention is just enormous. And we maintain every list in its original form for every day, basically, unless the DNC hasn't been published that day or there's a technical glitch, which happens about twice a year. And going back 10 years or however many years it goes back, it's just an enormous set of data. So --
Q. Uh-huh.
A. -- that's what we do. Oh, thank you so much.
Q. Thank you so much.
MR. JILIZIAN: Appreciate it.
THE WITNESS: That's super helpful.
MS. ENGLER: Here you go. The second copy has now been obtained.
MR. JILIZIAN: You can let this record show it's now here with me.
MS. ENGLER: Q. So how far back do your records go?
A. That's a good question. It interesting. I think 2018? 2017? Something like that. But we really started pulling every day sometime in 2020, I think. I don't have the precise date. October 10th, 2020, is the precise date actually.

Q. Okay. And so just to again confirm, you're pulling the full list and not just, like, a change list?
A. Right.
Q. Okay. So with that, you can determine, from the date that you're looking at the materials, whether a number has been on the DNC for at least 30 days?
A. More than 30 days.
Q. More than 30 days. So 31 plus?
A. Yeah.
Q. Uhm, then looking at the call detail records with the numbers that are on the DNC for at least 31 days, you then have the expertise to determine text messages that were sent on date 31 or afterwards?
A. Yes.
Q. Okay. Is there anything else?
A. I -- I have to compliment you because the way that you described that is -- is very particularized and I appreciate the precision of that because --
Q. Thank you.
A. -- I don't think a lot of -- a lot of people ask the right questions about it because it is nuanced. And there are nuances about that database that I think are idiosyncratic to it that most people don't -- they just don't ask because it's not within their domain.
Q. Uh-huh. Well, thank you. I appreciate the



compliment. So when we look back the class definition -- and I understand part of your work is with the reassigned number database, but I'm just going to represent to you that class definition does not include any mention of the reassigned number database.
A. I'm aware of that, yeah.
Q. So --
A. And -- and I don't know why I was asked to do that. That's something that --
Q. Okay.
A. -- I was asked to do, but I'm not -- I'm aware it's not within the class definition.
Q. Yeah. Now -- but -- but you're not offering, like, say any opinion about how BBQGuys acquired any of the numbers that's in their call detail record?
A. No.
Q. You don't have any of opinion on the content of text messages?
A. No.
Q. Any opinion as to consent to texting from BBQGuys?
MR. JILIZIAN: I'll object to the foundation.
THE WITNESS: Yeah. That's that really starts to hit the -- the areas of like a legal -- proffering a legal opinion about consent and I'm not comfortable in



offering any opinions about that.
MS. ENGLER: Q. That's totally fine. Just --
A. Yeah. I just -- I just want to say that I'm not challenging your question or trying to be adversarial. I just wanted to let you know I'm not a lawyer and I don't -- I mean what you guys do, I'm -- the -- I'm glad I don't -- I'm glad I don't have to make those -- those sorts of decisions.
Q. Yeah. But just to be very clear, you are not offering an opinion as to whether BBQGuys had consent to text any message -- to text any number in the call detail records?
A. I did not.
Q. Okay. And you're not offering any opinion on whether a particular number is a business number versus a residential number?
A. That is right. I do want to put an asterisk there. I had an interaction with a woman named Karen Shroder, S-h-r-o-d-e-r, at the FCC probably about -- gosh, it been probably about six years, where I asked about the National Do Not Call and it's my understanding that the National Do Not Call List is intended to protect residential owners. That was her statement. She gave some FCC rules --



Q. Uh-huh.
A. -- or some citations, which I don't remember specifically, but I did get asked at the time -- or I did ask at the time, and that was her response. But she also caveated with the FCC is not offering a legal opinion.
Q. Uh-huh.
A. So I -- I do want to say that. So it's my lay understanding that the National Do Not Call List protects residential numbers. But that might not be the question that you had quite. But that's my understanding of it.
Q. It's -- it's not quite. My question's a little bit more factual than legal.
A. Oh, okay.
Q. That --
A. Sure.
Q. -- I want to confirm that you're not offering any opinion whether any particular number that's in the call detail records is a business line or a residential line?
A. I have --
MR. JILIZIAN: Object foundation. Go ahead. Go ahead.
THE WITNESS: Do I have to put a mark down?



MAGNA LEGAL SERVICES

MR. JILIZIAN: No. No. You're good to go.
MS. ENGLER: No. Those -- those you get clemency from.
MR. JILIZIAN: That was my fault.
THE WITNESS: Then we're taking one off. No my -- my -- I'm so sorry, Counselor. Can you --
MS. ENGLER: Q. It's okay.
A. -- can you restate that?
Q. Sure. It's that -- just wanted to get confirmed from you because it's more a factual question than a legal question that you are not offering an opinion as to whether any particular number in the call detail records is a residential telephone line versus a business telephone line?
MR. JILIZIAN: Same objection there.
THE WITNESS: That's correct.
MS. ENGLER: Q. Okay. And you're not offering any opinion as to the identity of any subscriber of a telephone number in the call detail records?
A. As within the records, no.
Q. And you are not offering any opinion as to whether the current telephone subscriber for a phone number is the person who registered the number on the Do Not Call List?



A. That is correct.
Q. And you're not offering any opinion on whether any subscriber whose number appears in the call detail records had a preexisting business relationship with BBQGuys?
A. That's correct.
Q. And we've been through it a couple of times that you're not a lawyer and so you are staying far, far away from offering any kind of like legal opinion that is not a part of your expertise. So just to confirm, you're not offering any opinion as to whether any of the messages that you evaluated as part of your data analysis violate the law?
MR. JILIZIAN: Objection; foundation.
THE WITNESS: So you said offering -- you're not offering any legal --
THE REPORTER: (Clarification.)
MR. JILIZIAN: That was foundation. Sorry.
THE WITNESS: You -- you asked the -- part of that question was you're not proffering any legal conclusion outside your expertise, and I just want to say I'm offering no legal conclusions.
MS. ENGLER: Q. I probably stated that weird and that's --
A. Yeah, I just want to make that clear because



even if it's -- you know, data is, I think, within the four corners of my expertise.
Q. Uh-huh.
A. I'm not going to off any legal opinions about the data or what it means --
Q. Legally.
A. -- even if it's within my expertise because I don't want to mislead the Court any way whatsoever because I understand the importance of -- of -- of -- you know, I understand the importance of experts. I understand the importance of lawyers. I understand what that those two are not to blend into one another.
Q. Right. So I -- I think we're on the same page here that you're not looking to offer any kind of, you know, opinion as to whether any text message that was within the call detail records violates any law?
A. That's right.
Q. Okay. So you have no opinion as to whether any of the text messages that you evaluated in the call detail records violated The Telephone Consumer Protection Act?
MR. JILIZIAN: Objection; foundation to the last two questions. Go ahead.
THE WITNESS: That's correct.
MS. ENGLER: Q. Okay. Let's take a look



at -- you need a -- another coffee?
A. Well, it's tea.
Q. Or tea?
A. I mean, let's just keep going I -- I want to respect your time and I appreciate how generous you've been with the breaks.
Q. Okay. Well, at any point or if you -- or if we need to take a quick five or two so you can grab a bottle of water or something, I don't mind doing that if we need to.
A. Appreciate it. Thank you.
Q. Let's -- let's take a look at your C.V. that is in your report.
A. That would be Exhibit 1.
Q. Exhibit 1. I didn't know if it was -- I didn't recall if it was an actual exhibit?
A. Are you entering this or marking it on the record as separate? So, like, for instance, my report you entered into -- as Exhibit 5. Do you want to call this Exhibit 5A or something just to keep the record clean or how do you want to do that?
MS. ENGLER: I mean, we're entering the entire report plus all exhibits, and so if --
THE WITNESS: Okay.
MS. ENGLER: Q. -- so we can say?



MAGNA LEGAL SERVICES

A. Exhibit 1 to --
Q. Exhibit 1 to the report is going to -- will be clear enough.
A. I just -- because when you get a number and a number, it starts to become difficult I think.
Q. I understand. But Exhibit 1 to the report I think should do just fine in this instance.
A. Okay.
Q. Okay. So looking at that, can you identify that document for me, please?
A. It's my curriculum vitae.
Q. Uh-huh. When did you last update it?
A. It's been several years.
Q. Been several years? Do you have a general idea of when that would have been?
A. 2020 -- year '24 maybe.
Q. Okay.
A. I have them dated in my actual computer, but I don't recall the date. It's been several years.
Q. Can you take a look through it and let me know if it looks complete to you or if there's anything that you think is missing?
A. It's complete. I can tell you that.
Q. Okay.
A. The main thing that I did was to take the



cases off of this, like, C.V. and put a cases onto a separate page of exhibit -- you know, just considered Exhibit 2 to my report.
Q. Uh-huh.
A. Because they change so often.
Q. Okay. Just to kind of go through some of your background you went to San Joaquin Delta College from 1991 to 1994?
A. Yes, that's spelled J-o-a-q-u-i-n, just like that.
Q. And majored in sociology and cultural anthropology?
A. Yeah. So when I was there, I had to designate what my interest area was and they had called that your intended major.
Q. Uh-huh.
A. I was scolded at a deposition for declaring a major at my junior college. So I'm just going to put that out there and say that that was my interests.
Q. Did you graduate?
A. No.
Q. Why did you choose not to continue with the program?
A. Well, my main thing was I had this interest in telephony and I had a California Public Utility License



to operate as a phone carrier. The other, I think, more important reason was my mom and I were probably heading toward homelessness --
Q. Yes.
A. -- and so I had to create a -- I created a company that would give her meaningful employment and she was my partner through 2017. She passed away.
Q. That makes sense.
A. So yeah. And it, you know, made her -- she had an expertise in saving businesses that were in failure and I said, well, let's put that expertise to practice. And so she was my unofficial CFO. I just called her mom.
Q. CFO comma mom?
A. Yeah. It was -- it's great. It worked out really well.
Q. How did you get interested in telephony?
A. I was always interested in since I was 15, 14 years old. I remember reading an article in -- I think it was time magazine about a new communications company called Microwave Communications that was specifically for truckers to be able to maintain long distance communications between St. Louis Missouri and Chicago and I was enthralled. I thought it was so incredibly cool. I said that's what I said to do. I was, like, 12



or 14 or something. And then I just sort of went through it. And for my high school economics project, I presented a mock telephone company. And then after high school, I built a phone equipment sight unseen of how to actually connect it to the phone network, and I've never had anything like this before.
I ordered special circuits from the phone company for interconnecting. Got a license from the Public Utility Commission. I was mentored by the Chief of the Telecommunications Bureau at the -- the California Public Utility Commission. He showed me how to get a license by following some templates. And then, surprise, we got it and then I interconnected my phone equipment with the phone network and it worked. We got paying customers and then we entered into a shared service agreement with AT&T and got favored nation pricing. And I ran with it for years. Built software that tallied the phone calls and was integrally involved in assisting Japan telecom build out their United States presence. That's all I've been interested by.
Q. There wasn't any kind of program at your junior college for anything related to that that you could have done?
A. None.
Q. Hmm?

A. Yeah. I mean -- Yeah. I mean, at the time, I -- I took a computer class and we had a mainframe like a Burroughs, B-u-r-r-o-u-g-h-s, mainframe. We'd type in these programs to, you know, make the man on the screen say hi. --
Q. Yeah. Hello, world?
A. -- stuff like like -- yeah. Hello, world. Draw a balloon. And that was -- seemed very pedestrian.
Q. Uh-huh.
A. And there were no advanced courses. I did work for the University of Illinois programming main frames. And I worked under auspices of the computer education research lab. They're named Donald Bitzer, B-i-t-z-e-r. Actually invented flat screen TVs. And I -- I still work with his -- his partner in another project. Just amazing. Who gets to work with their childhood heroes, right? Some of us like actors and some of us like technologists.
Q. So your training, then, and learning was really was on the job. It's with the University of Illinois?
A. For computers and databases, yes.
Q. Okay.
A. For telephony, it's all self taught.
Q. What kind of resources do you use -- were you



using to teach yourself?
A. I had a computer terminal called PLATO, capital P-L-A-T-O. I don't know what it stands for anymore -- in an office when I was 15 at the University of Illinois. We had online resources at that time and that was -- that was -- and -- and I had a typewriter at home. I'd write out the computer programs because I didn't have a computer at home.
Q. Okay. So, uhm, was there ever any, like, did you ever try doing another degree program or, you know, getting form -- another kind of formal education at any time afterwards?
A. No.
Q. Okay.
A. I wish I had. Because I really enjoyed that academic setting.
Q. So there was mainly for the academic setting is why you wish you had?
A. Yeah. I mean, I wish I had. I think it would have been immensely interesting.
Q. Do you have any professional certifications?
A. No.
Q. Any particular licenses by a licensing board?
A. I got that California Public Utility License. I was NACHA certified to work within the constructs of



the banking network for electronic fund transfers. I got global payments certified and experience sort of interconnecting and doing data with the credit networks and the credit card networks, which is really interesting.
Q. Yeah. And I do see on your C.V. a listing of professional certifications?
A. Yeah. I would call -- I don't know if they're all certifications. I call them for like accolades, acknowledgments, or authorities to operate in certain areas. But yes.
Q. Okay. It looks like you've done a number of different things over the year. TelSwitch so -- but at some point it was, you know, you stuff with the University of Illinois, then San Joaquin Delta College then Delta Telecommunications?
A. That was the predecessor to TelSwitch that we incorporated.
Q. That was going to be my question for you. You also noted an invention of the efficient IXC10 network switch and associated databases.
A. That's what we ran our phone network out of for seven, eight years.
Q. Did you apply for a patent?
A. I've applied for a number of patents over the



years, but I don't think -- I don't think we ever went beyond a provisional patent. It's a good question.
Q. Well, for right now, I'm jut asking about the IXC10 network switch if you applied for that one?
A. No.
Q. Okay. Now, I do recognize that you did say that you applied for some other patents over the years. Uhm, first one listed is the wide-area CENTRIXS that there was an application as part of a partnership between TEMPO Networks and you?
A. TEMPO networks was a partnership between me and guy named Jim Palmer, some other people with Worldcom.
Q. Okay.
A. And we had this process where we used -- we converted voice to packets to send over the Internet so that you can have a phone number, a local phone number, anywhere in the world. And we filed for a patent. I wish we had followed through.
Q. Okay.
A. Because it is now ubiquitously known as voice over IP or such an Internet protocol.
Q. Got it.
A. But, you know, you make different choices and I'm still working for a living.



MAGNA LEGAL SERVICES

Q. I understand. Now it says you also authored a patent application for SMS text initiation of a telephone call between two people when one is originated in a foreign country?
A. Yeah. It was international call back. Yeah. I used it. I mean, I invented it. I created it. I used it. For a long time, you could get incoming calls for free if you were in a foreign country. So if you want to call back the United States, you just send a text message from a foreign country. Tell, hey, call me and they would call and then you would pick your call into the United States. And it was transparent, but you wouldn't have to pay outbound international rates from Europe to here.
Q. Okay.
A. It's kind of a cool concept.
Q. Yeah. Definitely. But, of course, now we're talking about TelSwitch. When was TelSwitch formed?
A. April 20th, 1994.
Q. And what kind of entity is TelSwitch?
A. C corporation.
Q. And what is its state of incorporation?
A. California.
Q. Was services was it offering when it began in 1994?



A. Telephone services. Consumer telephone services and wholesale database services to other telephone companies and switching services.
Q. Okay. What kind of databases were you selling at the time?
A. Microsoft SQL databases for the collection and analysis of telephone calling records and call detail reports.
Q. So were you just selling the structure or the selling the data inside of the database?
A. Just the structure and ability to conduct reports analysis do the billing. We still have Airnet. Airnet is the product. And we still have customers on Airnet in 2026. Amazing to me. We use it ourselves as well for billing to our clients because these kinds of records are -- my expert time is still -- looks like a call record.
Q. Uh-huh.
A. Doesn't make any difference if it's a call record or a billing record.
Q. So you said you still have clients that are using Airnet; is that right?
A. That's right.
Q. What -- and I -- I know that this sometimes can be tough to like figure out, so I'm just looking for



a -- your best estimate. About what percentage of TelSwitch's revenue is attributable to customers that are receiving Airnet services?
A. I think we have one or two customers still on Airnet and the rest is all expert work.
Q. Okay.
A. We -- we probably make less than $10,000 a year Airnet and the related databases.
Q. Okay. And so I believe now we've been talking that your focus has switched primarily to expert work. And so why -- why the change to focus on that?
A. Telecom is a high volume, low margin business.
Q. Okay.
A. Requires a lot of expensive capital expenditures. These companies -- there just aren't any private telephone companies anymore. And I think this is just much more interesting opportunity. I follow my passion.
Q. Looking at your C.V., you have a number of different professional experiences where you put consulting that resulted in deliverables. And it looks like those projects end around 2011. Is that when you made the switch to more expert work?
A. Yeah. I mean, I started doing expert work, I believe, in 2007, end of October of 2007. And so it



just -- focus so much on that. And our business just became so big a part of that, unless somebody really wants something special, like more Patriot missile consoles or something where we have to follow D-PAS assertions or, I don't know, whatever you call them. And we're not going to do it, like, unless somebody calls up and says we need 10 of something you have to build them. Okay. Then we'll do it. But we just prefer not to.
Q. Okay.
A. And we do still support all those systems that are out there that we've worked on, whether it's the FAA stuff or Patriot stuff or.
Q. What's involved with providing support?
A. Well, not much unless something breaks. We've had one thing break in the last 9 to 10 years. But there's still fuel handlers in Basis Bay Canada that came out of our office and used at the nuclear power plant there. So we -- we still maintain inventory of parts that needs to be taken care of.
Q. Okay. Uhm, on your -- the first page of your C.V., you put your career summary where you have 25 years of experience. And then there's a number of bullet points. In the current services you offer, which we've been talking is primary around expert witness



MAGNA LEGAL SERVICES

Page 86

work, do you, in -- do you, in that work, provide to customers or clients database transition planning and disaster recovery experience?
A. Not much, but we do some database stuff. I mean, obviously when you do a database transitioning and database transformation, you're going to get data from defendants in cases or plaintiffs or our own defendant's clients and we have to --
Q. Uh-huh.
A. -- put that into a SQL database. So we use -- we use most of those skill sets still every day.
Q. So doing the database transition skill set is still a part of your work today?
A. Sure.
Q. Okay.
A. Data transformation. I'd probably use a different word now, but, yeah, I mean, we do it every day. Every single day. Data transformation.
Q. Uhm, and then I mean, obviously for some of this it's obvious that it's still a part of your work. Like, you'd agree that efficient database design through data modeling is still a significant part of your work?
A. I don't think anyone has ever gone in any area of -- advanced any questions or gone through any veins of inquiry about these. But so thank you for -- thank

Page 87

you for looking at -- yes. Yeah. It's every day.
Q. Uh-huh.
A. I do it every day, I mean, I can always tell you on here which ones I don't.
Q. Okay. But that might be easier and save us some time. So which ones do you not really use any more as part of your expert witness services?
A. Extremely high performance IVR systems. We maintain one last IVR system.
Q. Okay.
A. I guess that's it.
Q. Okay. So other than the special emphasis in IVR systems, all of these other bullet points are all skill sets or tasks that you still perform today as part of your expert witness work?
A. Yes.
Q. Okay. And then we talked earlier about you having some employees. Do you ever have any contractors that you also work with support your work?
A. Yeah.
Q. Who do you work with?
A. Well, I can't think of all the 20 or 30 peoples names right now. They're mostly doing data entry or data verification for wage-and-hour cases where there's handwritten time sheets that need to be cross

Page 88

referenced against import techniques that we use.
Q. So those contractors are primarily for data entry and wage-and-hour cases?
A. Correct.
Q. Can you think of any instances where you've used these contractors in TCPA litigation?
A. No. And I -- I just want to predicate in California -- so Sam and Eric are technically -- who work for me -- are 1099.
Q. Right.
A. Right, but California has this weird rule. They say if you're a 1099 but you're doing employee type of work --
Q. Uh-huh.
A. -- you're an employee --
Q. Uh-huh.
A. -- right? In fact, TelSwitch had to pay some penalties because we miscategorized -- ironically, we miscategorized people who are contractors who are working on a case involving mischaracterization of employees, right? So that was -- that was the irony of that. So I just want to say that there's like this real fine line. So I'm not drawing a legal conclusion as to what's a contractor, what's employee. But I'm telling you that the contractors that we have, except for Sam

Page 89

and Eric, who I consider employees, were all related to wage-and-hour space and doing auditing of time records.
Q. Sure. I --
A. Which -- yeah.
Q. -- and I -- I appreciate the clarification as I was thinking in my head I probably should have made the same caveat concerning Eric and Sam. Uhm, so you have folks that you work with that are, you know, regular participants in the business, and so my question around contractors is meaning more folks that either you hire on an ad hoc basis to help with a particular matter, or who are service providers that support your work.
A. Okay. That's an interesting -- that's an interesting classification. I hadn't thought of --
Q. Okay. So we talked about the individuals that do the data entry and helped with the verifications. Were there any other individuals that you hire on, you know, a limited or temporary or like specific project basis?
A. Can't think of anyone.
Q. What kind of service providers do you use to support your business?
A. Well, we use the Federal Trade Commission's Do Not Call List. We use data from the -- the -- and the


MAGNA LEGAL SERVICES

National -- I can't think of it right now. But Somos, who does the North America Numbering Plan Administration.
Q. Got it.
A. We use them. Those are the primary ones that we use right now.
Q. Okay. For -- I probably should have asked this earlier when we were talking about Eric and Sam, but did either -- but did Eric contribute to your work in creating your -- in preparing your declaration in this matter?
A. I prepare my own declarations. So the answer is no.
Q. Did he assist with any of the database, you know, analysis work that you did before preparing your report?
A. No database analysis.
Q. Did he do anything relating to the BBQGuys call detail records?
A. Yes.
Q. Okay. What did he do?
A. He took those and put -- put them into a SQL database and validated or verified that I had independently, as well, imported them into the database in the same way.



Q. So he imported them and then you'd also imported them?
A. Just to confirm that we had both -- yeah. We reached the same end points. Yes.
Q. Okay. So that --
A. It's just the raw data part.
Q. Okay.
A. So it's -- it's helpful when you have somebody who is validating and verifying --
Q. Uh-huh.
A. -- that your -- your steps -- the integral steps or the requisite steps are taken to achieve an importation before doing the analysis.
Q. Okay. Any other validation work done after an import?
A. No.
Q. Okay.
A. I mean, we -- we do it internally. We have mechanisms within the SQL code that do it, but we don't have any -- I mean, it's internal to the database. It's not individuals helping.
Q. What kind of mechanisms are internal to the database that assist in validation?
A. You make sure that the date-time stamps are -- date-time format. That the data is in the right



columns. Sometimes there's embedded characters that will push -- like, if you open an Excel sheet and 95 percent of it looks great and then there's five percent is just misaligned.
Q. Uh-huh.
A. There's things like that that we check for internally and make sure that everything is structured correctly.
Q. Okay. And then with these tools that you have -- I know you said some are just integral to the database themselves?
A. Integrated.
Q. Probably just come stock with Microsoft?
A. So yeah. Yes.
Q. Okay. But then there's some you probably have also built yourself; is that correct?
A. Right.
Q. Okay. And are those SQL commands proprietary to TelSwitch?
A. No.
Q. Okay.
A. We don't do anything proprietary.
Q. Okay. And then how about Sam? His role in either helping with any of the call record -- call detail records?



A. Uhm, I believe that Sam followed my directions in setting up the original database, created the database partition. I think that his role was limited to that.
Q. So he set up the database that would handle this particular case?
A. He just set up the blank container.
Q. Okay.
A. Yeah. You set up a container then you a structure the data and transform it. Put in it. Then you do an analysis. Then you do data validation. And then you do cross checking. And then you do outputs. And like same -- same structure every time.
Q. Okay.
A. Paint by numbers.
Q. Okay.
A. I will need a break if we're at a good, natural stopping point. If not, we can go -- I'm probably good for another 15 minutes.
Q. Why don't we go for another 15 and then we can break for lunch?
A. That sounds great. Does that work for you, counsel?
MR. JILIZIAN: Yeah.
MS. ENGLER: Q. Because it's -- it is



MAGNA LEGAL SERVICES

getting close to 1:00 o'clock?
A. How is our court reporter doing? Do you need a break?
THE REPORTER: No. Thanks.
THE WITNESS: Okay.
MS. ENGLER: Q. Pass you document that we'll mark as Exhibit 6.
(EXHIBIT 6 WAS MARKED FOR IDENTIFICATION.)
MS. ENGLER: Q. And apologies if these are screenshots. When I tried to print it out, it just was white and blank so --
A. Yeah. I'm not -- not surprised.
Q. Why do you say that?
A. As -- web designers do this stuff are doing it for visual presentation a web browser and they don't even think about printers.
Q. Gotcha. Do you know what this is?
A. It's our company website.
Q. It's the TelSwitch company website?
A. It is.
Q. Okay. And that's -- again we're marking as Exhibit 6 --
A. Okay.
Q. So I, you know, went through your website and stuff to try and kind of learn a little bit more about



y'all and your company before we -- we got to sit down today. And looking at that first page, that has bringing insights into life's digital fingerprints. In your about section, it says that that is your motto. What does that mean? As in the motto itself, not what is a motto.
A. Everywhere we go we leave digital fingerprints --
Q. Okay.
A. -- and by consuming those digital fingerprints, we can build back patterns. Data is agnostic. Data doesn't, itself, have an agenda. It's the narrative that we put around it.
Q. Uh-huh?
A. I don't build that narrative. What I do is I put together the facts and then other people build those narratives. It's agnostic. It's without prejudice. It just is. And so that -- we have that bringing insight into life's digital fingerprints is the embodiment of -- the manifestation of years and years of trying to figure out what do we do? What -- what is our job role in this giant machine in which we are just one little part that is consuming digital information and drawing out back patterns to describe what may be considered, otherwise, very complex business or personal interactions.



Q. Okay. Well, can you say -- explain what you mean by very complex business or social interactions?
A. Right. So good example is fast food restaurant. As somebody who clocks in and out at a point-of-sale terminal.
Q. Okay.
A. They clock in at 6:00 a.m. They clock out at noon for lunch. They clock back in at 12:30 and they clock out at 2:00 p.m.
Q. Okay.
A. And let's say seven -- seven a.m. So between noon and 12:30 or noon and 1:00, they -- they took their meal and they were supposedly not working.
Q. Uh-huh.
A. But if you overlay point-of-sale entries for that same employee onto that person's workday, maybe those point-of-sale entries were working -- started coming in at 5:58 a.m. Maybe they worked during the meal period that employee was clocked out. So by bringing insight into those life's digital fingerprints, we're able to say, okay, when you start to examine the holistic -- the set of data from a holistic standpoint of maybe there's some off-the-clock here.
Q. Uh-huh.
A. Maybe the employee didn't really clock out at



a certain time. Maybe that was their manager making that edit.
Q. Uh-huh.
A. So we tend to do a lot of that. It's the more prevalent in wage-and-hour cases.
Q. Uh-huh.
A. Another example is there's maybe a point-of-sale system that a restaurant manager goes in right before payroll --
Q. Uh-huh.
A. -- and draws -- compresses the amount of hours that someone was -- was working. Well, when an employee clocks in, they're clocking in with hours minutes and seconds. When the manager's making the edits, they're only using hours and minutes. So it's real easy to identify where the manager edit's taking place. Right?
Q. Uh-huh.
A. It's called time shaving, right?
Q. Uh-huh.
A. And you don't -- you don't practice in California. You're, you know, wage-and-hour, but it is there is a -- there's a presumption that employees have to have their meal. It's been five hours if a shift lasting greater than five hours unless there's a waiver, and or that's what I've been told. And so by -- by



MAGNA LEGAL SERVICES

applying these different strategies, one can bring insights into those --
Q. Uh-huh.
A. -- digital fingerprints, whether it's point-of-sale, manager entry. You know, somebody is -- I don't know -- whether -- maybe ghost employees, right? There's all these different things.
Q. Uh-huh.
A. There's all these different points of data, whether it's intrinsic and within the four corners of data or whether it's extrinsic and external to the data itself, that when overlaid, one can draw out presumptive patterns.
Q. So taking your example of the, you know, discrepancies in the timings and stuff that there is -- if the discrepancies issues always seem to come up when there is one manager in particular that's working, is that the kind of stuff that possibly inference is going --
A. Yeah. I mean, that's happens, right? I mean, I do a lot of defense side work in restaurants and that seems to be the case. Managers are being compensated based upon -- based upon performance metrics, right, at the restaurants. I just spoke recently at California Lawyers Association -- guess it wasn't that recently --



and California Employment Lawyers Association. Two different organizations. One's State Bar and one is just plaintiff's side attorneys about this precise thing where you can find out what's going on. If you look at different ways of overlaying data, you can draw those fact patterns out. It's interesting, you know. I love doing that stuff. It's like a puzzle.
Q. Uh-huh. No. Data can be fun. Now, you've given two examples that were obviously in the, you know, wage and labor and employment kind of space. Can you give an example that's in the TCPA or just other, you know, telephone communications related litigation space?
A. Sure. Being able to identify when someone's on the National Do Not Call List for more than 30 days.
Q. Okay.
A. Right? That's -- it's not terribly difficult itself.
Q. Uh-huh.
A. But when you have a million call records or 50 million call records, that can become very cumbersome, right?
Q. Uh-huh.
A. So how do those overlapping datasets --
Q. Uh-huh.
A. -- match up.



Q. Okay. So -- but it sounds a little bit to me, versus kind of the examples that you provided with the labor and employment aspect, that this, on the TCPA side, seems to be a little bit more simplistic?
A. A lot simpler.
Q. Okay.
A. Easier.
Q. Because rather than having to look at a long, you know, perhaps time period and pattern of changes, we're looking at discrete data of -- on the DNC yes/no. When, you know --
A. Yeah.
Q. -- for the text messages and when for 30 days past?
A. So yeah, I mean, I think in terms of individualized inquiry, I think there's more of that on wage-and-hour side because people are doing things based upon human characteristics, whereas TCPA tends to be mechanized. There's a regimented style of recording data points. There's a more uniform approach to the data on the TCPA side, which doesn't lend itself to individualized inquiry, but rather the holistic analysis of data en masse because data is data. Whereas on the wage-and-hour side, those are human interactions that are driven by human decisions.



Q. Okay. That makes sense. You mentioned that -- on the website that -- you know what, actually, I'm going to ask you this about the website. When was your website last updated?
A. When I was last able to convince my web developer to take care of it.
Q. Which, I did note that you -- you listed your web developer at the bottom which is pretty cool?
A. Yeah. I mean, why not, right?
Q. Ross Reyman?
A. Yeah. He's -- he's a good -- he's very good with design. Yeah. The user interface is his specialty.
Q. Okay.
A. Love Ross. He's great. We need to update this. Unless -- I don't know if this says how many cases we did.
Q. I think 2024 is the dates?
A. We did 169 cases. 149 -- 69 cases last year.
Q. And that would have been cases initiated?
A. Yes.
Q. Okay.
A. Not -- not considering all the ongoing cases.
Q. Sure.
A. Opposition declarations in support of, you



MAGNA LEGAL SERVICES

know, plaintiffs motion and opposition of, you know --
Q. Uh-huh.
A. -- however these things -- these captions get pretty long. But yes.
Q. Sure. Of course. How many cases would you say you've initiated 2026 so far?
A. I don't know. I knew that question was coming. I don't know.
Q. Okay. Do you have a range? 10?
A. Well, probably somewhere between 80 and a hundred.
Q. On these cases where you're brought in as an expert witness, when in the litigation are you typically retained?
A. Unfortunately, usually a week before class cert is due. We probably have a lot more in common in that -- I mean, I had one case --
MR. JILIZIAN: Excuse me.
THE WITNESS: -- where we got data on a Friday and in class cert motion that was due on Monday. And the data was corrupt. And so we got a data production on Sunday night and Monday morning or Monday afternoon class cert, you know, analysis was done. I don't like doing that.
MS. ENGLER: Q. So I'm not talking so much



about those.
A. It's terrible.
Q. The corner cases where they're terrible are always more memorable. Just in -- just -- that's just how the human brain works sometimes. But -- but in a typical case, are you typically brought in at the time, like, a petition is filed or a complaint is filed or is it much further along in the process?
MR. JILIZIAN: And I'll just caution the witness here to not disclose any specifics about the engagement or exchange of documents with the client and only just to answer the questions.
MS. ENGLER: Q. I'm only asking for, like, when --
A. In general?
Q. -- like a -- in general around what time in, like, the process of litigation. Not asking for anything related to communications or documents or anything like that.
A. Sure. Appreciate that clarification. Usually after discovery is propounded and before the first or second mediation.
Q. Okay.
A. That's almost always the way it works. Although lately, I have been a neutral where I was hired



on behalf of plaintiffs and defendants my engagement letter puts everyone on the top.
Q. Uh-huh.
A. Really strange. And I was responsible for actually working with the defendant to get the information. So I've been trying to get further and further away from that class cert deadline or the mediators -- mediator deadlines by which mediators expect their statement of facts.
Q. Okay.
A. Does that answer your question?
Q. It does.
A. Okay.
Q. It does.
A. Sorry.
Q. Thank you.
A. It was a little bit circuitous.
Q. No. And I know I'm -- and I'm going to stay true to my word so we can take break in -- in the 15. So I think we're right at about that.
A. We're about 10 minutes in. If you have the another question or two I mean, I'm happy to --
Q. Let me see.
A. If it's a natural break point, great. You could set that -- I'm not -- I'm here at your pleasure



and you may get the best.
Q. Do you know how many cases you're actively working on today?
A. Just this one today.
Q. Well, fair. Touché.
A. Asked and answered, right?
Q. Do you have a estimate as to how many cases that TelSwitch currently has active? And this would be a combination of both ones initiated this year and ones initiated in previous years that have not yet closed.
A. 15 to 20.
Q. 15 to 20 currently active?
A. Yes.
MS. ENGLER: And we can pause here. Okay. We'll go off the record.
(The deposition was in recess from 12:44 to 1:42.)
MS. ENGLER: Q. Okay. We're back on the record. Before we resume testimony, just going to confirm conversation that plaintiff counsel and us had off the record concerning the -- the discussion about whether Mr. Woolfson would provide any kind of review of the data categories and view of the DNC information. Plaintiff counsel has advised that we are not going -- that they are not going to be showing that and we are,



MAGNA LEGAL SERVICES

Page 106

for the purposes of this deposition, agreeing to proceed without that information.
However, nothing about our decision to proceed with the deposition, it counts, like, should be taken or interpreted or is intended to act as a waiver of our right to request that information at a later time should we deem it necessary. Is that confirmed?
MR. JILIZIAN: Yes, that's agreeable.
MS. ENGLER: Q. Okay. Great. All right, Mr. Woolfson, before we broke, we were talking about your website and some of the stuff that's on it. And that the projects initiated in 2023 and in 2024 largely represent litigation cases take you've been retained as an expert; is that correct?
A. Cases.
Q. Okay. You also list National DNC audits. What is that?
A. It's where a company does not want to -- is not in litigation, but they want to determine -- they're pre-litigation or maybe they've had a demand sent to them and somebody wants to see if they are, in fact, getting leads that are questionable.
Q. Okay. Are -- so for the DNC audits that you do in this pre-litigation space, are those also considered projects or is that a separate category?

Page 107

A. It's just a separate category.
Q. Okay. I believe also you testified that the last time you would have updated the website would have been in 2024; is that correct?
A. 2025.
Q. 2025. Okay. Do you know what your current number of National DNC audits you've performed is?
A. It's easy to find out. But I -- I know that we did 1.3 billion this -- records so far this year against the National DNC list.
Q. Okay.
A. And I'm not sure how many cases that represents.
Q. Okay.
A. 1.3 or 1.4 billion records.
Q. Okay. Yeah. And I see this around like 91, close to 92 billion DNC records consumed in 2024. What do you mean by consumed?
A. We get the National Do Not Call List every day. So that's the cumulative amount of records that was in the National Do Not Call List transmissions that we consumed in that year.
Q. Okay. So from your prior testimony, you were saying that you run and download the full list of the DNC every single day. So if a record is already on the

Page 108

Do Not Call List as a yes, they are, you know, on the Do Not Call List on Monday and then you run it again on Tuesday. Presumably, that number would also be on the list on Tuesday; is that correct?
A. No. I don't make any presumptions. I see numbers come off the list.
Q. Okay.
A. So it's possible that numbers come off the list.
Q. If a number remained as on the Do Not Call List, you would expect, though, that it would be there the following day unless it was removed?
A. Right.
Q. Okay. When you were talking about this count of, you know, at, like, almost 92 billion records, would that same phone number that's been registered on the Do Not Call Registry be counted as a separate record for every day?
A. Yes.
Q. Okay.
A. Yeah. Presumably if a number was on the Do Not Call List and it didn't come off, then it would be on every day's file.
Q. Uh-huh.
A. Which, optimally, is -- is -- would be 365

Page 109

files in a year. But --
Q. Uh-huh.
A. -- it's not quite because there's some days where they have maintenance windows or the data is not available because of transmission issue or their website's offline. So there's couple days a year that it is offline that we just have to defer, especially when the government shut down.
Q. Sure.
A. It was a month and a half that they just weren't publishing it.
Q. Uh-huh.
A. So we had to use -- during that period of time, numbers weren't coming off. Numbers weren't going on.
Q. Uh-huh.
A. It was almost like in frozen status, and nobody got the list during that time.
Q. And what time period was that?
A. Oh, I don't know. It was most recent government shutdown.
Q. Is that common during government shutdowns to not have the list be updated?
MR. JILIZIAN: Objection; foundation.
THE WITNESS: Yeah, I -- you know, I don't


MAGNA LEGAL SERVICES

know what the mechanics are for the updating. I've seen it still be available during government shutdowns and I've also seen it not be available during government shutdowns. So I don't really have an authoritative answer on that.
MS. ENGLER: Q. Okay. When you download the file on your daily -- let's just take you through a day of interacting with the DNC file. When you download it, what kind of file is -- is it?
A. It's a CSV file -- or I'm sorry. It a dot TXT file.
Q. Okay. And when you download the file, what do you do with it?
A. I stage it on what's called the N drive for National DNC.
Q. Uh-huh.
A. I then upload a backup of that that to our off-site storage. I then make a secondary backup of that. Then I run a script called SP_importdnc, and it pulls the file in, builds a database table for that day's specific file, indexes the records, logs that file as having been imported into a SQL database table called files.
Q. Anything else?
A. No.



Q. Okay. So you said after making your two backups, you then run the sp_importdnc script?
A. Scripts.
Q. Scripts. Yeah. Did -- did I say something else?
A. Maybe, but it -- I just wanted to make sure that it was -- yeah. I -- I heard it as something else.
Q. Which pulls the file in. What does it pull the file into?
A. A database table for that specific day's records. So each database -- each file is imported exactly as it's presented from the FTC into a database table and then it's indexed.
Q. So by saying each file is put into a database table, is this a file that contains, you know, a summary of the data inside of the downloaded file or is it just a listing of this date, here's the location of the file with that?
A. It's the complete contents of the file.
Q. Okay. So it pulls in the complete contents of the file that you download from the DNC, and then you said it builds a database table. What kind of database table is it building?
A. It's building a single column that is associated with that date and it is bringing every



telephone number that is on the National DNC list for that date into that table.
Q. So there would be -- if -- if I'm going to talk about it in very, probably, simplistic terms in comparison?
A. That's a way to discuss it because I think it needs to be meaningfully enumerated for anyone who is going to consume or review the transcript later. So I think this is great. And it -- I think it also helps me describe it because it's very often that, as experts in a particular field, we start to use language and lexicon that is full of acronyms and other types of things that becomes lost on most peoples who don't have nuanced experience with that particular field.
Q. So when I think of a table in my simple brain, I think of like an Excel file?
A. That's a great analogy.
Q. So you're saying it brings in the day of what the file was and then all the numbers. So if column A in a Excel spreadsheet would be the date, it would have the -- we'll say today -- if it was a date today August 13, 2026, for each line and then the phone number associated?
A. No. It doesn't even go that far. The date is part of the database table itself. So imagine naming a



file today's date --
Q. Uh-huh.
A. -- and the contents of that are just the telephone numbers.
Q. Okay.
A. Because it's inefficient to just save the -- write the same date 280 million times --
Q. Sure.
A. -- in a row. So by doing that, you save an awful lot of space. We also use what's called -- there's different data storage types within SQL or within databases in general, and one of them is called bigint, b-i-g-i-n-t, and it is the most efficient way to maintain data that is numeric that is 10 digits. Phone number is 10 digits. In a way that is extremely fast and efficient for the -- that computer to -- to paginate and to sort through. So we use a bigint, data type. B-i-g-i-n-t, and that is how we store those numbers so efficiently.
Q. Oh. So back to my simplistic analogy, would it be fair to say, if we were using Excel, that this would be -- just for -- just for example purposes, this would be as if Column A had a listing of all the phone numbers and then the sheet was named that particular day?



MAGNA LEGAL SERVICES

Page 114

A. That's a great analogy.
Q. Okay. I -- I got it now. So once you build this database table, you said it then indexes the records. Can you describe that process?
A. An index is, like, imagine if you had a -- a binder of paper and each exhibit or each block of exhibits had a placeholder or separator page that said Exhibits 1 through 10.
Q. Uh-huh.
A. 11 through 20, 31 through -- you know, 21 through 30 so on and so forth. That's what indexing does internally. So the computer organizes the data so that can be quickly recollected.
Q. How would -- what do you mean by recollected?
A. So if I put your phone number into -- or a phone number into SQL and asked for a index of every file in which that number appears when it's on the National Do Not Call List, it could go through 10 years worth of files in 30 seconds when it's indexed versus maybe 15 minutes when it's not.
Q. Okay. So when you're going to see whether a particular number is on the Do Not Call List, you're going and taking this -- this index that you have of the databases, running that number and then it's presumably returning the file names that are the dates so you can

Page 115

look at the file names to determine the dates?
A. There we go. Perfect.
Q. Okay. And then you said it logs the file as having been imported. That's just, your -- basically check the box that we brought in the file that day?
A. Yes. It also has the original file name as that file identifier as it's indicated from the FTC because it's got this weird 30 or 40 digit alpha numeric code on it --
Q. Uh-huh.
A. -- that should need -- needs to be retained just for audit trail. And how many records are in there and what date was on the file. And we can see the file changing size from day to day. Sometimes it drops off. Numbers drop off sometimes -- so it's a visual check as well to confirm that it's been imported properly.
Q. Do you do any comparisons between day to day files to determine which numbers have been removed or added?
A. No.
Q. Okay. So going back to your work and the projects you've initiated over the past number of years as being a TCPA and other -- other experts, specifically talking about TCPA and telephone-based litigation, do you -- do you typically -- like, are you typically

Page 116

retained by plaintiffs or defendants?
A. Both.
Q. Okay. Now --
A. Sometimes both in the same case.
Q. Yes. When the -- you're a neutral. I remember you saying that, but I recall also some earlier testimony where it says -- where it sounded like you kind of transitioned to mostly working with plaintiffs these days versus defendants?
A. Oh, it changes. I mean, it goes back and forth. Yeah. I think there's a desire by defendants not to hire someone who's worked on plaintiff side cases. Some attorneys --
Q. So you think that defendants are less inclined to work with a expert that has been on plaintiff's side?
A. I think some attorneys. But I still get calls very often from defense counsel, well-known defense counsel. And sometimes I can do these cases and sometimes I'm conflicted out.
Q. Uh-huh.
A. I mean, I -- sometimes I'm opposite of my own clients.
Q. Uh-huh.
A. On a plaintiff side. Sometimes I'm opposite of my own clients on the defense side.

Page 117

Q. And that's not a conflict?
A. No. There's no estoppel for experts. The -- the fact patterns are unique to each case and the data that I do the analysis on -- I'm very transparent about this -- it's the same analysis whether I work for plaintiffs or defendants. It's just how certain -- how -- what facts they -- what -- not facts, but what -- what avenues toward that analysis is do they feel is relevant. Sometimes they de-emphasize things on the DNC List. And sometimes we have consent records and opt ins and opt outs on the defense side, for instance, that they want more emphasis on that.
Q. Do you know if there were any opt-in or opt-out records in this matter?
A. I don't recall.
Q. You didn't receive any documents that showed opt-in or opt-out records, did you?
A. I don't recall receiving any. The files that I actually relied upon are listed in my report.
Q. Uh-huh.
A. And I didn't see anything.
Q. Okay. And did you see anything -- any documents in this matter concerning consent records?
A. No, not that I recall.
Q. Okay. Is there a side that just you like to



MAGNA LEGAL SERVICES

work with more? Do you, like, prefer being plaintiff versus defense?
A. I prefer being on the defense side.
Q. Really?
A. Sorry for interrupting you.
Q. That's okay. Why do you prefer defense?
A. I think it's more interesting from a -- from a standpoint of having better access to information. And I do a lot of work where defendants hire me just to pull through their systems to -- to prepare the data for the productions, right? So I see the data and then I'm curating that. And then it gets produced. And very often I have people calling me on those same cases who say listen I -- we got this data production in this case. I'm like, I know.
Q. Uh-huh.
A. And then it sometimes hurts peoples feelings.
Q. Yeah, sometimes -- sometimes it does.
A. Yeah.
Q. Why do you feel like you have better access to information when you're on the defense side?
A. Because I generally am provided insights into those systems that I wouldn't have otherwise because very often I know what questions to ask.
Q. Uh-huh.



A. So let's say, for instance, somebody uses Twilio, T-w-i-l-i-o, as a platform which is a common platform.
Q. Uh-huh.
A. And I can ask to inspect certain code --
Q. Uh-huh.
A. -- where it's not otherwise something that plaintiff counsel would know how to ask or even defense counsel wouldn't know that that's necessary. So, like, in the Athena Bitcoin case in which I was the defense expert, I was able to look at the -- the Twilio account to see why certain things were taking place from a mechanics standpoint that might not necessarily be germane to -- I'm sorry. Might not necessarily be something that would ordinarily be asked for. But it was germane to figuring out why something happened, not just that it happened.
Q. Uh-huh. Are there particular questions that you would ask if the platform was attentive?
A. No.
Q. Okay. So you don't have additional questions for all platforms, just specific ones?
A. Well, my role is different as a plaintiff expert than a defense expert. I don't really have any say in what happened during the process of producing



data outputs. Sometimes people ask what to ask a PMK or PMQ. Do you call them PMQs where you are or PMKs?
Q. It depends on -- it depends on who is asking a lot of times, but you know whichever you prefer is fine.
A. Okay. I just find the courts -- the judiciary in -- in Louisiana so interesting from a -- an academic standpoint. I don't have the privilege asking questions usually when I'm on the plaintiff's side. I just have to work with what I get.
Q. Okay. When -- you mentioned that that were -- it looks like three documents that you relied upon in preparing your report. Did you ask for those documents specifically?
A. No.
Q. Okay. Did you ask to see any documents that -- any documents and you did not receive them?
A. No. Now, if -- if I ask for documents --
Q. Uh-huh.
A. -- and somebody says no, especially if I know they exist, that's it. I withdraw. I'm not someone who will -- especially on the defendants side, right?
Q. Uh-huh.
A. As an expert -- I was expert for Verizon Wireless. I had to have access to certain things. And sometimes I would get told no and I just -- I just have



to deal with the fact because if I know something is -- exists, I'm not going to advance somebody's, you know, agenda or whatever. That didn't happen. I'm just using an example.
Q. Oh, sure. I know this is hypothesizing and being general and not anything specific. So the -- okay. Did you have any role with preparing the discovery requests that were sent to BBQGuys?
A. No.
Q. Okay. And I think we already addressed that you didn't see any responses BBQGuys?
A. None.
Q. Okay. To your knowledge, and I'm not asking for a legal opinion, what is the goal of the TCPA?
MR. JILIZIAN: Objection; foundation.
THE WITNESS: The goal of the TCPA?
MS. ENGLER: Q. Yeah. Like what are underlying concerns or values that the regulation sought to enforce or, correct?
MR. JILIZIAN: Same objection.
THE WITNESS: That is a question I've never been asked before, and I've never put any thought into it. So I -- sitting here, even as a hypothetical, I couldn't answer because I don't -- I haven't really had any time to think about it. I'm sorry.



MAGNA LEGAL SERVICES

MS. ENGLER: Q. That's okay. That's okay. Fair enough. Other than doing your, you know, doing your expert witness work, is this any other kind of work you do, whether it's for a client or on behalf of TelSwitch related to the TCPA?
A. Yeah. I do some -- part of two organizations one is called the Call Communications Fraud Control Association or CFCA of which I'm a member. Looking at best practices for incorporating screening, abatement of fraud. I'm part of something called the E-Tag working group, which files position papers with the FCC through their ECSF system -- ECFS or ECSF, one of the two -- with respect to comments in reply to the FCC's notice of rule -- notice for proposed rule making or NPRM.
Q. So for e-Tag, is it -- are they filing position papers for all FCC dockets or just specific matters?
A. Proceedings related to the TCPA specifically 02-278 and number resource delegation type of rules, but if you look at the FCC's website and you look at TelSwitch as filer or author or e-tag you'll -- I mean, it's all public record. You'll see everything that we have positions on -- or I have positions on.
Q. Does e-Tag have a mission statement?
A. No.



Q. Does it have a particular goal it is trying to fulfill?
A. No.
Q. Who else are members of e-Tag?
A. Kelly Daniels, K-e-l-l-y D-a-n-i-e-l-s, and I don't know who else is.
Q. Who does Kelly Daniels work with?
A. I don't know who he's working for. I know that he's the initial -- he's the father of local number portability.
Q. Okay. Is --
A. He does a lot of telecom policies, but I don't know anything else beyond that.
Q. Is there any kind of unifying theme amongst the members of e-Tag?
A. We talk about fishing.
Q. I guess I'm -- I -- I -- I guess I'm trying to ask is, you know, how did this group get together? Is there some shared value or some shared principal as to why you and the other folks came together for e-Tag?
A. I think we're interested in the fair and equitable distribution of number resources so that people, companies, industry, and litigators alike and American citizens have the ability to exercise better insights into the types of phone calls that either that



they're making or that they're receiving.
Q. So equitable access?
A. That's it.
Q. What about the CFCA? What is their goal?
A. I don't know --
MR. JILIZIAN: Objection; foundation.
THE WITNESS: -- quite. Do you want to say -- I'm sorry.
MR. JILIZIAN: Objection; foundation. Sorry. Go ahead.
THE WITNESS: I don't quite know what their goal is. I think it's advancement of policies that reduce fraud, especially surrounding senior fraud and scams that part people from their money. You know, we've all gotten those texts that say you have a unpaid road toll or you have a UPS package stuck and you need to put your credit card number in to pay for the remainder of the shipping due. And that's all -- most of that stuff's fraud. And so CFCA is advocating toward policies and methods to reduce those sorts of things.
MS. ENGLER: Q. Okay.
A. But I don't speak for CFCA. That's my impression of that organization.
Q. And that's all I'm looking for.
A. Yeah. I just want to make sure that because



I'm not a board member or anything up there. I'm just a constituent member.
Q. Are you affiliated with any other professional organizations?
A. Uhm. I'm a member of the Society for Information Displays.
Q. Did you say information displays?
A. (Nods head.)
Q. Is -- is that what it sounds like?
A. It's -- it's a organization that is advancing technologies related to displays such as computer displays and televisions and setting standards. It's really has little or nothing to do with my experience. It's something I'm interested in.
Q. Associated with any other organizations concerning consumer protection?
A. No.
Q. Any other organizations concerning consumer privacy?
A. No.
Q. Let's take a look back at the screenshots of your website and let's specifically look at the -- it's going to be on the second page. And this is Exhibit 6. There's a section that says history. Do you want to take a --



MAGNA LEGAL SERVICES

Page 126

A. Okay. Yeah. Familiar with it, but sure.
Q. In that last sentence, it says after divesting our retail assets, TelSwitch focused our commitments to bringing solutions to other telephone companies who we license our unique hardware and software. What is meant by divesting retail assets?
A. Well, we -- TelSwitch used to maintain retail communications products and services. We also maintained licenses. And the last of those was about eight years ago. We sold to a company in San Francisco called Monkey Brains our name -- brand name of Tel-1 network services and the licenses and some other things that were sort of grandfathered in to the public utility framework of California.
Q. And you said that was about eight years ago?
A. Pre-COVID, so roughly.
Q. Yeah. Yeah. Because, yeah, doing the math, that would be around 2018.
A. That sounds about right.
Q. Okay. Was this also part of your continued narrowing of your focus to expert witness work?
A. Yes.
Q. Is that what meant by focused our commitments on bringing solutions to other telephone companies or does that mean something else?

Page 127

A. I -- I don't -- I don't remember what specifically we meant we wrote that, but that's where we were focused on at the time. Telephone companies, I mean, independent phone companies are far and few between now. I doubt we'll ever be involved in any more telecom ventures just because of the changing dynamics of the industry and the marketplace.
Q. Understand. You do -- like, I heard you about the hardware, it -- but it also says software. Was there any software that was proprietary to TelSwitch or Tel-1 when you divested?
A. No. No. We -- the company, Monkey Brains, did not want any of that. They just wanted our licenses and our expertise with navigating the -- the regulatory framework of California, which is a pretty complicated set of frameworks for operating as a public utility.
Q. Okay. I seem to recall from your expert declaration that you invented a programming language? Canvas?
A. Yes.
Q. What is Canvas?
A. Canvas is a scripting language that is used on telephone calling platforms colloquially known as IVRs or Interpretive Voice Response systems.
Q. Okay. Now, I know you said it was a

Page 128

programming language, so -- that was invented. Is it -- does it bear any similarities to any other programming languages?
A. Not really. I mean, it's really focused on scripting telephone calls. So, for instance, call a hundred thousand numbers and leave a pre-recorded voice message. You could do that.
Q. Okay.
A. And we left hundreds of thousands of those a day. Take someone's call over the phone and direct them to the customer service agent who has been idle the longest.
Q. Uh-huh.
A. Create an index of individuals who are requesting internal DNC. We handled 250,000 internal DNC calls a day on behalf of 112 telemarketers. So there's -- I shouldn't say we. We built equipment that was for that that was -- that was actually the target that was employed by -- wasn't the target of, but it was employed by company called EngageTel, which was a defendant in Spiegel, S-p-i-e-g-e-l, v. EngageTel, which I think was venued in Northern District of Illinois. So we -- our -- so our equipment became part of that whole TCA controversy. Sort of -- in a way that our equipment was conscripted to do stuff that we originally didn't

Page 129

intend.
Q. Was that equipment and software part of your, like, divested?
A. No. They -- the company did not want that.
Q. Okay.
A. So we just don't do it anymore. We have one platform we still use for some limited inbound calling purposes, but we don't do much anymore with it.
Q. Was Canvas ever commercially available?
A. Yeah.
Q. Okay. Can you think of any third parties that implemented canvas?
A. First National Collection Bureau in Reno, Nevada. AllCom out of Rancho Cucamonga C-u-c-a-m-o-n-g-a, California. EzTel e-z-T-e-l out of Brookneal, Virginia. I think at one time we had 14 different companies -- maybe 12 different companies using it.
Q. Do you know if any of those users still use Canvas today?
A. No, they do not.
Q. Do you know when -- of those users that did use Canvas, do you know when was the last -- like when was the latest time a customer was using Canvas?
A. Maybe nine years ago.


MAGNA LEGAL SERVICES

Page 130

Q. Okay.
A. Ten years ago. It's been a long time.
Q. Okay. Did you publish any writings about Canvas?
A. No.
MR. JILIZIAN: Sorry. I'm just going to object to this line of questioning as outside the scope permitted by Rule 26 and -- or sorry, by discovery. And you can still answer. I'm just stating objection.
MS. ENGLER: The -- he references Canvas, as in -- like and about Canvas and the invention and what it does is all in his expert report. So I believe this is fully within the scope.
MR. JILIZIAN: Okay. I'm -- I'm just stating objection. I'm not going to be --
MS. ENGLER: Sure. So just making a point for the record that he discusses Canvas in his declaration.
MR. JILIZIAN: Okay.
MS. ENGLER: Q. All right. Did -- did a third party ever evaluate Canvas and, you know, to produce audit or review?
A. I don't know.
Q. Okay.
A. There may have been some of that in the Spiegel v. EngageTel dispute. I was on the phone a lot

Page 131

with bandwidth.com during that period who was handling calls on behalf of EngageTel and things that got routed to our platform. So I don't -- I feel like there was, but I don't -- I don't know what extent.
Q. Turning to the section on your website that says expertise at the top. I believe that's on the third page. We were talking a bit earlier when we were talking about your motto, about your, you know, how you put together data points in order to help parties construct narratives about them.
A. Well, to help parties develop fact patterns that then the attorneys are able to present in a way that they feel best aligned to. Yes.
Q. Okay. And so with that is the line that we are expert in weaving multiple data points into a thread of consistency and continuity.
A. It's a pretty good sentence, right? Yeah.
Q. Yeah. So I guess my question --
A. That was before AI. Imagine what we could write now with AI.
Q. What data points are you typically putting together?
A. The ones that I described earlier when you asked me about some examples of what -- what I mean by putting together data points. The -- the wage-and-hour,

Page 132

especially. But also TCPA provided, you know, calls. And if there's an internal Do Not Call List, we -- so very often those things are separately maintained. So we weave that together. And then there's the platforms. Sometimes there's more than one platform. Sometimes there's consent records that got weaved into there. So you take all these records, sometimes nine or 10 different sources, and they come together to create a -- a -- a set of -- set of models, data relationship models that can then be used to describe the -- the way that events occurred. I hope that answers the question.
Q. It did. Thank you. Then the next sentence says the results are then accurately measured to achieve maximum objectivity in litigation. What do you mean by the results are accurately measured?
A. Well, there's a way of doing data that is free from any implicit bias. And that is you start with no assumptions and you just look at what the data says.
Q. Okay.
A. And that's what I do. That's what we do and we excel. This data should be just as useful and beneficial meaningful for all parts in litigation. My client just happened to hire me, but that doesn't mean that my report wouldn't be equivalently as helpful to the defendants. Because if there are certain fact

Page 133

patterns that are being alleged and the data doesn't demonstrate that -- and it's happened before -- my report is meaningfully helpful to resolving the dispute that would have otherwise run the course of litigation. I mean, if I don't see something, I don't see it and it doesn't show in the report.
Q. And I think you also mentioned using a combination of Python, Visual Studio, and -- I don't know if this is ABBYY or A-B-B-Y-Y?
A. ABBYY, A-B-B-Y-Y, which is an OCR package.
Q. Okay.
A. That's mostly wage-and-hour where you have handwritten time sheets.
Q. That was going to be actually my question for you was I know we've talked a lot about SQL, but do you use Python visual studio or ABBYY for TCPA?
A. Python, yes. Simply some great libraries for looking at data types and seeing how data is maintained within Excel sheets in order to ascribe the correct data type parameters for imports.
Q. What kind of Python libraries do you use for TCPA cases?
A. I don't recall. There's an Excel library and CSV library that is common. I don't recall off my head.
Q. And so you wouldn't also recall whether the



MAGNA LEGAL SERVICES

Python, CSV, or the Python Excel libraries would have been used in preparing your expert report in this matter?

A. I don't know if Python was used. It was used -- well, I don't know if it was used for any purpose other than just simply bringing in the data from the spreadsheets. I don't think there was any -- any manipulation directly within Excel. So if it was, it was very minimally used.

Q. So I think we already went through some of the stuff. I know we talked about you doing the daily downloads and that you retained them and how they are all stored. Can you tell me why you do these daily? In case you haven't already? From the DNC? The daily downloads? I apologize. I was not clear on that question.

A. Oh, well, because the day's data is only there for that day.

Q. Uh-huh.

A. So I have to download them every day if I wanted to have an accurate identification of whether or not a number was on the DNC list as of a certain date.

Q. Is there a reason why you don't instead just download the change file and update, you know, what your current listings are based on the change file?



A. Yes, there is.

Q. Could you please explain?

A. Because the questions that I get -- the deposition or trial -- oh, I guess there haven't been any TCPA trials. Looking forward to one at some point. Would have thought that at least one would have went to trial, but none never have. The question is whether or not the number was been -- has been on the DNC list for 30 days. I mean, more than 30 days. And I want to be able to point toward that exact file and whether that number was on it as part of the entirety of that -- the totality of this file rather than just looking at changes.

Q. Okay.

A. I think other companies use the change logs and we used to use another company for doing our DNC data work. [redacted]



[redacted]



MAGNA LEGAL SERVICES

[redacted]



[redacted]

Q. When did you stop using them?
A. They terminated my services about seven or eight years ago.
Q. What do you mean by terminated your services? Do you mean terminated your access?
A. Terminated my services meaning that they would not run DNC audit trails for me anymore because they did not want me working with the data in context of litigation.
Q. Okay. So they terminated because of your expert witness work?
A. Correct.
MR. JILIZIAN: I'll object to form on that last question. Sorry.
MS. ENGLER: Q. That's fine. So looking at -- back at your website, there's a section I believe it's on the last page or page 4 that says products -- and so -- where it basically reflects that you primarily focused on class action litigation and that you maintain



your subscriber account number and your daily download. But then last sentence we also maintain specialized databases to assist companies in avoiding activities that may cause violations of the Telephone Consumer Protection Act. What specialized databases are you referring to?
A. We maintain a copy of the National Exchange Carrier Association Numbering Assignments.
Q. Okay.
A. So for cell phones and things like that.
Q. Okay. Any other databases?
A. None right now.
Q. Any in the works?
A. That's a good question. I can't think of any right now, but I'm -- we were always in discussions with other data providers.
Q. Understood. And then as far as the databases go, of course, the DNC indexed database would also be one of those, correct?
A. Yes.
Q. Other than yourself and Eric and Sam, does anyone else have access to the DNC database you maintain?
A. I don't think even Eric and Sam have access to it. They might have access to the computers, but I



don't think they know what to do with it. It's on a separate server because we do data for both plaintiffs and defendants. So we partition that out from the rest of our business. So that's on separate and distinct servers.
Q. Okay. So only you would be able to add or modify or delete any data?
A. I don't delete any data. I don't modify any data. The only thing I do is add the daily DNC.
Q. Have you ever built any other databases or indexes that combined data from the DNC with any other identifiers?
A. Yeah.
Q. Can you describe those?
A. Yeah. There's a -- IS wireless database that I use. That's -- maintain FCC's Wireless Do Not Call database. I used data from a company in the past called Tel-Lingua, T-e-l-L-i-n-g-u-a, although I'm not using them anymore. I use data from the National Exchange Carrier Association and the North American Numbering Plan Administrator. I'm trying to think if there's anything else that I use. I use the FTC's list of TCPA eligible area codes. I think that's it.
Q. So do you ever take the data from these different providers and then put it together to create a

Page 142

profile about a number?
A. That's an interesting way to describe it. I just call it tagging. Yeah. I do.
Q. You're -- you're free to use your own --
A. Okay.
Q. -- lexicon.
A. I can --
Q. So if you would have a number that you will pull in from the DNC, you may also have a record from the IS Wireless and as well as the other --
A. RND.
Q. The RND as well. As well as the other, you know, databases that you previously worked with and have that data. I know you mentioned that you're not working with Tel-Lingua anymore. Do you -- from the time that you were, do you still have access to the data that you received prior to you go -- parting ways with Tel-Lingua?
A. I mean, I -- I maintain data for the previous cases that I've worked on, right? As part of the case file. But I don't use it and I don't access it. I don't refer to it. Yeah. Tel-Lingua got tired of getting subpoenas from me. So they -- you know, so we -- I -- I made an agreement with the president and the owner of Tel-Lingua that we would just let that

Page 143

relationship go. Who knows if that'll ever be reconciled or used again or not. But we're -- we don't find it actually necessary anymore as part of our business practices.
Q. Okay. Now you say you have data that you maintain from cases afterwards as part of your file. What kind of data are you retaining?
A. All original data that was provided. All analyses. The waterfall analysis the SQL queries the constituent components that were used for tagging. We have those generally offline.
Q. So like an archive?
A. Yeah. Like a cold storage. I mean, on a series of 14 hard drives, which I could never afford now with the price of memory and storage. But a series of 14 hard drives that are in a cabinet that's not connected to any computer.
Q. Do you have a data destruction policy?
A. No.
Q. A data retention policy?
A. Not a written one. When we -- cases sometimes come back after 10 or 12 years, and we have a policy in our company of being able to pull up -- if data's online --
Q. Uh-huh.

Page 144

A. -- any piece of information within about 90 seconds because we'd never know when a judge or arbitrator or a mediator is going to call us and ask us something that's very specific about a specific case. So all the data's normalized, standardized in a way that we have instructions, a quick reference sheet that we can pull up any piece of information. And it's been invaluable to us. ABM Janitorial went on for 15 years. That data is -- once in a while, a claims administrator might call us up and ask us something, or somebody might call and we have to have access to it. So that's the only sort of data retention policy that we have. We do eventually dispose of data. We certainly take it offline. But we dispose of it when we're told this is done. This is settled. That we're never looking at this again. And you won't believe sometimes those things still come back.
Q. Okay. So those matters where you've said that this is done, this is closed, settled. What is your policy about deleting that information once they tell you you no longer to retain this?
A. Two things happen. One is we delete it off of our computers completely, off of our cold storage.
Q. Okay.
A. Number 2 is we will often put that -- all of

Page 145

our file including the data databases in a back-up form onto a USB drive and we'll send that to the clients and we'll let them know that we do not have any recourse. Like, can't pull that stuff off of Dropbox or hit the rewind button. It's gone.
Q. Okay.
A. And there's a joke. It's kind of a running joke which is what are you going to be doing in 10 years from now? Working on this case.
Q. Uh-huh.
A. So, I mean, unless it's really done, done -- and we go through a lot of effort to make sure that we maintain all of those files.
Q. Okay. So you wouldn't -- you wouldn't go and delete information associated with a file until the attorney says delete it, it's over?
A. That's right.
Q. Okay.
A. If it's fully disposed and then we'll send it to the Attorney General.
Q. And if the attorney just reports that the matter has settled, but doesn't say -- give any instructions concerning the data, you would retain it?
A. Yep.
Q. Okay. Now I know you went through a couple of


MAGNA LEGAL SERVICES

Page 146

other different databases, so I'm going to ask you probably some simplistic questions just so I understand what we're talking about. The IS Wireless database, what categories of data are available through that?
A. Well, it's -- it's a little bit of a shifting sands based upon what clients need and what relationships we have with our data vendors and who's -- who's on the receiving end of that request. But generally, we have the telephone number and whether or not it's a wireless number or a non-wireless number. We often have, but not always have, the operating company number or the National Exchange Carrier -- I'm sorry the North American Numbering Plan Administrator's assignment of which carrier that is associated with. And often whether or not it's been ported or whether it's been with the carrier -- the home carrier the entire time.
Q. What do you mean by ported?
A. Means one carrier -- means that you move your number from one telephone company to another.
Q. So that's why I don't have to get a new number anymore if I change phone providers?
A. That is precisely why.
Q. Good to know. There was also -- you mentioned the Tel-Lingua that you don't use that data anymore.
A. Not at all.

Page 147

Q. And remind me -- I don't think I asked you this. When did you stop using your data from Tel-Lingua?
A. So there were two separate incidents -- two separate times. First time was couple years where we had to go out and get a reseller license from iconectiv, which is i-c-o-n-e-c-t-i-v. And then once we got the reseller license, we were using Tel-Lingua as our data aggregator. These databases are just too big and too complicated to sometimes use the data directly. So we went through aggregators and then most recently, in December of 2025, there was a dispute between iconectiv and TelSwitch as to whether or not that the FCC's data, which was administered by iconectiv, would be used for purposes related to the TCPA. Which is funny because it's actually written into the Federal Register that it can be, but in the abundance of interest of not -- not creating a hardship on -- on Tel-Lingua, we agreed that that was the best. Part ways.
Q. And you're not offering a legal opinion today about what is in the Federal Register?
A. No, I'm certainly not. I'm just saying that FCC1535 paragraph 142 may suggest that there is a -- a reason to -- that the data is made available for purposes stemming from the TCPA, but if you're looking

Page 148

in the FCC's filing system, there's several, eight or nine, different position papers and filings related to our use of the data and how we use it. We also got an opinion about that at one point as a result of a -- a Congressional inquiry sent through our Congressional Services Constituent Services Manager asking for clarification.
Q. Okay. But, again, you're not offering a legal opinion?
A. No.
Q. Okay.
A. No. I'm just telling you what I've been told by -- by my attorneys.
Q. Understood. Understood. Now I ask this, but I still don't think I actually got the answer. For Tel-Lingua, I know you don't use it anymore and there's reasons why, but what actual data was it that you were receiving?
A. We were receiving the telephone number, whether it was ported, whether it was ever ported, the date of port, and the operating company number from the North American Numbering Plan Administrator. So they were mashing it up and putting it together for us.
Q. Okay. So that's what you meant by the aggregators. That they were going and, you know,

Page 149

getting the information from the North American Planning?
A. North American Numbering Plan Administrator. It's big --
Q. Uh-huh.
A. -- big sentence. But yes.
Q. Okay.
A. Yeah. And I -- I -- I love that company and I love Andrew Mangold, and I just think the world of them. And I'm very lucky to have a personal relationship with him, which is not related at the business side at all.
Q. Wonderful.
A. I'm very fortunate that I got to do that.
Q. Now, these different varieties of --
THE REPORTER: (Clarification.)
MS. ENGLER: Q. Okay. So with these different types of databases -- I know we already went through your DNC database. That really it's only you that has access. Is that the same for the data that you would have received from these third parties?
A. Well, I don't know who has access to Somos, which is one of the -- the -- the data guardian for the Reassigned Number Database, but I, in my own company, am the only one who has access to that.
Q. Okay. I think I skipped a question and that's



MAGNA LEGAL SERVICES

why it's confusing. Is -- the data that you get from Somos and that you previously would have gotten from Tel-Lingua or iconectiv, those are downloaded as well into your -- your, like, server system, correct?
A. Well, yes. With all of the exceptions of the DNC, we actually produce files that we send to their systems for the tagging and then we get the results back.
Q. Okay. So you, instead of just downloading the data and maintaining it on your system, for those particular data -- those particular records, you would instead compile a list of numbers and send it to them and then they would report back?
A. Yes.
Q. Okay. And when you would get that report back, what would you do with it?
A. I'd import it into the SQL database. I keep a copy of it locally.
Q. Okay.
A. And then I would run my SQL steps or my waterfall analysis.
Q. Okay. And so were those SQL steps similar to what we talked about with the indexing of the DNC or is that a different process?
A. It's very different.



Q. Okay.
A. I mean, it follows the same uses, the same tools, and the same -- it's like you can open Microsoft Word. You can write a -- a -- a declaration or you could write a reply. They're two very different documents, but you're using the same tool, which is Microsoft Word.
Q. Sure.
A. I think there is a the best analogy.
Q. Okay. How often do you, like, audit your DNC database?
A. Other than when we get the data -- from when we were doing the comparison to our previous vendor, who was doing it for us not very often. I mean, we do check the original files the constituent files before putting them in the database, but not exhaustively.
Q. Okay.
A. The DNC data is the DNC data. There's really no audit that can be done on the DNC data. If we see something like an incomplete file come from the FTC, we'll -- we'll know that right away because it shows incomplete or there's a -- a drastic record change. And we can reach out to the DNC List or if it's the same amount of records on two separate days, we'll -- we'll see that too. But in general it -- we don't get those



flags very often. Maybe once or twice a year.
Q. Does the DNC file download ever have errors in it from -- from the FTC's records?
A. It is a zip file that will not decompress if it's an incomplete file or there's an error in it. So it has to match certain -- I mean, there's internal checksums and characteristics that are inherent with the -- within the program -- zip program itself. So if it's corrupt or if there's a problem with it, it won't open.
Q. So I guess what I mean more is about the data itself, about a number appearing on the list or not. Is there ever errors in that data?
A. I don't think so, but I don't -- I don't really know. I'm not the -- I'm not the originator of that list.
Q. And we've talked previously and I believe you testified earlier that you don't really run compares between days to see changes in numbers so if there was --
A. I see -- I run a daily aggregate, but I don't see what numbers in particular have dropped off or gone off.
Q. Okay. So if there was an error that was remediated within the following record, you wouldn't be



able to tell based on the test you currently do today?
A. Correct.
Q. Okay.
A. Yeah. And that's not -- that's not a function of -- of me to decide there's an error. The FTC is responsible for publishing that list and I have to trust that that list is correct.
Q. Sure. Have you ever had had a third-party do an audit of your databases?
A. Databases plural?
Q. Let's start with the DNC database?
A. Yeah. I think Jan Kostyn has done it before, you know, in Federal Savings. He's run his opinions and he's wrong. I mean, it -- it just is a fact. He doesn't -- it doesn't have the data that we have. But I think David Kalat, which is K-a-l-a-t, from Berkeley Research Group has run his own cross-checks and audits in cases where he was an opposing expert and I believe that he saw that -- maybe negligible differences but not really anything significant.
Q. Let me -- let me make sure that we're on the same page. I'm not necessarily asking for those who have, you know, tried to follow your steps and came up with different result.
A. Oh.



MAGNA LEGAL SERVICES

Page 154

Q. I'm asking about like an internal audit --
A. Oh, yeah.
Q. -- where you -- okay. So you haven't had somebody internally come and review your database for -- and provide any evaluations concerning its, you know, process? Accuracy? Security?
A. No. I mean, we used to co- -- I used to co-expert with Peggy Daley and David Kalat from Berkeley Research Group on behalf of Wells Fargo and SGS Carol -- I'm sorry, on behalf of SGS and Honda Finance and I don't think they ever found problems with the data I always have to provide it. So seemingly would have known if there was a problem. But other than that, no.
Q. This sounds like an incredible amount of data that you're maintaining.
A. Yeah.
MR. JILIZIAN: Objection to form.
MS. ENGLER: Q. Okay. So I guess what I'm curious about -- you know, because we've talked about storage and, you know, the different databases you have running. I mean, where in the world are you storing all this data? Are you doing cloud or you know --
A. No. No cloud whatsoever. So this is -- it's very interesting because Jan Kostyn has this in his report. Every report, about Paragraph 37 and 38, he

Page 155

says it's impractical to manage and maintain this much data. And what he fails to recognize and what most people fail to recognize is I'm really one of the top data experts as per the appellate and ABM Janitorial and other cases where I'm recognized having the ability to maintain large amounts of data.
We have physical computers. They're in Concord, California. They are maintained by me. I built them. There's a cluster of 14 or 15 computers where this data is stored. And it takes 15 minutes per day to import the entirety of the DNC daily outputs. It takes about eight minutes to run five million records against National DNC in the way that we've built it.
You're right. It's a lot of data and we have perfected the approach and have internally audited exhaustively to figure out the most efficient way to handle the inputs, the outputs, and the data types, and the indexing. Those are the four key components: The inputs the outputs the data types, big-end, for instance, and the indexing. Clustered versus non-clustered. Things like this. Which are terms of art, but make a huge difference in the efficiency of how the data is -- is managed and can be conformed.
Q. Okay. So I think -- just talking about the actual equipment itself, you said no cloud.

Page 156

A. No cloud.
Q. No cloud. Got that.
A. Zero.
Q. And then --
A. No AI.
Q. No AI. That -- you beat me to that question.
A. I knew that was coming.
Q. No AI whatsoever?
A. Jan Kostyn says there's no way to do this without AI, so like a natural step.
Q. And then it sounds like you have a network of 3 -- 13 to 14 computers?
A. Cluster. Yeah.
Q. Cluster. Okay. Any other equipment? Physical servers?
A. We employ Nvidia GPUs for data acceleration techniques within the servers. It's not AI. It's just we're using the parallel pathways through the GPUs to accelerate the data recollection. We have -- I think we have Nvidia listed as a partner or our website. And there's a -- there's a position paper that RAID wrote about our use of a -- of the GPU.
THE REPORTER: (Clarification.)
THE WITNESS: And there's a -- I'm not going to mess with this. It's bad. I'm not going to mess

Page 157

with it. But there is a --
MS. ENGLER: Q. You can probably -- it can probably just be there at least.
A. Yeah.
Q. Closer.
A. Okay. There we go. So there's a position paper that RAID wrote about our use of our -- their the GPUs and how our actual physical facilities works. It's really good. Oh, you have a copy of it. Great.
Q. I was going to say is the document that I just handed to you the study or position paper that you're referencing?
A. Yeah, they -- they did this. I don't know how they chose our company to do this, but they did a -- a deep dive into it.
Q. Well, it has some quotations from you. So did you participate in preparing this report?
A. No. I was interviewed, though, for it.
Q. All right. It refers to a pilot that y'all did first before you went and implemented SupremeRAID system?
A. And that's -- for the benefit of the court reporter, it's capital R, capital A, capital I, capital D.
Q. When did you do that pilot?


MAGNA LEGAL SERVICES

Page 158

A. I don't remember. It's been a while.
Q. Just did you have an idea of a year?
A. I forgot that we did a pilot for it until you mentioned it.
Q. Well, I believe the website says that you started getting integrating it in 2024. Is -- does that sound right?
A. I think we probably were looking at it from 2023 onward, but I don't recall the dates.
Q. Do you recall whether it was implemented by the time you were preparing your report for this matter?
A. Oh, we've been fully implemented in this for year -- at least a year before we started doing anything on this.
Q. Okay. And I believe there was a number of references in there about how it really sped up your processes and transformed your ability to, you know, be able to generate results quicker. What kind of change are we talking about in timing?
A. As a delta between what we used to do --
Q. Yeah.
A. -- and now? Okay. So yeah. It's a great question. It's interesting. So it would have probably taken a typical load of a hundred million records a day or two to go through that. We're looking at two hours

Page 159

now.
Q. That's something.
A. Yeah. I think so. And one of the reasons we did this is -- one of the reasons RAID approached us to do this is because we -- the -- our rep is named Gill, G-i-l-l. He was really intrigued by how we were able to find nuances within their process or really working with them to improve their product. And he was interested in how we were able to get such -- squeeze such efficiency out of this. Plus people weren't using it with this particular framework at the time, so we were sort of a test case for them as well.
Q. I believe so there's reference in there to, like, multi SQL servers.
A. Yeah.
Q. And so is that what you're just talking about is the system hadn't been tested on yet?
A. Yeah. It was a -- a cluster of servers on Dell -- whatever servers we're in here. I think it says it in here. Dell 1923 or Dell 1432 or whatever the model was.
Q. Sure.
A. Right? And -- and -- and Samsung and NVME solid state drives. I don't remember what your question was now.

Page 160

Q. It's -- I had asked about how just the changes that, you know, were made and that, you know, that you said that it hadn't been implemented on that particular type of system before. So just confirming that you were referring to the, you know, multi SQL server system?
A. Yeah. That's the right way to describe it.
Q. Okay.
A. Yeah. GPU -- GPU integration with multi SQL clustering is probably, you know, what we're known for. And we're -- you know sometimes we can get 400 million records a day. Push them right through.
Q. That's something.
A. Yeah. It's an interesting -- I mean, it's, you know, it was an expensive -- an expensive -- it was either going to be an expensive failure or a welcome success. And I'm really glad it didn't become an expensive failure because at some points, we were really concerned about whether or not the efficiencies outweighed the cost.
Q. And I know you said you didn't have anything to do with the authorship of this case study. Do you know if you got a discount or anything because of allowing for the case study?
A. We have two rules in our business. One is we'll never take a discount and we'll never take a gift

Page 161

from someone. I mean, people send their Christmas stuff.
Q. Well, sure.
A. Yeah. But we'll never do that, right? So if I recommend a technology to a client, it's because I believe in that technology. So we've never gotten any preferential treatment from RAID. Although I suspect if I called with problem at, you know, 10:00 at night, they would call me back pretty quick. The second rule is that none of my employees can accept any gifts from anyone or any preferential treatment. And if they do, they'll be fired.
Q. Pretty good rule.
A. I think so.
Q. The case study makes a lot of references to, you know, that there were better legal outcomes that came out of implementing the SupremeRAID program. What kind of better legal outcomes?
A. Well, imagine if you have the a hundred million records and the only way to handle something is to do sampling.
Q. Okay.
A. And in sampling, maybe you missed something. Or a good example, named plaintiff isn't in the data that was sampled somehow. So by using all the data



MAGNA LEGAL SERVICES

Page 162

available which this allows us to do, there's better outcomes. Because if the court, for instance, says we only want to look at all the data from California, you don't have to do sampling anymore. You get to use full datasets.
Q. Okay. Makes sense. Now your website listed RAID as a partner. What does that mean?
A. It means that if somebody calls for a reference to ask us our opinions --
Q. Uh-huh.
A. -- and how to implement something, we have committed to RAID that we will give every opportunity to RAID -- I'm sorry, to the person -- every opportunity to describe fully what we have done with RAID and to readily give that information and how that we implemented stuff.
Q. Okay. So this wouldn't a person that would be looking the hire TelSwitch to help implement RAID at its own company?
A. It -- no one's ever asked.
Q. Okay. It really more you're going to be a good reference?
A. We're going to tell people how to do it.
Q. Okay.
A. If Jan Kostyn or anybody else wanted to

Page 163

implement RAID in their -- in their workflow, happy to do it.
Q. Is that also why you list Nvidia as a partner as well? Because you would have to also tell them how to do it with Nvidia provided solid state drive?
A. I think at the time we listed Nvidia because I think that was a condition of us using RAID, but I don't remember all of the -- all the reasons. RAID and Nvidia have some sort of relationship. So it wasn't just one or the other, but it was both.
MS. ENGLER: Before I forget, we're going to mark that case study at Exhibit 7.
(EXHIBIT 7 WAS MARKED FOR IDENTIFICATION.)
THE WITNESS: I'll write that down here. That's fine.
MS. ENGLER: Q. Also listed at partners on your website is Somos, which -- what's the nature of you're relationship with Somos?
A. It's a good one. Any specific?
Q. Like, are you a consumer or do you have a different role?
A. We're a consumer of the data for the RND and the North American Numbering Plan Administration's data which they serve as that. They also operate what's called the DNO or Do Not Originate List.

Page 164

Q. What's the Do Not Originate List?
A. It's a list of telephone numbers that telephone carriers a supposed to block calls from in network or at any point when they discover that they're not supposed to be originating calls or they're unassigned spoofed numbers, things like that. I don't know how often it happens, but we're -- not we're aware of it, but we're -- I am aware of the list that people are supposed to be using. We are close to Somos.
Q. Okay. And are you also a reseller?
A. No.
Q. So you only purchase services from Somos. You don't resell or provide any detail to third parties?
A. No. Third parties can go get it directly themselves from Somos. So nobody can use us as a pass-through. Somos is also the Toll-Free Numbering Administrator and I also think that there's some relationship between them and the local number portability structure, but I don't -- don't know what that is. I just want to add that.
Q. Could you take a look at your report page 7. And this is -- and that's footnote 8, below where it says TelSwitch is a registered a consumer and reseller of the RND?
A. Yes.

Page 165

Q. So but -- are you a reseller then?
A. No.
Q. Why does --
A. We can be, I mean, we have the choice to, but we're not doing it.
Q. Okay. So you're saying that you are registered to -- and authorized to be a reseller, but that's not a service you're currently providing. Is that your testimony?
A. That's right.
Q. Okay.
A. Yeah. We did some paperwork at some point, I think. I mean, it's been a while, but I think we've done something allows us to use it. And it might be just they wanted us to do that because of the way that we are using their database as part of our expert services. I don't really know.
Q. So do you know is there a reason why you are not acting as a reseller?
A. Yeah. I don't like giving somebody something that I then have to pay for that I might not get paid for myself. It's really that simple.
Q. You don't charge an up-front charge?
A. Well, I didn't ask for a deposit for today's deposition, but I assume that you're going to pay for


MAGNA LEGAL SERVICES

today's deposition. So I mean, it's the same kind of thing. Maybe I'm a little too trusting.
Q. Does Somos have any obligations on you as a consumer or a reseller to minimize your data usage?
A. To minimize my data usage?
Q. Yeah. Any daily use minimization obligations?
A. I -- I'm not trying to be coy but what is a data minimization use --
Q. Oh.
A. -- obligation? I'm so curious.
Q. I'm probably saying, you know, weird things so. An obligation to minimize, as in only use what you need?
A. I'm not aware of any such thing.
MR. JILIZIAN: Just object to form. For this line of questioning.
THE WITNESS: Oh, okay. I --
MR. JILIZIAN: Go ahead with what you were going to say.
THE WITNESS: That's -- that's an interesting question. I don't quite know what that means. But I'm not aware of any such limitation on my use of any databases that Somos maintains. I'm not aware of any. I've never been told that.
MS. ENGLER: Q. Uhm --



A. But that's such an interesting question.
Q. So I guess to add a little more. I guess another way of looking at it, you're familiar with, like, data sharing on a need to know basis, right?
A. I'm familiar with the concept.
Q. So does Somos have any requirements that the data you request for them is data that is necessary?
A. Put another way, I would never use Somos database for anything outside of the scope of identification and clarification as to whether or not numbers that were actively part of litigation were on the RND. So I'm very narrow in scope that answers your question. And the only reason I do that is to be -- to be able to inform a try -- ultimately the beneficiary of which is the trier of fact. That's it. I don't know of any restriction on that. Haven't ever been told there was one. Pretty close to Somos, so I think I would have heard about it by now.
Q. You mentioned when you, you know, started working with Somos and they wanted you to sign some paperwork concerning being a reseller. Do you have written contracts with Somos?
A. I do have some written contracts with Somos. Most of it's related to pricing and I think that's about it. I would have to look. It's been a while since I've



looked at that.
Q. Okay. Last partner you list on here is Fremont Bank. How are they a partner?
A. They're our line of credit. They're a great bank to work with. I love working with those guys. And they're -- they're a leader in the advocacy of small businesses. I used to be with -- just to tell you a story. I was with Silicon Valley Bank and Fremont -- and -- and First Republic. And they both went out of business on the same week. And I will never -- I will never forget that, and Fremont Bank stepped up to the plate because they were our mortgage loan, and I just thought so highly of them that I asked them if I could list them as a partner on our website.
Q. Very nice. Okay. Going back to your set up and storage of data, which we -- which we were talking to and pivoted your relationship with RAID. Which, relevant. How is -- like, how are you typically receiving data like from your -- like, from attorneys whenever they're going to send you a dataset. Is it email? Like --
A. Dropbox.
Q. Okay.
A. Almost always Dropbox. Sometimes some it's on physical USB, which creates a real problem if there's a



deadline and we don't get it in time.
Q. Any other problems with USB?
A. No.
Q. Okay. And then after you do your analysis, how do you typically send any data files to the attorneys?
A. Did you say urinalysis?
Q. Your analysis.
A. Sorry.
Q. It's all good. I told you I was going to be probably say something silly at some point. It's okay. After you complete your analysis of the call detail records and produce -- and produce data such as like you've done with your report it -- at Exhibits 8 and 9, how do you typically send that information to counsel?
A. Usually in an email.
Q. Is it --
A. The exhibits? 8 and 9 to my report, which are the --
Q. Uh-huh.
A. -- summaries. Oh, usually as in a -- a part of an exhibit packet. I drop them the PDF.
Q. Now were produced natively because they are large Excel spreadsheets --
A. Understood.

Q. -- so would those typically just be an email attachment or do you use a secure file link?
A. I usually just send them as an email attachment. Yeah, I mean, they're devoid of anything except the numbers and they don't have any of the underlying details with them. If it's a larger type of file or something that's a little more sensitive, I'll send it via Dropbox or a zip file with a password protection.
Q. Okay.
MR. JILIZIAN: I'll just caution the witness, too, for this line of questioning that the -- the nature of the documents and the form that they're sent is fine, but just make sure you don't disclose any communications that were sent off with them for privileged purposes.
MS. ENGLER: And I'm done asking about that so we're all good.
THE WITNESS: Is this a good time for me to use the bathroom?
MS. ENGLER: Absolutely. We've been going for a bit so let's -- let's take a seven or five. Whatever we need.
MR. JILIZIAN: Yeah, that should be fine.
(The deposition was in recess from 3:20 to 3:33.)



MS. ENGLER: Q. Okay. When we were last talking, we were talking a bunch about, like, how data is transferred back and forth between you and, you know, your -- your customers and clients and the type of system that you have set up with the clusters of computers. How do you go about securing that tech?
A. Well, the RAID drives are striped, so any drive gets taken it's -- it's useless. They're in a secure data facility that's co-located at the cable company and, as far as I know, there's 24-hour surveillance with people on site. We use VPNs and, generally, data is zipped if it has any -- with the password if there's anything that's sensitive in it.
Q. Do you have any, you know, technical safeguards that are on the computers themselves?
A. Yeah, I mean, we have virus protection and things like that. We follow PCIDSS best practices. I mean, we're a small company, so we can self-audit, right? So --
Q. Sure?
A. -- we don't have an -- an auditing company, but we -- we do follow best practices.
Q. So you -- so you follow PCIDSS.
A. Yeah. Even though we don't take credit card on. It's the closest that describes the way that we



have to maintain our data.
Q. And you perform those self-audits annually?
A. Not lately. I don't remember the last time we did an audit. We have a -- we do -- I guess we do have a company that does a penetration audit.
Q. That was going to be my next question if you had any third parties that did evaluations or pen testing?
A. We do. I would have to -- I don't remember the name of the company, but we get a monthly report from them. The other thing we do is we don't have any public-facing data -- any public-facing websites on our own equipment and everything is segregated by different local area network subnets, and we have -- we have login.
Q. Are these policies and safeguards you have in place written down anywhere?
A. No. I think, though, they -- most they keep out is us. I mean, I feel the people most impacted. Like, I will sometimes lock myself out of my own VPN for half hour, hour because I'm -- somehow, you know, hit the password wrong a two, three times. Stuff like that.
Q. When we were talking about Sam and Eric and their ability to, you know, put data into the databases and such, and I think you said that they didn't have



access to actually get into the databases. Did I hear that wrong?
A. Yeah.
Q. Okay. So they have access?
A. They have access to the databases they're working on, but they don't have access to DNC and some of the other databases.
Q. Okay. That -- that's where I'm mixed up is they have access to the databases that they're working for particular cases, but not to the whole big all DNC. Is that restricted through admin permissions or some other way?
A. I think it's just on a different network partition. And they have no need to go into that, so we don't do anything with it.
Q. Is all data that you deal -- all personal information -- let me start that again.
For the personal information that you maintain in your servers and databases and systems, is it only on work related devices?
A. I don't understand the question. I'm sorry.
Q. Sure. So we talked about, you know, downloading data of phone numbers that's in the DNC and receiving, you know, records of phone numbers and perhaps other personal information from, you know,



MAGNA LEGAL SERVICES

Page 174

customers and clients or third-party providers. Is all of that data stored on only work-related devices or does it at times get stored on personal devices?
A. Only work.
Q. Okay. Do you have any third parties other than that vendor you mentioned that does pen testing that assists with your network security?
A. No.
Q. Do handle your own I.T. needs or do you use a MSP?
A. Just me.
Q. Just you?
A. I'm the I.T. person. But if it's any device that's, like, a consumer device, then that I.T. support desk goes to bed at about 10:30 at night and has school the next day.
Q. Oh, goodness. Oh, goodness. So and I would presume that also that you handle any cybersecurity related needs as well? That you don't have an MSSP?
A. Right. Eric -- Eric Olson used to work for American Express and their companies and has a huge knowledge of -- of security and such. So sometimes, I'll consult with him on, like, how to best sub -- subnet certain computers and how to make sure that we don't get -- you know, how to keep our vulnerability

Page 175

exposure low. Things like that. But it's all internal. We don't have any outside companies --
Q. Okay.
A. -- helping us.
Q. And I believe you said you have firewalls, right?
A. Yes.
Q. Okay. Do the firewalls keep logs?
A. Yeah. They do. It's a TP-link firewall.
Q. Okay.
A. And then we also use Netgate.
Q. Okay. How often do you review your security practices for any updates or changes?
A. Well, I mean, really depends on which areas of -- on the computers?
Q. Uh-huh.
A. Every week.
Q. Weekly?
A. We make sure that everything is up-to-date and security features are in place.
Q. Okay. So I -- I didn't ask that it -- well. So I'm not so much talking about when you update, like, you know your software programs and do patches and things like that to prevent against -- and implement any releases. I mean, look at your overall security

Page 176

infrastructure and evaluate whether any changes need to be made to -- just your overall policy?
A. Maybe every couple of months we have a internal discussion about it.
Q. Okay. Have you ever -- I know you mentioned that you use PCI as kind of your -- your standard. Have you ever done any ISO certification?
A. I think years ago we did when we were doing a project for Experian and for the banks. I don't remember what level it was. I just remember ISO9900 something something dash something something I don't know.
Q. Yeah.
A. I don't remember what those --
Q. And you wouldn't happen to have a SoC 2 report?
A. No.
Q. Okay.
A. We're not.
Q. Do you have cyber insurance?
A. I don't think so.
Q. Professional liability insurance?
A. Like errors and omissions or something?
Q. Yes?
A. Nope.

Page 177

Q. Crime insurance?
A. Crime insurance? What's that? What's crime insurance?
Q. Insurance when you're the victim of a crime.
A. When I'm a victim of a crime?
Q. Yeah. Your business?
A. I don't know. I have no idea.
Q. Often used frequently for retail for theft, but also, you know, it sometimes provides coverage in the event of, like, a ransomware incident?
A. I don't think we do. I don't know what -- I mean, I have an insurance agent and he puts stuff on there sometimes, so it's entirely possible we do. I know that we don't have errors and omissions and I know that I don't carry any expert liability --
Q. Okay.
A. -- insurance, and I let my clients know that.
Q. I'm sorry. I meant to ask you this about the website and I promise this will be --
A. That's okay.
Q. -- possibly the last question?
A. I'm proud of the website. You can ask it. Lot's to be happy. Ross should be happy.
Q. So are -- is TelSwitch the one that's responsible for maintaining the website?


MAGNA LEGAL SERVICES

A. No. Ross Reyman is.
Q. Okay.
A. R-e-y-m-a-n.
Q. And he's a third party? He's not affiliated with TelSwitch?
A. Right. And Tel -- and the website's just a brochure site. There's no physical connection or interaction with any products or services that we have.
Q. But it still, essentially, belongs to TelSwitch, right?
A. Yes. TelSwitch owns the domain name but someone else is doing the graphical work behind the scenes.
Q. Okay. Do you know when you started analyzing the data produced by BBQGuys? Like, the -- the call detail records in order to prepare your report?
A. It is on Exhibit 1 that we marked as the -- the notes that you -- I had written down that you had taken into --
THE REPORTER: (Clarification.)
THE WITNESS: It's on Exhibit 1 of the notes that we put into the record.
MS. ENGLER: Q. What was the date that you started?
A. March 6th, 2026.



Q. Okay. And when did you start drafting the report?
A. Oh, probably on 5/11 or 5/12 whenever that -- that -- no, it wouldn't have been that. That date -- probably within a day or two of actually writing the -- signing it which would be around April 26th, April 28th. Something like that.
Q. Okay. Is there a reason why it was signed in Illinois instead of California?
A. That's where my father lives.
Q. Oh. Okay. So and then looking -- we're going to go and take a look at your report and spend on time with that now, so. Now, we talked a little bit beforehand, but I want to make sure I have your testimony clear. On page 7, the listing of documents and materials that you relied upon?
A. Yes.
Q. Okay. And it lists three documents. The complaint, BBQGuys 59, BBQGuys 60. Those are the only documents you reviewed?
A. Yes.
Q. Other than the three documents named in your report, did you receive any other documents.
A. I don't think so.
Q. So to confirm, there were no documents you



received that you chose not to rely on?
A. That's right.
Q. Are you aware of any other documents that BBQGuys produced that you did not receive?
A. No.
Q. Okay. So you reviewed no materials concerning BBQGuys consent procedures?
A. No.
Q. No materials concerning BBQGuys opt-out procedures?
A. No. That would require analysis of a legal nature and it's not what I -- I mean, even if I was given those documents, I would let my clients know that it's not something that I review or look at.
Q. Okay. So you didn't look at anything concerning or have any -- so you -- you reviewed, though, no materials concerning any opt-in process either, right?
MR. JILIZIAN: Again, sorry if I -- if I interrupted you.
MS. ENGLER: Go ahead.
MR. JILIZIAN: I was just going to say, again, I instruct the witness to -- again, the documents and everything exchanged is fair game, but just to not disclose any of the conversations had between you and



the legal counsel.
THE WITNESS: I'm not aware of any documents that I received related to any opt-in or opt-out.
MS. ENGLER: Q. Okay. Were you at any point instructed not to review any particular data?
A. No.
Q. Okay.
A. And like I -- I just want to mention if someone tells me that --
Q. Uh-huh.
A. -- that will be the last case I say ever work on for them and I quit right there. That's just -- I don't -- I have a zero tolerance for being told me what I can and cannot look at --
Q. Okay.
A. -- or what I should look at or not.
Q. Uh-huh. Other than counsel, have you consulted with anyone else in formulating your opinions in that declaration?
A. Well, I didn't consult with counsel to formulate my opinions in this declaration. I just -- I did the analysis myself and reached the conclusions myself.
Q. And -- sure. What I mean by consult with counsel is I just don't want you telling me about what



MAGNA LEGAL SERVICES

Page 182

y'all talked about, your reports. I'm trying to make sure we're not going to getting into, you know, that -- that territory. So if there was any third parties who, you know, you ran ideas by or no? So --
A. None.
Q. Okay. Other than counsel, did you consult with anyone drafting your opinion?
A. No.
MR. JILIZIAN: Object to form. Assumes facts not in evidence.
MS. ENGLER: Q. Were you asked to make any assumptions when preparing your report?
A. No.
Q. Is there any software that you used other than what we've discussed with, you know, the SQL commands and process, as well as Microsoft Word presumably that you used to create your report?
A. I'm a WordPerfect guy. No. No. There's no other software. Remember people used to use those green screens with WordPerfect and WordStar?
Q. Uh-huh.
A. I still see that once in a while. But the answer is no. I only used Word and Microsoft -- well Microsoft Office, right? Because --
Q. Uh-huh.

Page 183

A. -- Excel is part of that --
Q. Sure.
A. -- framework and Microsoft SQL.
Q. We've already established you don't use AI?
A. Don't use AI.
Q. So --
A. I want to say we use AI for doing some OCR work when it's -- when it's wage-and-hour stuff. So I don't want to say we don't ever use AI, but we don't use it for anything that's -- I've never used it for TCPA related work and I don't use it for anything that's related to the analysis, either.
Q. And so you don't use to help, like, get a draft going for your opinion?
A. No. I think that's terrible.
Q. Okay. Happy to hear that.
A. I mean, look, not to editorialize not to waste the time of the record here, but if someone spends a ton of money litigating or defending a case and then some expert goes in and decides to take a shortcut and not -- and employ AI as part of their methodology and, you know, in a way that creates an opinion, that just seems like a really bad idea. And it seems like it just wastes a lot of people's time. I think it's terrible. And I'm sorry. I think people think it's acceptable. I

Page 184

don't think it's acceptable.
Q. Glad to hear for this for sure. So we've obviously spoken at length about your DNC, like, database and such, so I'm not going to walking you back through that.
A. Yeah, we can. I mean, I -- you -- it's your deposition. You can ask the questions. I'm happy to indulge you in any way so you have a clean record and you have a full record.
Q. So part of that is not going back through the stuff we've already talked about. But how does a person put their name on DNC or number on the DNC let's say?
A. When I did it, I had to call a toll-free number from my phone.
Q. Okay. Do you know how anybody could do it in this day and age?
A. I don't know.
Q. And we'd look to the FTC for guidance on that?
MR. JILIZIAN: Object to form.
MS. ENGLER: Q. On guidance on how to sign up for the RND?
A. I mean, I'm a -- I don't have any knowledge. I -- the answer is I haven't sought any insight from the DNC on how to do that.
MR. JILIZIAN: And, sorry. Same objection to

Page 185

the reiteration of the question phrased.
MS. ENGLER: Q. I'm just going to ask if you've seen this before?
MR. JILIZIAN: Is this Exhibit 7?
MS. ENGLER: This would be Exhibit 8.
MR. JILIZIAN: Oh, 8?
(EXHIBIT 8 WAS MARKED FOR IDENTIFICATION.)
THE WITNESS: Can we -- 7 is --
MR. JILIZIAN: Oh, yeah. That's No. 8. That's correct.
THE WITNESS: Sorry. Just a moment. I don't want to get this out of -- this is Exhibit 8. I have not seen this document before.
MS. ENGLER: Q. Okay. Then -- okay. So I'm -- I'm just going to represent to you that this is the FAQ that the Federal Trade Commission has on their website for consumers that want to put their number on the do not call list.
MR. JILIZIAN: And I'll instruct the witness, since he hadn't seen the document, he has the ability here to just review it reasonably. Oh, if no --
THE WITNESS: I mean, I don't have any -- there's no opinion that I'm carrying into this deposition from a document or about this. So I have no -- no opinion either way.


MAGNA LEGAL SERVICES

Page 186

MR. JILIZIAN: You don't have to. I'm just saying.
THE WITNESS: Yeah. Yeah. I appreciate that.
MS. ENGLER: Q. Is there any obligation on a person to renew their listing on the Do Not Call List?
A. I don't think so. I had a brief interaction with the DNC help desk recently about if numbers do get dropped off or being reassigned or something and they said no, that they don't have any process in place right now to do that. I don't know if that's always been the case, but that's extent of my knowledge.
Q. So you said you had a conversation you said with the help desk?
A. Yeah, it was just a quick web type of check-in.
Q. Uh-huh. And they told you they didn't have a process in place to actually move numbers?
A. They weren't doing that at this time. That was the answer.
Q. Okay. Please take a look at -- this is back of the third page of Exhibit 8.
A. Okay.
Q. You'll see at the top there's a question that says do I need to take my old phone number off the list when I get a new number?

Page 187

A. Okay.
Q. And the answer is no. The system removes numbers automatically when they're disconnected and reassigned?
A. I'm afraid to say they don't. Based upon personal knowledge of -- of having changed number or my -- when my daughter's changing number and seeing that the number was already assigned on the list. And also based upon the information that I got from the DNC itself. And so what's wrong?
Q. From one of the -- I don't know if this is something you would know. I'm just genuinely curious. When the DNC was created, was there the intent to establish a mechanism to remove reassigned numbers?
MR. JILIZIAN: Objection; foundation. Form.
THE WITNESS: Uhm, so Ken Sponsler, at one point, wrote in one of his declarations that his company Compliance Point was responsible for sanitizing the DNC list they called it sanitization process.
MS. ENGLER: Q. Uh-huh.
A. Uhm, I don't know what became of that. I feel like there was some record of comment period with the FTC about whether or not the numbers would come off, and I feel like it was the -- I might be misascribing this, but I believe it was -- might have been the direct

Page 188

marketing association that petitioned the FCC to not automatically drop those numbers. It seems to counterintuitive to me. I personally think that if numbers get re-assigned, they should come off. I mean, that's my open personal feeling. Has nothing to do with the fact that I'm an expert in this case or that I'm doing analysis. But, I mean, I'll tell you the same thing I tell my defense clients is that it so preposterous to me that a number continues to stay on.
Q. Uh-huh.
A. Does that answer your question?
Q. It does. And also brings up just one other one. This is not a document you've seen before so take some time to look at it. It's only one page, so. And what this is it's an email from Ryan Thurman, uhm, at DNC.com where he was asked questions by Elaine Smith concerning the removal of a number from the -- from the DNC. And he just provides some information or his take on what -- when exactly the FTC actually removes numbers. So I'm just going to ask you to first read that first paragraph.
A. Well, I know Ryan Thurman. I know him well. I respect his opinion, but I don't think his views are necessarily representative of the FTC. Peggy Daley and David Kalat at this point were where Berkeley Research

Page 189

Group. I was working with them on various things so I'm aware of this particular --
Q. Okay.
A. -- stance that they have taken. I disagree. My mom's number, I believe, is still on the DNC list. She died 10 years ago. So I'm not -- are you putting this into the record? Exhibit 9?
MS. ENGLER: Yeah. We'll go ahead and add as Exhibit 9.
(EXHIBIT 9 WAS MARKED FOR IDENTIFICATION.)
THE WITNESS: So I respect Ryan. I don't know what the foundation of his opinion is here. These -- he's a great guy. He's affable and nice guy. Well respected. So I'm sure he could give you more information than I can.
MS. ENGLER: Q. Yeah, I'm not really asking you to hypothesize --
A. Oh, okay.
Q. -- on what Ryan -- what Ryan thinks, or whether, you know -- I just -- there was a couple things he mentioned and I was just curious if, in your experience, you -- you saw the same things. So let's get specific for it. So he says his understanding is the FTC only removes disconnected and reassigned numbers if their service provider that they hired deems them as



MAGNA LEGAL SERVICES

such. Do you -- in your experience do you know if that's -- do you agree or disagree?
A. Disagree.
Q. Okay. And in looking over the data over all the years, we don't see a lot of numbers that actually come off of the DNC. Do you agree or disagree?
A. I agree with that.
Q. Okay. You don't see -- you agree that you don't see a lot of numbers come off?
A. I agree with that statement there. And I think that the numbers that do come off are generally grouped around certain dates.
Q. Uh-huh.
A. I don't know why that is, but I -- I see them. But it's not -- it's not the quantity -- I believe there was Ryan Thurman's organization -- no. I'm sorry. It was Convoso, I believe, said that one out of 24 numbers gets reassigned in -- I don't remember what period of time -- if -- or disconnected. And if that's the case, you would expect to see a lot more numbers coming off that DNC. I think it needs to be fixed, myself. But I'm not -- that's not a battle that I can take on.
Q. The -- in the second paragraph, he said early on in the Do Not Call List -- in the Do Not Call List when numbers are set to expire after five years, they



then make them permanent. Is that what you were referring to earlier about, you know, there being some kind of time limit toyed with at one point?
A. I think so. Yeah.
Q. Okay.
A. I mean, I don't remember the exact point of delineation when that choice was made or how.
Q. Uh-huh.
A. But I seem to remember the Direct Marketing Association had something to do with it, which seems so anti -- as I said counterintuitive.
Q. Uh-huh. That's it. That's all the questions I have on this.
A. Yeah. I wish there was more clarification on that. And, you know, I wish it was fixed.
Q. Me too.
A. My defense clients are as well.
Q. Now, of course, we obviously gone through exhaustively how you set up your DNC database and you started working on your analysis on March 6th. When do you typically finish your analysis, like, after starting?
A. Uhm, when do I typically finish it?
Q. Right. So if you started on March 6, does it usually take a couple of days to do the analysis or, you



know?
A. It's -- I mean, it really depends upon, I mean, the -- the -- everything in our -- I'm sure it's the same thing as -- as what counsel goes through is if you've got 10 things and you're working on it. And you know that three things aren't due until three weeks from now, somehow those three things end up being filed at 11:59 p.m. and being served on the day that they're due, right?
Q. Fair.
A. And so it's really variable. I mean, it depends on how much other sort of dispositive declarations and analyses and supportive dispositive motions -- motions that we have to write declarations in support of. It really depends. I've turned around an analysis from data to final report six hours.
Q. I get --
A. Sometimes it takes two weeks. I just don't know.
Q. Yeah. Like, I guess, let me ask -- get to what I'm actually trying to -- I'm actually interested in. Is -- since you're going and doing daily download of the DNC and maintaining those full lists, was it the March 6, 2026, DNC iteration that was -- that was used or was there another date?



A. Well, it doesn't matter because we're not looking at the date that we get the data. We're looking at in arrears when was those -- when were those calls made and what date was -- what list was more than 30 days prior.
Q. Okay. Have you compared any of the D -- like any of your DNC records either to backups or to other materials to ensure that, you know, they haven't been corrupted at some point?
A. Uhm, yeah we do run a process where we look the -- the record counts in the files to make sure that the record counts match when we imported. We do that -- I don't know, every couple of months to make sure that we have a full set of data. We do it when we run SQL, Microsoft updates, things like that.
Q. And then you also talked about assessing the reassigned number database and is that done through Somos?
A. Yes.
Q. Okay.
A. They are the manager of the resigned number database --
Q. I see.
A. -- for the FCC I understand.
Q. And for that one you don't download daily



MAGNA LEGAL SERVICES

records. Instead, you send them numbers that you want checked and they provide what information back?
A. They provide three fields --
Q. Okay.
A. -- telephone number is active or disconnected and the date that we put in that we want to check.
Q. What -- how do you determine the date that you want to check?
A. In this case, we just use the date of the first call and the date of the last call to see if the number had been reassigned or disconnected between the first call and the last call.
Q. Okay. And so when you would go ahead and put in those numbers, and then the date that you want checked, what -- what does it possibly return as the answer?
A. Yes or a no.
Q. Is there ever, like, a no data?
A. There is.
Q. Okay. What would that be for?
A. If a number is not valid or if it's malformed. Area code doesn't exist. I think there's a few other conditions, but I don't know what they are.
Q. Okay. And so then -- so you would go first and run the -- for a particular number, the date of the



first message and then run it again with the date of the last message?
A. Right. And that data is generally published on the 16th of every month. So forgot the rest --
Q. That's okay.
A. -- statement. I'm sorry. It's getting a long day. Yeah. It's -- that's -- that's what we do.
MS. ENGLER: New document you've probably seen before, and it's just because of how it's printed, it has -- and we'll mark this as Exhibit 10.
(EXHIBIT 10 WAS MARKED FOR IDENTIFICATION.)
MS. ENGLER: Q. Have you seen this document before?
A. No.
Q. Okay. Well, as you can probably tell, this is the declaration of Beth Sprague. That was in the matter Davis v. Capital 1. Do you know Beth Sprague?
A. No.
Q. Okay. She says that she is the Director of the Reassigned Numbers Database established by the FCC in Paragraph 1 and that she works for SomosGov, Inc. Would you have any reason to disagree with that?
A. So she's the Director of the Resigned Number Database Project administered by Somos.
Q. Okay.



A. Yeah. So she's not an employee of FCC, but she is a director of that particular silo that is the FCC's reassigned number database that's managed by Somos.
Q. Understood.
A. Yeah.
Q. Understood.
A. I didn't know her -- I don't know her personally. I've seen her name, but I don't know much about her or I've never interacted with her.
Q. I want you to take a look for me at paragraphs 10, which starts with to query the RND through 13 and let me know with you're done.
A. Yes.
Q. All done?
A. Yep.
Q. Okay. Is the way that Ms. Sprague described how the RND operates consistent with your experience?
A. Yes.
Q. If you can also take a look number 15.
A. That's correct.
Q. Okay. So the date that would be -- so if it comes back with a yes, it means it's been disconnected?
A. Right.
Q. It doesn't mean that it's necessarily been



reassigned, correct?
A. I just know it as it's either disconnected or reassigned. I don't know if that means it's necessarily been reassigned or not.
Q. Okay.
A. Yeah. I mean, if -- if it's in a disconnected status and there's calls completing through it, then one can presume that it's reassigned.
Q. Well, sure. That's --
A. I mean, that's just the logical --
Q. Sure, but that's relying on other data. I'm going off of just the RND. If you have the a phone call and you wanted patent determine whether or not it's been reassigned and you give it to the RND, all the RND can tell you is that it's been disconnected or hasn't been disconnected as of the date you provided, correct?
A. Well, the disconnected is used for reassigned as well.
Q. You're going to be have to --
A. It's called a reassigned number database. It's not called a disconnected database.
Q. I understand that.
A. Right.
Q. Uhm.
A. So the language itself is inherently related



MAGNA LEGAL SERVICES

to reassigned numbers. But they're just using -- I mean, if they had built this thing in a more coherent way -- I mean, there's a lot of problems with DNC. But just simply -- RND just simply by virtue of how they describe things. But if they would have described this properly, they would have three files. One is called disconnected, one is called resigned, and one is called active.
Q. Uh-huh.
A. But they use disconnected for reassigned and I know that factually.
Q. Okay. But a person who is just looking at the record that has a yes or no response would have no idea whether it is actually, like, resigned or it has just been disconnected without consulting other data?
MR. JILIZIAN: Objection; foundation and form.
THE WITNESS: Yeah. I -- I agree with that statement. You have to use it in context with other things. So, like, if you -- if you're looking and seeing a text message was sent to somebody --
MS. ENGLER: Q. Uh-huh.
A. -- and or there's a delivery flag on that, whatever else have you, then it's -- it's clearly -- just it's clearly reassigned. But I agree with your statement.



Q. Okay.
A. And for purposes of this deposition, I agree with your statement.
Q. Okay.
A. And I think it's a -- I think it's a -- it's a well intended product with a poorly -- poorly described. I mean, the people who are do -- you know, doing this aren't necessarily the people who have to use it --
Q. Uh-huh.
A. -- and rely upon it such as your client or my client or whatever, right?
Q. Sure. Okay. So what are the --
A. Is this Exhibit 10?
Q. Yes. I believe we marked that as Exhibit 10.
A. Okay.
Q. Thank you. Helping me stay organized.
A. I am the keeper of the exhibits. Sequencing.
Q. Very nice. Okay. So let's kind of walk through the methodology.
A. Do you mind if -- I'm going to write this site down. I haven't seen this document, but I find it really interesting.
Q. Sure.
A. Because this is really nicely laid out. 933ECF85-2, declaration of -- it's interesting.



Q. You know what? I'm going to show you -- I wasn't sure if I was going to show you this one, but I'll show you this one as well. That was also in that case. You might also find this interesting.
A. Davis v. Capital 1, huh?
Q. Davis v. Capital 1.
A. Interesting.
MR. JILIZIAN: This will be No. 11 here?
MS. ENGLER: Q. This will be Exhibit 11.
(EXHIBIT 11 WAS MARKED FOR IDENTIFICATION.)
MS. ENGLER: Q. Now, I know you haven't seen the document before, but do you know Scott Rice is?
A. I'm not familiar with him, but I'm familiar with the company.
Q. Okay. And this was also a declaration that was made in Davis v. Capital 1?
A. ECF77-6. These aren't tagged as confidential on that Pacer are they?
Q. No.
A. Okay. I just want to make sure I'm not --
Q. No. We were able to pull them ourselves off Pacer.
A. Thank you. Hold on a second here. Scott Rice. Okay.
Q. So if you could take a look for me. Similarly



to Ms. Sprague's declaration, we're going to look at paragraphs 5 through 9 -- oh, of Scott's. Not of Beth's.
A. Oh, okay. Oh, okay. Sure.
Q. So -- Scott paragraph -- actually go to Paragraph 5 through 11.
A. Okay.
Q. Okay. You mentioned that, you know, the RND it's -- it's got some problems?
A. Yeah. I mean, it's got some problems in the way that -- I think that data is described because I think it gives an impression that there's a -- there's a -- it's either disconnected or it's not when it could also be reassigned. I -- I think that the -- that the descriptions could be verbose. They're not.
MR. JILIZIAN: I'll object to form on that last question. Also just make sure you let her finish the question.
MS. ENGLER: Q. So one of the things that's described as an issue when using the RND in hindsight is that Scott Rice says is that, you know, if you have the an input number that was disconnected multiple times between January 27, 2021, and today, then it's still going to reference that '21 date; is that right?
A. Not my understanding, no.



MAGNA LEGAL SERVICES

Q. Okay. But so -- what he -- that's probably actually not exactly what he said. So he said if an input number was disconnected multiple times after January 27, 2021, a query executed in hindsight using a date before the first reassignment would return yes. Do you agree with that statement?
A. Yeah.
Q. Okay. Similarly, a query executed in hindsight using an input date after the first disconnection event, but before the second disconnection event would also return yes. Do you agree with that statement. In Paragraph 10?
A. No. I don't -- I don't disagree -- I don't agree because if I put in numbers that have never been disconnected -- my own -- I'll get a yes for all dates even though my number has not been disconnected or reassigned before the start of that RND.
Q. Uh-huh.
A. So I -- I think that this may be misaligned with the realities of the data and I'm thinking about when I looked at my own number in the RND, which is not reassigned --
Q. Uh-huh.
A. -- it didn't say it was reassigned. So I disagree with this a little bit.



Q. Okay. So you -- you just -- just so I understand, you disagree that if you were doing a hindsight review and you were looking at an input date that was after the first disconnection event and then -- but prior to the second disconnection event, it would return a yes. You disagree with that?
A. Yeah. The data that I've seen errors on the side of saying something is not disconnected.
Q. Okay.
A. Because I know for a fact that I have worked on cases where a number has been reassigned. But then our -- because it's been reassigned and then assigned, but because of the dates, whatever reason, the reassigned number database says that it's never been reassigned, when, in fact, the carrier records themselves say that they are. I brought this up with Somos and asked them and --
Q. What gives?
A. Well, I wouldn't say what gives. I mean, I have a pretty close relationship with them. So, like, hey guys, like, yeah. There's an ambiguity it's -- it's going to err on the side of active.
Q. Okay.
A. So I disagree with that statement and I tend to rely upon Somos since they are arguably closer to the



source. Data East is a data aggregator or reseller. I think they're registered with the State of California as a data broker.
Q. Okay.
A. Pacific East. Pacific East. Empire. Pardon me. Yes. Pacific East. Very good company. They do a lot of great things, but they might --
Q. Okay. Looking back to your report and how you went about actually, you know, evaluating the data or all detailed records. So after you received the call detail records from counsel, did you do any kind of validation or, you know, file inventory or just kind of --
A. We always do a file inventory, yeah. I mean, that's just part of our standard operating procedure. See how many records there are. We make a regional copy of the data before we do any analysis. We put that in calls underscore complete or calls underscore total.
Q. Okay. And it's mentioned in paragraph 30 that you opened the files to determine whether they would need any pre-processing and that you determined that you did not need to apply any pre-processing as they were already in electronic data interface capable. What do you mean by that?
A. It means that we did not need to do any



recasting of the data based upon embedded characters or a tab that would throw a column off or something like that, which is a fairly common thing to occur in certain systems. But this data was clean.
Q. Okay. Did you test for any duplicate records?
A. We always test for duplicate records. I don't think there -- I don't think we saw any. I shouldn't say that conclusively, but I don't recall any duplicate records that were within the data.
Q. I'm going to direct to you Paragraph 32. That might help.
A. Yeah. I don't recall -- I don't recall any duplicated messages. And I also don't recall -- I can look at the SQL code and see, but I don't recall duplication.
Q. Other than the steps listed in Paragraph 32, did you do any other quality control steps before relying on the data?
A. I don't believe so, no.
Q. Did you document which -- what, like, records you decided to exclude from your analysis?
A. Yes.
Q. And those materials are not produced, correct?
A. Well, they're in a SQL database. Every record is tagged with an original new I.D., which is a unique



MAGNA LEGAL SERVICES

identifier per record. And then those records are then put into their various categories for duplication. Not North American Numbering Plan or --
Q. Sure.
A. -- so on and so forth.
Q. Let me -- let me just I guess --
A. So I don't really --
Q. -- be a bit more direct. It's not attached to your expert report, correct? The data you excluded?
A. Right. It's a -- it's a SQL database that was -- I mean, it exceed the size of anything that could be attached to this. But yes.
Q. Okay. And then once you had type reprocessed, you went ahead and did your run against your DNC database, which we're not going to get into. We've got plenty of discussion on that. How did you calculate whether a number had been on the DNC list for more than 30 days since the first message?
A. There's a process called IZ DNC.
Q. Okay.
A. Which is the server that we have. That's literally what it called. And there's a tag called IZ DNC now and IZ DNC more than 30. The database that would be related to -- topically related to that date that was more than 30 days prior would be tagged. So



that's where we're looking to make sure and then we also look in the database for now to make sure that the data -- the number is still in that database --
Q. Okay.
A. -- and then that table list. And then if both of those match, only then is a number considered more than DNC. So if it falls off, it's not going to be considered.
Q. What do you mean if it falls off?
A. Meaning if it gets -- if it was 30 days -- if it was on the DNC list 30 days ago, but it's no longer on the DNC list as of the date of the call or --
Q. Oh, okay.
A. -- point it falls off.
Q. And I now understand what you mean.
A. Yeah. Falls out. And we don't include that.
Q. Okay. If you had, you know, a number that was previously on the DNC, now no longer is, but they received messages while they were on the DNC, are they still included in your count or because they're no longer on the DNC, they are not?
A. No. If they were still included -- if they were on the DNC contiguously for 30 days as of the date of the call or text, then they were included.
Q. Okay.



A. But if they're not on the DNC anymore, but they were at the time they're still included.
Q. Uh-huh.
A. But we wouldn't include any calls after they dropped off.
Q. Of course.
A. Yeah.
Q. Of course.
A. We're careful about that. And the SQL database, the actual calls themselves --
Q. Uh-huh.
A. -- has -- and I do think it's important that that SQL database be provided. Was that -- there was no document request, but typically in a subpoena, we get a document request. We get asked for the original data. So I'm just going to say that. I'm going to send that to you guys. Just as a, I mean, you know, I -- I think it's important to, you know, I don't know --
MR. JILIZIAN: I -- I mean, again, that -- that's going to go through the counsel, et cetera.
THE WITNESS: Oh, okay.
MR. JILIZIAN: I mean there are, like, channels that we have to follow.
THE WITNESS: I'll make it available if that's desired. How about that? I didn't realize that that



wasn't provided.
MS. ENGLER: Q. It's -- it's fine. It's fine.
A. So okay. I'm sorry. I -- I thought it was provided. So okay.
Q. It's okay.
A. So we are in the database itself. There's a tag that says which DNC file we looked at from the --
Q. Okay.
A. -- Federal Trade Commission for more than 30 days as well as today's date or the date of the call.
Q. Okay.
A. Both of those are populated. The actual file names as well.
Q. Okay. So it's the actual file names. It's not like a yes or no?
A. It's -- it's actual file names.
Q. Okay.
A. Yeah. We have every -- so we have both the file name and then we also have a yes or a no to indicate whether or not that number was on that file.
Q. And after you go and do this processing against the DNC records, what validation do you do afterwards?
A. Not really. I mean, the -- the DNC process



MAGNA LEGAL SERVICES

itself runs validation checks. I don't -- I mean, after it's done, it's -- it's done. We don't do any additional validation.
Q. You don't do any, like, spot checks or other kinds of just --
A. We used to --
Q. -- validations?
A. -- but we don't anymore because we've never found any errors in that process.
Q. Okay. Okay. Now you mentioned you're using some standard SQL queries in order to do this work. How -- how complicated are these queries?
A. They're complicated in the sense that one really has to have a lot of SQL expertise to be able to construct them efficiently --
Q. That makes sense.
A. -- and to be able to interjoin and outerjoin -- I'm sorry. Join or to take data that's associated between different tables, like a telephone in the DNC tables versus telephone number in the call detail records. You know, anyone can tally 50 numbers on an Excel spreadsheet probably. It takes a lot of sophisticated techniques to tally 43 million records, for instance. And that's -- that's really where my expertise from the database standpoint is.



Q. If there was going to be another person that would have the capability to do this kind of coding, what education or experience level would they have?
MR. JILIZIAN: Objection; sorry. Objection; form, foundation.
THE WITNESS: David Kalat Berkeley Research Group.
MS. ENGLER: Q. Okay. So it would definitely be somebody more than just a computer science B.S. grad?
A. I have no idea what they're teaching in computer science.
Q. Fair.
A. But someone like David Kalat. That's his own work.
Q. Are there any other experts that you --
A. You know, I'm not saying that he does a great job or not, but Jan Kostyn, I think, has the knowledge maybe to do it. But I don't think he has all the data sources that I do and he doesn't have the SQL stuff and the --
Q. Okay.
A. -- clusters of servers, but David Kalat does.
Q. Any other experts that you respect their experience?



A. Oh, I respect everyone's experience.
Q. Yeah. That's probably not a -- not the right question.
A. As -- as an expert, I can't say who is a bad expert, right.
Q. Sure.
A. But I can tell you who is a good expert.
Q. Uh-huh.
A. And I really like David Kalat, K-a-l-a-t, Berkeley Research Group. I like Charlie Platt P-l-a-t-t. He's a mentor of mine. He was opposing expert in a case of -- against me. Great guy. He doesn't have the telecom experience, but he knows SQL. He doesn't have this DNC stuff, though. I think that's it.
Q. Okay.
A. I think Jan is good at certain things. As long as he's not proffering legal opinion, I think he's good.
Q. Okay. I'm trying to minimize some of the stuff we've already reviewed over, so --
A. Would it help if I went to the restroom and took a few minutes?
MS. ENGLER: It's been about an hour since we took one, so yeah. Let's go ahead and go do that.



(The deposition was in recess from 4:30 to 4:43.)
MS. ENGLER: Q. All right. We're back on the record. When we took our break, we were starting to go through some of your methodology about how you went about putting together this report. And we talked about the DNC and how you did your run with that. So now I want to take a look at Paragraph 34 using the RND.
A. Okay.
Q. Okay. So with the RND, how long after a number is disconnected does it take to show up on the RND?
A. It's published on the 16th of each month so anything that happened between the 15th -- is 16th of the last month and the 15th of this month will appear on the 16th.
Q. Okay. So --
A. That's my understanding.
Q. So it's updated once a month?
A. Yes.
Q. Okay. So it could be that it was disconnected, you know, literally the day before or 29 days before?
A. It's possible.
Q. Okay. So and you tagged the earliest date a



MAGNA LEGAL SERVICES

text message had been sent to that number and the latest date to use as -- to use for the RND, correct?
A. Yes.
Q. Okay. It's going to be easier for me to work through this if we use an example of dates. Is that -- does that work for you?
A. Sure.
Q. Okay. Let's say an example is date No. 1 is January 1, 2024, and date No. 2 is January 1, 2025. Just New Year's Day, just 2024, and 2025. So when you would do the first pass-through of RND, you would use the 2024 date with the number and if it returned. And what would you be looking to see it return if it was possibly disconnected?
MR. JILIZIAN: Object to form.
THE WITNESS: I believe that would be a yes for disconnected. I alias it immediately upon getting back the files. So I look at the disconnected file and it's labeled disconnected file --
MS. ENGLER: Q. Uh-huh.
A. -- and I change the word in there to disconnected --
Q. Okay.
A. -- just so that there's none of this yes means active or yes means disconnected or vice versa because



that gets pretty confusing.
Q. Okay.
A. So I looked to see if it's disconnected -- on the disconnected list.
Q. On -- on the date of first text?
A. Yeah.
Q. Okay. And then after you see whether it's been disconnected on the date of the first text, what do you -- what date do you run next?
A. The last date. Calls --
Q. Okay.
A. -- for that particular number.
Q. And for the dates that you are running the first and the last text for a number, what did those results have to be in order for you to believe the number had been disconnected between the first and second date?
A. It either has to be active on the first and disconnected on the end or, I believe, disconnected on the first and disconnected on the end. Because disconnected means reassigned.
Q. So if a number was active on January 1, 2024, and then reported as disconnected on January 1, 2025, that would be an included number in your set of reassigned numbers?



A. Yes.
Q. Okay. And if --
A. Reassigned or disconnected.
Q. Reassigned or disconnected?
A. Yeah.
Q. And if a number came up on January 1, 2024, as disconnected, and then on January 1 2025 as disconnected, you would also consider that a number that had been reassigned?
A. Yes.
MR. JILIZIAN: And objection; form. Objection; foundation.
MS. ENGLER: Q. Any other results for --
A. So I -- I just want to say I believe I only included disconnected to active, meaning that they went from a disconnected state to an active state.
Q. So meaning that if date No. 1, January 2024 was disconnected and then in January 1, 2025, it was then active, you included that?
A. Right.
Q. Okay.
A. Because it had shown as a reassignment between those two.
Q. Okay. But if a -- if a number -- like if -- if a number for the two dates had come up with



disconnected and then disconnected, was that included as well?
A. I don't believe so.
Q. Okay.
A. Yeah. I just wanted the make that clarification --
Q. Sure.
A. -- because it's possible that there was a disconnected to a disconnected, but there was not a transition and I was just looking for the transitions.
Q. Okay. So that -- that's really the key here is the transitions?
A. Yeah, it is.
Q. Okay. And just to make sure that I've got it clear, it's date No. 1 active, date No. 2 disconnected. Or date No. 1 disconnected, date No. 2 active. Those would be the conditions to have them included in the dataset?
A. That's correct.
Q. Okay. Any other conditions that would cause the number to be included in your dataset?
A. I don't believe so.
Q. Okay. Is there any requirements or timelines -- well, let's say that again.
Do you know if there's any kind of



MAGNA LEGAL SERVICES

Page 218

requirements for how long a number must be disconnected before it can be reassigned?
A. A hard disconnect to a new assignment is, I believe -- it used to be 30 or 60 days. Those were FCC rules and I just know that from my own knowledge of having operated a phone company. But a number can be reassigned. Say you are working -- you have a number as part of a family plan and you give it to your brother, who goes off to college or something. Uhm, that can happen immediately. I don't think there's any -- any rules about that.
Q. Are those reassignments, like, the ones between family members -- well, let me say this differently.
Is there any distinction that's made in the reassigned number database for those immediate disconnections versus a hard disconnections?
A. I wish there was. And not to my knowledge.
Q. Okay.
A. Yeah. I think the RND is -- is -- it's -- it's really just showing resigned or disconnect, but I don't think they get into that area -- level particularity. It's not particularized.
Q. Okay. So -- so with this -- this grouping that you get of the numbers that meet the standards that

Page 219

we, you know, set out, do you do any, like, additional filter to try and figure out when the disconnection happened?
A. I do, occasionally, is what's called an iterative -- an iterative process to go back month by month by month --
Q. Uh-huh.
A. -- and put the dates in as of the 16th of each month. But in a case like this, where I'm just looking for one or more calls during reassigned, I don't.
Q. Okay. So as long as there was a change from date No. 1 to date No. 2, it was the included in it dataset without any further filtering or --
A. That's right.
Q. Okay.
A. Are you okay if I drink some --
Q. Of course.
A. -- drink a beer. Just kidding.
Q. Of course.
MR. JILIZIAN: Let the record show it's not a beer.
THE WITNESS: It's root -- it's root beer. Oh I'm -- yeah. It is root beer. Oh, ginger ale. Pardon me.

Page 220

MR. JILIZIAN: There you go.
MS. ENGLER: Q. Of course. Now, obviously, in the binder, we do not have the document because it is gigantic, but you produced a spreadsheet showing all the messages that you contend are the ones that are left in the data after performing your filtering methodology; is that correct?
A. Yes.
Q. Okay. And I believe that was identified as -- let's see -- see the exact exhibit number. It was either exhibit -- yeah, the output of the text messages is attached as Exhibit 8. So the native version of that Exhibit 8.
A. Yes.
Q. Okay. And after that production was made, did you do any kind of, you know, validating after the filtering -- all that filtering was done?
A. No. I did some spot checking, but I didn't do any additional validating because the way that the database works, it's a rules-based engine. So it's either going to be right or it's going to not be. And what if it's not right? Then you get sort of a -- get a lot of SQL error messages and strange things. So I -- I cross-check my steps. I have a cross-check list of a -- a waterfall, which has these numbers on it.

Page 221

Q. Okay.
A. And then I compare and run SQL queries blindly to make sure that -- say, for instance, the named plaintiff has records that are included. Sometimes there are surprises at the end and sometimes that's where it ends.
Q. Fair. That's fair. And then, of course, you have Exhibit 9. I almost did that with the coffee earlier. We're good. You have your Exhibit 9 where it says an output reflecting the quantity of these text messages sent to each telephone number?
A. Yes. And produced in native format.
Q. Again, also didn't print it because it's gigantic.
A. Yeah. I'm surprised when people have printouts and things.
MR. JILIZIAN: And -- and I'm just asking to make sure. You're just referring to these documents?
MS. ENGLER: I'm just referring --
MR. JILIZIAN: Right. Not just -- okay. Got it. Got it.
MS. ENGLER: Yeah. I mean, we've entered the entire report and all attachments.
MR. JILIZIAN: Yeah. Yeah. Of course.
MS. ENGLER: But, you know, we'll just use the


MAGNA LEGAL SERVICES

Page 222

placeholders for the --

MR. JILIZIAN: Not a separate exhibit, sounds to me.

MS. ENGLER: No. No. And I don't have any questions about them other than just confirming what they are in your report.

MR. JILIZIAN: Okay.

MS. ENGLER: Q. And for your output No. 9 -- the output for No. 9, did you do any kind of validation against, you know, other -- against the messages or otherwise?

A. Uhm, I cross checked using SQL to make sure that the telephone numbers were part of the Reassigned Number Database responses and so and on so forth, but other than that, there was no other sets of validations that I could think of doing.

Q. Okay. Okay. And I know I -- I probably asked something similar to this earlier in the day, but your evaluation doesn't include any assessment on whether any of these numbers are business or residential?

A. No.

Q. Are you aware of any database that's available where somebody could with certainty determine residential versus business lines?

MR. JILIZIAN: Objection; form. Foundation.

Page 223

THE WITNESS: Carla Peak in Head v. Citibank references a database. I can't remember which one, but she's a claims administrator and she talks about how she has a method of filtering those business lines out. Pacific East, which was the -- one of the vendors in Davis v. Capital 1 --

MS. ENGLER: Q. Uh-huh.

A. -- appears to have something -- I think they used to call it accurate database.

Q. Uh-huh.

A. But I'm not sure on what those databases -- which ones are available and what's being used now.

Q. Uh-huh.

A. Telephone companies have a business or residential flag on those telephone numbers and telephone companies can be sent a subpoena and they will get -- they will return the business or residential flag.

Q. Uh-huh.

A. But I myself don't know of any publicly available database -- or I haven't used any publicly available database to do that.

Q. Okay.

A. It's usually part of a claims administration process. And in cases that have settled or where class

Page 224

notice was sent out, such as in the XM radio case, I don't know what databases were used.

Q. Okay.

A. Simpluris uses one as well, but I don't -- I don't know. Sorry.

Q. No. It's fine.

A. Okay.

Q. There's no need to apologize. Is there any percentage of error you've calculated for your results?

A. Percentage of error?

Q. Uh-huh.

A. None that I'm aware of.

Q. Okay. Are you aware of any other experts that use similar methods to this for TCPA cases?

MR. JILIZIAN: Objection; foundation.

THE WITNESS: On the plaintiff's side or defense side?

MS. ENGLER: Q. Either?

A. Yeah. David Kalat.

Q. He uses a method that's similar your -- your SQL method?

A. I think so Peggy Daley does as well. Margaret Dailey. As well as Madeline Moran, M-o-r-a-n.

MR. JILIZIAN: Objection; form. Foundation, to just to that line.

Page 225

MS. ENGLER: Q. Now, you've obviously developed this methodology over -- your experience over many years. Is there any texts or, you know, other writings?

A. Treatises.

Q. Treatises, sure --

A. We can use fancy words.

Q. -- that inform your methodology that you rely on?

A. I have been told that I am the one who has developed the most comprehensive methodologies that there are. So, uhm, no.

Q. Who has told you that you have the most comprehensive methodologies that there are?

A. Dan Nelson is an attorney. I've been told also by my client at the time, Dan Plunkett. I've been told by other experts.

Q. Okay.

A. I mean, I -- I think in -- certainly in my use of the DNC, you know, 1.3 billion records so far this year, we're probably doing the most. By my estimate, we're a fairly meaningful percentage of the RND stuff. And I go to the Somos conferences, talk to people about best practices. Just informally, but --

Q. Yeah.



MAGNA LEGAL SERVICES

A. -- I mean, I'm sort of the -- I'm sort of considered, I guess, or I've been told I'm considered an authority on it. I think if you were to ask Somos or someone else, they would probably say that, too. But I don't really know. But I have been told that about the -- from attorneys that I developed the preferred methodology.
Q. Okay. Are there any texts or writings that you use or rely on in your work?
A. No. Other than the -- the declarations that have come before in the -- you know, having been accepted and granted and challenges lodged and overcome.
Q. Have you published any articles concerning this methodology?
A. Is Pacer considered a published?
Q. Pacer? Not -- not quite.
A. I mean, you know, it's -- lot of stuff on Pacer, but I had a copyright case that hinged on publication in Pacer that I prevailed on. So --
Q. Have you done any training sessions for other experts on how to apply this methodology.
A. All seven of us? No. I think there's seven of us.
Q. Have you published any articles or papers on the Reassigned Number Database?



A. No.
Q. Okay. If you could look back at page 10, note 10.
A. Page 10, footnote 10?
Q. Footnote 10. Yes. You say it's my understanding that plaintiff has requested full detail records for the inbound text messages. And once they are produced, you can run SQL statements to exclude any text messages to any telephone number that sent an inbound message on the date on or after the RND update. Okay. So you never received any such documents, correct?
A. I have not.
Q. However, if you would have received such documents, this would have been your process for excluding some of these numbers?
MR. JILIZIAN: Objection; form foundation.
THE WITNESS: It follows the same methodology as that which I did in Spring EQ, as I also applied in Steel Supplements on behalf of defendants, as I would have also, as I would have applied in or did apply in -- in Athena Bitcoin. Those -- those cases don't necessarily have RND elements, but they rely upon inbound messages to discount anything that had been sent a message implicating an interest in a product or a



service.
MS. ENGLER: Q. Okay.
A. And I'm saying that as expert on behalf of defendants, not in Spring EQ.
Q. Sure.
A. But in -- in general, it's the same method I would have applied.
Q. But going back to what you wrote, it's that once any inbound records had been produced, you would be able to run SQL statements to exclude any text message to any phone number that sent an inbound text on a date on or after the RND update?
A. Right.
Q. Okay.
A. And just to explain and an abundance of caution, if there was an inbound -- often in these cases if there is an inbound message --
Q. Uh-huh.
A. -- I take all of those -- if it's an inbound message, I take -- generally take those messages out.
Q. The messages or phone numbers?
A. Well, the messages to the phone numbers.
Q. Got it.
A. So I guess in that sense we're both right.
Q. Okay. Okay. I was just making sure you



weren't saying just that oh, I take out that inbound one but then I still keep --
A. Yeah. No. I appreciate the clarification. I misspoke.
Q. It okay. I've done it a bunch myself today. Then you also mention that, to the extent if there's any other kind of data received -- to -- that you would be able to run SQL statements to exclude other text messages related on additional criteria. For example, whether a person that is associated with the phone number made a purchase?
A. Yes.
Q. So you would exclude people that had made a purchase somewhere within that time -- within the time frame of the number being re-assigned?
A. Or any purchase.
Q. Or any purchase?
A. Yeah. I mean I think it's important to do an analysis as -- and all the benefit of anything possible should go toward -- toward the defendant in the case that there's a potential. So get a very clean fairly defined set of data. I -- this is already very clean and very narrowly defined, but you can further refine it.
Q. Now, obviously, a person that goes and makes a



MAGNA LEGAL SERVICES

purchase shows true interest in the sender's products. Would you similarly exclude any numbers or messages if a person clicked on the link that was in the message and added an item to the cart?
MR. JILIZIAN: Objection; form. Foundation.
THE WITNESS: I think so. I mean this, you know, I -- these are the -- this is the approach exactly what you described -- that I took in Athena Bitcoin and I was on the defense side. I think class certified anyways, right? There wasn't anything I could do. I mean, did analysis and court's, like, no. We're, you know, taking plaintiff's position. The point is that I would apply the exact same methodology --
MS. ENGLER: Q. Uh-huh.
A. -- because that's the methodology that's correct.
Q. Okay. Would you similarly considering excluding phone numbers of individuals who received a text message and clicked on the link, but didn't add any products to the cart?
MR. JILIZIAN: Objection; foundation.
THE WITNESS: Yeah. That's -- I mean, that's -- that's starts to get into the area of, you know, me making a judgment call and I don't -- I don't make judgment calls --



MS. ENGLER: Q. Understood.
A. -- so I wouldn't -- I wouldn't approach that.
Q. Understood.
A. But I think if there was a purchase, that's a different story.
Q. Okay. Now, sometimes an inbound call could come between the time, like, with you're looking at your two dates. Especially if it's a longer period of time, there could be an inbound message that comes during that time?
A. Sure.
Q. And you've seen, obviously, BBQGuys text messages and some of the content being, like, text back football to hear more about X?
A. Father's day is coming up. Get your 20 percent discount. Click here.
Q. Uh-huh.
A. Yes. I've seen those messages.
Q. So if a person would have responded to one of those messages of a, you know, one two or three what are you looking most forward to for the fall? Like, football, Thanksgiving, you know, cool weather. And a person responds back with, like, you know, football or something. Would that be something that would make you consider excluding that number?



MR. JILIZIAN: Objection; form. Foundation.
THE WITNESS: That calls for, really, a legal conclusion --
MS. ENGLER: Q. Okay.
A. -- because, I mean, that's -- I mean, you've got that fast, easy, case and you've got the case in Texas recently about, you know, the solicitation and informational purpose. I mean, then you've got the Carroll VSPS case which was in -- which I was the expert for defendant. And I believe that was in --
Q. Is it --
A. -- LaPorte.
Q. -- Carroll VSPS, is that what you said?
A. Yes. LaPorte.
Q. That was in -- that's my -- my neck of the woods --
A. Yeah.
Q. -- Louisiana, yeah.
A. So I was qualified by the -- the court there, I believe, and full purpose. I mean, so it's really -- it's really calls for however you guys do it because I don't have any say in that.
Q. Now, once you have your results, you draft a report, add exhibits, and just send it to plaintiff? Plaintiff counsel, I mean.



A. Yes.
Q. Okay. Did plaintiff at any point ask you the change your opinion or any of your content of your report?
MR. JILIZIAN: Objection; foundation and also to any extent it would require you to disclose communications that you can keep those private.
THE WITNESS: Uhm, the answer is no. There is no -- there is no request. Generally -- and at this point, hey you put the wrong -- you know, you put yesterday's date. You need today's date. Hey, you got the court wrong. That kind of stuff.
MS. ENGLER: Q. Sure.
A. But there's nothing substantive that's coming from the attorneys.
Q. Then that's what I care about is no substantive changes. Okay.
A. Font style to match the local rules, Garamond font size 14 verses Times New Roman 12. Stuff like that.
Q. Uh-huh. I've obviously been, you know, trying to suck every single bit of information out of you about your methodology, your process, your setups. As you sit there today, is there any other testimony that you intend to offer concerning your proposed methodology in



MAGNA LEGAL SERVICES

Page 234

this matter?
A. Yeah. I mean, I -- I think that there is always an opportunity or an expectation that if I receive information that is -- that could either be helpful to trier of fact or could be used to further refine an analysis -- I don't know if discovery's been closed or not, but if there's supplemental discovery that is -- is potentially useful or the attorneys feel it's useful anyway, I -- I definitely want to get the opportunity to do that.
Q. Okay. That -- that is getting a bit more into, you know, potential for future testimony. I'm just asking --
A. Oh.
Q. -- as of today, with everything you know, everything we've talked about, you know, is there -- currently, do you intend to offer any other testimony concerning your methodology?
A. Thank you for the clarification. The answer is no.
Q. Okay. Do you intend to offer any other testimony concerning the call detail records from BBQGuys?
A. Or those who made -- yeah, I don't have -- I'm sorry. BBQGuys.

Page 235

Q. Uh-huh.
A. Right. So I -- I misheard you.
Q. Okay. Do you need me to restate?
A. No. No. You -- you asked if I have any other opinion or tend to offer any opinions -- further opinions related to the analysis I've done on the records as they are provided so far from BBQGuys.
Q. Correct.
A. Okay. Thank you. I misheard you earlier. No, I don't have any further opinions that I intend to provide on the methodology.
Q. Other than the limitation you've said a number of times today, you're not a lawyer, you're not offering legal opinion, is there any other limitations that you want to state concerning your testimony?
A. I can't think of any.
Q. Okay. That's fine. How much time do you think you spent preparing the report?
A. Two hours.
Q. Two hours.
A. The report itself?
Q. Well, the report itself first, but then -- the doing the analysis and report?
A. The analysis? I have the time written here --
Q. Okay. Yeah. Please.

Page 236

A. -- on Exhibit 1 which would be 21 hours -- 21.68 hours total. Of that, I think about two or two and a half hours is actually writing -- is actually putting the numbers into the report.
Q. Because I imagine that a lot of stuff you can reuse over and over again just because the methodology isn't changing?
A. It changes a little bit. More -- it's idiosyncratic to the -- or -- I'm sorry -- to address the idiosyncrasies of this call detail layout itself.
Q. Uh-huh.
A. But generally, it's the same approach in -- in every case. Regardless of which side I'm on, it's the same report.
Q. Uh-huh. When were you retained in this matter by plaintiff counsel?
A. Approximately February -- probably 15th or 20th of this year.
Q. Have you ever -- have you -- are you currently retained in any other litigation as an expert where the plaintiff is Andrew McGonigle?
A. Oh, I don't keep track of the plaintiffs' names. I don't think so. But I'm not limiting myself to that answer. I don't know, but I don't think so.
Q. Does Office Depot ring a bell?

Page 237

A. Office Depot?
Q. Uh-huh.
A. I don't recall if I was on Office Depot. I might be confusing it with Loan Depot. Loan Depot or Office Depot.
Q. Office Depot?
A. I don't recall the plaintiff's name in that case.
Q. Okay. Have you been retained by plaintiff counsel in any other matters where your methodology incorporates the Reassigned Number Database?
A. Yes.
Q. Do you know how many?
A. At least a dozen.
Q. Uh-huh.
A. Probably more. A lot of times I'm retrained as a consulting expert --
Q. Of course.
A. -- and not a testifying expert. In which I am tasked with running an analysis without a full verbose report. And so I don't really know how many cases that would be. I think about 12 cases involving RND. There must be more though. I just can't remember.
Q. Okay.
A. I'm sorry.



MAGNA LEGAL SERVICES

Q. That's okay. That's okay. I know these are -- these tend to be -- depositions tend to be memory tests just a little bit.
MR. JILIZIAN: It's all right, man.
MS. ENGLER: Q. How many matters for -- either for RND-based cases or other TCPA cases -- have you been designated as an expert, whether -- or retained or not designated. Retained as an expert for the same plaintiff's counsel as in this case?
A. 40 maybe.
Q. Okay.
A. That's a pretty small percentage of my TCPA matters. Probably done 4 or 5 hundred of these if not more.
Q. So 4 to 5 hundred. But considering the TCPA cases you have done with Anthony Paronich's firm, Avi Kaufman, and Dana Oliver you would think collectively, it's 40?
A. No. It's more than that.
Q. Okay.
A. I was just thinking Anthony Paronich.
Q. Yeah. So think Anthony plus Avi plus Dana?
A. I would be guessing, but I would estimate --
Q. Okay.
A. -- probably 150.



Q. Okay. What does -- is it easier to put a percentage on it? Like an estimated percentage?
A. No. I'm just thinking, I mean, I'm just in an analog sense right now --
Q. Sure.
A. -- it feels like about 150. Might be less somewhere between 120, 150 cases. Because I've been working with Avi for a very long time. He was the first plaintiff's side case I worked on.
Q. Okay.
A. And it was several years ago. It's before COVID. So 120, 150. Somewhere in there.
Q. Does plaintiff's counsel refer cases or clients to you?
A. My entire business is predicated on word of mouth and doing a good job and I won't even take a client if they haven't been referred to me by someone that I've already worked with. Plaintiff's side or defense side. I'm just too busy to do it. And so they will occasionally refer someone, but, I mean, I think I'm already working with everyone in this business, so I'm just surprised when there's a new name that calls me up and says they've -- they're working in TCPA.
Q. Uh-huh. Okay. Do you recall when you first spoke with plaintiff counsel concerning the use of the



RND in litigation? Not particular to this litigation. Just litigation in general?
MR. JILIZIAN: And I'll interject, sorry. Saying when you spoke is okay, but just don't disclose the content of those conversations.
THE WITNESS: I -- I do not recall when I was first asked.
MS. ENGLER: Q. Do you recall when you first began incorporating the RND into your methodology in TCPA cases?
A. You ask me to search pretty hard into the annals of my memory here. I don't recall.
Q. Okay.
A. I mean, I could probably look at my billing records see when the first time I billed for RND use was, but I -- I don't recall just here.
Q. Okay. Do you maybe, like -- well, the RND, of course, first became available in '21. So any chance of a particular year, perhaps, you started incorporating it?
A. I think it was 2024.
Q. 2024?
A. That seems about right.
Q. Okay. Would that he have been around when you first got access to the RND or were you using it before



then?
A. No. I have not used the RND until I had formal access to it from Somos.
Q. Okay. And would have that been around the time you got access?
A. It took a while to get access so I first interfaced with Joel -- guy named Joel. I remember that.
Q. Okay.
A. And then I don't remember all the iteratives.
Q. Sure.
A. But I do remember it is shortly that.
Q. Okay.
A. I mean, not shortly after that. It took a while to get established and then had to get my login ID and do some testing and validation and make sure that I could pass the tests of how to pass files back and forth.
Q. Okay. Do you recall if you had the -- you potentially had the -- I mean, scratch that.
Do you recall whether you spoke with plaintiff counsel in general about using the RND in litigation before you got your access with Somos?
MR. JILIZIAN: I'm just going to instruct you not to answer the -- the contents of our conversation,

which I'm not sure you would be able to provide an answer here to that question. I mean, that calls for the content of conversations between attorney and the expert.
MS. ENGLER: Q. I mean, but it's -- concerning the litigation. I'm just talking about the general -- from a general perspective on using the RND in litigation when there -- this litigation wasn't filed until October 2024. So it's --
MR. JILIZIAN: So hold on one sec. I -- I understand that you -- I'll permit him to answer as to the timeline of the engagement, but the content of the conversations about when it was discussed between attorneys and experts to use the RND database would remain privileged.
THE WITNESS: I'm -- I'm going to answer the question by saying that, first of all, I said earlier I don't remember which attorney I spoke with first.
MS. ENGLER: Q. Sure.
A. I don't recall anybody asking me if I can use the RND in the context of litigation. I just remember somebody saying, I mean, hey, run RND on this.
Q. Okay.
A. But I don't recall who that was, but I know that I was able to do it.



Q. Okay.
A. And I'm pretty transparent about the fact that I'm using it for this purpose. I'm not -- I'm not a hide-the-ball guy, so. But that's notwithstanding Counselor's objections, I don't recall with whom I had those conversations with or what the content was. I just remember getting access to it and then --
Q. Okay.
A. -- using it eventually.
Q. Okay. Have you ever had a TCPA case where your fee was contingent on the outcome of the litigation?
A. Uhm, no. Never.
Q. Okay.
A. That would not be something I would ever consider.
Q. And you'd never consider a, you know, a bonus potential for a favorable settlement?
A. Oh, my God, no. No. Yeah. I've -- I would never have a -- if a client mentioned that to me, I would just, gently -- I wouldn't even gently -- I would just say conversation's over.
Q. Uh-huh. Okay.
A. I got up from dinner one time in San Francisco from a -- from a claims administrator who asked if I



would be willing to -- to steer business their way and I got up and left. I don't even remember which one it was. I just said dinner's over, guys. Thanks. Bye.
Q. Uh-huh.
A. And I don't know whatever happened to my meal I never called to find out.
Q. Okay. We'll go ahead and take a look at Exhibit 2 to your report, which I believe is a list of cases.
A. Is this a good time for me to take, like, a three-minute just make sure that end of a day --
Q. Sure.
A. -- details are taken care of here?
Q. Fine.
A. Off the record?
(The deposition was in recess from 5:25 to 5:34.)
MS. ENGLER: Q. We're going to take a look -- back on the record. We were beginning to take a look at Exhibit 2 to your report when we just took a break, which was the listing of different cases. When was the last time this case list was updated?
A. Updated after every case. Like today updated it already.
Q. Do you add cases or remove any?



A. I add cases. Every so often I go through and delete cases if there's been no activity for four years.
Q. Okay. How -- when's the last time you did a review for cases where there's been no activity for four years.
A. It's probably been six months or a year.
Q. Okay. The website said that you've been retained as an expert in, like, over a thousand cases, I believe. Did you produce a report in all of those cases?
A. No. I've also had my name used to submit declarations in approximately 196 cases in which I wasn't the expert, but somebody actually used my name. So that's not included in that thousand, but there's a lot of --
Q. Okay.
A. -- there's times out there my name comes up and I wasn't actually the expert.
Q. Uh-huh. So the 1,000 count is when you were retained as an expert and does not include times that you submitted, like, an affidavit in support of a motion?
A. If I support -- if I was anything that -- no there's -- those -- well, say -- ask again. I'm sorry.
Q. It's okay. So that 1,000 count that you have



MAGNA LEGAL SERVICES

about the number of times being retained as an expert, where in -- you just, I believe, testified that you don't produce a report in every single one. Does that 1,000 number also include cases where you may have produced a declaration but not an expert, like, report?
A. No. If I produced a declaration or an affidavit, even if it's in support of a motion for preliminary approval in a case where I was otherwise just simply a consulting expert, I'm going to consider that as part of the retained cases in which I produced a report.
Q. Okay. Is there any, like -- is there any logic to how this is organized?
A. In order of when I started the cases or when I had -- no. When I had my depositions taken.
Q. Okay. So you update it based on when your deposition is taken?
A. I do.
Q. Okay. Is it going from most recent -- like, is it most recent to furthest in time or is it --
A. Furthest in time is -- yeah, so it's going in date ascending order.
Q. Got it. So the most recent testimony would have been on the last page of exhibit to the Irma Barboza and Cecilia Matta matter?



A. That's pretty dated now. There's probably four or five other matters in which I've given testimony.
Q. Okay. So there's a number of probably other cases that need to be added to this?
A. Well, they have been added. It's just at the time that I proffered this declaration, this was the most recent one.
Q. That -- that case was the most recent one as of April 28th, 2026?
A. Correct.
Q. Were there any cases that you omitted your testimony that occurred within the past four years?
A. No.
Q. Okay. Do you know up -- now, I counted to try and make sure and see how many there were, and I believe there's 53 cites on here.
A. Okay.
Q. Do you know which of these are for TCPA or telephone-related cases versus another claim?
A. Yeah. We can go through it if you like.
Q. Sure.
A. Okay. So how would you like me to do this? Do you want me to write them down? Do you want me to just tell you? Do you want me to go through and mark up



a copy somehow? We make a photocopy of this and -- how -- how do you prefer to do that?
Q. Yeah. If you want to just go ahead and check -- do a check mark by the ones that are TCPA?
A. Well, we've already entered this into the record so maybe -- let me just -- can we go on a break for just a second? I'm going to see if they can make a photocopy of this.
Q. I think most of the support is gone, but we have a -- could we use your copy?
MR. JILIZIAN: I mean, honestly I think it might just be easiest, right, to just go through on the record and just say. I mean, it will appear on the transcript, right?
MS. ENGLER: Okay. That's fine.
THE WITNESS: I just want to be respectful of time.
MR. JILIZIAN: Because I think -- because that creates a situation where we have to now admit, like, your written up exhibit and stuff. I think it would just be easiest --
MS. ENGLER: That's fine.
MR. JILIZIAN: -- if we could do it like this.
MS. ENGLER: We can just do it like that. So if you just want to go, like, I don't need you to --



THE WITNESS: I'll just read the defendant name. The first word -- the first two, the words of the defendant's name. So, like, for instance, SGS Automotive. I'll just say SGS.
MS. ENGLER: Q. Okay.
A. If that's okay with you.
Q. And you can -- and just to make it also easier, is you only need the read it off if it is a TCPA case and we can skip the ones that are not.
A. Sure.
Q. With the assumption if you do not --
MR. JILIZIAN: Yeah, yeah, absolutely, yeah. You can --
THE WITNESS: Do you want me to highlight this for your benefit as well? Always carry a highlighter --
MS. ENGLER: I have a highlighter.
THE WITNESS: -- until it --
MR. JILIZIAN: There you go.
THE WITNESS: -- leaks. Then it's a mess. Okay.
MR. JILIZIAN: I think this is the start.
THE WITNESS: Yeah. Okay. Let me know if you need me to slow down or clarify anything, Ms. Court Reporter.
SGS is TCPA, EXP Realty, TriVita, Public



MAGNA LEGAL SERVICES

Reputation, Houston Baptist, First Team, Gold Co, Blue Green, Green Dot, Allsup, A-l-l-s-u-p. Victory Phones. Bright Solar, Club Exploria, DSW, Federal Savings, Brokers Data, Brock Pierce, P-i-e-r-c-e, Van Tuyl which is V-a-n-T-u-y-l, Hertz H-e-r-t-z, move.com, XM radio. The maids M-a-i-d-s, Loan Depot, Exam Works, Capital Vision, Loan Depot again. Spring EQ.

MS. ENGLER: Q. Okay. So I'm counting 27 cases that are TCPA related on this list.

A. Okay.

Q. Does that number sound correct?

A. Could be. I -- I didn't count, but I think that I went through them all on this list.

Q. Well, the record will reflect the names you just said, so we can count, certainly, in the record as to how many you just said. And I think you testified earlier that you haven't done trial testimony.

A. Not in any TCPA matters except for Lofton v. Verizon. And the only time I was in trial was for a sanctions motion against Verizon.

Q. Okay.

A. So I don't know if that's considered part of this or not, but I did give testimony in a court.

Q. Is -- was it testimony concerning, like, your methodology and work as an expert witness?



A. Certainly work as an expert witness. It was a -- if I'm not mistaken, it was a sanctions motion against Verizon Wireless for non-production of business records.

Q. I see. Yeah, so that's not so much a trial but a hearing. So --

A. Yeah. I think it was pretrial. You know, one of those. One of those.

Q. Understand. Do you know in the -- the TCPA cases that you checked off, do you know which of those cases -- in which of those cases your methodology was accepted by the court?

A. I don't know.

Q. Okay. Do you know which ones where your testimony was excluded?

A. I feel like I should know this. Everglades.

Q. Okay.

A. And Houston Baptist. I think that was on here.

Q. Yeah.

A. And --

Q. And also, when I say excluded, I don't necessarily mean just because they didn't find a methodology reliable. It could also be for untimeliness of disclosures and for other procedural reasons.



A. SGS, there was an untimely report. It was stricken --

Q. Okay.

A. -- for being untimely.

Q. I don't know how to pronounce that last name but -- oh, wait. That's something else. Never mind. Scratch that.

Okay. So when -- when you have a -- when you do though have, say, a party that files a, you know, a motion in limine to restrict the enter -- like your ability to testify as an expert and they are successful in excluding your testimony, are you typically informed of that exclusion?

A. I wish I was. No. I'm not. Sometimes I find out in a deposition or a -- in another type of environment where, you know, one of my clients is asking me about cases I was involved in and what happened and sometimes first time I find out.

Q. So for the cases where you do find out that you have testimony that will be excluded, do you read those orders and the judge's you know --

A. Of course. Yeah.

Q. Have you ever changed anything about your methodology in working with TCPA based on a judge's exclusion of your testimony?



A. I don't know if my testimony was excluded or my opinions just weren't given weight. That's what -- the first thing. Have I changed anything? I can't think of anything that I changed.

Q. Okay. And so just because -- the -- the clarifier you put is a good one about accepted but given no weight or -- versus excluded --

A. Right.

Q. -- and not permitted to testify at all. You're saying in both of those categories, you may have read the opinion of the judge, but nothing you've read in those opinions that you recall has led to you changing anything about your methodology?

A. I'm more careful in my reports to write that I'm not a lawyer and that I don't make an assessment on what should or should not be excluded.

Q. Uh-huh.

A. And that I respect the trier of fact in that the trier of fact is the ultimate beneficiary of the report that I'm writing. That's really what I think my -- I have changed. I don't remember the timing of everything, but I feel like that's the -- the real lesson is to be very careful to stay in my lane and not offer any opinion that does trespass into that which would otherwise be afforded exclusively to the domain of



MAGNA LEGAL SERVICES

the -- of the court. Stay within the four corners of the data.
Q. Okay. We say four corners of contracts in law, so I've been enjoying the four corners of data line.
A. That's interesting. Yeah.
Q. Do you know that current status of any of these cases?
A. Federal Savings is quite contentious. Yes. The -- the -- the light it is -- understandably the -- I think the court's being very careful.
Q. What do you mean understandably?
A. Well, I think there's a lot of -- a lot of competing motions right now. I don't know if you've read the docket, but it's an interesting read.
Q. That's the Michaels case, right? Or Michael v. --
A. Anthony --
Q. -- Anthony.
A. -- v. Federal Savings. We all have our favorite cases.
Q. Uh-huh.
A. As far as I know that -- that all the Wells Fargo cases are -- have been summarily adjudicated and are no longer active.



Q. Michael Anthony. That's what his first name was.
A. Spring EQ is -- I don't know where that is. I think Steel Supplements has been pretty supplemental authority and is now -- might be stayed. I don't know. That's the last I heard.
MS. ENGLER: Okay. Just since you mentioned some contentious filings, we'll go ahead and enter this declaration of plaintiff's expert, Aaron Woolfson, in support of plaintiffs' opposition to defendant's motion for reconsideration in the matter Anthony v. Federal Savings Bank before the Northern District of Illinois as Exhibit 12.
(EXHIBIT 12 WAS MARKED FOR IDENTIFICATION.)
MS. ENGLER: Q. So is this a declaration that you prepared in this matter?
A. It is.
Q. And --
A. And this looks like it's attached as an exhibit to ECF183. I don't know what the lead document is this. So looks like it's part of a -- a lighter filing or a motion or something.
Q. Sure. And I'm not going to ask you questions about the motion just because it's, you know, it's more questions about just what you wrote --



A. Sure.
Q. -- in here. One is I know we've been talking a lot about the R -- like, the RND and the DNC and I saw the term WDNC used in here. Is that different than --
A. It is.
Q. Okay. What is D -- WDNC?
A. Wireless DNC. It's a product that the FCC requires iconectiv to make available for identification of numbers that are wireless or not wireless at the date that they are said to call or text.
Q. Okay. So is that similar to the, like, IS Wireless records that we talked about earlier --
A. It is.
Q. -- is -- or is it the exact same thing?
A. It's similar. IS wireless is a little bit more expanded because it uses data from data aggregate -- points of data aggregation, but WDNC is the wireless DNC product. Iconectiv asserts that it should not be used only by defendants and not by plaintiffs, and our understanding, with both communications with the FCC and with what FCC15-35 Paragraph 142 -- this is coming from my attorneys -- states that we're allowed to use and it. And so there's become a contention as to whether or not a certified class relied upon data that is -- was used inappropriately.



Q. Okay.
A. And we think the record with the FCC says that it's fine to use. Defendants, arguably, say it's not.
Q. Uh-huh.
A. Court? Who knows. They -- it's -- it's -- it's been a lot of -- a lot of posturing. It's an interesting case. A lot of people ask me about it.
Q. I bet. It's a -- it's interesting stuff.
A. You know, I -- I think also it's interesting my damage model, based upon just pure statutory damages, I think, was 3.2 billion and the defendants stated that they're looking at a 13 or $15 billion exposure.
Q. Uh-huh.
A. I don't know why the defendants came up with a number that's higher than mine. Jan Kostyn was the expert in that report. Maybe he miscalculated. I don't know. But it's a big number and I -- I'm glad that both sets of counselors are so zealously litigating their respective positions because I think, as Charles Messer once told me, he was -- he was the attorney who took Daubert's deposition. You know, you don't get good case law without a genuine dispute and you want to make sure that it's fully briefed. So --
Q. Absolutely.
A. -- happy that they're doing it. I don't envy



MAGNA LEGAL SERVICES

Page 258

them. It's been a long -- lot of work.
Q. Sure. So the basis of presenting this case, in terms of what you're saying, using a database inappropriately, it's not so -- it's not so much an issue of, you know, like, you're going and hacking into the database in that kind of way.
A. No.
Q. It's more of a you didn't have a permissible use?
A. Well, in retrospect, I think there's a bit of revisionism going on. The -- the administrator of that data, which is iconectiv, and the FCC knows what our use cases is. And very clear on the record on that on the FCC site. So it's not a -- it's not a whether or not we were using the data in a -- like, we were somehow circumventing things to get to it, but really whether or not the data can be used to inform the trier of fact. And I find it academically interesting and I dread every time that there's a new entry on the docket because I know my Pacer bill is just going to skyrocket. I look at my Pacer bill, like, you know 2, 3 hundred dollars a month. I'm just a proprietor. I'm not a law firm, right? So -- but I -- I have to stay informed. And the attorneys are so vicious.
The irony is the motion to exclude is lodged

Page 259

by my own client for whom I'm a defense expert for. And I brought that up in deposition when they took my deposition and disavowed and it I had so show them the caption on that other case and, look, I'm -- I'm your expert over here. Everyone's going to suffer if something happens. So it's a -- it's, you know, very, very delicate. Going to read what a bad guy I am. And really? I don't think so.
Q. Now, you attached the FCC?
A. That is not my attachment.
Q. That is not your attachment. Then --
A. Correct.
Q. -- scratch that.
A. I just wanted to make that clear. That's why I wanted to bring that up when -- when you -- I -- this is a -- there's a predicate filing to which this is Exhibit 1.
Q. Okay.
A. Or ECF whatever hyphen 1.
Q. Uh-huh.
A. So I don't want you to miss --
Q. Well, your declaration, if you go to Paragraph 12 --
A. 12 of the Exhibit 12? Sure.
Q. 12 of Exhibit 12. Yes. It says iconectiv

Page 260

administers the WDNC data on behalf of the FCC and the FCC requires that WDNC data be made available for the purposes of the TCPA. And then you say to see an FCC, you know, document. Attached hereto is Exhibit 2. So this would be your attachment, right?
A. No. It's Exhibit -- Exhibit --
Q. Exhibit 2's on the bottom over there.
A. Oh, yeah. I think it is. Well, I don't know if this is my -- I don't know how this was all constructed within Pacer in this filing, but yes. This is 1535.
Q. And just to, kind of, also with the continuity -- I know you say you're familiar enough with Pacer and the document numbers to know how to identify things as attachments. It's still the same document number --
A. It is.
Q. -- on the exhibit. So do you know what this particular FCC order was about?
A. Yes. It is based upon the necessity to maintain or it's -- it's the framework by which the number -- the selection for the Local Number Portability Administrator was made, and this is starting to step outside of both my -- what I was retained to do in this case, but also my expertise, because there's a lot of --

Page 261

of legal -- I mean, there's a lot of legal stuff in here. So I'm trying to be very -- I'm trying to answer the question without striking a legal opinion.
Q. And -- and I don't need you to --
A. Okay.
Q. -- go and testify about what, you know, this is supposed to mean, what this does. It's, you know -- obviously, they have the matters up there about what this is in relation to. I just wanted to know what your understanding was about what the order was as a non-attorney, but as an expert that deals regularly with the FCC --
A. Yeah.
Q. -- because you attached it, clearly, for a reason.
A. Yeah. I mean, I -- the, uhm, FCC says this data need to be available.
Q. Uh-huh.
A. I meet with -- I confer with the FCC. There's a record of -- of the communications back and forth with the FCC and the record on the FCC website reflects it the North American Numbering Plan Administrator -- I'm sorry, not the North American Numbering Plan Administrator, the local Number Portability Administrator, they have their opinions that were --



MAGNA LEGAL SERVICES

that are attached to some documents we filed with the FCC along with that NAPM, whatever that stands for. Uhm, that's all part of the public record as well as PMK testimony from iconectiv and whoever else. I mean, it's such a mess of a situation.
Q. Uh-huh.
A. Thankfully, I'm the least impacted person by it all. But I think iconectiv is -- is carefully navigating that.
Q. Uh-huh.
A. There any other wounds you'd like to open?
Q. Only the ones you're probably expecting.
A. Yeah. I'm fine with it, you know. You're --
Q. We had talked previously in the day about you and basically Tel-Lingua deciding to consciously uncouple, we'll say.
A. Yeah. I mean, yeah, the owner's of -- Andrew's great. I love Andrew. We talk all the time. But this is -- yeah, this is his memo to me. I recognize it.
Q. And this was in, you know, August 22nd of 2023?
A. Are you putting this in as Exhibit 13?
MS. ENGLER: Yeah. We'll -- we'll mark it. Yeah. So we'll go ahead and put into the record at



Exhibit 13.
(EXHIBIT 13 WAS MARKED FOR IDENTIFICATION.)
THE WITNESS: I'll tell you the -- the consequence of all this litigation is that all these kinds of memos that are stamped confidential and all of iconectiv's memos and internal communications and stuff, which they would never want on the record. The FCC is now all part of the public record. And it's -- it's uncomfortable for a lot of companies. Yes. I'm familiar.
MS. ENGLER: Q. So that -- this was the like the memo that basically was written to paper the fact that y'all were going your separate ways?
A. This is the first one.
Q. The first one. Okay. That's right. You did have two -- two splits?
A. Yes.
Q. So this --
A. We've been divorced twice.
Q. So the first is about that you hadn't achieved all the steps necessary for PTRS certification with iconectiv.
A. Right.
Q. What is PTS -- PTRS certification with iconectiv?



A. Well, iconectiv has this process by which they decide who is a provider of telecom related services.
Q. Okay.
A. And their auditor, actually, a guy named Don, said that we are qualified to use certain products --
Q. Okay.
A. -- the WDNC product and so on and so forth. And iconectiv decided to give us a negative finding anyway against their auditor's own findings, which started this whole debacle.
Q. Okay.
A. So yes. This is based upon the fact that Tel-lingua sources part of their data from iconectiv and iconectiv was not pleased with Tel-lingua providing us data, whether or not that was data that was sourced from iconectiv or from Somos or anyone else. They just didn't want us to use that data.
Q. Okay. So I guess iconectiv, perhaps, was leaning on some pass-through terms about what --
A. Well --
Q. -- Tel-lingua could and couldn't do?
A. -- maybe, yeah. I -- I don't -- I don't know. I -- iconectiv is simply maintaining the data on behalf of FCC. They've not really the owners of data so it's -- it's a little bit ambiguous as to as to whether



or not the data is allowed to be used. It's not ambiguous to me. Especially because after iconectiv told Tel-lingua to stop working with us, they authorized us -- iconectiv authorized TelSwitch -- to be a qualified -- qualified as a reseller and we had to fully disclose all of the reasons why we were using this data. So seems a little strange to terminate -- to -- to force iconect -- to force Tel-lingua to terminate our relationship and then to approach us directly.
Q. Uh-huh.
A. Seems very strange.
Q. Okay. Understand. So this was the first break up?
A. This is called a divorce.
Q. First divorce. And so when in time was the second divorce?
A. December of 2015 -- 2025.
Q. December of 2025. With Tel-Lingua?
A. Yes.
Q. Okay.
A. But I do want to emphasize I did not use this data in this analysis.
Q. The WDNC?
A. I did not use it.
Q. Understood.



MAGNA LEGAL SERVICES

Page 266

A. So this is extrinsic to -- this is not germane to this in my opinion. I'm not an attorney, but as a sort of ex -- extrinsic to the sources of data that I use in this case.
Q. I hear you. Okay. Take a look back at your C.V. for a second. That would be Exhibit --
A. Exhibit 1 to Exhibit --
Q. To the report.
A. -- 5.
Q. So we're looking under professional certifications. Okay. Uhm, I mean, we already talked about one divorce. So --
A. No. Let's bring up all the others.
Q. Ask about -- ask about the other. And your C.V. says that you're an authorized reseller of iconectiv for resale of WDNC data and that's not the case anymore?
A. No. But that was the case of 3/27/20 -- shouldn't say 2015 there. That's interesting.
Q. I think that's referring to the statute. The -- or.
A. Oh, yeah.
Q. The FCC decision? Yeah.
A. It is. Yeah. So we were a reseller until iconectiv decided not to, but that's still part of our

Page 267

professional certifications.
Q. Okay. So what year should this say instead of 2023 and nothing else?
A. Well, 2023 through December of 2025.
Q. Okay. So the second divorce with Tel-lingua and the divorce with iconectiv were at the same time?
A. Yes.
Q. Okay. Tough Christmas.
A. Oh, yeah. I mean, if we -- I think everyone saw it coming. I mean, Federal Savings was putting an awful lot of pressure on iconectiv and, I mean, if you look at the FCC filings around that period of time, it's pretty remarkable. Especially because we were told that we could use the data from the FCC and we even went so far as to speak with the FCC via a -- via a liaison at our congregational -- our congregational office about it. So it's -- it's interesting. It led to a lot of instability at iconectiv. I think that there's still a cloud over them and potentially even the relationship they have with the FCC in the future. So we'll see what happens and how that works.
Q. Uh-huh. Got it. So you told me earlier in the day to go and look for your -- for TelSwitch on the FCC site and see what comments that I could find and I did find this one?

Page 268

A. Good. Good. Good.
Q. Which seemed to be, at least in the text, quite complimentary of iconectiv's position on availability of the NANCA related information.
A. Yeah. Sure.
MR. JILIZIAN: Sorry, this is going to be 14.
MS. ENGLER: Yes.
THE WITNESS: Yeah.
MS. ENGLER: We'll go ahead and mark as Exhibit 14.
(EXHIBIT 14 WAS MARKED FOR IDENTIFICATION.)
THE WITNESS: Yeah.
MS. ENGLER: Q. Do you recall around when you filed this --
A. I do.
Q. -- this comment?
A. Yes. This is filed -- oh, shoot. I normally put a date on these things. Yeah. I think it was filed within the last 30 days or so. 45 days.
Q. Okay.
A. And there's a new comment on there as well that was filed 12th or on the 10th.
Q. Okay.
A. Under a different -- under a different docket.
Q. Okay.

Page 269

A. Yeah.
Q. By TelSwitch?
A. Yeah.
Q. But related to similar topics?
A. Yeah.
Q. Okay.
A. Yeah. I mean, look, iconectiv is iconectiv. And I have grievances, but I understand the difference between grievances and the pragmatics of this business. And so yeah, I was fairly -- I think you're right. I can't take a complimentary ember I think is the right word toward them. I don't agree with some of the stuff but, I mean, it's part of the record and speaks for itself.
Q. I just noted the comment in, I think it looks like footnote -- footnote 12 of "We're hopeful that iconectiv's prima facie commitment towards the permissions objectives in the matter that Congress intended is followed up by their re-allowing their use of the FCC data for purposes stemming from the TCPA."
A. Is that a question or just a statement?
MR. JILIZIAN: I'll object to form there.
MS. ENGLER: Q. It -- was this genuine or is it a --
A. Yeah. It's absolutely genuine. I mean, I



MAGNA LEGAL SERVICES

Page 270

really hope that they do because I think it prejudices people who are trying to be -- adhere to the TCPA as well as individual companies that are -- are -- are on the defense side of having to face a TCPA case. You're extremely prejudiced by not being able to use this information and especially because Congress specifically -- I'm not drawing a legal conclusion. I'm telling you what my attorney has told me. But Congress has specifically tasked the FCC's data or FCC with making this data available. So the fact that one of their contractors -- not administrator, they're just a contractor -- is going to be like the janitor to Wells Fargo bank saying you can't bank here. What -- what authority do they have? It's so strange to me.
Q. Okay.
A. And I -- I appreciate it being on the record and, look, we'll continue to do what's right for defendants and plaintiffs in these the TCPA cases.
Q. Okay.
A. Are those the exhibits there?
Q. They are the exhibits. Now looking at -- yeah, the attachments that were to -- this was Exhibit 13 right?
A. I think -- are you on Exhibit -- you're on Exhibit 14.

Page 271

Q. On Exhibit 14. Yeah. Exhibit 14.
A. Yeah. 14 is the one that has the -- yeah. I mean, when -- when iconectiv says they didn't know what we were doing with the data. I'm looking at -- I'm looking at the document that on the top Exhibit 14. The document says 228 hyphen 6 page 23 and it lists exactly what we're doing with the data. I don't think there's any ambiguity. It tells what does with data and how we interface with plaintiffs and defendants in the context of litigation. So I find it mystifying that this is even an issue.
Q. The only question I have for you about this particular exhibit or attachment is -- it's okay -- is just confirming that these are communications between yourself and iconectiv considering your intended use of the data they would provide?
A. They do entail that, yes.
Q. All right.
A. So I answered your question but there wasn't a question pending and I apologize.
Q. It's okay. We'll look at the next one which is a lengthy letter dated March 26, 2026, from Dominic Maisano. Is this the communication terminating TelSwitch's access to iconectiv's data?
A. Yes. I believe it is.

Page 272

Q. Okay. Was there any correspondence that occurred after this directly with iconectiv concerning the termination?
A. No. I don't think so. I think there may have been a single we acknowledge your letter of notice.
Q. Leading up to this, though, were there any communications, back and forth concerning -- before the formal termination?
A. Oh, boy. Yeah. And to preserve litigation privilege, I can't really talk about it.
Q. That's fine.
A. Uh-huh. Yeah. Because there's some stuff that's occurring that -- surrounding that.
Q. I understand, and we don't need to say anything more. The next exhibit is a letter dated March 18th, 2026, from an attorney with the North American Portability Management. Mr. Todd Daubert?
A. Daubert.
Q. That's funny.
A. It's the same -- same name as Daubert, but different -- different dude.
Q. Yeah. And so was this -- what exactly was in letter supposed to be, to your knowledge?
A. Still not able to really figure out what that meant. I don't know. Speaks for itself. I don't know

Page 273

quite what their intention was since iconectiv is the one that I had a relationship with.
Q. Okay. Understand. I see back and forth through this letter that was sent you to reference to request for data on behalf of Anthony Paronich?
A. That's correct.
Q. Okay.
A. Anthony had a -- a relationship with iconectiv, yes, so that we were able to ask for data on behalf of Paronich.
Q. So was it pretty routine for you to send emails that would include Anthony on an email to iconectiv to request data?
A. It wasn't routine, but it would happen from time to time.
Q. Okay. Does Anthony Paronich or his firm, Paronich Law, have a subscriber account number?
A. Well, subscriber account number's for the DNC, but they had a consumer registration with iconectiv for the WDNC data. Yes.
Q. Okay. How long have they had that registration?
A. I don't know.
Q. I'm just about done, but I could use a few minutes to go through --



MAGNA LEGAL SERVICES

A. Sure.
Q. -- my notes to make sure there isn't anything I'm forgetting.
MR. JILIZIAN: Sure. Sure. I was going to say, too, I think after I have a very short redirect and maybe six-ish questions or so. Something like that. So I was going to say if we want to come back and then you could like maybe finish up. And then we can just switch right away we won't need like a seconded break --
MS. ENGLER: Yeah. I think that makes sense.
MR. JILIZIAN: -- or anything like that. Yeah. Yeah. If you wanted to do that.
MS. ENGLER: Yeah, that's fine with me.
MR. JILIZIAN: That would be fine. So we'll take, like, five minutes here.
MS. ENGLER: Sure.
(The deposition was in recess from 6:21 to 6:27.)
MS. ENGLER: Q. Okay. Back on the record. I don't have too much for you. Just a couple of questions. Obviously, doing this expert witness work, you know, and doing all of your FCC filings and, you know, comments that you do, what -- you obviously have to keep up with what's going on in the TCPA and FCC to do that right?



A. I have an insane appetite for what takes place in -- in the TCPA for -- from a policy and a implementation standpoint just because I'm fascinated by it. It's just a natural curiosity. So it doesn't actually take much time.
Q. Okay. What -- how do you, you know, stay up to speed? Like, what do you -- like, what do you usually read or listen to podcasts?
A. Are you asking me to give a plug to Eric Troutman's TCPA --
Q. He -- he wants to. I mean, I think everybody --
A. -- world.com? TCPAworld.com. $3,000 an hour. Best defense counsel in the world. Like that?
Q. I think he's probably 6,000 now.
A. Oh, is he. Can't help it. I like the guy. Yeah. So that -- I -- I find out a lot about my own matters that I'm working on through that and I do consider Eric a friend. That's my primary source of news. I also follow people like Jerry Christensen, C-h-r-i-s-t-e-n-s-e-n, who is a -- a thought leader and I think he works for Convoso now.
Q. Okay.
A. Fantastic, fantastic content. And I follow the -- the FCC docket.



Q. Uh-huh.
A. And just reading decisions that come out of the different courts.
Q. Like on govinfo or something?
A. Pacer.
Q. Okay. Okay. Govinfo is free.
A. Good to know. I'd love to check it out.
Q. Federal court orders. It's -- you can search by keyword and organize it in time. It's free. So help you out with your Pacer bill.
A. Thank you.
Q. Other than the TCPA, are there any other consumer protection or privacy laws that you keep up with?
A. Well, only from a academic interest standpoint. There's, you know, recording laws and things like that. I mean, I just think it's interesting, but I'm not a lawyer.
Q. Sure.
A. And I don't use anything to sculpt my opinions because data is data.
Q. Sure.
A. No. It's just interesting. But I don't -- other than TCPA and maybe some of the California Privacy Stuff and the Chicago -- the Illinois biometric stuff



which I've done no -- no cases on biometrics or the CC -- CCPA I think it is called --
Q. Well, it's just --
A. -- in California. I just don't -- I mean, I keep up on it, but I don't -- it's not for any --
Q. The --
A. -- purpose.
Q. Yeah. So there's -- there's the California Consumer Privacy Act as, you know, amended by the CPRA. Is that the one you're keeping up with or is it the California Invasion of Privacy Act because that one's been pretty in litigation?
A. No. I think it's the CCPA. Just out of just the natural curiosity. Looking at some blogs and some things.
Q. Well, and you're also a business owner too, right?
A. I am.
Q. Okay. Have you implemented any particular policies in your business in order to, you know, be compliant with the CCPA?
A. Is this where I plead the Fifth and don't -- I -- I am not aware of anything that we have implemented responsive to any particular policies that have been advanced by the California Legislature.



MAGNA LEGAL SERVICES

Q. Have you done any evaluation to determine whether or not you are subject to the CCPA?
A. No.
Q. Okay. Let's look at your website for just a second. That was Exhibit 6.
A. (Nods head.)
Q. And look at the very last page. I believe --
A. Page 4.
Q. -- it will be page 4. That's where it says products. And scroll all the way down to the bottom. You do not have a privacy policy your website, right?
A. I don't think we do.
Q. Have you ever had a privacy on your website?
A. I don't think.
Q. All right.
A. I mean, we're not collecting any information. We don't track anything on the website. So we're not even -- we don't have anything to maintain privacy over. It just a static site.
Q. So it your belief that a privacy policy is only necessary as it pertains to data collected by the website and not the company itself?
MR. JILIZIAN: Objection; foundation.
THE WITNESS: We don't collect any data related to any visits to our website.



MS. ENGLER: Q. Okay. But you do collect data outside of your website, correct?
A. Not really. I mean, we -- we maintain our billing system, but we're not collecting any metrics or any data. We don't measure visitors. We don't keep track of who calls us for services or emails or anything like that.
Q. I mean, as a business, outside of the website. I mean, that's what we've been talking about. Do you receive data from different databases? So --
A. Only as so far as they're related to our clients -- our clients needs for us to do analysis.
Q. Okay. Okay. And that becomes -- and that includes phone numbers, right?
A. Yeah. It includes -- it includes phone numbers, but we don't have any information as to who they belong to or which -- which individuals. There's no personally identifying information, generally, on any of those records.
Q. Are you -- you're not offering a legal opinion about what constitutes personally identifiable information under the CCPA are you?
A. No.
Q. And have you done any kind of evaluation as to whether or not TelSwitch would be considered a data



broker?
A. We are not selling or aggregating information in a way that would be used to create derivative outputs, so we are not registered as a data broker.
Q. So that was an evaluation you underwent?
A. It was sort of --
MR. JILIZIAN: Objection to form, foundation. Sorry. You can answer.
THE WITNESS: Yeah, I mean, it was some sort of self-evaluation that we went to the website and looked at the data broker requirements for California.
MS. ENGLER: Q. Okay.
A. Yeah.
Q. Okay. And the basis is because of you're not collecting and aggregating to then sell is that -- is that what I'm understanding your reason why?
A. We -- don't.
MR. JILIZIAN: Objection; foundation. Sorry. Go ahead.
THE WITNESS: Yeah. We are -- we have other people's data. We do not collect that data for the purpose of any sales or provision of information, aggregation or accumulation of information such as, like, taking lists of leads and putting on phone numbers and attributing addresses and then reselling those. Any



data that we do, we don't charge for. Not that that would be a gating condition, but we don't have any, to the best of our understanding and at the advice of our attorneys, we don't have anything that would encumber us in a way that would require us to register to the State of California as a data broker.
MS. ENGLER: Q. Have you considered whether you need -- whether or not you need to register with Oregon?
A. No.
Q. Have you considered whether or not you need to register with Texas?
A. Nope.
Q. How about Vermont?
A. No.
Q. Aside from the California Consumer Privacy Act, have you considered any other state laws that TelSwitch would be subject to concerning consumer privacy?
MR. JILIZIAN: Objection; foundation.
THE WITNESS: In anything that's in best practices for PCIDSS, I think we have to maintain that. We apply that across our enterprise regardless of whether or not we take credit cards. It's actually really hard to get PCIDSS auditing services without



MAGNA LEGAL SERVICES

taking credit cards --
MS. ENGLER: Q. Uh-huh.
A. -- on your own system. They don't quite understand why you -- why we need it or why we want it. We do it prophylactically. That's the only thing I think of.
Q. I have no more questions for you, Mr. Woolfson. Thank you very much for --
A. No. It was nice.
Q. -- you know, fighting the good fight with me.
A. Well, I appreciate the opportunity to be -- you know, have my deposition taken and I -- as they say in Hunger Games may the odds always be with you.
MR. JILIZIAN: All right. Thank you Jessica. We have a very short redirect.
MS. ENGLER: Yeah.
MR. JILIZIAN: We can just go ahead. Madam Court Reporter, I -- I think we're just going to go ahead and switch right now we don't need any more time in between.
THE REPORTER: That's fine.
MR. JILIZIAN: Are we off the record by the way?
MS. ENGLER: No, we're on now.
MR. JILIZIAN: So we -- we can go off the



record real -- for --
THE WITNESS: Just -- do we need to?
THE REPORTER: You can just do it from there if you like.
MR. JILIZIAN: Oh.
MS. ENGLER: Yeah.
MR. JILIZIAN: If you want me to just do it from here.
MS. ENGLER: Yeah.
MR. JILIZIAN: Okay. That's fine.
THE WITNESS: Yeah. Just come a little bit closer.
MR. JILIZIAN: Yeah. I'm not using --
THE WITNESS: The microphone's right here and there's this block right here.
MR. JILIZIAN: Yeah, how is that? Everyone can hear any okay?
THE WITNESS: Yes. Exactly -- whatever questions you have before --
MR. JILIZIAN: Yeah. Sorry about that. I'm going to go ahead and proceed now.
EXAMINATION BY MR. JILIZIAN
MR. JILIZIAN: Q. Mr. Woolfson, how are you?
A. Good.
Q. All right.



A. It's been a long day.
Q. So earlier in your deposition, you were asked whether a few hypothetical actions on behalf of the plaintiff, such as a purchasing a product from the defendant or responding to the defendant's text campaign in the way that they invite would be reason for you to remove a number for -- from your list of numbers in the class. Do you recall being asked that line of questioning?
A. Yeah.
MS. ENGLER: Object to form solely as to the term plaintiff as to whether or not it's individual versus a collective.
MR. JILIZIAN: Q. I'll strike that and correct myself and say I was talking about the plaintiff in this action.
Okay. So -- okay. So do -- do you understand that line of a questioning that I was referring to as it pertains to it plaintiff not plaintiffs?
A. Yes.
Q. Okay. And you -- and I don't have a live in front of me or the transcript, so I'm sorry. But you responded along the lines that something such as a purchase and potentially other actions by the plaintiff could make it so number is removed from your final list



as compiled. Do you remember that answer or series of answers?
A. Yes.
Q. Okay. So when you gave that answer, was that like, your own speculation on what could result in a plaintiff being removed or was that you proffering like an official opinion of what types of actions constitute a consent defense?
MS. ENGLER: Objection; vague and compound.
THE WITNESS: So I think that, first of all, it's -- it's just my opinion. It's not a legal opinion. The second thing is is that I have been asked to do it by a court, I believe, in the case that limited -- there was some limiting factor or something, so if -- if somebody asked me to do and there's a request from a court I will. But I'm not drawing a legal conclusion about that. I'm just saying what's possible.
MR. JILIZIAN: Q. And your report -- I believe it's marked as Exhibit 5 here. Does your report offer any opinion on whether a plaintiff purchase or participation in a text campaign constitutes consent in the TCPA matter?
A. No.
MS. ENGLER: Objection to form.
MR. JILIZIAN: Q. And would you -- if your



MAGNA LEGAL SERVICES

report had proffered that or if you had proffered that today, would you consider that improper legal opinion?

A. I don't proffer legal opinions. I just say what's possible in the data. But I don't -- I don't stray into the area that trespasses upon the contours of what would be considered legal opinion.

Q. And right at the end of your deposition, too, you were asked a series of questions about some potential cases that you were involved in. Do you remember that series of questioning?

A. Yes.

Q. And during that series of questioning, again I'm paraphrasing because I don't have the transcript in front of me, but you had responded something along the lines that one of the -- one or multiple of the cases, like, that they're interesting to you and described some of your thoughts on those cases. Do you recall doing so?

A. Yeah.

Q. Okay. And when you were doing so, were you -- again kind of similar question -- were you proffering a legal opinion on those cases or were you just providing layperson opinion?

A. No. I thought the whole line of question was surrounding my own lay opinion of them and I find cases



academically interesting. I can't sleep at night, sometimes I'll go and read cases that have nothing even to do with things I worked on. Just from a purely academic curiosity. Natural curiosity. But I'm not proffering any legal opinion.

MR. JILIZIAN: Okay. All right. That's all I have.

MS. ENGLER: Okay. And no follow-up from me. So thank you so much, Mr. Woolfson.

THE WITNESS: Real quick. What's the running time, please?

THE REPORTER: Did you -- are we off the record?

MS. ENGLER: We are now off the record.

(The deposition was in recess from 6:42 to 6:43.)

THE REPORTER: Could I just ask for any special orders or counsel, if you want to order a copy.

MS. ENGLER: Yeah. We'll -- we'll have a copy for sure. We don't need a physical, just an electronic. All exhibits are being attached to the deposition. I will get them scanned and emailed to you for attachment to the deposition and we would like a transcript within one week.

MR. JILIZIAN: And I'll just say same for



plaintiff as it pertains to the -- we don't need the physical. We'll -- we'll just be good with electronic. And then I'll also just note here -- I mean, should have done on the record but, you know, we'll -- we'll go through and -- and do a confidentiality review. I guess there was, I think, a short portion where --

THE WITNESS: There was a short portion --

MS. ENGLER: That's right. there was a short portion.

THE WITNESS: Related to DNC.com --

THE REPORTER: Did you want your copy in week also.

MR. JILIZIAN: That would be great thank you.

(The deposition was concluded at 6:44 P.M.)

__________________________

AARON WOOLFSON



CERTIFICATE

I, the undersigned, a Certified Shorthand Reporter, State of California, hereby certify that the witness in the foregoing deposition was by me first duly sworn to testify to the truth, the whole truth, and nothing but the truth in the within-entitled cause; that said deposition was taken at the time and place therein stated; that the testimony of the said witness was reported by me, a disinterested person, and was thereafter transcribed under my direction into typewriting; that the foregoing is a full, complete, and true record of said testimony; and that the witness was given an opportunity to read it and, if necessary, correct said deposition and to subscribe the same.

I further certify that I am not of counsel or attorney for either or any of the parties in the foregoing deposition and caption named, nor in any way interested in the outcome of the cause named in said caption.

Executed this 20th day of August, 2026.

__________________________

LAURA AXELSEN, C.S.R. 6173



MAGNA LEGAL SERVICES

ERRATA SHEET FOR THE TRANSCRIPT OF:
Case Name: McGonigal vs. ShoppersChoice.com
Dep. Date: August 13, 2026,
Deponent: Aaron Woolfson

Pg. Ln. Now reads Should read Reason
____ ____ _______________ _______________ ______
____ ____ _______________ _______________ ______
____ ____ _______________ _______________ ______
____ ____ _______________ _______________ ______
____ ____ _______________ _______________ ______
____ ____ _______________ _______________ ______
____ ____ _______________ _______________ ______
____ ____ _______________ _______________ ______
____ ____ _______________ _______________ ______

_____________________
SIGNATURE OF DEPONENT

SUBSCRIBED AND SWORN BEFORE ME
THIS____DAY OF_____________, 2026

_______________________________________
(Notary Public)
MY COMMISSION EXPIRES:________



MAGNA LEGAL SERVICES