**Before the**
**Federal Communications Commission**
Washington, D.C. 20554

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Combatting Illegal Robocalls Through FCC Numbering Policies | ) | WC Docket No. 26-49 |
| | ) | |
| Implementation of TRACED Act Section 6(a) - Knowledge of Customers by Entities with Access to Numbering Resources | ) | WC Docket No. 20-67 |
| | ) | |
| Numbering Policies for Modern Communications | ) | WC Docket No. 13-97 |
| | ) | |
| Telephone Number Requirements for IP-Enabled Service Providers | ) | WC Docket No. 07-243 |
| | ) | |

## REPLY COMMENTS OF TELSWITCH, INC.

### I. INTRODUCTION

TelSwitch, Inc.[1] respectfully submits these reply comments in response the comments of iConectiv[2] in the above-captioned proceeding to encourage the Commission in adopting rules that further facilitate an accurate, transparent, and equitably-administered numbering ecosystem while strengthening numbering policies to reduce and eliminate unwanted and illegal robocalls, including those prohibited under the Telephone Consumer Protection Act ("TCPA" or "The Act")[3] and related statutes.

---

[1] TelSwitch, Inc. is an independent data analytics and litigation support firm in the telecommunications and consumer protection ecosystem. Incorporated in 1994 and headquartered in Pleasant Hill, California's work includes tagging tens of billions of Do-Not-Call ("DNC") database records each year, operating specialized infrastructure for the documentation and analysis of North American Numbering Plan data, and providing litigation analysis and testimony as an independent expert to be assistive to the trier of fact. TelSwitch's clients include telephone companies in routing and billing, as well as compliance professionals, call centers, debt-collection firms, marketing agencies, and counsel representing both plaintiffs and defendants in Telephone Consumer Protection Act (TCPA) proceedings.
[2] https://www.fcc.gov/ecfs/document/1060834090508/1
[3] 47 U.S.C. § 227.

EXHIBIT 14

TelSwitch's perspective on numbering resources is founded on the experience gained from over thirty years of interfacing with regulatory agencies and those entities designated by the Commission to manage numbering resources and data such as Somos, the current North American Numbering Plan Administrator ("NANPA"), and Neustar and iConectiv, the previous and successor Local Number Portability Administrator ("LNPA") respectively.

As both a telecommunications carrier initially licensed in 1994 by the California Public Utilities Commission,[4] and later as a Provider of Telecommunication Related Services[5] ("PTRS"), TelSwitch, Inc. has been afforded a unique and meaningful vantage point from which it has gained unique insights into the symbiotic relationship between regulators and the companies which participate in that telecommunication landscape. This includes the practicalities of how numbering resources apply toward billing and rating, as well as the practical and aspirational applicability of numbering resources toward the adherence to, and enforcement of, the TCPA.[6]

The opinions of TelSwitch, Inc. are also founded upon participation in the Communications Fraud Control Association ("CFCA"),[7] which has led toward significant, constructive insights about trust and transparency and how to further advance layers of the trust framework within the network in a way that benefits all parties, and especially consumers.

TelSwitch, inc. is delighted that iConectiv has taken a position in its' June 8, 2026 comments to the FCC. [8] In specific, iConectiv stated that elements of the North American Numbering Plan Administrator's data related to the Operating Company Numbers ("OCN's")

---

[4] California Public Utility Number U-5410-C. TelSwitch, Inc. no longer maintains a CPCN.
[5] TelSwitch, Inc. continues to conduct billing and rating activities and transcoding on behalf of telecommunications carriers as a PTRS.
[6] Our particularized uses of the FCC's data for purposes related to the TCPA is described in depth within our January 7, 2026 filing. (https://www.fcc.gov/ecfs/document/10108094832323/1 last visited 07/06/2026)
[7] See CFCA website; TelSwitch's views expressed herein are its own and not representative of the CFCA
[8] https://www.fcc.gov/ecfs/document/1060834090508/1 (last visited 07/06/2026)

numbers should be made available to those who wish to identify those calls that have been placed in violation of the TCPA to *ported* numbers as well.

> "Pursuant to its Master Services Agreement with NAPM, LLC, the LNPA provides the PortData Validate service, which allows NPAC data to be used for assessing risk, mitigating fraud, and determining the risk for a call or text to be a robocall or robotext, as defined by the Commission." (page 11)
>
> and...
>
> "iconectiv supports the Commission's efforts to combat robocalls and robotexts. If the Commission believes that identification of resellers in the NPAC aids in combatting robocalls and robotexts, iconectiv as the LNPA is ready to support such requirements. As the Commission considers implementation of the number portability rule proposed in the NPRM, iconectiv recommends the Commission leverage the expertise of the industry through the NPIF, as well as the considerations described in these comments to enable the Commission to meet its objectives."

We are pleased that iConectiv's position is consistent with FCC 15-35A para 142, which states that the data shall be made for "purposes stemming from the TCPA" – a rule that is predicated on 47 C.F.R. § 64.1200(a)(1)(iii). iConectiv's public comments are also aligned with FCC 04-204 (published September 21, 2004) [9], which requires companies to comply with the following: "We will not find persons liable for placing such autodialed or prerecorded message calls where such calls are made to a wireless number ported from wireline service within the previous 15 days, provided the number is not already on the national do-not-call registry or the caller's company-specific do-not-call list."

We are grateful that, with iConectiv's *newly* stated position supporting the objectives of the FCC in identifying and abating robocalls under the TCPA – is further codified by the FCC. In specific, that the use of the NANPA-assigned Company Number ("OCN") elements to identify line-types for *ported* numbers is similarly made available in the same fashion as those data

[9] https://docs.fcc.gov/public/attachments/FCC-04-204A1.pdf (last visited 07/06/2026)

elements made from NANPA for non-ported numbers to support the Commission's efforts, consistent with that which has *already* been promulgated and relied upon by the Courts.[10],[11],

We thank iConectiv for their substantive and meaningful comments in support of the Commission's objectives in ensuring that data remains available[12] for purposes stemming from the TCPA, and are grateful that the Commission remains guided by the impartiality and equitable-access standards Congress imposed in Section 251(e)(1) of the Communications Act.

Respectfully submitted,

Aaron Woolfson
Founder, TelSwitch, Inc.
1937 Oak Park Blvd, Ste D,
Pleasant Hill Ca 94523
woolfson@telswitch.com
209-915-2483

---

[10] Defendants cite not a single judicial decision barring this sort of discovery ("NPAC data") based on FCC regulations, and the Court is aware of such discovery having taken place by Rule 45 subpoena. See Scoma Chiropractic, P.A. v. Nat'l Spine and Pain Ctrs., No. 2:20-cv-430-JLBMRM, 2021 WL 4991523, at *2 (M.D. Fla. Oct. 27, 2021). A litigant who fails to press a point by supporting it with pertinent authority, or by showing why it is a good point despite a lack of supporting authority or in the face of contrary authority, forfeits the point." United States v. Giovannetti, 919 F.2d 1223, 1230 (7th Cir. 1990). See also Hakim v. Safari/and, LLC, 79 F.4th 861,872 (7th Cir. 2023) ("[W]e have made clear that ... perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived.") (Order, ECF 213, *Michael Anthony et al v. The Federal Savings Bank et al*, Case No. 1:21-cv-02509, ND, Il, Eastern Div.)

[11] The Court also places little weight in defendants' reliance on Rule 30(b)(6) deposition testimony of a private entity's ("iconnectiv") (Exhibit A to the Motion) in a separate lawsuit, and on and that entity's apparently internal document (Exhibit C to the Motion), both characterizing federal regulations and their purportedly limiting effect on federal discovery here. (*ibid*)

[12] We are hopeful that iConectiv's prima facia commitment toward the Commission's objectives and in the manner that Congress intended is followed up by their re-allowing our use of the FCC's data for purposes stemming from the TCPA.

# EXHIBIT A

These documents have been ordered by the court to be filed in an un-redacted form and available for public consumption.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

MICHAEL SMITH, individually
and on behalf of all similarly
situated individuals,

Plaintiffs, Civil Action File No.
8:21-cv-02746-PX

vs.

CONFIDENTIAL

EXAMWORKS, LLC, and
GOVERNMENT EMPLOYEES
INSURANCE COMPANY,

Defendants.

CONFIDENTIAL
VIDEOTAPED 30(b)(6) DEPOSITION OF ICONECTIV, LLC
TESTIMONY OF CATHRYN MCMAHON
November 13, 2025
10:11 a.m. - 3:20 p.m.
TAKEN BY REMOTE VIDEOCONFERENCE

Shawn E. Fleck, RPR, CCR #2859

These documents have been ordered by the court to be filed in an un-redacted form and available for public consumption.

We're the administrator.

Q. I appreciate that clarification.

While we're here on that subject, as the administrator, what is the scope of your duties in administering that data on behalf of those companies?

MS. SHELLEY: John, can you clarify? When you say "your duties", do you mean Iconectiv?

MR. MITTLEBACH: Yes. Excellent clarification. Yes. I mean Iconectiv.

BY MR. MITTLEBACH:

Q. What is its role as the administrator of that data, generally speaking?

A. Okay. So, the Number Portability, the way it operates in the U.S., all of the carriers provide input to Iconectiv. For example, when a -- when a subscriber ports their phone number from Carrier A to Carrier B, that -- that is facilitated through the Number Portability Administrative Center. We maintain that center.

And then, so there's a database there, and

These documents have been ordered by the court to be filed in an un-redacted form and available for public consumption.

a more specific term -- receives a license from Iconectiv to be able to access and utilize that data?

MS. SHELLEY: Does it depend on the product?

A. So, if I were to describe it in my terms, what I would say is, is they apply, and if they are approved, they register -- they are registered under a service agreement, and they have a certain right to use the data.

THE COURT REPORTER: And I'm sorry to interrupt, Mr. Mittlebach, but, Ms. Shelley, when you do speak, I'm having trouble hearing you, unless you kind of put your face into the computer. So.

MS. SHELLEY: Okay. Thank you.

THE COURT REPORTER: Thank you.

BY MR. MITTLEBACH:

Q. And when you say somebody applies, does that -- and then they are approved, is an application approval necessary for anyone to access the data that Iconectiv administers?

These documents have been ordered by the court to be filed in an un-redacted form and available for public consumption.

A. Yes.
MR. SOSTRIN: Object to form.
BY MR. MITTLEBACH:
Q. Is any of the data that Iconectiv administers publicly available, that anyone can access without applying, and registering?
A. No.
Q. And has -- I assume -- as you're answering that true today, has that also been true historically, or was it ever publicly available?
MS. SHELLEY: To the extent you know the answer.
A. To my knowledge, it is not publicly available.
BY MR. MITTLEBACH:
Q. And I have a reference in this topic to PortData Comply. Am I naming that -- I refer to it as a license.
What would be, in your words, how I would refer to the PortData Comply service?
A. It is -- it is a subscription, I would say.

These documents have been ordered by the court to be filed in an un-redacted form and available for public consumption.

Iconectiv manages the nation's Number Portability Administration Center, NPAC, the largest system of databases of ported telephone numbers in the world. The U.S. NPAC includes approximately one billion telephone numbers from approximately 1,600 service providers, and providers of telecom-related services, PTRS. NPAC data can be accessed for very specific uses, and only qualified businesses and organizations are authorized to receive that data."

Is that your understanding of how Iconectiv operates, and has operated in the time that you have been working with them?

A. Yes.

Q. And as I scroll down, I -- over the next two pages or three pages, I see a reference to a few different topics.

There's the first one I see is authorized N-P-A-C or NPAC impact user, and then --

A. Uh-huh.

Q. -- on the second page, I see PortData Source. And then if I continue to go down, I see

These documents have been ordered by the court to be filed in an un-redacted form and available for public consumption.

looks like we're on the bottom of Page 2 -- under authorized NPAC user, it's -- it's routing, rating, billing, and network maintenance in connection with providing and facilitating telecom services.

As written, that's -- that is the use of that data.

Q. Would it be correct to describe that as -- as that is the scope of the permitted uses of that data --

A. Yes.

Q. -- under the subscription?

A. Yes.

Q. And is authorized impact user a subscription? Or how would you describe that category?

A. It's also -- yes, it's also an agreement, and it's -- it's a subscription.

Q. Are you familiar with the -- the law known as the Telephone Consumer Protection Act, TCPA?

A. I have some knowledge. It's -- I don't -- I don't know all -- I'm cert -- I'm not an expert,

These documents have been ordered by the court to be filed in an un-redacted form and available for public consumption.

is -- is probably an exaggeration.

There are daily files, so it's -- it is a daily record.

Q. Were you involved in the creation of this subscription, Cathy? And now I'm asking you personally, while you were working at Iconectiv.

A. I'm not -- what do you mean by creation of the subscription?

Q. The PortData Comply subscription, and its description there, were you involved in, when Iconectiv became the administrator of the data, the creation of this particular subscription service that's been described as PortData Comply?

A. So we have a software development organization that actually built the service. I was not directly involved in that.

I was involved in the -- as we talked about before, the contracts, and the customer interactions.

Q. And are there set specific permitted uses of the data that Iconectiv administers in connection

These documents have been ordered by the court to be filed in an un-redacted form and available for public consumption.

with the PortData Comply subscription?

A. Yes.

Q. What is your general understanding of those permitted uses?

A. There are two primary ones: A subscriber to the service may use the data to avoid engaging in TCPA prohibited activity, and the other is they may resell the data to others who are -- also have an agreement with Iconectiv for the service.

Q. Starting with the first one you -- you mentioned, to avoid engaging in TCPA violations? Am I characterizing that correctly?

A. Yes.

Q. What do you mean by that?

A. Well, those are the words that are -- that are in the agreement. And when I think of it, it is to not make phone calls. That would be in violation of the TCPA.

Q. So would that be for companies, such as call centers who are making calls, to be able to avoid making calls to somebody that would be a TCPA

These documents have been ordered by the court to be filed in an un-redacted form and available for public consumption.

compliance."

A. Yes.

Q. So am I understanding correctly, then, that the use of user data for TCPA compliance is not a permitted use under a PTRS license or agreement?

A. That's correct.

Q. And that it would require what I saw earlier described as an ancillary service agreement?

A. Yes. It would require the PortData Comply.

Q. That was my next question, was is that ancillary service agreement in this context the PortData Comply license?

A. Yes.

Q. Is there any other subscription that provides authorization for the use of user data for TCPA compliance, other than the PortData Comply subscription?

A. As a service provider, so if -- one of the service providers, who owns the data, they are allowed to use the data under their -- their main agreement with Iconectiv for TCPA compliance.

These documents have been ordered by the court to be filed in an un-redacted form and available for public consumption.

Q. If we scroll down, please, to Page 3. And I'm looking at Paragraph 5, labeled "Qualification", and then Subsection 5.1, "Application".

A. Yes.

Q. Is this -- is this the contractual confirmation of the application process you described earlier, whereby a customer can apply to be authorized to use the NPAC data?

A. So what is the specific question?

Q. Is this -- is this the contractual term that encapsulates what you described earlier, when I asked you the general question of how someone becomes a customer. That they submit an application, and then they're approved and registered.

Is this that application process being described?

MS. SHELLEY: I'm going to object to the extent that you're asking her to affirm what's written in the agreement.

But, Cathy, can you respond?

These documents have been ordered by the court to be filed in an un-redacted form and available for public consumption.

A. I -- so yes, this is the application. The first step in the application process, which is to submit an application or registration form, we would call it.

BY MR. MITTLEBACH:

Q. And as I'm reading that first sentence, which states:

(Reading) "In order to qualify as a customer, an applicant is first required to complete an application, in which the applicant identifies the data requested, the intended use of the intermodal ports to be received through the service."

Is that "intended use" described there what's reviewed to make sure that the intended use is a permitted use for the service being requested, here the PortData Comply subscription?

A. Yes, as stated on the registration form. Yes.

Q. And -- and is it the case that Iconectiv asks the customer applicant to self-certify what

These documents have been ordered by the court to be filed in an un-redacted form and available for public consumption.

their intended use is, and that you rely on that representation to determine whether to approve the application?

A. Yes.

Q. Scroll down to the next page, Page 4, and then Paragraph 5.3, "WDNC Agreements".

A. Okay.

Q. I'm going to read -- I'm going to focus my question on the first two sentences, which state:

(Reading) "Each type of customer, defined in Section 5.2 type of customer, must sign a WDNC service agreement with Iconectiv. In addition, reseller customers must also sign an agreement with their second tier customers."

Is this the section that describes what we talked about earlier, in that second tier customers must also sign a WDNC service agreement in order to have access to the data?

A. Yes.

Q. In the next paragraph, 5.4, "Continued Qualification Process".

These documents have been ordered by the court to be filed in an un-redacted form and available for public consumption.

Do you have an understanding of what the continued qualification process, being described here, is, and what I -- in terms of a certification of compliance with the terms of the agreements? Can you describe what that process is to me, generally?

A. There is a -- there is a continued -- an annual qualification document, which each customer submits when they renew their agreement.

And -- and so that's -- and then signs, indicating that they agree to the permitted uses, and nothing has changed in their application.

Q. And does Iconectiv rely on that certification to continue to renew that subscription for the following year?

A. We require that that be submitted, and signed prior to doing or in conjunction with doing the renewal.

Q. One moment.

If you scroll down to Page 6, and Paragraph 10. Paragraph 10 described as "Representations, warranties, and disclaimers."

These documents have been ordered by the court to be filed in an un-redacted form and available for public consumption.

Q. Could a customer -- and, for example, we'll say TelSwitch as the customer -- could they access the PortData Comply -- access Iconectiv's data under the PortData Comply subscription for the purpose of supporting a plaintiff alleging TCPA violations in a lawsuit against a company?

A. Um, I don't -- I don't think so.

I think if someone were -- someone could subpoena Iconectiv for that information, but it wouldn't be part of his subscription to the service.

Q. Thank you. I appreciate you answering that to the best of your ability, and I'll do my best to get specific as we go along.

I'm going to introduce the next exhibit, which will be entitled Exhibit 9.

MS. SHELLEY: Cathy, do you need to take a break?

THE WITNESS: No.

(Defendant's Exhibit 9 marked.)

BY MR. MITTLEBACH:

Q. And my intention is that this exhibit will

These documents have been ordered by the court to be filed in an un-redacted form and available for public consumption.

What I'm asking is your understanding, on behalf of Iconectiv, as to why there's a third party review for this type of application, and not for a PortData Comply subscription application.

MS. SHELLEY: If you know, you can testify, but don't guess.

A. Yeah, there are -- there are two reasons that I'm aware of, and there may be more that I'm not aware of, but the first reason is, under this provider of telecom-related services, the amount of information that is available to an approved applicant is extensive. And so there's more protection, and caretaking in that evaluation in that application process, because of the extent of the information.

And it's also to -- in support of the neutrality requirement that I had mentioned earlier, that the third party is part of the process to help ensure that Iconectiv remains neutral in these evaluations.

Q. Thank you. I appreciate that.

These documents have been ordered by the court to be filed in an un-redacted form and available for public consumption.

Q. So then the Defendants in this case could have used the data for that purpose?

MR. MITTLEBACH: Object to the form of the question.

A. If they were -- if they were subscribers to the service.

BY MR. SOSTRIN:

Q. And that includes if they were a subscriber via a reseller; correct?

A. It -- yes, it doesn't matter whether they were a direct (inaudible) or a second tier.

Q. Okay.

You -- there's been some mentions of the FCC today, and I want to explore that a little bit.

A. Okay.

Q. What is Iconectiv's relationship with the FCC?

A. The number portability -- so our -- Iconectiv has an agreement to serve as the local Number Portability Administrator under -- and that contract is managed by the North American

These documents have been ordered by the court to be filed in an un-redacted form and available for public consumption.

Portability Management, LLC.

The FCC ran the selection process for Iconectiv to be that local Number Portability Administrator, approved the recommendation of the NAPM, LLC for Iconectiv to be the administrator, and -- and the contract is managed by the North American Portability Management, LLC.

Q. Okay.

A. (Simultaneous conversation.)

Q. And what is --

A. I don't know if it's the exact right words: Under the direction of the FCC, or under the purview of the FCC.

I'm not sure of the exact right words there.

Q. Okay. And what is the FCC's relationship with the North American Portability Management, LLC company?

MR. MITTLEBACH: Object to the form of the question.

MS. SHELLEY: Did you understand the

These documents have been ordered by the court to be filed in an un-redacted form and available for public consumption.

hey, you can release this to anyone.

It's all within the NAPM agreement.

BY MR. SOSTRIN:

Q. Is what your counsel just said correct?

A. Yes. We have -- we are under -- we are obligated to provide the PortData Comply Service under our -- our contract with -- with the North American Portability Management, LLC.

Q. Okay. And obligated by the FCC; correct?

MR. MITTLEBACH: Object to the form.

MS. SHELLEY: Object to the form of the question.

If you know the answer. I don't know --

A. Yeah, I mean, the FCC provides oversight. I'm not sure what the official term is, but the under direction of, with their awareness.

BY MR. SOSTRIN:

Q. Okay. And that obligation to provide that data -- sorry -- the permitted use that we've been talking about today, avoiding, engaging in TCPA prohibited conduct, that is part of that obligation,

These documents have been ordered by the court to be filed in an un-redacted form and available for public consumption.

whether it comes from the FCC or the FCC in conjunction with other entities, that's part of that obligation; correct?

A. Yes.

MR. MITTLEBACH: Object to form.

BY MR. SOSTRIN:

Q. Okay. Are you aware of any FCC documents or statements by the FCC that say -- that says -- that means that avoiding, engaging in TCPA prohibited conduct, that means only to determine whether a call is wireless before placing the call?

MS. SHELLEY: I'm going to object to the form of the question.

A. I don't know. I don't know the answer.

BY MR. SOSTRIN:

Q. You're not aware of any documents from the FCC that say that; correct?

MS. SHELLEY: Objection. That's not what she testified. She said she's not --

A. Yeah, I'm not aware.

MS. SHELLEY: -- that she's not aware.

These documents have been ordered by the court to be filed in an un-redacted form and available for public consumption.

Q. If there is such prior communications, would you produce them?

MS. SHELLEY: Yes. I can make a representation I thought we produced all the e-mails that we had with him. I don't think it was limited.

Because the date on the subpoena preceded this date, but I'll check.

MR. CORTHELL: Okay.

A. Yeah, it...

BY MR. CORTHELL:

Q. Are you aware of whether Mr. Woolfson has PTRS certification, as we sit here right now in 2025?

A. He does not.

Q. Has he not had PTRS certification since 2023?

A. To my knowledge, he's never had it. He applied, and was denied, and does not have it.

Q. Ms. McMahon, earlier today, you testified about a slight change in process at Iconectiv, regarding second tier customers.

These documents have been ordered by the court to be filed in an un-redacted form and available for public consumption.

and then I just have one or two questions about it.

(Reading) "Following class certification -- "

This is the second sentence.

(Reading) "Following class certification, I assisted in developing a class notice strategy, using WDNC data to issue subpoenas to carriers for purposes of directing notice to class members."

Is Iconectiv's WDNC data sufficient to identify carriers?

A. No.

Q. If Aaron Woolfson, in his personal capacity, used NPAC data after calls were made to identify carriers and recipients of calls, would that be a permitted use of the data?

MR. SOSTRIN: Object to form.

A. So the permitted uses are defined by each service, and there are, let's say, five different categories. Permitted use for each one is different.

So it would depend on what the service was,

These documents have been ordered by the court to be filed in an un-redacted form and available for public consumption.

but he's not registered for anything other than PortData Comply.

BY MR. CORTHELL:

Q. And the PortData Comply data would not be sufficient to identify carriers; correct?

A. Correct.

Q. If we go to Exhibit 13, I'll direct you to Page 2.

A. Okay.

Q. We talked about the agreement that would need to be signed by second tier customers, like Hiraldo Law, P.A.; Kaufman, P.A.; Paronich Law; Terrell Marshall.

A. Uh-huh.

Q. Just to be clear, are they signing the same service agreement as Woolfson?

A. Yes.

Q. Can you produce those service agreements to us for the second tier customers listed here, Hiraldo, Kaufman, Paronich, and Terrell Marshall?

MS. SHELLEY: We can if you -- can you send

These documents have been ordered by the court to be filed in an un-redacted form and available for public consumption.

just discussed. The PTRS application of TelSwitch.

A. Yes. Uh-huh.

Q. Scrolling down on this document -- it's a long e-mail chain, but if we scroll down to Page 36 of 53.

MS. SHELLEY: Okay. That's a ways.

BY MR. MITTLEBACH:

Q. Which -- which will contain -- the top e-mail is -- is from Diane, and then within that is an e-mail dated November 21, 2023.

Do you see that?

A. Yes.

Q. And what I'm seeing is, in the opening sentence of that, there's a -- it's addressed to Aaron Woolfson. It's from LNPA Account Management, and it states:

(Reading) "Dear NPAC applicant: We're advising you that the NAPM, LLC's PTRS User Finding Report Evaluation for access to Iconectiv's NPAC has been completed by the NAPM, LLC, and resulted in a negative finding."

These documents have been ordered by the court to be filed in an un-redacted form and available for public consumption.

Do you see that?

A. Yes.

Q. Is that what you were referencing by saying that their application was denied?

A. Yes.

Q. Do you know if there was any further resubmission or amendment of the application following this negative finding?

A. I would have to check.

The -- the applicant -- I'd have to double check on the process. The applicant may have an opportunity to modify it, but I am not sure whether he did.

MR. MITTLEBACH: Okay. That's my only question. Thank you.

THE COURT REPORTER: Anybody else?

MR. SOSTRIN: (Shakes head negatively.)

THE VIDEOGRAPHER: Ready to conclude, Counsel?

MR. MITTLEBACH: Yes.

THE VIDEOGRAPHER: This concludes the

These documents have been ordered by the court to be filed in an un-redacted form and available for public consumption.

# EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| MICHAEL ANTHONY, individually, and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>THE FEDERAL SAVINGS BANK, an Illinois Federal Savings Association, and NATIONAL BANCORP HOLDINGS, INC., a Delaware corporation, and FDE MARKETING GROUP LLC, a Florida limited liability company,<br><br>Defendants. | Case No. 1:21-cv-02509<br><br>District Judge LaShonda A. Hunt |

**DECLARATION OF JAN KOSTYUN**

I, Jan Kostyun, being over the age of 21 and having personal knowledge of the facts contained herein, declare as follows:

1. I was retained by The Federal Savings Bank to serve as an expert in this case, and have previously submitted an Expert Rebuttal Report on or about December 2, 2022, as well as a Declaration on or about October 7th, 2025.

2. Under the broad responsibility of regulating communications across the U.S., and in addition to its specific implementation and enforcement of the Telephone Communications Protection Act ("TCPA"), the Federal Communications Commission ("FCC" or "Commission") is also responsible for regulation and enforcement of Local Number Portability in the U.S., which generally allows consumers to switch telephone service providers ("carriers"), while keeping their existing telephone numbers.[1]

3. To manage Number Portability, the Commission interacts with a number of ancillary organizations, including: (1) the North American Numbering Council ("NANC"), which

These documents have been ordered by the court to be filed in an un-redacted form and available for public consumption.

[1] See, for example, *Porting: Keeping Your Phone Number When You Change Providers*, at https://www.fcc.gov/consumers/guides/porting-keeping-your-phone-number-when-you-change-providers (last visited 4/18/2026)

advises the FCC, makes recommendations related to telephone number administration, and is also responsible for selection of the Local Number Portability Administrator[2] (2) the North American Numbering Plan Administrator ("NANPA"), which is selected and overseen by the FCC, and is responsible for planning and assignment of telephone numbering resources, including the allocation of telephone numbers to carriers[3]; (3) the North American Portability Management, LLC ("NAPM, LLC"), which ensures proper use of Number Portability Administration Center ("NPAC") data, by defining and enforcing contracts between the NPAC Administrator, and users of NPAC Data, based on orders and direction from the Commission[4]; and (4) the NPAC Administrator (also known as the Local Number Portability Administrator "LNPA"), who manages the NPAC under the guidance of the NAPM, LLC, maintains the database of ported telephone numbers and related NPAC Data, and provides interfaces to telephone carriers, enabling them to receive or donate ported telephone numbers, along with the consumers associated with those numbers.[5] See the diagram below for the relationship of these organizations with respect to their management and protection of NPAC Data.

These documents have been ordered by the court to be filed in an
un-redacted form and available for public consumption.

---

[2] See *North American Numbering Council*, at https://www.fcc.gov/about-fcc/advisory-committees/general/north-american-numbering-council (last visited 4/18/2026)

[3] See *North American Numbering Plan Administrator*, at https://www.ecfr.gov/current/title-47/chapter-I/subchapter-B/part-52/subpart-B/section-52.13 (last visited 4/19/2026)

[4] See, *North American Portability Management, LLC*, at https://napmllc.org/ (last visited 4/18/2026)

[5] See, for example, *Understanding Number Portability*, at https://numberportability.com/about/npac (last visited 4/18/2026)




Relationship of Organizations managing and protecting NPAC Data

4. Each of these organizations are bound by strict and definitive regulations which protect data associated with the Number Portability process, each of which limit the permissible usage or disclosure of that data.

5. For example, NANC, in its role as advisor to the Commission, is charged with directing the creation of regional databases used by telephone carriers for placing calls to telephone numbers that have been ported (47 CFR § 52.25(a)). Moreover, NANC must ensure that the information in those regional databases is "limited to the information necessary to route telephone calls to the appropriate telecommunications carriers". One critical piece of data that must be housed in those regional databases is the identification of the carrier for any telephone number that has been ported. NANC is also responsible for determining "what specific information is necessary" (47 CFR § 52.25(f)).[6]

These documents have been ordered by the court to be filed in an un-redacted form and available for public consumption.

[6] See *Database architecture and administration*, at https://www.ecfr.gov/current/title-47/chapter-I/subchapter-B/part-52/subpart-C/section-52.25 (last visited 4/19/2026)

6. The Local Number Portability Administrator ("LNPA") (currently iconectiv, also known as the "NPAC Administrator") is firmly bound by Federal rules stating that:

> Local number portability administrators *shall* keep all data obtained from contributors [telephone carriers] confidential and *shall not disclose* such data in company-specific form unless directed to do so by the Commission.

and:

> The local number portability administrators *shall* keep confidential all data obtained from other administrators. The administrators shall use such data, from carriers or administrators, only for purposes of administering local number portability (47 CFR § 52.32(c), emphasis added).[7]

7. The Billing and Collection Agent (B & C Agent"), who calculates, assesses, bills and collects payments for all numbering administration functions (including the costs associated with number portability), is also subject to Federal confidentiality rules covering data collected from carriers and administrators. The B & C Agent shall:

> Keep confidential all data obtained from carriers and not disclose such data in company-specific form unless authorized by the Commission

and:

> shall keep confidential all data obtained from other administrators. The B & C Agent shall use such data, from carriers or administrators, only for calculating, collecting and verifying payments. (47 CFR § 52.16(c))[8]

8. Similarly, NANPA, in its role of managing telephone numbering resources, must "Manage proprietary data and competitively sensitive information and maintain the confidentiality thereof" (47 CFR § 52.13(c)(7)).[9] And among the proprietary data used in Number Portability that must be kept confidential by NANPA are Carrier Identification Codes (47 CFR § 52.13(d)(9)).

These documents have been ordered by the court to be filed in an un-redacted form and available for public consumption.

[7] See Code of Federal Regulations, Allocation of the shared costs of long-term number portability, at https://www.ecfr.gov/current/title-47/chapter-I/subchapter-B/part-52/subpart-C/section-52.32 (last visited 4/18/2026)

[8] See *Billing and Collection Agent* at https://www.ecfr.gov/current/title-47/chapter-I/subchapter-B/part-52/subpart-B/section-52.16 (last visited 4/18/2026)

[9] See *North American Numbering Plan Administrator*, at https://www.ecfr.gov/current/title-47/chapter-I/subchapter-B/part-52/subpart-B/section-52.13 (last visited 4/19/2026)

9. And NAPM, LLC, serving as the intermediary between the FCC and the NPAC Administrator, also certifies that NPAC Data is being properly and permissibly used by any parties with authorized access to that data. One of the items of oversight performed by the NAPM, LLC is that it "Ensures appropriate use of NPAC data as outlined in the NPAC/SMS User Agreement between User and NPAC Administrator".[10]

10. As previously described, iconectiv currently serves as the NPAC Administrator, or LNPA. In this role, iconectiv operates the Number Portability Administration Center ("NPAC"), under the guidance of NAPM LLC. The NPAC is the central vehicle that telephone carriers communicate with in order to port telephone numbers between carriers.

11. As part of its charter, iconectiv manages the data associated with Number Portability ("NPAC Data"), and makes that data available to specific, authorized users under strict guidelines: "Since the NPAC contains proprietary data from thousands of competing Service Providers, access to NPAC Data is limited to specific, permitted uses and is available only to authorized NPAC users."[11]

12. That NPAC Data is made available to authorized users in the form of four distinct service offerings:

1) Authorized NPAC User – allows access by Service Providers, Providers of Telecom-Related Services (PTRS) and Service Bureaus to telephone number portability data (NPAC Data) for routing, rating, billing and network maintenance in connection with providing or facilitating the provision of telecommunications services
2) PortData® Source – provides Law enforcement and public safety agencies access to NPAC Data to help quickly verify porting history and provide the Service Provider's Law Enforcement Emergency Contact information
3) PortData® Validate – allows access to NPAC Data to Healthcare providers, financial institutions and fraud mitigation and risk assessment businesses, for purposes of verifying a customer's identity before approving a transaction or disclosing information, using recent porting activity that may indicate fraud.
4) PortData® Comply – offered to businesses that need to stay in compliance with the TCPA (and resellers to such businesses), by providing information about whether a number has been ported between wireless and wireline.

These documents have been ordered by the court to be filed in an un-redacted form and available for public consumption.

[10] See *NAPM LLC MEMBERSHIP INTRODUCTION*, at https://nanc-chair.org/docs/mtg_docs/Oct07_NAPM_LLC_Recruiting_Presentation.ppt (last visited 4/19/2026)
[11] See *Understanding Number Portability* at https://numberportability.com/about/npac (last visited 4/19/2026)

13. Access to this NPAC Data is strictly controlled, requiring users to demonstrate specific needs for the data, agree to permitted uses, and successfully complete service agreements with iconectiv. The terms of those service agreements are defined by the NAPM, LLC, under the direction of the FCC.

> The use of NPAC User Data or Derived Data is restricted to authorized users for specific purposes as defined by the Master Services Agreement for Number Portability Administration Center/Service Management System between iconectiv, LLC and the North American Portability Management LLC.[12]

14. It is noteworthy that Operating Company Number ("OCN"), is a vital piece of NPAC Data maintained by iconectiv, and is also a key piece of data necessary for Plaintiff's subpoena process. In this context, the OCN identifies the telephone carrier responsible for telephone numbers in Plaintiff's class at the historical date(s) of calls to those numbers. Of the four iconectiv service offerings (described above) that include NPAC Data, the Authorized NPAC User service – available only to authorized Service Providers, PTRSs, and Service Bureaus – is the only service that could be practically used to identify the OCN of given telephone numbers on given historical date(s). Moreover, all NPAC data available in the Authorized NPAC User service are strictly limited to usage in network maintenance or the routing, rating, or billing of telephone calls. The PortData® Source service can identify OCN, but is strictly limited to Law Enforcement usage. The PortData® Validate service may identify the OCN, but only for recent time periods, and only for use by Healthcare, financial, and risk assessment institutions, for fraud prevention purposes. And the PortData® Comply service identifies only the telephone numbers that have been ported from wireless to wireline, or wireline to wireless, without any identification of the OCN.[13]

15. As referenced above, there are strict regulations on the permissible use of all NPAC Data. For example, Exhibit A includes the iconectiv document *NPAC Permitted Use Clarifications*, which identifies the strict permitted usage of NPAC Data available to Service Providers and PTRSs. For Service Providers and PTRSs, permitted usage of NAPC Data is restricted to use in

These documents have been ordered by the court to be filed in an
un-redacted form and available for public consumption.

[12] See *Who can access NPAC Data?* at https://numberportability.com/about/permitted-use (last visited 4/19/2026)
[13] *See Solutions for Accessing NPAC Data*, at https://numberportability.com/services/overview (last visited 4/20/2026)

routing, rating, billing and network maintenance on behalf of Service Providers, and clearly identifies examples of **non-permitted uses to include** – among others – **TCPA compliance**.

16. In addition to the documentation cited herein, iconectiv has also testified as to their role in maintaining the confidentiality of NPAC Data. In the case of Michael Smith, et. al. vs. ExamWorks, LLC and Government Employees Insurance Company (No. 8:21-cv-02746, D. Md.), Cathryn McMahon was deposed as the corporate representative of iconectiv ("McMahon Dep.").

17. For example, McMahon testified that the NPAC Data maintained by iconectiv may be accessed only for permissible uses by authorized organizations:

> Q. … (Reading) "As the Local Number Portability Administrator. LNPA. for the United States, Iconectiv manages the nation's Number Portability Administration Center. NPAC, the largest system of databases of ported telephone numbers in the world. The U.S. NPAC includes approximately one billion telephone numbers from approximately 1,600 service providers, and providers of telecom-related services, PTRS. NPAC data can be accessed for very specific uses, and only qualified businesses and organizations are authorized to receive that data." Is that your understanding of how Iconectiv operates, and has operated in the time that you have been working with them?
>
> A. Yes. (McMahon Dep. 42:20-43:13)

18. When questioned regarding the enforcement of specific, permissible uses of NPAC Data, McMahon explains that iconectiv, as the NPAC Administrator, must follow the usage rules for that NPAC Data as defined by the NAPM, LLC, and as documented in the service agreements for each user:

> Q. And, in general, Cathy, what -- why is there a distinction between permitted uses and non-permitted uses with, let's say, with respect to the PortData Comply license? Why is there only specific uses authorized?
>
> A. So, in our role -- and I can (inaudible) to the role as the administrator -- we follow rules that are established by the owners of the data, which is the carriers in the U.S. who provide that data. There is a limited liability corporation, the North American Portability Management, LLC. They set the rules for how the data -- their data may be used, and not used, and those -- those are documented in the service agreements, and that is what's followed. (*Id.* 32:1-16).

19. In other words, iconectiv is presented with terms of usage for all NPAC data, as defined by the NAPM, LLC, and may provide NPAC Data only to users who have agreed to those terms of usage by way of their specific service agreement.

20. I have reviewed the service agreement between iconectiv and TelSwitch, Inc. (the business name used by Plaintiff's Expert), for iconectiv's Wireless Do Not Call service (a.k.a.

PortData® Comply) dated 8/28/2025. Under Section 6 "Permitted Use", Sub-section 6.1 "Customer Use" of that agreement, it is specified that "Customer may … use the Service and the provided Intermodal Ports for the sole purposes of avoiding TCPA Prohibited Conduct by verifying whether TNs are assigned to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call." This usage description is the only permitted usage described under "Customer Use".

21. During her deposition, McMahon was questioned about email communication between iconectiv and Plaintiff's Expert Mr. Woolfson, related to Woolfson's application for the PortData® Comply service. Here, she described permitted uses of the NPAC Data under the PortData® Comply service, for avoidance of TCPA violations (before they occur) versus investigation of TCPA violations (after they occur), confirming that using the service for avoidance of violations – before they occur – was the only permitted use:

> Q. And what they say there is: (Reading) "The intended use provided, what was described below in that paragraph, could be interpreted as being used for investigative purposes. which is not allowed." What is your understanding on behalf of Iconectiv of what the phrase "investigative purposes" means?
>
> A. To investigate a TCPA violation.
>
> Q. And do you have an understanding — what would an example of investigating a TCPA violation be?
>
> A. Um, if there were a complaint that a call was made that shouldn't have been made, and there was an investigation of that.
>
> Q. Investigating whether a call violated the TCPA?
>
> A. Yes.
>
> Q. And what is your understanding of what that reply e-mail from the PortData Comply Account Management Team means when it says investigative purposes. which is not allowed?
>
> MS. SHELLEY: Objection. You can ask her what her understanding of that phrase is, but not what they intended
>
> MR. MITTLEBACH: Thank you.
>
> BY MR MITTLEBACH:
>
> Q. And I mean what your understanding is as the representative of Iconectiv is.
>
> A So as we discussed earlier, the PortData Comply Service is for avoidance of TCPA violations. And investigation after is not — is not avoidance.

These documents have been ordered by the court to be filed in an un-redacted form and available for public consumption.

Q. So am I correct in understanding that that would not be a permitted use of the PortData Comply subscription?

A. Investigation after the fact of calls would not be a permitted use. (*Id.* 111:6-112:21)

22. McMahon was also questioned about a Declaration that Plaintiff's Expert has submitted in the instant case, and McMahon confirmed that iconectiv was NOT aware that Plaintiff's Expert has used NPAC Data – from iconectiv – to investigate violations of the TCPA during litigation based on phone calls that had previously been placed:

Q. All right. I'm going to direct you to Paragraph 32. And that paragraph states: (Reading) "TelSwitch, Inc., and I are presently authorized to use the WDNC data elements in the ways I explained in my declaration submitted in this case. Iconectiv knows that I have access to the data, and both FCC and Iconectiv are familiar with my use of data for the purposes related to the TCPA, because Iconectiv granted it."

To confirm, was Iconectiv aware that TelSwitch or Mr. Woolfson was using any data provided by Iconectiv in connection with investigating violations of the TCPA from phone calls that had already been made?

A. No. (*Id.* 195:13-196:7)

23. Moreover, McMahon attested to the sensitivity of the NPAC Data, and the fact that none of that data is publicly available:

Q. And when you say somebody applies, does that -- and then they are approved, is an application approval necessary for anyone to access the data that Iconectiv administers?

A. Yes.

MR. SOSTRIN: Object to form.

BY MR. MITTLEBACH:

Q. Is any of the data that Iconectiv administers publicly available, that anyone can access without applying, and registering?

A. No.

Q. And has -- I assume -- as you're answering that true today, has that also been true historically, or was it ever publicly available?

MS. SHELLEY: To the extent you know the answer.

A. To my knowledge, it is not publicly available. (*Id.* 22:18-23:14)

Further:

Is the WDNC data from Iconectiv publicly available?

A. No. (*Id.* 187:9-11)

And:

Q. But no Iconectiv data is publicly available; is that correct?

A. The NPAC user data that we make available through services, none of that is publicly available. (*Id*. 187:19-188:2)

24. It is clear that the FCC, as well as multiple ancillary organizations that manage and support Number Portability, are committed to protecting sensitive NPAC Data, and guaranteeing that NPAC Data is made available only to authorized users with specific needs for that data.

25. I am also aware of the negative consequences that can result from the exposure of NPAC Data to unauthorized users, such as the financial damage that can occur with Port-out Fraud, whereby scammers can use the identification of the carrier to which a consumer has ported their number, in order to hijack the consumer's telephone number, intercept messages or calls used for multi-factor authentication, and gain illegal access to the consumer's financial or other accounts[14]. And this represents just one of many harmful results that a consumer can experience, based on the exposure of sensitive and confidential NPAC Data.

Pursuant to 28 U.S.C. §1746, I declare under the penalty of perjury and under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: April 23rd, 2026



These documents have been ordered by the court to be filed in an un-redacted form and available for public consumption.

[14] See, for example, *FCC Adopts Rules To Protect Consumers' Cell Phone Accounts*, at https://docs.fcc.gov/public/attachments/DOC-398483A1.pdf (last visited 4/19/2026)

# Exhibit A

These documents have been ordered by the court to be filed in an un-redacted form and available for public consumption.

**From:** PortData Comply
**To:** Aaron Woolfson
**Cc:** St. Jacques, Carol; PortData Comply; Turner Wuerger, Lisa
**Subject:** RE: Documents to Begin Registering TelSwitch"s Customers for the iconectiv PortData Comply, WDNC Service
**Date:** Tuesday, July 23, 2024 12:01:37 PM

Aaron,

The intended use provided could be interpreted as being used for investigative purposes, which is not allowed. Can you please re-write your use case to remove this ambiguity? As an FYI, most attorney users choose the first option.

Regards,
PortData Comply Account Management Team

**From:** Aaron Woolfson <woolfson@telswitch.com>
**Sent:** Monday, July 22, 2024 4:52 PM
**To:** Turner Wuerger, Lisa <lturner@iconectiv.com>
**Cc:** St. Jacques, Carol <cstjacques@iconectiv.com>; PortData Comply <PortDataComply@iconectiv.numberportability.com>; Aaron Woolfson <woolfson@telswitch.com>
**Subject:** Re: Documents to Begin Registering TelSwitch's Customers for the iconectiv PortData Comply, WDNC Service

This message has originated from an **External Source**. Please use proper judgment and caution when opening attachments, clicking links, or responding to this email.

Hi lisa,

Thank you for your question.

There are really two use case scenarios. Pre-litigation, (a) compliance - identifying whether calls had violated, or caused a violation of the TCPA after they were made for identification as to whether the calls were made in a manner that would subject them to the TCPA; and (b) they need to be able to identify the calls when conducting audits after a lawsuit for either settlement purposes, or for identifying trends of non-compliance, as per FCC 15-35A1, paragraph 142. ; and (b) Post-litigation, his information is used to assist with the courts in developing settlement plans.

Just as background, TelSwitch, Inc. specifically outlined the use-case scenarios that this data would be used for in it's filing with the FCC in 2023: https://www.fcc.gov/ecfs/document/110178529590/1 and iConectiv acknowledged in kind. Let me know if there are any additional questions.

I am attaching the IMS description, because I think that it best describes the process.

Aaron Woolfson



EXHIBIT
13

These documents have been ordered by the court to be filed in an un-redacted form and available for public consumption.

On Mon, Jul 22, 2024 at 1:36 PM Turner Wuerger, Lisa <lturner@iconectiv.com> wrote:

Aaron,

Can you be more specific on the Intended Use case for these new customers?

For example, do these customers intend to avoid engaging in prohibited TCPA activities, do they intend to investigate calls for TCPA violations, or is it something else?

Thank you,
Lisa

**From:** Aaron Woolfson <woolfson@telswitch.com>
**Sent:** Monday, July 22, 2024 1:13 PM
**To:** Turner Wuerger, Lisa <lturner@iconectiv.com>
**Cc:** St. Jacques, Carol <cstjacques@iconectiv.com>; PortData Comply <PortDataComply@iconectiv.numberportability.com>
**Subject:** RE: Documents to Begin Registering TelSwitch's Customers for the iconectiv PortData Comply, WDNC Service

This message has originated from an **External Source**. Please use proper judgment and caution when opening attachments, clicking links, or responding to this email.

Attached, please find the second tier registrations, thank you.
I was able to access the NetSuite account, I presume that once these are built, we can pay for them through that website.

Thank you again.
Aaron

These documents have been ordered by the court to be filed in an un-redacted form and available for public consumption.

iconectiv

Dominic Maisano
Head of Legal
t 732.699.7763
dmaisano@iconectiv.com | iconectiv.com

March 26, 2026

**VIA UPS and EMAIL**
TelSwitch, Inc.
1937 Oak Park Blvd., Ste D
Pleasant Hill, CA 94523
Attn: Aaron Woolfson, President
woolfson@telswitch.com

Re: Notice of **Termination of the Wireless Do Not Call Service Agreement dated August 28, 2025 by and between iconectiv, LLC and TelSwitch, Inc. ("Agreement").**

Mr. Woolfson,

With regard to the Agreement referenced above, it has come to our attention that TelSwitch, Inc. ("Customer") has materially breached the Agreement by utilizing the Intermodal Ports data ("WDNC Data") for post-call forensic analysis and/or litigation purposes, as evidenced by your own admission in an email response to Todd Daubert, Attorney for NAPM LLC, dated March 18, 2026, and your Declarations as Expert Witness in Michael Anthony v The Federal Savings Bank, Case No. 1:21-cv-02509, United States District Court, Northern District of Illinois, and Michael Smith v Examworks, LLC, Case No. 8:21-cv-02746-PX, United States District Court, District of Maryland.

In your sworn Expert Witness Declaration, you state that you obtain the WDNC Data from iconectiv and use it for purposes of post-call forensic analysis for litigation purposes; and in fact admit that you have "used the WDNC data in this way in hundreds of matters involving the TCPA on behalf of plaintiffs and defendants (as a disclosed expert and as a consulting expert)."[1]

After you requested historical WDNC Data files to be redistributed and used for TCPA litigation purposes,[2] iconectiv advised you that the WDNC Data could not be used for post-call analysis and/or litigation purposes. Unhappy with this response, you sought clarification from the NAPM LLC. In response to your request, the NAPM LLC stated that "[a]pplicable law explicitly prohibits TelSwitch and Mr. Paronich from accessing or using WDNC data for TCPA litigation purposes."[3] In response to the NAPM LLC's statement, you state that you do not recognize the NAPM LLC as the authority on the permitted use of WDNC Data, and emphatically state that "we continue (and will continue) to use WDNC data in association with assisting triers of fact. And in avoiding TCPA violative activities. Just as we have done so in the past - and shall continue to do in the future."[4]

---

[1] Woolfson Declaration in Anthony v The Federal Savings Bank, Case No. 1:21-cv-02509, United States District Court, Northern District of Illinois, paragraph 8.
[2] See Woolfson email to PortDataComply email mailbox, dated February 25, 2026.
[3] See Todd Daubert Letter to TelSwitch re: WDNC Data and Permitted Use, dated March 18, 2026.
[4] See Email from Aaron Woolfson, TelSwitch Inc. to Rodsa Warnuvongs, Todd Daubert, et al, dated March 19, 2026.

iconectiv

Section 6.1 of the Agreement states in relevant part that Customer may use the WDNC Service and the Intermodal Ports for the "**sole purposes of avoiding** TCPA Prohibited Conduct by verifying whether TNs are assigned to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call (emphasis added)." Section 6.2 of the Agreement sets forth the permitted use of Second Tier customers, "to permit such third party **itself** to avoid engaging in TCPA Prohibited Conduct (emphasis added)." Customer's admission that it has and will continue using the WDNC Data for post-call forensic analysis for the purposes of litigation is a material breach of Section 6, and leaves iconectiv no choice but to immediately terminate Customer's Agreement, Customer's access to the WDNC service, and Customer's designation as an authorized reseller of PortData Comply service. These limitations govern, as they are the terms under which the service providers, who are the owners of LNP data,[5] permit the disclosure to third parties that are not engaging in number porting, or the rating, routing or billing of calls.

Furthermore, in Section 10.1(c) of the Agreement, you "expressly represent[ed], certif[ied] and warrant[ed]" that you would receive the Intermodal Port data "for the sole purposes of: 1. avoiding engaging in TCPA Prohibited Conduct by verifying whether TNs are assigned to a [mobile service] or other service for which the called party is charged for the call," or 2. to disclose or sell to a Second Tier customer. Use for a purpose other than avoiding making a TCPA prohibited call violates that representation and warranty.

You have asserted that you are permitted as a WDNC user to utilize LNP data for post-call litigation analyses pursuant to Paragraph 142 of the Order in which the FCC approved iconectiv's selection as LNP.[6] However, your assertion is incorrect. In Paragraph 142, the FCC stated, "The RFP section 11.1 states that the LNPA must provide the service discussed above (Intermodal TN ID Service), as well as other requirements stemming from TCPA." Section 11.1 of the RFP stated:

> The LNPA shall determine, based upon a good-faith, reasonable interpretation of the information provided by such applicant whether the User Data requested constitutes solely Intermodal Ports AND whether the intended use of the requested User Data is for the sole purposes of permitting that applicant as a Qualified Limited User Data Recipient to avoid engaging in TCPA Prohibited Conduct by verifying whether TNs are assigned to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service or any service for which the called party is charged for the call or allowing that applicant as a Qualified Limited User Data Recipient to disclose, sell, assign, lease or otherwise provide to another third party who qualify as a Second Tier Limited User Data Recipients.[7]

Thus, Paragraph 142 of the *2015 Selection Order* did not confer a right to use LNP data for a TCPA purpose other than "to avoid engaging in TCPA Prohibited Conduct."

Accordingly, your use of WDNC data for purposes other than avoiding placing a TCPA prohibited call is a material breach of the Agreement.[8] The fact that your representation and warranty as to your use of

---

[5] NAPM-iconectiv Master Services Agreement § 18.1.1.
[6] *Telcordia Technologies, Inc. Petition to Reform Amendment 57 and Order a Competitive Bidding Process for Number Portability Administration, et al.*, 30 FCC Rcd 3082 (2015).
[7] 2013 NAPM RFP § 11.1 (emphasis in original).
[8] Agreement § 13.1(c).

iconectiv

WDNC data is "incorrect in any respect" is also a material Breach of the Agreement.[9] As such, Section 13.1 of the Agreement applies and states:

> ***13.1. Termination for Breach.*** *In the event that Customer commits a material breach of any obligation hereunder, iconectiv may, by giving written notice to Customer, immediately suspend or terminate this Agreement for…(c) failure by Customer to comply with its obligations under Article 6 (Permitted Uses).*

By way of this letter and in accordance with Section 13.1 of the Agreement, be advised that, although it has no duty to do so, iconectiv is providing formal, written notice of the immediate termination of: (i) the Customer's WDNC service, (ii) Customer's designation as an authorized reseller of PortData Comply, and (iii) the Agreement, for material breach of Section 10, Representations, Warranties and Disclaimers, and Section 6, Permitted Use of the WDNC Data, effective March 26, 2026. Pursuant to Section 13.6 of the Agreement, Customer must immediately cease and desist using WDNC Data for any purpose, including post-call analysis and/or litigation purposes and immediately cease providing WDNC Data to third parties and providing analysis of third-party data using WDNC Data.

iconectiv reserves all rights and remedies available to it under the Agreement and applicable law, including the right to seek damages arising from this breach.

Please acknowledge receipt of this notice and compliance with the above requirements.

Sincerely,

*Dominic Maisano*

Dominic Maisano
Head of Legal, iconectiv

cc: K. Timko
J. Zamlong
C. McMahon
J. Nakahata

---

[9] Agreement § 13.1(a).

# EXHIBIT C

DENTONS

**Todd D. Daubert**
Partner

todd.daubert@dentons.com
D +1 202-408-6458

Dentons US LLP
1900 K Street, NW
Washington, DC 20006
United States

dentons.com

March 18, 2026

**VIA EMAIL – woolfson@telswitch.com**

**Re: WDNC Data Access and Permitted Use**

Mr. Aaron Woolfson
Telswitch Inc.
1937 Oak Park Boulevard, Suite D
Pleasant Hill, CA 94523

Dear Mr. Woolfson,

I am writing on behalf of the North American Portability Management LLC ("NAPM LLC") in response to your email correspondence with iconectiv, LLC ("iconectiv") regarding TelSwitch Inc.'s ("TelSwitch") request for access to historical Wireless Do Not Call ("WDNC") data for a non-permitted use.[1]

The NAPM LLC understands that TelSwitch has requested the WDNC data to enable TelSwitch to identify the wireless status of numbers dating back to February 2024.[2] TelSwitch has stated that it requested the data on behalf of its client, Anthony Paronich, in relation to a Telephone Consumer Protection Act ("TCPA") action.[3] Mr. Paronich is an attorney who represents consumers in class action litigation.[4] Therefore, our assumption is that TelSwitch wishes to access the requested WDNC data so that Mr. Paronich may use the data as evidence in TCPA litigation.

Applicable law explicitly prohibits TelSwitch and Mr. Paronich from accessing or using WDNC data for TCPA litigation purposes. Requirements for use of WDNC data are specified in the Master Services Agreement for Number Portability Administration Center/Service Management System by and between iconectiv and the NAPM LLC ("MSA"), which is incorporated by reference into the Wireless Do Not Call Service Agreement dated August 28, 2025 by and between iconectiv and TelSwitch ("TelSwitch WDNC Agreement").[5] The MSA and the TelSwitch WDNC Agreement are clear: the extent to which WDNC data may be used for TCPA purposes is limited to permitting lawful recipients to avoid engaging in TCPA

---

1 Email from Aaron Woolfson, TelSwitch, Inc to PortData Comply Listserv and PortDataValidate Listserv, iconectiv, LLC and Anthony Paronich (February 25, 2026, 10:45 EDT) (*February 25 Email*); Email from Aaron Woolfson, TelSwitch, Inc. to PortData Comply Listserv, iconectiv, LLC et. al. (February 26, 2026, 10:03 EDT) (*February 26 Email*); Email from Aaron Woolfson, TelSwitch, Inc. to Dominic Maisano, iconectiv, LLC et. al. (March 3, 2026, 15:07 EDT) (*March 3 Email*).

2 *See February 25 Email* (stating that "One of our clients (cc'd) needs us to tag the isWireless status of numbers going back to approximately 02/04/2024 related to a TCPA action. Can you please the daily archive files between 01/01/2024 and 01/30/2025 to the sFTP site so that I can re-download those, I would appreciate it.")

3 *Id.*

4 *See* Paronich Law, About Us, https://www.paronichlaw.com/about (last visited Mar. 12, 2026) (stating that "Attorney Paronich prides himself on representing consumers against some of the country's largest corporations. He has been involved in consumer work for over a decade, including more than 100 class action lawsuits, and involved in litigation that has resulted in over $200,000,000 in settlements or judgments for consumers").

5 Sections 4.2 and 13.4 of TelSwitch WDNC Agreement.

Prohibited Conduct, which is defined as "the initiation of telephone calls using automatic telephone dialing systems or an artificial or prerecorded voice to telephone numbers assigned to a paging service, cellular telephone service, specialized mobile radio service or other radio common carrier service, or any service for which the called party is charged for the call."[6] Accordingly, WDNC data may be used solely to determine the service to which a number belongs so that a lawful recipient of the data may avoid making illegal calls to mobile numbers. Nothing in the operative TCPA language allows a recipient of WDNC data to use it in support of TCPA litigation or after-the-fact forensic analysis (*i.e.*, after any alleged TCPA Prohibited Conduct would have already occurred, clearly indicating that the data was not being used to prevent such conduct).

Further, nothing in the operative TCPA language, the TelSwitch WDNC Agreement, or the MSA gives Mr. Paronich any right to use WDNC data for litigation purposes. There are three classes of iconectiv customers that may use WDNC data: (i) Direct Customers, (ii) Reseller Customers, and (iii) Second Tier Customers. Direct Customers of iconectiv may use WDNC data to help the *Direct Customer* avoid initiating illegal calls; Reseller Customers that provide WDNC data to third parties (*i.e.* Second Tier Customers) may use WDNC data to help the *Reseller Customer or Second Tier Customers* avoid initiating illegal calls, in the latter case so long as the Second Tier Customer is registered with iconectiv; and Second Tier Customers that receive WDNC data from Resellers may use WDNC data to help *the Second Tier Customers* avoid initiating illegal calls, so long as the Second Tier Customers are registered with iconectiv. This structure establishes two requirements for using WDNC data: (i) the only permitted use of the WDNC data is to allow the data recipient to avoid initiating illegal calls under the TCPA; and (ii) any WDNC data recipient must be registered with iconectiv.

TelSwitch is registered with iconectiv as a Reseller Customer, which means that TelSwitch may obtain WDNC data solely so that *TelSwitch or its registered Second Tier Customers* can avoid engaging in TCPA-prohibited conduct (*i.e.*, so that TelSwitch or its registered Second Tier Customers can avoid initiating illegal calls to mobile numbers). Therefore, TelSwitch's recent request is fundamentally inconsistent with applicable law and the TelSwitch WDNC Agreement because: (i) TelSwitch itself does not intend to use the data to avoid making illegal calls; and (ii) TelSwitch intends to provide the data to a third party (Mr. Paronich) who also does not intend to use the data to avoid initiating illegal calls.

Contrary to TelSwitch's assertions in its email correspondence,[7] iconectiv's representations that TelSwitch may not obtain WDNC data and provide it to Mr. Paronich for litigation purposes: (i) are aligned with, and required by, the Federal Communications Commission's guidance in the *2015 LNPA Selection*

---

[6] The MSA expressly limits use of WDNC data to "permitting the Qualified Limited Use Data Recipients to avoid engaging in TCPA Prohibited Conduct by verifying whether TNs are assigned to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call (emphasis added)." This limitation is incorporated into the TelSwitch WDNC Agreement at Section 6.2.

[7] *See February 26 Email* (stating "[t]his is the issue I have. Neither iConectiv [*sic*], nor NAPM LLC is an adjudicatory organization. Simply, it cannot unilaterally make **new** rules on behalf of the FCC. This is because, among other things, non-delegation clauses forbid non-governmental agencies from making decisions on behalf [*sic*] the government itself (e.g. such as the FCC). Those rules (e.g. FCC 13FCC 15-35A1) [*sic*] is [*sic*] set forth by the FCC—a central requirement of iConectiv's administration of the LNPA by the FCC itself—are a condition of iConectiv's continued administration of the LNPA.. [*sic*] And by not providing data in the manner set forth in the agreements between the FCC and iConectiv], (yet still making those items available to other organizations that rely upon it) violates iConectiv's covenants surrounding neutrality and puts iConectiv squarely in violation of its' [*sic*] duties toward the FCC, and in turn, the American Public.")

*Order*,[8] and (ii) are not tantamount to adjudications of a "new" rule on behalf of the agency. The FCC stated in the *2015 LNPA Selection Order* that "[t]he RFP section 11.1 states that the LNPA must provide the service discussed above (Intermodal TN ID Service), as well as other requirements stemming from TCPA."[9] This means that iconectiv is required to make the WDNC Service (formerly named Intermodal TN ID Service) available consistent with the requirements of the relevant RFP, which expressly limits use of WDNC data to allow recipients to avoid initiating illegal calls.[10] The RFP does not state that a recipient of WDNC data is allowed to use the data for TCPA litigation support. Specifically, Section 11.1 of the RFP mirrors the TelSwitch WDNC Agreement and states in relevant part that:

(i) "The FCC has adopted rules prohibiting the ***initiation of telephone calls using automatic telephone dialing systems or an artificial or prerecorded voice to telephone numbers assigned to a paging service, cellular telephone service, specialized mobile radio service or other radio common carrier service, or any service for which the called party is charged for the call (such conduct referred to as TCPA Prohibited Conduct)***. If selected, an LNPA must provide in each Region a service separate from the Service provided to Users, to provide certain User Data elements to certain parties satisfying specific qualification requirements ***for the sole purpose of allowing such parties to avoid engaging in TCPA Prohibited Conduct.*** This service shall be referred to as the [WDNC Service]" (emphasis added);[11]

(ii) "The LNPA shall determine, based upon a good-faith, reasonable interpretation of the information provided by such applicant . . . whether the intended use of the requested User Data is ***for the sole purposes of permitting that applicant as a Qualified Limited User Data Recipient to avoid engaging in TCPA Prohibited Conduct by verifying whether TNs are assigned to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service or any service for which the called party is charged for the call*** *or* ***allowing that applicant as a Qualified Limited User Data Recipient to disclose, sell, assign, lease or otherwise provide to another third party who qualify as a Second Tier Limited User Data Recipients***" (emphasis added);[12]

---

8 *Telcordia Technologies, Inc. Petition to Reform Amendment 57 and to Order a Competitive Bidding Process for Number Portability Administration et al.*, WC Docket No. 07-149, Order, 30 FCC Rcd 3082, 3142, para. 142 (2015) (*LNPA Selection Order*).

9 *Id.*

10 *Wireline Competition Bureau Announces Release of Procurement Documents for the Local Number Portability (LNP) Administration Contract*, CC Docket No. 95-116, WC Docket Nos. 07-149, 09-109, Public Notice, 28 FCC Rcd 1003 (2013) (bid documents provided by web links demonstrate discussed and implemented revisions to the Request for Proposals (RFP), Technical Requirements Document (TRD), and Vendor Qualification Survey (VQS)).

11 RFP § 11.1.

12 RFP § 11.1, Req. 2. The RFP incorporates the definition of "Second Tier Limited User Data Recipients" that is used in the MSA, which corresponds to "Second Tier Customer" in the TelSwitch WDNC Agreement. That definition expressly states that a Second Tier Customer receives Intermodal Ports "so that the Second Tier Customer can *itself avoid engaging in TCPA Prohibited Conduct*" (emphasis added) (*i.e.* so the Second Tier Customer itself can avoid initiating illegal calls). Section 5.2(c) of the TelSwitch WDNC Agreement. TelSwitch would like iconectiv, the NAPM LLC, and the FCC to ignore the words "to avoid engaging in TCPA Prohibited Conduct" and their meaning in every instance that they appear in the RFP, MSA, the TelSwitch WDNC Agreement, and relevant FCC orders to allow TelSwitch to provide WDNC data to Mr. Paronich for use in TCPA litigation. The parties do not have the liberty to ignore this language as TelSwitch has done to date.

(iii) "The LNPA shall make available ***on a daily basis***, two files consisting of lists of intermodal ports to TNs segregated between wireline to wireless ports and wireless to wireline ports on a password secure Web/FTP site for downloading by Qualified Limited User Data Recipients." (emphasis added); [13] and

(iv) "The [WDNC] Service shall only be provided to Qualified Limited User Data Recipients after execution and delivery of an agreement ***satisfying the requirements set forth in the Master Agreements and substantially the form approved by the NAPM LLC*** (the [WDNC] Service Agreement) (emphasis added).[14]

In other words, the limitations governing who may use WDNC data and for what purposes have been in place since the inception of the current LNPA arrangement. The FCC established these limitations through a multi-year agency-supervised procurement and expressly approved them through approval of the RFP and MSA.[15] Indeed, I personally went through the agreements on a line-by-line basis with the agency, including the provisions discussed in this letter, and I can assure you not only that the FCC explicitly reviewed and approved the language, but the limitations on permitted uses, including the limits that prohibit TelSwitch continuing to use WDNC data as it has to date, were intentional. Hence, iconectiv and NAPM LLC are not "unilaterally mak[ing] new rules" by restricting TelSwitch's use of WDNC data. iconectiv and the NAPM LLC are faithfully administering contract terms that the FCC stipulated and approved.

Finally, the excerpts of the RFP cited in this letter demonstrate that: (i) TelSwitch's contractual entitlement is to the current daily file, not a twelve-month archive as suggested in your email correspondence with iconectiv and the FCC, and (ii) the NAPM LLC must approve any amendments to the TelSwitch WDNC Agreement.

We trust this resolves the matter.

Sincerely,

Todd D. Daubert
on behalf of the NAPM LLC

cc: Edward Krachmer, Deputy Chief, Competition Policy Division
FCC Wireline Competition Bureau; edward.krachmer@fcc.gov
Dominic Maisano, Head of Legal, iconectiv; dmaisano@iconectiv.com

---

13 RFP § 11.1, Req. 6.

14 RFP § 11.1, Req. 9.

15 *See LNPA Selection Order*, 30 FCC Rcd at 3086–90, paras. 8–13 (describing the multi-year competitive procurement process beginning in 2010, including NANC oversight, public comment periods, and Wireline Competition Bureau review of bid documents); *see also Telcordia Technologies, Inc. Petition to Reform Amendment 57 and to Order a Competitive Bidding Process for Number Portability Administration et al.*, WC Docket No. 07-149, Order, 31 FCC Rcd 8406 (2016), *aff'd sub nom, Neustar Inc. v. FCC*, 857 F.3d 886 (D.C. Cir. 2017) (approving the terms of the MSA).