**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF LOUISIANA**

**ANDREW JAMES MCGONIGLE,**, *on behalf of himself and all others similarly situated*,

*Plaintiff*,

v.

**SHOPPERSCHOICE.COM, L.L.C.**

*Defendant*.

Case No: **25-cv-00152-SDD-RLB**

Presiding:
**Hon. SHELLY D. DICK**
Referral:
**Hon. RICHARD L. BOURGEOIS**

## DECLARATION OF EXPERT AARON WOOLFSON

I, Aaron Woolfson, state and declare as follows:

1. I have been retained by the Plaintiff to determine whether there is a reliable methodology for analyzing the text messaging records in this lawsuit reflecting the text messaging done by or on behalf of the Defendant ShoppersChoice.com ("ShoppersChoice" or "Defendant" as captioned).

2. More specifically, I have been asked to opine whether there is a reliable method to identify those text messages within the Call Detail Records ("CDRs") maintained by or on behalf of Defendant that were sent to telephone numbers that (a) were text messaged two (2) or more times in a twelve (12) month period after being reassigned and (b) were registered on the National Do Not Call Registry ("DNC") list for more than thirty (30) days before the date of each of the texts.

3. As described in this Declaration, it is my conclusion that, by using records of the texts sent by or on behalf of Defendant, there is a reliable method to identify which text messages were sent to telephone numbers that (a) were text messaged two (2) or more times in a twelve (12) month period after being reassigned and (b) were registered on the DNC for more than thirty (30) days before the date of each of the texts.

4. It is also my opinion that there is a reliable method to identify text messages with

other particular criteria based on the additional types of information included in the CDRs, including whether they were sent on a date after an inbound text message from the telephone number to which the text message was sent, and/or other records maintained by or on behalf of Defendant.

5. The methodology that I have applied to the text messages in the CDRs demonstrates a reliable manner to achieve the identification of all text messages within the CDRs maintained by Defendant to identify text messages to reassigned, DNC registered telephone numbers.

6. This report reflects the results of my study of the underlying facts, independent analysis of the data and documents provided by the Defendant and third parties. My rate is $440.00 per hour for expert engagements, and $675.00 per hour for depositions, trial, and arbitration appearances.

7. I am personally familiar with the matters that are contained within this declaration, and if called to testify, I can accurately and competently testify as to them.

**Qualifications and Expert Engagements.**

8. I have over 25 years of experience in developing and analyzing databases and telephone systems and establishing the interfaces between telephone systems and the networks that convey calls. I have implemented call recording and call data collection and retention systems for commercial, government, aerospace, telecommunications, and payroll industries. My professional experience includes serving as an expert witness in cases where I evaluated the technical aspects of telephone systems, including whether they had a random or sequential number generator.

9. My qualifications and curriculum vitae are attached to this expert report as Exhibit 1. A list of the other cases in which I have testified as an expert at trial or by deposition during the previous four years is attached as Exhibit 2. I have been qualified by both Federal and State courts.[1]

---

[1] *ABM Industries Overtime Cases* (Case No JCCP 4502, San Francisco Superior Court) (2017) 19 Cal. App. 5th 277, footnote 5, at page 8, ("[T]here was evidence in the record that Woolfson had previously qualified as an expert in both state and federal court ...") *(ABM Industries Overtime Cases, A132387, A133077, A133695, 19 Cal. App. 5th 277 (Dec. 11, 2017; pub. ord. Jan. 10, 2018))*. (Exhibit 3).

My testimony has been relied upon by courts in both individual and class actions,[2] by plaintiffs and defendants. My opinions have also been relied upon in arbitrations, including TCPA claims.

10. I was the developer of the automated Verification of Deposit ("VOD") and Verification of Mortgage ("VOM") system that was used by Chase, Wells Fargo, Bank of America, as well as some regional banks and mortgage lenders, to facilitate the review of mortgage applications by call center staff. These systems required a great deal of integration between the telephone systems and the financial institution's computer systems, and relied heavily on my deep understanding of database and time keeping integration technologies. It also required me to build interfaces to the ACH[3] exchanges, and with Global Payments and other large automated electronic inter-exchanges of financial information. Other processes necessitated integrating fax and OCR[4] capabilities as well as enhanced call routing – inbound and outbound – including predictive elements of enhanced call processing, and the precise timings of these events.

11. I am the inventor of "Canvas", a programming language that I developed for interfacing between telephone systems and telephone networks, capable of processing hundreds of thousands of calls a day. To date, hundreds of millions of calls have been handled by Canvas on behalf of call centers, financial institutions, conference calling companies, and organizations offering Interactive Voice Response ("IVR") services. [5]

---

[2] "The Court notes that Mr. Woolfson's expert report appears to include information related to the merits of the case in addition to class certification issues." *Gaines v. Law Office of Patenaude & Felix, A.P.C.*, Case No 3:13-cv-01556-JLS-DHB (S.D. Cal.), Sep. 21, 2015 ECF 132 at page 3.

[3] Automated Clearing House ("ACH").

[4] The OCR ("Optical Character Recognition") process as integrated into the automatic monitoring of telephone calls in real time to determine whether the call was a voice or fax call, and if a fax call, decoding the contents of each fax-page into machine readable text *while* a fax was being transmitted to the bank's computers for integration with a database.

[5] IVR is a technology that allows a computer to interact with humans through the use of voice and/or DTMF tones input via a telephone keypad. DTMF ("Dual Tone Multi Frequency") is the signal you generate when you press a telephone's touch keys.

12. I have developed highly available, upwardly scalable databases for use in the telecommunications industry. The databases and telephone systems that I have personally developed and/or coded are used by telephone companies and call centers throughout the United States and Canada to catalogue and index various customer-calling activities. Some of the companies that have used my databases and/or telephone equipment (which I personally created and manufactured) have included Japan Telecom, Experian, Bank of America, Wells Fargo Bank, JP Morgan, Bank of the West, Cogent Communications, Zone Telecom (ANPI), Aion Networks, Smartcall Conferencing, and First National Collection Bureau, Inc., and the United States government, including the Department of Justice.

13. Through my hands-on work experience in developing databases and telephone systems, I have become very familiar with the technology related to telephone systems and their interfaces with the networks through which calls are processed, received, and transmitted. I am also familiar with how dialing systems work, and how telephone systems handle inbound and outbound calls.

14. I have been responsible for the design and development of specialized hardware and software systems that are highly dependent upon the capabilities of the computers upon which they run, and are in use at mission-critical applications, including Patriot Missile (SAIC, Patriot RTOS), Air Traffic Control Systems (Kongsberg Geospatial Corporation), and Point Lepreau Nuclear Generating Station, New Brunswick, Canada (Energié NB).

15. I held a CPCN[6] ("Certificate of Public Convenience and Necessity") – a special license and compliance certification granted to companies that provide essential public services, such as telephone corporations. The California Public Utilities Commission granted my most recent CPCN on July 18, 2017. This was a reissue of my initial CPCN granted to TelSwitch on June 10, 1994, which I held for approximately 18 years before taking a hiatus from providing public telephone

---

[6] Certificate of Convenience and Necessity U-5410-C granted to TelSwitch, Inc. on 06-10-1994 (Decision 94-06-022). Reissued as U-7327-C on 07-18-2017 (Decision 17-07-009).

services. The license originally granted to me in 1994 allowed me to interconnect the equipment that I designed, built, and programmed with the phone network for the purpose of providing wholesale and retail telecommunications services.

16. I have also been qualified as an expert in matters involving the TCPA and have previously been engaged on behalf of defendants and plaintiffs to analyze records of calls.

17. For example, in *Wright v. eXp Realty, LLC*, No. 6:18-cv-01851-PGB-EJK (M.D. Fla.), I was engaged on behalf of the defendant in a case in which the Court certified a class of consumers who received pre-recorded calls to their cellular telephone numbers.

**Expertise Specifically Related to Database work.**

18. I was relied upon as an expert witness in the case of *Hines v. KFC*, filed in the United States District Court, Southern District of California (Case No. 09cv2422 JM (POR). In *Hines*, the court granted plaintiff's motion for class certification and certified plaintiff's meal period and rest break claims based on my analysis after finding that I am an "expert in the compilation and analysis of databases …."

19. I was expert for the plaintiffs in *Albert H. Cicairos, Frank A. Daniel, Richard Wheeler and George Thompson v Summit Logistics, Inc.* and *Kenneth Bluford v Safeway Stores, Inc.* (Case No. CV014837 [Consolidated with Case No. CV028541] Superior Court of California, County of San Joaquin). I have been told that, among other cases, *Bluford v Safeway, Inc*. established the framework for what eventually became known as AB1513 and Labor Code section 226.2, which governs compensation in the piece rate context.

20. In addition, I served as an expert in the *ABM Industries Overtime Cases* (Case No JCCP 4502, San Francisco Superior Court). Relying heavily upon my expert finding, the Appellate Court reversed the trial court's ruling and certified the plaintiffs' proposed wage and hour classes. The court noted that there was sufficient evidence contained within my expert report to support certification of the classes and subclasses, and that my experience was sufficient to allow my expert report to be admitted as evidence for that purpose. (Exhibit 3).

21. I was also expert in *Beatriz Aldapa And Elmer Avalos v. Fowler Packing Company,*

*Inc., Ag Force, LLC, Fowler Marketing International LLC,* (Case No. 1:15-CV-00420-DAD-SAB ED, Ca.), where the employer used Datatech to maintain an accounting of piece-work and non-piece-work hours worked by agricultural workers. The court order in *Fowler Packing* is attached as Exhibit 4.

22. I have applied similar methods to structure large amounts of unstructured data on behalf of defendant *Verizon Wireless* and *Collecto* in *Lofton v. Verizon* (Case No. 3:13-cv-05665) and *Lofton v. Collecto* (Case No. 4:13-cv-03293-YGR). In *Lofton v. Collecto*, I was ordered by the District Court of the Northern District of California to reconstruct a database from information that was in defendant Verizon's possession that Plaintiff stated was "un-structurable" and useless for purposes of analysis and determination of the results of calls that took place. I was able to complete the re-structuring of Verizon's data so that the parties could reach a successful settlement. The portion of the Court's Order from *Lofton v. Verizon* instructing me to create a database from Verizon's unstructured data is attached as Exhibit 5.

23. I engaged on behalf of plaintiff Michael Anthony in Michael Anthony v. The Federal Savings Bank, National Bancorp Holdings, Inc. and FDE Marketing Group LLC (Case No. 1:21-cv-02509, ND, Il, Eastern Div.) in which I undertook a comprehensive analysis of the Defendants records in support of class certification. The order granting class certification is attached as Exhibit 6.

24. I was also engaged on behalf of plaintiff Robert Mason in Robert Mason et al v. Spring EQ, LLC (Case No. 5:24-cv-01833-MWC-AGR, CD, Ca). In the court's order denying defendant's motion to decertify the class, the course stated that the plaintiff has sufficiently identified a method by which an expert can separate residential from business numbers and that "The fact that most of the numbers identified by Defendant did not appear in the post-Waterfall dataset, as Mr. Woolfson attests, further suggests the method is reliable. Defendant's new evidence does not compel a different result" (ECF 166, page 12 of 14). The court's order is attached as Exhibit 7.

**Materials and Documents Reviewed and Relied Upon.**

25. In conducting my analysis and preparing my conclusions and opinions, I relied upon the following materials and information:

**I. Materials that I relied upon:**

(a) The Complaint, ECF 1.

(b) The CDRs produced by Defendant in the electronic files: "*BBQGUYS00059.csv*" and "*BBQGUYS00060.csv*"

**II. Electronic database resources that are available to me:**

(a) FTC's National Do Not Call Registry ("DNC") Database[7].

(b) FCC's Reassigned Number Database ("RND")[8].

**Methods and Tools Used to analyze Records.**

26. I create and analyze databases using Structured Query Language (SQL). A database is a computerized compilation of data organized into tables, each table having columns (attributes), with column headings, and rows of information. Tables that share at least one attribute in common are "related." Tables without a common attribute may still be related via other tables with which they do share a common attribute. The pathways relating those separate tables are called "joins." Once tables have been related by a join, a user may view the combined information in the joined tables to derive new and/or useful information. To access such information, a user sends queries to the database, which executes the queries and retrieves the requested information from the tables in the database. A database, however, only recognizes queries written in complex "query languages." The most common query language is SQL. A proper query in this language consists of one or more "clauses." Common types of clauses are SELECT, WHERE, FROM, HAVING, ORDER BY, and GROUP BY clauses. Thus, to compose a proper inquiry, a user must understand the structure and

---

[7] TelSwitch, Inc's FTC Organization ID is 10159990-70991, Subscription Account Number (SAN) 10376173-476173-26.

[8] TelSwitch, Inc. is registered as a consumer and reseller of the RND. Somos Registration ID # C657465476.

content of the relational database as well as the complex syntax of the specific query language.

27. When analyzing call or text message records, I start by creating a database to serve as a repository for the call or text records and any other related records. I then create database tables to accumulate the results of the associated DNC Database fields, which contains the *isDNC* and *DNC_30* fields for each call, and the RND fields, which contains the *somosStatus* and *somosChangeDate* fields.

28. By using a set of standardized SQL queries, I am able to tag each call or text record according to (a) any data field contained in the call or text records, including the telephone number called, the date of a telephone call, and the disposition of the call; (b) any data field contained in any associated leads records; (c) any data field maintained in the DNC Database, including whether the number was on the DNC, and if so, whether the number had been on the database for at least thirty (30); and (d) any data field maintained in the RND, including the status of the telephone number during a particular date range.

29. This is precisely the task that I undertook for Plaintiff in this matter, guided by my many years of experience with these precise tasks. I construct all SQL statements myself and am the sole author of all work product associated with the methodologies I propose.

**Steps I took to Organize and Analyze the Call Detail Records.**

30. I started by opening the files containing the text message records data (the "CDRs"). I did this to (a) determine the format that the records are stored in, and then (b) to determine what pre-processing that I would need to conduct in order to achieve an import of the records. I did not need to apply any pre-process to the CDRs, as they were already Electronic Data Interface capable.

31. The CDRs included records of 44,466,716 inbound text messages in the aggregate that were sent between 10/24/2020 and 08/27/2025. I imported the text messages that were contained within the CDRs into a SQL database table named *dbo.calls_complete* using Microsoft SQL™ Server Management Studio.

32. I then ran SQL statements to exclude any text messages that (a) were not sent to

standard 10 digit telephones numbers or telephone numbers within the FTC's list of valid TCPA eligible area codes, (b) were not associated with properly formatted dates and times in the CDRs, and/or (c) were duplicative of other text messages in the CDRs. This resulted in the exclusion of 1,113,082 text messages.

33. I then tagged each of the remaining 43,353,634 text messages with information from the National DNC Database, including whether each of the telephone numbers was on the DNC for more than thirty (30) days before the date of each of the text messages, and excluded any text messages that were not sent to a telephone number that had been on the DNC for more than thirty (30) days and/or that were not sent within 365 days of another such text message. This left 27,731,279 text messages that were sent to 281,471 unique telephone numbers

34. For each remaining unique telephone numbers, I then tagged the earliest date that a text message had been sent to that number and the latest date that a text message had been sent to that number with information from the RND as to the active or disconnected status of the telephone number on the RND updates[9] closest in date before and closest in date after the dates of each of the text messages, and excluded all text messages to any telephone number for which the RND data did not indicate a likely reassignment in the time between the dates of the earliest and latest text messages to that telephone number. This left 1,470,996 text messages sent to 13,865 unique, potentially reassigned telephone numbers, which included 828,111 calls to 5,781 unique numbers that had transitioned from *disconnected* to *active* between the first and last text dates.

35. I then selected the 5,781 reassigned telephone numbers that had been sent a total of 828,111 outbound text messages to identify which text messages were sent after the dates the telephone numbers were reassigned. I tagged each of the text messages to with information from the RND, including the status of each of the telephone numbers on the RND updates closest in date before and closest in date after the dates of each of the text messages. I then ran SQL statements to compare the statuses of each of the text messages in the RND updates before and after each text to

---

[9] The RND updates on the 16th of every month.

determine the date the associated telephone number transitioned from *disconnected* to *active*, and excluded 512,791 text messages that were sent on a date before the transition from *disconnected* to *active*.

36. I then I then ran SQL statements on the remaining 315,320 text messages to 5,703 unique telephone numbers to determine which of the remaining text messages were sent within 365 days of another remaining text message, and excluded seventy-nine (79) text messages that were not sent within 365 days of another remaining text message to the same number. As a result, from the total of 828,111 outbound text messages that had been sent to 5,781 unique telephone numbers, I was able to identify 315,241 text messages to 5,626 telephone numbers that were (a) sent after the number was reassigned, (b) more than thirty (30) days after the number was registered on the DNC, and (c) within 365 of another such text message.[10]

37. An output of these text messages is attached as Exhibit 8. An output reflecting the quantity of these text messages sent to each telephone number is attached as Exhibit 9.

**Conclusions.**

38. It is my opinion that using the text message records maintained by or on behalf of Defendant there is a reliable method to identify which text messages were sent to telephone numbers that (a) were text messaged two (2) or more times in a twelve (12) month period after being reassigned and (b) were registered on the DNC list for more than thirty (30) days before the date of each of the texts.

39. It is also my opinion that there is a reliable method to identify and/or exclude text

---

[10] It is my understanding that Plaintiff has requested the call detail records for the inbound text messages from the 5,626 unique telephone numbers that received the 315,241 text messages after reassignment. Once these are produced, I can then run SQL statements to exclude any text messages to any telephone number that sent an inbound text message on a date on or after the RND update date (the 16th of the month) of the month preceding the reactivation of the telephone number. To the extent other types of data is received regarding these 5,626 unique telephone numbers, I can also run other SQL statements to exclude other text messages based on any criteria relating to the additional data, including for example whether the person associated with the telephone number made a purchase during a certain timeframe before the text messages.

messages with other particular criteria based on the additional types of records maintained by Defendant, including whether they were sent on a date after an inbound text message from the telephone number to which the text message was sent, and/or were sent within a certain timeframe of a purchase.

I declare under penalty of perjury under the laws of the state of California that the foregoing is true and correct. Executed April 28, 2026 in Champaign, Illinois.

Aaron Woolfson