Case: 3:25-cv-00152-SDD-RLB Document 96-7 Filed: 09/14/25 Page 1 of 17

**IN THE UNITED STATES DISTRICT COURT**

**WESTERN DISTRICT OF WISCONSIN**

| | | |
|---|---|---|
| JAN SUMMERTON, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>GOLDCO DIRECT, LLC,<br><br>Defendant. | : | Case No. 3:23-cv-0028<br><br>**DECLARATION OF PLAINTIFF'S EXPERT AARON WOOLFSON IN SUPPORT OF PLAINTIFF'S MOTION FOR CLASS CERTIFICATION** |

**<u>DECLARATION OF EXPERT AARON WOOLFSON</u>**

I, Aaron Woolfson, state and declare as follows:

1. I have been retained by Plaintiff's counsel to provide structure to, and analyze, the electronic Call Detail Records ("CDR" or "CDRs") provided in this lawsuit reflecting the texting done by or on behalf of Call Loop, Inc. ("Call Loop" or Defendant"), and to provide expert opinions on such data.

2. More specifically, I have been asked to identify a reliable method to determine which texts within the CDR delivery reports labeled "*Delivered_1.csv*" through "*Delivered_6.csv*" provided by the Defendant were *delivered* to numbers that appear on the national DNC list (as of the date of delivery), and which of those numbers that had been texted after the number was tagged for opt-out by the Defendants as indicated within the file labeled "*goldCo_inbound_2023*" ("STOP file") where the word "STOP" or "Unsubscribe" appears. I was also asked to identify and the unique telephone numbers and the quantity of messages delivered to those numbers where two (2) or more messages had been delivered within 365 days.

3. I have also been asked to opine on whether there is a reliable method to cross-reference Defendant's CDR records with any additional information or data that might be

produced in the litigation to identify and/or exclude phone numbers for which Defendant or any third parties may claim to have consent to text.

4. As described in this declaration, it is my conclusion that, using the CDR records, there is a reliable method to identify instances where the Defendant had tagged numbers as opt-out, as indicated by the STOP or Unsubscribe within "*goldCo_inbound_2023*" ("STOP file"), and those numbers has been sent two (2) or more texts within 365 days after the recordation of a STOP request.

5. I was not retained in this matter to determine the legal standards of any court decisions or their applicability to this case, and I was not involved in the sampling or selection of data provided by the Defendants. This report reflects the results of my study of the underlying facts and independent analysis of the data and documents provided by the Defendant and third parties. My rate is $440.00 per hour for expert engagements, and $675.00 per hour for depositions, trial, and arbitration appearances. I am personally familiar with the matters that are contained within this Declaration, and if called to testify, I can accurately and competently testify as to them.

**Qualifications and Expert Engagements.**

6. I have over 25 years of experience in developing and analyzing databases and telephone systems and establishing the interfaces between telephone systems and the networks that convey calls. I have implemented call recording and call data collection and retention systems for commercial, government, aerospace, telecommunications, and payroll industries. My professional experience includes serving as an expert witness in cases where I evaluated the technical aspects of telephone systems, including whether they had a random or sequential number generator.

7. My qualifications and curriculum vitae are attached to this expert report as Exhibit 1. A list of the other cases in which I have testified as an expert at trial or by deposition during the previous four years is attached as Exhibit 2. I have been qualified as an expert in both Federal and State courts.[1] My testimony has been relied upon by courts in both individual and

---

[1] *See ABM Industries Overtime Cases* (Case No JCCP 4502, San Francisco Superior Court) (2017) 19 Cal. App. 5th 277, footnote 5, at page 8, ("[T]here was evidence in the record that Woolfson (footnote continued)

class actions,[2] by both plaintiffs and defendants. My opinions have also been relied upon in arbitrations, including in cases involving Telephone Consumer Protection Act ("TCPA") claims.

8. I was the developer of the automated Verification of Deposit ("VOD") and Verification of Mortgage ("VOM") system that was used by Chase, Wells Fargo, Bank of America, as well as some regional banks and mortgage lenders, to facilitate the review of mortgage applications by call center staff. These systems required a great deal of integration between the telephone systems and the financial institution's computer systems, and relied heavily on my deep understanding of database and time keeping integration technologies. It also required me to build interfaces to the ACH[3] exchanges, and with Global Payments and other large automated electronic inter-exchanges of financial information. Other processes necessitated integrating fax and OCR[4] capabilities as well as enhanced call routing – inbound and outbound – including predictive elements of enhanced call processing, and the precise timings of these events.

9. I am the inventor of "Canvas", a programming language that I developed for interfacing between telephone systems and telephone networks, capable of processing hundreds of thousands of calls a day. To date, hundreds of millions of calls have been handled by Canvas on behalf of call centers, financial institutions, conference calling companies, and organizations offering Interactive Voice Response ("IVR") services.[5]

---

had previously qualified as an expert in both state and federal court ...") *(ABM Industries Overtime Cases,* A132387, A133077, A133695, 19 Cal. App. 5th 277 (Dec. 11, 2017; pub. ord. Jan. 10, 2018)). (Exhibit 3).

[2] "The Court notes that Mr. Woolfson's expert report appears to include information related to the merits of the case in addition to class certification issues." *Gaines v. Law Office of Patenaude & Felix, A.P.C.*, Case No 3:13-cv-01556-JLS-DHB (S.D. Cal.), Sep. 21, 2015 ECF 132 at page 3.

[3] Automated Clearing House ("ACH").

[4] The OCR ("Optical Character Recognition") process as integrated into the automatic monitoring of telephone calls in real time to determine whether the call was a voice or fax call, and if a fax call, decoding the contents of each fax-page into machine readable text *while* a fax was being transmitted to the bank's computers for integration with a database.

[5] IVR is a technology that allows a computer to interact with humans through the use of voice and/or DTMF tones input via a telephone keypad. DTMF ("Dual Tone Multi Frequency") is the signal you generate when you press a telephone's touch keys.

10. I have developed highly available, upwardly scalable databases for use in the telecommunications industry. The databases and telephone systems that I have personally developed and/or coded are used by telephone companies and call centers throughout the United States and Canada to catalogue and index various customer-calling activities. Some of the companies that have used my databases and/or telephone equipment (which I personally created and manufactured) have included Japan Telecom, Experian, Bank of America, Wells Fargo Bank, JP Morgan, Bank of the West, Cogent Communications, Zone Telecom (ANPI), Aion Networks, Smartcall Conferencing, and First National Collection Bureau, Inc., and the United States government, including the Department of Justice.

11. Through my hands-on work experience in developing databases and telephone systems, I have become very familiar with the technology related to telephone systems and their interfaces with the networks through which calls are processed, received, and transmitted. I am also familiar with how dialing systems work, and how telephone systems handle inbound and outbound calls.

12. I have been responsible for the design and development of specialized hardware and software systems that are highly dependent upon the capabilities of the computers upon which they run, and are in use in mission-critical applications, including Patriot Missile (SAIC, Patriot RTOS), Air Traffic Control Systems (Kongsberg Geospatial Corporation), and Point Lepreau Nuclear Generating Station, New Brunswick, Canada (Energié NB).

13. I held a Certificate of Public Convenience and Necessity[6] ("CPCN") – a special license and compliance certification granted to companies that provide essential public services, such as telephone corporations. The California Public Utilities Commission granted my most recent CPCN on July 18, 2017. This was a re-issue of my initial CPCN granted to TelSwitch, Inc. on June 10, 1994, which I held for approximately eighteen (18) years before taking a hiatus from providing public telephone services. The license originally granted to me in 1994 allowed me to

---

[6] Certificate of Convenience and Necessity U-5410-C granted to TelSwitch, Inc. on 06-10-1994 (Decision 94-06-022). Reissued as U-7327-C on 07-18-2017 (Decision 17-07-009).

interconnect the equipment that I designed, built and programmed, with the phone network for the purpose of providing wholesale and retail telecommunications services.

14. I have also been qualified as an expert in matters involving the TCPA and have previously been engaged on behalf of defendants and plaintiffs to analyze records of calls and, among other things, compare them against records of leads.

15. For example, in *Wright v. eXp Realty, LLC*, No. 6:18-cv-01851-PGB-EJK (M.D. Fla.), I was engaged on behalf of defendant *eXp* to analyze call records and, among other things, compare them against records of leads from various sources.

16. I am not aware of any federal court that has issued an opinion that I was not qualified as an expert related to my opinions on the use of telephone systems and whether the use of those systems may have constituted a violation of the TCPA.

**Expertise Specifically Related to Database Work.**

17. I was relied upon as an expert witness in the case of *Hines v. KFC*, filed in the United States District Court, Southern District of California (Case No. 09cv2422 JM (POR). In *Hines*, the court granted plaintiff's motion for class certification and certified plaintiff's meal period and rest break claims based on my analysis after finding that I am an "expert in the compilation and analysis of databases …."

18. I was expert for the plaintiffs in *Albert H. Cicairos, Frank A. Daniel, Richard Wheeler and George Thompson v Summit Logistics, Inc.* and *Kenneth Bluford v Safeway Stores, Inc.* (Case No. CV014837 [Consolidated with Case No. CV028541] Superior Court of California, County of San Joaquin). I have been told that, among other cases, *Bluford v Safeway, Inc.* established the framework for what eventually became known as AB1513 and Labor Code section 226.2, which governs compensation in the piece rate context.

19. In addition, I served as an expert in the *ABM Industries Overtime Cases* (Case No JCCP 4502, San Francisco Superior Court). Relying heavily upon my expert finding, the Appellate Court reversed the trial court's ruling and certified the plaintiffs' proposed wage and hour classes. The court noted that there was sufficient evidence contained within my expert report to support certification of the classes and subclasses, and that my experience was sufficient to allow my expert

Case 3:25-cv-00152-SDD-RLB Document 96-7 Filed 09/11/25 Page 6 of 17

report to be admitted as evidence for that purpose. (Exhibit 3).

20. I was also an expert in *Beatriz Aldapa And Elmer Avalos v. Fowler Packing Company, Inc., Ag Force, LLC, Fowler Marketing International LLC*, (Case No. 1:15-CV-00420-DAD-SAB ED, Ca.), where the employer used Datatech to maintain an accounting of piece-work and non-piece-work hours worked by agricultural workers. The court order in *Fowler Packing* is attached as Exhibit 4.

21. I have applied similar methods to structure large amounts of unstructured data on behalf of defendant *Verizon Wireless* and *Collecto* in *Lofton v. Verizon* (Case No. 3:13-cv-05665) and *Lofton v. Collecto* (Case No. 4:13-cv-03293-YGR). In *Lofton v. Collecto*, I was ordered by the District Court of the Northern District of California to reconstruct a database from information that was in defendant Verizon's possession that Plaintiff stated was "un-structurable" and useless for purposes of analysis and determination of the results of calls that took place. I was able to complete the re-structuring of Verizon's data so that the parties could reach a successful settlement. The portion of the Court's Order from *Lofton v. Verizon* instructing me to create a database from Verizon's unstructured data is attached as Exhibit 5.

**Expertise Specifically Related to Outbound Dialing Systems in Call Centers.**

22. I have over twenty-five years of hands-on experience in telecommunications, in the design and programming of the equipment that handles calls. In specific, I was responsible for the development of specialized hardware and software systems, called Rapid Announce and Rapid Record that have been used in both telephone company central office and in call centers, for the pacing, dialing, and measurement of phone calls, and has cumulatively handled hundreds of millions of calls. At its peak use, Rapid Announce processed 240,000 inbound and 280,000 outbound calls per day for companies such as First National Collection Bureau.

23. Rapid Announce was primarily used to match the pacing of outbound calls with the availability of agents to accept the calls once they were answered. Rapid Announce also evaluated the connected calls to determine whether the phone was answered by an answering machine or a live person. Based upon the availability of the agents and the type of call that was being placed, the system would then transfer the call to the correct type of agent, or skill-set

group, to handle the particular circumstances for which the call was received, or dialed.

24. Rapid Record was responsible for handling the recording and media storage of inbound calls, as well as the implementation of a technology that I developed called AggravationSense. AggravationSense was designed to measure the cadence and speed at which an individual spoke. By measuring the cadence and speed of the speech against a baseline of background noise, AggravationSense would proactively patch in a customer service supervisor in advance of any party asking to speak with one, thus eliminating the stress associated with a particular call.

**Materials and Documents Reviewed and Relied Upon.**

25. In conducting my analysis and forming my conclusions and opinions, I relied upon the following materials and information:

**I. Materials that I relied upon that originated in this matter:**

(a) The Complaint, ECF No. 1; and,
(b) SMS Delivery confirmation files: *Delivered_1.csv, Delivered_2.csv, Delivered_3.csv, Delivered_4.csv, Delivered_5.csv, Delivered_6.csv.* ("delivered"); and,
(c) Inbound message stop logs: *sms_log_2023_11_21*, *Goldco_Inbound_2023*; and,
(d) Raw text message files: *Goldco_Br*; and,
(e) Additional files: *GCO_000001* (sms), *GCO_000002* (stop), *GCO_000003* (status), *GCO_000004* (stop), *GCO_000006* (notInterested), GCO_000010 (optIn, optOut), GCO_000011 (status), *GCO_000012* (optOut), *GCO_000043* (campaignSummary), *GCO_000044* (optIn, optOut)

**II. Electronic database resources that are available to me:**

(a) The National Exchange Carrier Association ("NECA") North American Numbering Plan 1000-block assignments database.
(b) External, publicly available databases, including iConectiv's WDNC[7,8] for use in identifying the type of line (and the carrier) and

---

[7] FCC order FCC-15-35A1 (03/27/2015) explicitly mandated *continued* availability of iConectiv's data for purposes of compliance with the TCPA. (¶.142). The historical information *does not* contain subscriber information, only carrier of record and line type. Before number portability, this would have been a simple task of looking at the Local Exchange Routing Guide ("LERG"), or (footnote continued)

the Federal TCPA-eligible area code list (Exhibit 6) and the daily DNC lists published by the FTC[9].

**Methods and Tools Used to analyze Records.**

26. I create and analyze databases using Structured Query Language (SQL). A database is a computerized compilation of data organized into tables, each table having columns (attributes), with column headings, and rows of information. Tables that share at least one attribute in common are "related." Tables without a common attribute may still be related via other tables with which they do share a common attribute. The pathways relating those separate tables are called "joins." Once tables have been related by a join, a user may view the combined information in the joined tables to derive new and/or useful information. To access such information, a user sends queries to the database, which executes the queries and retrieves the requested information from the tables in the database. A database, however, only recognizes queries written in complex "query languages." The most common query language is SQL. A proper query in this language consists of one or more "clauses." Common types of clauses are SELECT, WHERE, FROM, HAVING, ORDER BY, and GROUP BY clauses. Thus, to compose a proper inquiry, a user must understand the structure and content of the relational database as well as the complex syntax of the specific query language.

27. By using a set of standardized SQL queries, I am able to tag each call record according to (a) the date of a message call; and (b) the disposition (e.g. delivery status) of the

---

absent access to the LERG, finding the area codes and prefixes from an online collection of national phone books. TelSwitch, Inc. is a reseller and authorized user of iConectiv data.

[8] In *Perrong v Call Identified as Connor* (Case No. 1:22-cv-04479-CPO-EAP, DC, New Jersey, Camden Vicinage), "plaintiff has queried the database of iConectiv, the company charged by the Federal Communications Commission to administer the Number Portability Administration Center, which is the master database which lists which telephone provider services a particular number, among other information required to route telephone calls to the proper provider" (ECF 3)

[9] TelSwitch, Inc's FTC Organization ID is 10159990-70991, Subscription Account Number (SAN) 10376173-476173-21.

message, if one is present; and (c) the stop date associated with the telephone number; and, (d) any other data field contained in the call records. I am also able to add (e) whether the number was on the Federal DNC, and if so, when it was added; and (f) whether the number appears in any other file that was produced, such as on lead lists or summary sheets.

28. Using SQL, I am able to also associate other information that is extrinsic to the worksheets provided that may provide additional guidance to the trier of fact, such as the name of the telephone company to which the number was serviced by on the date that the number was called.

**Steps I take when Organizing and Analyzing Call Detail ("Text") Records.**

29. I start by opening each of the files that contain call records data (collectively referred to as "Call Detail Records" or "CDRs"). I do this to (a) determine the format that the call records were stored in, and then (b) to determine what pre-processing that I would need to conduct in order to achieve an import of messages.[10]

30. I then import the CDRs file into SQL database tables using Microsoft SQL™ Service Management Studio to apply a set of filters to include only calls to valid telephone numbers that were meeting the following criteria:

a. Were made to a number that contained precisely ten digits;

b. Were made to a number that started with a 2 through 9;

c. Were contained within structurable data[11];

d. Had an associated date;

e. Were placed to Area Codes that were subject to the TCPA, according to the FTC;

---

[10] I typically do not need to apply any pre-process to the CDRs, as most CDRs originate from electronic call data capture systems that are already Electronic Data Interface ("EDI") capable.

[11] All calls were structurable and conformed to a normalized database layout specification in which data is aligned to the designated columns. There were no records that were excluded because they did not conform to the Defendant's specified layout.

f. Was identified within the Defendants records indicating a record in the subscription log that has a date of an opt-out; and,

g. The number of days that text messages that had been sent to numbers *after* the receipt of the STOP.

h. Whether the telephone number had received two or more messages within 365 days *after* a STOP date; and,

31. Using these filters and criteria that I apply as part of my standard set of analysis methodology, I am able to accurately and reliably identify the texts that were sent, and the telephone numbers to which those text messages had been delivered, that met the definition of the proposed class.

32. I focused my analysis primarily upon two (2) categories of files, which included the six (6) files that contained the delivered messages that I placed into a single database table called "delivered" consisting of the contents of :*Delivered_1.csv", "Delivered_2.csv", "Delivered_3.csv", "Delivered_4.csv", "Delivered_5.csv", "Delivered_6.csv"* and the stop requests contained within *Goldco_Inbound_2023* that consisted of telephone numbers and the dates that those numbers indicated "STOP" or "UNSUBSCRIBE".

33. I started with the building all data that was contained Defendant's production of delivery files into a SQL database that I named *loop*. I then imported each of the constituent data files that were produced into a separate database table, organizing the data according to the type or style of data that was contained within the Defendant's production files.

34. I then imported the quantity of the unique telephone numbers from the *delivery files* into an index and added to the dbo.report index all of the unique telephone numbers that were within the opt-out file. I then performed an analysis upon the telephone numbers that were both within the *delivered* messages file, and where there was also a stop request from the corresponding same telephone number[12].

---

[12] The delivered messages logs contained 1,237,315 messages that had been delivered to 276,915 unique telephone numbers between 10/14/2021 and 10/05/2023 . The STOP files contained 436.506 stop requests that were associated with 373,651 telephone numbers. Out of the 373,651 unique telephone numbers that were contained within the STOP file, only 48,726 of the unique (footnote continued)

35. I started with 1,237,315 messages that were confirmed to have been delivered to 276,915 unique numbers between 10/14/2021 and 10/05/2023. From the 1,237,315 records, I removed 537 records that were duplicative of other records indicating the same telephone number had been sent a message at the precise same time. This left 1,236,778 messages remaining.

36. From the 1,236,778 remaining messages, I removed 3,768 messages that had been delivered to telephone numbers that were not contained on the FTC's index of TCPA-eligible area codes, leaving 1,232,992 telephone calls.

37. From the 1,232,992 remaining messages, I removed 494,120 messages to those telephone numbers that had were not contained within the National Do-Not-Call list on the dates that those messages were sent. This is important because I am told that the national DNC list is presumed to protect residential numbers. This left 738,872 messages remaining.

38. From the 738,872 remaining messages, I removed 560,938 messages that had been sent to telephone numbers where I was unable to find any indication within the STOP files that those particular numbers had ever requested STOP or UNSUBSCRIBE. This left 177,934 messages remaining.

39. From the 177,934 remaining messages, I removed 73,134 messages that had been delivered to telephone numbers *before* the initial STOP request had sent from that particular telephone number. I also removed 464 messages that had been sent within *one* day of the STOP request, to eliminate any possibility that a message had been as a confirmation to a number that had requested STOP. This left 104,337 messages.

40. Finally, from the 104,337 remaining messages, I removed 3,576 messages that had been sent to numbers that had not indicated two (2) or more messages within 365 days. This left 100,761 messages that had been delivered to 21,123 unique telephone numbers that had

numbers were also contained within the delivery confirmation files, which leads me to believe that I am still in receipt of incomplete data, since there should not be more STOP requests than numbers to which messages were *delivered*.

requested STOP and received two (2) or more messages delivered to those numbers within 365 days of one another, where the messages were delivered to those numbers more than one (1) day after the receipt of the STOP. This includes four (4) calls to the Named Plaintiff's number ending in -0435.

41. The steps that I conducted to complete the waterfall analysis are as follows:

| | | running sum: |
|---|---|---|
| All items within "Defendant Call Records" files [callLogs] :<br>**Production:**<br>Delivered_1.csv 226593 records<br>Delivered_2.csv 223925 records<br>Delivered_3.csv 223826 records<br>Delivered_4.csv 223405 records<br>Delivered_5.csv 223538 records<br>Delivered_6.csv 116028 records | **1,237,315** | 1,237,315 |
| Removal of any records that were duplicative of other records in production | **(537)** | 1,236,778 |
| Removal of any messages that were sent to numbers that were not part of the FTC's list of TCPA-eligible area codes (e.g. canada and others) | **(3,786)** | 1,232,992 |
| Removal of any records that indicated that the telephone number to which a text was sent had not been on the DNC list *as of the date* that the message had been sent | **(494,120)** | 738,872 |
| Removal of any output text to a number that had *never* indicated that "STOP". | **(560,938)** | 177,934 |
| Removal of any record that indicated a text was sent to a number *before* a STOP | **(73,134)** | 104,800 |
| Removal of any record that was sent *after a STOP*, but not more than one day after the STOP. | **(463)** | 104,337 |
| Removal of any record that was sent after STOP, but there were not two (2) or more calls within 365 days to that particular number. | **(3,576)** | **100,761** |
| | | |
| Quantity of unique numbers to which the **100,761** calls were placed, where the number was on the DNC list (residential), received two or more texts that had been **delivered** one (1) or more days after the word **STOP** was received by the Defendant, and there were two (2) or more ctexts to that number within 365 days. | **21,123** | |

42. In sum, out of the 104,337 texts that had been delivered to *residential* numbers, where the number had been called *after* the number had requested STOP (or UNSUBSCRIBE), there were 100,761 messages that were delivered to 21,123 unique *residential* numbers where the number had received two (2) or more messages within 365 days, including four (4) messages to the Named Plaintiff's number ending in -0435 where the number to which the message was

delivered had received the messages more than one (1) day after the receipt of the STOP.

43. From the 100,761 messages that were delivered to 21,123 unique residential numbers, I further refined the analysis to identify the quantity of unique telephone numbers, and the quantity of messages to which those numbers had been sent, based upon how many of the messages were sent "one or more days after STOP", "five or more days after STOP", " ten or more days after STOP", "fifteen or more days after STOP" and " thirty or more days after STOP".

44. In sum, out of the 21,123 unique telephone numbers that had been sent two (2) or more messages at least one day after STOP, 21,119 of the unique telephone numbers had been sent messages at least five (5) days after the initial STOP, 20,775 of the unique numbers had been sent messages at least ten (10) days after the initial STOP, 18,664 of the unique telephone numbers had been sent messages at least fifteen (15) days after the initial STOP and 13,564 of the unique telephone numbers had been sent messages at least thirty (30) days after the initial STOP.

**Telephone Companies databases maintain subscriber information in electronic format as part of their standard record keeping.**

45. Wireless and wireline carriers maintain historical records that can be used to identify the contact information (Exhibit 7, properly redacted). As part of record-keeping requirements imposed upon them by the FCC, telephone companies must maintain items that are responsive to subpoenas. They also use this information to for their own customer service purposes,

46. The line type and customer information attributes are also maintained to support local-number-portability ("LNP") requests. In other words, when someone wishes to move their number from one carrier to another, they are required to provide certain requisite information, such a name and contact information, which must match then match the other carrier's records from where the number was being ported. These exchanges of port-in/port-out requests are

handled electronically, and exchanged between and amongst the phone carriers[13] using a process called Electronic Data Interchange ("EDI") protocol. The EDI process encompasses a well-defined, regimented set of informational exchanges, and provides an efficient manner to handle, and route, port-in and port-out requests using a common set of data attributes.

47. I have become familiar with the manner in which telephone companies maintain these records to handle their own customer service and reporting requirements, as well as to provide support for the EDI protocol. Both in my role in providing billing and customer service software to phone companies, and in my role as a consulting expert for phone companies who are involved in litigation, I am familiar with the type of information that phone companies maintain on behalf of their customers.

48. As an example, I was the expert for Verizon Wireless in *Lofton v. Verizon Wireless (VAW) LLC*, No. 13-cv-05665-YGR (N.D. Cal.). In the course of my work on that case, I came to understand that Verizon Wireless maintained records of which belonged to which subscribers. In addition, I learned which types of information, which included line subscribership details that were maintained on a historical basis. Similarly, I am aware that other companies, such as AT&T Wireless and T-Mobile, maintain similar information for both compliance and customer support purposes. This information is also maintained so that calls (and texts) for invoicing purposes can be rated and billed properly, and so that subpoenas can be properly responded to.

49. I also formerly ran a consumer telephone company, called Tel-One Network Services, which was similarly expected to maintain contact information. Part of my responsibility at Tel-One Network Services was to interface with other telephone companies such as Pacific Bell

[13] LNP includes both non-mobile and mobile carriers. Companies, regardless of the carrier type are required to support Local Number Portability ("LNP"). The National Portability Administration Center ("NPAC") is responsible for maintaining the database of the national numbering inventory, and as part of the FCC's order granting authority to iConnectiv to maintain this, they agreed to continue to make data available for TCPA compliance purposes. (FCC 15-35, ¶ 142).

(now AT&T) during the process of onboarding new subscribers, and maintaining accurate customer information, because Tel-One was expected to to work with the proper department, depending upon the type of the product being offered.

**Identification of subscribers and Line-Classification by Telephone Number.**

50. As described previously, I utilize a database provided by iConectiv, called the WDNC database, to attribute the line classification type to telephone numbers, along with other pieces of information.

51. The line classification type processing engine allows a file containing phone calls (or texts) to be tagged with labels indicating whether the number called, or texted, was wireless (colloquially known as "isWireless") and the host Operating Company Number ("OCN") on the date indicated in the call record. It also indicates the date that a number was ported, and from whom.

52. Using the information from the Defendant's own files, I am able to apply the return-results from the national telephone number assignment database, which is required to be made available to entities for all purposes related to the TCPA, which is comprised of *isWireless*, *isPorted*, *isPortedDate, and Operating Company Number.*[14]

53. By using the information provided, I was am able to determine the Carrier (Company) of Record and Operating Company Number of each of the telephone calls (or texts) that were validly formatted and contained and were part of the FTC's DNC-eligible area codes. I am also able to determine which calls (or texts) are to numbers that were assigned to a phone carrier on the date that the number was called or texted, and whether the numbers were part of the United States portion of the North American Numbering Plan ("NANP") or the expanded

---

[14] The carrier-of-record and operating company number, in combination with the Telephone Number, colloquially called "MDN" or "ANI", provide the necessary fields for the creation of export files that are used by the various telephone companies in the Common-Language presentation-format expected by the Local Exchange Carriers or Wireless Exchange Carriers that host the telephone numbers, to provide subscriber information for each number.

area[15] on the date when contacted.

54. By using the *Carrier Of Record* and *Operating Company Number* from the data, I am able to build an Electronic Data Interchange ("EDI") record exchange database from the CDR records and organize it by carrier for the purpose of structuring the data into the correct EDI format that is in the expected layout that they are familiar with. The csv. files, organized by carrier, can, if necessary, be utilized in subpoenas to telephone carriers to determine contact information, and/or any other information desired from the carrier, by structuring the data into a format that the carriers already use for exchanging data between and amongst themselves will facilitate as much of a response as is possible.

**Identifying Calls to Numbers that had opted-out.**

55. I was able to identify those records within the defendant's inbound file that had requested to no longer receive messages, as indicated by either the word *STOP* or *UNSUBSCRIBE* – and the dates when the requests were made.

56. Using the STOP indicators, as compared with the dates of those additionally sent messages, I was able to then identify which of the outbound messages had been sent to a telephone number after the number had requested that the messages stop, and how many messages were sent within 365 days.

57. By using SQL queries to compare the telephone numbers that were sent messages to the index of the numbers that had requested messages to be stopped, I was able to determine which of the numbers appearing within the outbound CDR records should have not been sent messages.

58. Attached as Exhibit 8 is the precise SQL that I used to construct the database containing the Defendant's data and to conduct the analysis. The SQL queries that I used can accurately and reliably identify the telephone numbers, and the quantity of calls to those telephone numbers. The results are attached as Exhibit 9.

---

[15] Canada and some Caribbean islands that use the North American Numbering Plan but are not part of the United States Dialing Area.

**SUMMARY OF CONCLUSIONS:**

59. Defendant's delivery records indicate that 100,761 text messages had been delivered to 21,123 unique telephone numbers where the number to which the message had been sent had requested STOP, and the messages were sent more two (2) or more messages more than one (1) after the initial STOP request.

60. This includes four (4) records associated calls that were made to the Named Plaintiffs' record that ends in -0435 after the Named Plaintiff had opted-out.

| date_sent | to_number | status | text |
|---|---|---|---|
| 2022-10-17 19:16:45.000 | [redacted]0435 | delivered | Goldco: Jan, we can't ship your FRE... |
| 2022-10-24 19:23:05.000 | [redacted]0435 | delivered | Goldco: Jan, have $50k or more save... |
| 2022-10-31 19:29:36.000 | [redacted]0435 | delivered | Goldco: FREE SILVER for ALL RETIREE... |
| 2022-11-07 19:36:05.000 | [redacted]0435 | delivered | Goldco: Your FREE SILVER coin will ... |

61. Finally, by using the data contained within the Defendant's productions, I will be able to compile the list of the telephone numbers for distribution to telephone carriers in order to obtain subscribership identification, using the same methodology that I have previous conducted on behalf of litigants, using the standardized data exchange format that I am familiar with and that which was used by my client Verizon Wireless during my engagement with *Lofton v Verizon.*

I declare under penalty of perjury under the laws of the state of California that the foregoing is true and correct. Executed this 7th day of February 2025 in Pleasant Hill, California.



Aaron Woolfson