**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISCTRICT OF LOUISANA**

| | |
|---|---|
| ANDREW JAMES MCGONIGLE, *on behalf of himself and others similarly situated*,<br><br>Plaintiff,<br><br>v.<br><br>SHOPPERSCHOICE.COM D/B/A BBQGUYS.COM,<br><br>Defendant. | Case No. 25-CV-00152-SDD-RLB |

**<u>EXPERT REPORT OF MADELYN MORAN</u>**

## I. DESCRIPTION OF ENGAGEMENT

1. Plaintiff brings a putative class action against ShoppersChoice.com, LLC. d/b/a BBQGuys.com (hereinafter "BBQGuys") alleging that it initiated text messages to telephone numbers on the National Do Not Call Registry ("NDNCR") to text message recipients that did not consent to receive such messages in violation of the Telephone Consumer Protection Act ("TCPA").

2. I was retained by counsel for BBQGuys to review, analyze and respond to the claims made by Plaintiff's expert, as set forth in the Declaration of Aaron Woolfson filed April 28, 2026, as well as any later amendments or rebuttal reports, opinions, or testimony that may be provided by Mr. Woolfson.

3. I was also retained to provide an opinion as to whether the text messages referenced in the Complaint sent to telephone numbers appearing on the NDNCR can be accurately identified, and if so, whether the recipients of these text messages can also be accurately identified.

## II. SUMMARY OF OPINIONS

Opinion No. 1: Text Messages That Were Allegedly Sent In Violation Of The NDNCR Cannot Be Identified Absent An Individualized Investigation Of Records That Show That Text Message Recipients Consented To Be Contacted.

Opinion No. 2: Mr. Woolfson's Unorthodox Use Of The RND To Identify Class Members Is Unreliable, Inaccurate and Impermissible.

Opinion No. 3: Mr. Woolfson Cannot Reliably Determine Which Telephone Numbers Are Associated With Businesses.

Opinion No. 4: The List Of Telephone Numbers Plaintiff's Expert Aaron Woolfson Identified In His Analysis Contains Telephone Numbers Registered To The NDNCR By Persons Other Than The Recipient Of The BBQGuys Text Message.

Opinion No. 5: Mr. Woolfson's Use Of Restricted Number Portability Administration Center ("NPAC") Data For Litigation Purposes Is Likely Impermissible And The Court May Need To Determine If His Proposed Class Identification Process Will Violate NPAC Licensing Restrictions.

Opinion No. 6: Mr. Woolfson Purports To Be Able To Accurately And Reliably Identify Putative Class Members, Yet He Historically Has Been Unable To Do So.

## III. QUALIFICATIONS

4. I am an Associate Principal in the Forensic Services practice at Charles River Associates ("CRA"). CRA is a global management consulting and expert services firm that provides independent expert testimony, litigation and regulatory support, financial, economic, and strategic expertise, and data analytics to law firms, Fortune 500 corporations, government agencies, and regulatory bodies.[1]

5. In the last five years, in conjunction with my team members at Charles River Associates, I have provided various types of litigation support, including conducting data analytics and assessing internal TCPA compliance efforts in over 150 TCPA related matters.

[1] My most recent curriculum vitae is attached as Exhibit 1.

6. In the last three years I have been retained as a data analytics and subject matter expert witness in the following cases:

a) *Brent v. My Goals Solutions, Inc. d/b/a Goals Aesthetics and Plastic Surgery*, 1:25-cv-03584-JPO (S.D. Ny.) (TCPA class action – Report filed June 2, 2026)
b) *Hudson-Bryant v. OCMBC, Inc. d/b/a LoanStream*, 8:24-cv-00067-FWS-JDE (C.D. Cal.) (TCPA class action – Report filed May 8, 2026)
c) *The People of the State of California v. MV Realty PBC, LLC, et al.,* 23STCV30464 (Superior Court of the State of California, County of Los Angeles) (California Do Not Call – Declaration filed April 8, 2026)
d) *Espanol v. Capital Vision Services, LLC d/b/a MyEyeDr*, No. 6:24-cv-01024-PGB-DCI (M.D. Fla.) (TCPA class action – Report filed January 26, 2026)
e) *Brockington v. Yoli, LLC.*, No. 3:25-cv-00159-KAC-JEM (E.D. Tn.) (TCPA class action – Report filed January 23, 2026)
f) *Rivera v. Cabela's, LLC.*, No. 1:25-cv-00290-NYW-KAS (D. Co.) (TCPA class action – Report filed January 14, 2026)
g) *Teman v. Select Justice*, *LLC.*, No. 1:24-cv-12656-LTS (D. Ma.) (TCPA class action – Report filed December 12, 2025)
h) *Wilson v. Southern Oregon Credit Service*, No. 1:24-cv-2087-MTK (D. Or.) (TCPA class action – Report filed October 13, 2025)
i) *Smith v. Examworks, LLC. And Government Employees Insurance Company (GEICO)*, No. 8:21-cv-2746-PX (D. MD.) (TCPA class action – Report filed July 24, 2025).
j) *Lazo v. TOHVT,* No. 8:24-cv-00127-JFB (D. Neb.) (TCPA class action – Report filed April 1, 2025).
k) *Sapan v. The Federal Savings Bank*, No. 8:23-CV-00075-cv-ADS (C.D. Cal.) (TCPA class action – Report filed November 22, 2024).
l) *Abboud v. Circle K, Inc.*, No. 2:23-cv-01683-DWL (D. Az.) (TCPA class action – Report filed November 19, 2024).
m) *Clark v. Spark Energy*, No. 3:24-cv-00568-JSC (N.D. Cal.) (TCPA class action – Report filed November 15, 2024).

n) *Tobajian v. Allstate Insurance Company*, No. 2:23-cv-00753-DMG-PD (C.D. Cal.) (CIPA class action – Report filed May 21, 2024).

7. I am an expert in TCPA compliance and have led teams assessing the dialing operations of businesses in various industries to enhance their efforts to comply with the TCPA, the Telemarketing Sales Rule, and applicable state telemarketing laws. As part of this work I have, among other things, performed the following tasks:

a) Performed audits of corporate TCPA policies and procedures.
b) Reviewed the technical operations of corporate dialing systems, Customer Relationship Management systems, customer service notation systems and audio recording systems.
c) Identified the nature of the consent which companies relied upon to communicate with consumers via their cellular telephone numbers.
d) Reviewed how consumer consent to be contacted was documented and maintained.
e) Reviewed the consent and privacy language contained on webforms and other types of requests for contact filled out by consumers.
f) Reviewed the processes for collecting, handling, calling, and reallocation of webforms and other requests for contact by consumers
g) Examined opt-out protocols and performed tests to determine if such protocols were followed.
h) Identified potential areas of improvement related to the handling of opt-out requests
i) Identified the way wrong numbers, “bad numbers,” disconnected and failed calls were documented, including examining the codes used by the dialer system to identify call dates, times, durations and call outcomes.
j) Reviewed NDNCR and Reassigned Number Database (“RND”) scrubbing procedures performed by the company, if any, prior to placing calls and texts.
k) Provided written assessments of the compliance procedures which included suggestions for process improvement where applicable.
l) Reviewed contract language with lead generation vendors and assessed the documentation and consent provided by such vendors

8. In the last ten years, I have been the lead data analyst supporting the expert testimony of other CRA experts in more than 10 consumer class actions alleging violations of the TCPA or violations of similar state consumer protection statutes:

a) *Smith v. Examworks, LLC. And Government Employees Insurance Company (GEICO)*, No 21-2746 (D. MD.).
b) *Mitchell v. Toyota of Dallas*, No: 3:23-cv-1278-N (N.D. Tex.).
c) *Elliot v. Humana, Inc*., No. 3:22-cv-329-RGJ (W.D. Ky.).
d) *Usanovic v. eXp Realty, LLC*., No. 2:23-cv-00687-JLR (W.D. Wash.).
e) *Brian J. Lyngass, D.D.S. P.L.L.C. v. Solstice Benefits, Inc*., No. 2:22-cv-10830 (E.D. Mich.).
f) *Williams v. Pillpack, LLC*., No. 3:19-cv-05282-DGE (W.D. Wash.).
g) *Sabatier v. American Health Reform Solutions, LLC. et al*., No. 1:23-cv-22203-RKA (S.D. Fla.).
h) *Bayles v. The Hertz Corporation*, No. 1:22-cv-01092-JRS-MKK (S.D. Ind.).
i) *Powell v. H&R Accounts, Inc. D/B/A Avadyne Health, et al*., No. 7:22-cv-01052-TMC (S.D.S.C).
j) *Doup v. Van Tuyl Group, LLC et al*., No. 3:20-cv-02742-x (N.D. Tex.).
k) *Nightingale v. National Grid USA Service Company, Inc. et al*., No. 1:19-12341-NMG (D. Mass.).
l) *Perrong v. Victory Phones*, No. 2:20-cv-05317 (E.D. Pa.).
m) *Vance v. Microsoft Corporation*, No. 2:20-cv-01082-JLR (W.D. Wash.) and *Vance v. Amazon.com, Inc*., No. 2:20-cv-01084-JLR (W.D. Wash.).
n) *Walker v. CRME Financial Services*, No. 3:20-cv-02218-BEN-JLB (S.D. Cal.).
o) *Chinitz et al., v. Realogy Holdings Corp*., No. 3:19-cv-03309-JD (N.D. Cal.).
p) *Head v. Citibank, N.A*., No. 3:18-cv-08189-MHB (D. Ariz.).

9. I have degrees in Economics and Political Science from Indiana University, and I have worked as a data scientist and litigation consultant for the past ten years.

10. I work with complex datasets commonly referred to as "Big Data," which are used in expert witness testimony in a variety of industries including telecommunications, healthcare, securities,

and forensic accounting. I specialize in creating and producing data analytics while providing unbiased and impartial findings pertaining to consumer class actions.

11. I have served as a moderator and speaker at conferences and webinars regarding topics related to the analysis of consumer data, including the analysis of call and text message records in TCPA litigation.

12. I primarily use Microsoft's SQL Server (a relational database management system) to perform data analytics related to TCPA class actions, amongst other types of consumer class actions. I have been working in Microsoft's SQL Server Management Studio conducting "Big Data" analytics for over ten years.

13. I have been retained by counsel for Defendant BBQGuys and am being compensated at the hourly rate of $725. I have been retained to review Mr. Woolfson's Declaration and opine whether members of the putative class can be reliably identified using the methodologies he proposes.

14. My understanding of the factual matters at issue in this litigation is based on my review of the pleadings, written discovery responses, and other documents produced in discovery.[2] I understand that additional information relevant to my opinions may be disclosed in subsequent reports, document productions, and depositions. I reserve the right to amend my findings based upon additional information.

## IV. DOCUMENTS REVIEWED

15. My understanding of the factual matters at issue is based upon my review of the documents and data appended to this report as Exhibit 2.

---

[2] Throughout this report, when I use the first person to describe my analysis, I am referring to work conducted by me or by my staff under my direction.

## V. FACTUAL BACKGROUND

***Business Operations of Defendant BBQGuys***

16. BBQGuys is an online retailer of outdoor furniture, appliances and design services.[3] Through its website, BBQGuys allows customers to subscribe to receive text messages and email communications via a webform.

17. Contained within the promotions on the website and the webforms, BBQGuys displays the below disclaimer with a link to both the Terms & Conditions as well as the Privacy Policy.[4]

> By signing up via text, you agree to receive recurring automated promotion and personalized marketing text messages (e.g. cart reminders) from BBQGuys at the cell number used when signing up. Consent is not a condition of any purchase. Reply HELP for help and STOP to cancel. Msg frequency varies. Msg and data rates may apply. View Terms & Privacy.

18. When a customer completes a webform, either (1) the customer is prompted to send BBQGuys a text message requesting to subscribe to text messages from BBQGuys (an "Introductory Text Message") or (2) BBQGuys will text the customer first requiring the customer to respond to the text message with the message, "Y" to confirm the subscription.

19. Per the Terms and Conditions linked in the disclaimer included in the webform through which customers can subscribe to text messaging, BBQGuys honors numerous keywords to cancel the subscription to text messaging. To cancel, customers can text any of the following:[5]

a) STOP
b) END
c) CANCEL
d) UNSUBSCRIBE
e) QUIT
f) REVOKE
g) OPT OUT

---

[3] https://www.bbqguys.com/ accessed June 15, 2026.
[4] BBQGUYS00001.
[5] BBQGUYS00029 - BBQGUYS00030.

***Attentive***

20. To contact its customers and potential customers, BBQGuys uses Attentive email and SMS marketing platform.[6] Attentive integrates directly with the BBQGuys website to collect and maintain customer contact information and monitor customer website activity.[7] Through Attentive, BBQGuys is able to sent text messages to its customers and potential customers who have submitted their telephone numbers on its website or texted BBQGuys directly subscribing to receive text messages.

21. Attentive actively monitors inbound text messages to record and honor opt-out responses.[8] Attentive also provides analytics related to the text messages sent through its platform detailing a variety of metrics such as the volume of messages that were actually delivered.[9] In addition to data related to text messaging activity, Attentive monitors various customer website activities such as whether the recipient of a text message clicked a link provided in a text message deployed by BBQGuys.[10] Attentive also collects data related to when customers navigate to specific webpages, place items in their carts, and purchase items.[11]

---

[6] BBQGuys.com's Objections and Responses to Plaintiff's First Set of Interrogatories and First Set of Requests for Production, p. 3.
[7] BBQGUYS00005 – BBQGUYS00008.
[8] *Id.*
[9] *Id.*
[10] *Id.*
[11] *Id.*

***Text Messages to the 5410 Number***

22. Telephone number [redacted] (the "5410 Number") entered the BBQGuys system on September 8, 2020 when the user of the 5410 Number visited the BBQGuys website and was shown a promotion for a "Text Original Pits Prize Pack" which required the user to sign up for email and texts.[12]




23. The user of the 5410 Number clicked the "ENTER TO WIN" button on the promotion and subsequently texted BBQGuys the below message enrolling in text messaging.[13]

> Send this text to subscribe to recurring automated personalized marketing alerts (e.g. cart reminders) from BBQGuys (ref: OY2mE)

24. At no point did the user of the 5410 Number send BBQGuys a text message containing "STOP" or any of the other words contained within the glossary of terminology honored as opt-out language through the Attentive system.[14]

[12] BBQGUYS00001.
[13] *Id.*
[14] BBQGUYS00002.

***Data Produced In This Case***

25. I received several files from Defendant, detailing outbound messages, inbound messages, consent records, user interaction data, and outbound deliverability data.

| File Received | Description |
|---|---|
| BBQGUYS00059 | Plaintiff Outbound Text Message Records |
| BBQGUYS00060 | Outbound Text Message Records |
| BBQGUYS00061 | Inbound Text Message Records |
| BBQGUYS00062 | Opt-In and Opt-Out Records |
| BBQGUYS00063 – BBQGUYS00110 | Deliverability Data |
| BBQGUYS00111 – BBQGUYS00482 | Purchase Data |
| BBQGUYS00501 | Add to Cart |
| BBQGUYS00502 | Message Link Click Through |
| BBQGUYS00503 – BBQGUYS00534 | Deliverability Data |

***The Purported Class***

26. Plaintiff Andrew McGonigle seeks to certify the following class:[15]

> All persons throughout the United States (1) who did not provide their telephone number to Shopperschoice.com, L.L.C. d/b/a BBQguys.com, (2) to whom Shopperschoice.com, L.L.C. d/b/a BBQguys.com delivered, or caused to be delivered, more than one voice message or text message within a 12-month period, promoting Shopperschoice.com, L.L.C. d/b/a BBQguys.com goods or services, (3) where the person's residential or cellular telephone number had been registered with the National Do Not Call Registry for at least thirty days before Shopperschoice.com, L.L.C. d/b/a BBQguys.com delivered, or caused to be delivered, at least two of the voice messages or text messages within the 12-month period, (4) within four years preceding the date of this complaint and through the date of class certification.

## VI. THIRD-PARTY DATA SOURCES

***The Reassigned Number Database***

27. The Reassigned Number Database was established by the Federal Communications Commission ("FCC") in 2021 with the objective of preventing consumers from getting unwanted calls intended for someone that previously used their telephone number.[16] To do this, the FCC

[15] Class Action Complaint, ¶21.
[16] *See* https://www.fcc.gov/reassigned-numbers-database, accessed June 15, 2026.

began requiring major carriers to report permanent disconnections each month beginning on April 15, 2021, with all carriers eventually reporting by October 15, 2021.[17] The database containing the limited record of permanent telephone number disconnections was made available to paid subscribers on November 1, 2021 and is regularly updated as carriers continue to fulfill their requirement to report monthly. Callers use the database to determine whether a telephone number may have been reassigned for the purpose of avoiding inadvertent calls or texts to consumers that did not give consent to be contacted.

28. The RND is not designed to and does not provide the specific date that a telephone number was disconnected. It also does not report a timeline of the historic disconnections associated with a particular number. Instead, to query the RND, a user must provide a telephone number and an associated date ("Associated Date") from which a search should commence. The user then receives an output containing a binary code with a value of '0' or '1' for each telephone number and Associated Date combination submitted.[18] A value of '0' indicates the telephone number was *not* permanently disconnected *after the Associated Date provided*. The RND may also return a value of '1,' indicating the telephone number was permanently disconnected on an unknown date *on or after the Associated Date provided*.[19] The specific date of any permanent disconnection or reassignment is not provided.

29. Based on the FCC's reporting requirements, service providers are "required to maintain records of the *most recent* date that each phone number assigned to one of their subscribers was

---

[17] *See* DA-21-134A1_Rcd.pdf, Reporting requirement under For Service Providers at https://www.fcc.gov/reassigned-numbers-database, accessed June 15, 2026.
[18] FCC documentation also refers to these codes as "Yes" and "No" in some reporting— "Yes" meaning the number *has* been permanently disconnected and "no" meaning it has *not* been permanently disconnected.
[19] *See* DA-21-1649A1_Rcd.pdf under Announcements – Supplemental Guidelines Published (12/29/21) at https://www.fcc.gov/reassigned-numbers-database, accessed June 15, 2026.

permanently disconnected."[20] This data collection began on July 27, 2020.[21] Given the time constraints and relative newness of the RND, this leaves some categories of numbers that cannot be reported on including, (1) numbers that have been active since prior to the advent of the RND and never permanently disconnected during the lifetime of the RND, and (2) numbers that have become active during the lifetime of the RND and have not yet been permanently disconnected.

30. Finally, the RND also contains no information identifying any current or prior subscriber of the telephone numbers upon which it reports.

***National Do-Not-Call Registry***

31. As a result of the Do-Not-Call Implementation Act of 2003 and to facilitate compliance with the TCPA, the FCC and FTC established the National Do Not Call Registry ("NDNCR"), which commenced in 2003.[22] People can register their telephone numbers on the registry by calling in or going online to DoNotCall.gov.[23]

32. Once registered, there is a 30-day grace period provided to callers to cease communications. Per the FTC website, registered telephone numbers will only be removed from the registry if they have been disconnected or reassigned.[24]

***NPAC Porting Data***

33. The Number Portability Administration Center ("NPAC") is an extension of the FCC handling the routing of telephone calls and text messages as well as the facilitation of the local number portability ("LNP") or the porting of telephone numbers from landline to cellular or vice versa. In its capacity, NPAC generates a large volume of User Data logging the porting of

[20] *See* DA-20-706A1_Rcd.pdf, Aging requirement under For Service Providers at https://www.fcc.gov/reassigned-numbers-database, accessed June 15, 2026.
[21] *See* DA-20-706A1_Rcd.pdf, Aging requirement under For Service Providers at https://www.fcc.gov/reassigned-numbers-database, accessed June 15, 2026.
[22] *See* https://consumer.ftc.gov/national-do-not-call-registry-faqs; https://www.fcc.gov/general/do-not-call.
[23] *See* https://consumer.ftc.gov/national-do-not-call-registry-faqs, accessed June 15, 2026.
[24] *Id.*

telephone numbers and their associated carriers. iconectiv is the federally appointed administrator of NPAC data. The data which iconectiv maintains and administers is made available for purchase by qualified third parties. One of the products offered by iconectiv which contains NPAC User Data is called Wireless Do Not Call ("WDNC").[25]

34. To qualify to purchase certain NPAC User Data from iconectiv, the purchaser must be an authorized service provider of telecom-related services and maintain a PTRS (Providers of Telecom-Related Services) Certification.[26]

## VII. THE DECLARATION OF AARON WOOLFSON

### *The Opinions In Mr. Woolfson's Declaration*

35. Plaintiff's expert Aaron Woolfson provided two opinions in his declaration. First, he opined that there is a "reliable method" to identify telephone numbers that (1) received two or more text messages within a 12-month period and (2) were registered to the NDNCR for more than thirty days prior to having received those texts.[27] He also opined that "there is a reliable method to identify and/or exclude texts with other particular criteria based on the additional types of records maintained by Defendant, including whether they were sent on a date after an inbound text message from the telephone number to which the text message was sent, and/or were sent within a certain timeframe of a purchase."[28]

### *Data And Documents Produced By Mr. Woolfson*

36. As Exhibit 7 to his Declaration, Mr. Woolfson produced a script containing SQL queries that he states he used to perform his analysis.

---

[25] *See* https://numberportability.com/portdata-comply-service, accessed June 15, 2026.
[26] *See* https://numberportability.com/about/permitted-use, accessed June 15, 2026.
[27] Declaration of Aaron Woolfson, ¶3.
[28] Declaration of Aaron Woolfson, ¶39.

37. As Exhibit 8 to his Declaration, Mr. Woolfson produced an excel document containing 315,241 text message records associated with 5,626 unique telephone numbers identified in his analysis. This file contains the data elements 'filename,' 'phoneNumber,' 'text,' and 'datetime_UTC.' For all records contained within this file, Mr. Woolfson has truncated the datetime_UTC provided in the original data, eliminating the seconds and milliseconds, making it impossible to reconcile them to the original records. Additionally, he has failed to produce a datetime_UTC for nearly 4,000 of the records as he improperly populated the data in the excel file causing the body of the 'text' values to overflow into the datetime_UTC field. So instead of seeing a timestamp in the datetime_UTC column, there is text he improperly populated from the 'text' column. This effectively deleted the datetime_UTC for these 3,929 records in this output.

38. An example of the improperly populated records contained in Exhibit 8 to Mr. Woolfson's Declaration is included below:

| filename | phoneNumber | text | datetime_UTC |
|---|---|---|---|
| BBQGUYS00060.csv | [redacted] | BBQGuys: Elevate your outdoor adventures with Dad with our top-quality portable grills! Because nothing says I love you | Dad" like a perfectly grilled steak in the great outdoors. SHOP NOW: https://bbqguys.attn.tv/aczwxgTVghe5" |

39. As Exhibit 9 to his Declaration, Mr. Woolfson included a list of the 5,626 telephone numbers identified in his analysis, which I presume to be the telephone numbers that allegedly received violative text messages, although he never states so specifically. He also provides a count of text messages associated with each of the telephone numbers.

***Mr. Woolfson's Proposed Methodology To Identify Telephone Numbers That Received Violative Text Messages***

40. Mr. Woolfson states that to formulate his methodology and the basis of his opinions, he relied on the following materials:[29]

a) "The Complaint, ECF 1."

b) BBQGUYS00059.csv

c) BBQGUYS00060.csv

41. In addition to the Attentive Data contained in BBQGUYS00059.csv and BBQGUYS00060.csv and the operative complaint in this matter, Mr. Woolfson states that the following databases are available to him:[30]

a) "FTC's National Do Not Call Registry ("DNC") Database"

b) "FCC's Reassigned Number Database ("RND") Database"

42. Mr. Woolfson states that to perform his analysis, he created a SQL database and imported the records directly into a table called 'dbo.calls_complete.' Mr. Woolfson states that within this table, he began with "44,466,716 ***inbound*** text messages."[31] (Emphasis added) It should be noted that there are 14 ***outbound*** messages contained within the file BBQGUYS00059 and there are 44,466,702 ***outbound*** messages contained within the file BBQGUYS00060. There are no *inbound* messages contained in the data he states he relied on. If he examined only *inbound* texts, which are texts sent by consumers to Defendant, none of these texts could have violated the TCPA. I have reviewed his work under the presumption that he mistakenly referred to the outbound texts sent by BBQGuys as inbound texts.

---

[29] Declaration of Aaron Woolfson, ¶25.
[30] Declaration of Aaron Woolfson, ¶25.
[31] Declaration of Aaron Woolfson, ¶31.

43. From his population of text message records, Mr. Woolfson states he first removed 1,113,082 text messages to telephone numbers that (1) did not contain 10 digits or "TCPA eligible" area codes, (2) text message records that did not have properly formatted dates and times and (3) text message records that were duplicative of other text message records.[32] He does not explain how he identified which area codes he determined to be "TCPA eligible" nor does he describe how he determined text message records to be duplicative.

44. Next, Mr. Woolfson states that using data from the NDNCR, he identified which text messages were sent to telephone numbers that were registered to the NDNCR for 30 days prior to the date on which the messages were sent and removed from consideration text messages to telephone numbers that were not registered for 30 days prior to the date on which the messages were sent "and/or that were not sent within 365 days of another such text message."[33] This step in his analysis resulted in a population of 27,731,279 text messages to 281,471 telephone numbers.

45. Notably, Mr. Woolfson does not produce any of the data from the NDNCR upon which he relied from his analysis, he does not produce the dates on which any of the telephone numbers were registered to the NDNCR and he does not produce the SQL script with which he performed his analysis, making his analysis irreplicable and his results unverifiable.

46. With the remaining text messages, Mr. Woolfson states he identified the first and last text messages to each telephone number to search the Reassigned Number Database (RND) to identify numbers for which the RND reports "a likely reassignment" at some time between the first and last message.[34] Mr. Woolfson states that by using the RND he would be able to determine when a telephone number "transitioned from *disconnected* to *active*."[35]

---

[32] Declaration of Aaron Woolfson, ¶32.
[33] Declaration of Aaron Woolfson, ¶33.
[34] Declaration of Aaron Woolfson, ¶34.
[35] Declaration of Aaron Woolfson, ¶34.

47. Mr. Woolfson's statement that the RND data indicates whether a telephone number became "active" again is misleading and inaccurate. As stated above, the RND does not and cannot tell a user whether a telephone number has been reassigned. The RND does not report whether or when a telephone number was "active" and able to receive text messages. The RND can only return a value indicating that a telephone number was permanently disconnected *after* a date that is searched. It does not provide a date on which that permanent disconnection occurred, nor does it report whether or when a telephone number was reassigned. Further, the RND is ***not*** an historical lookup and only reports the most recent permanent disconnection.

48. Mr. Woolfson's approach to applying data from the RND to determine whether a telephone number has been reassigned is fundamentally flawed because using the first date and last date a telephone number was texted only indicates whether a telephone number was permanently disconnected *at some unknown date* between those two dates and it would only be present in the data he received from the RND if it was the *most recent* permanent disconnection. This means that if a permanent disconnection occurred *after* all text messages from BBQGuys ceased, a permanent disconnection and text messages to any potentially reassigned telephone number during the period in which BBQGuys was texting are unidentifiable using the RND data. The RND data upon which he is relying would not and cannot identify this permanent disconnection and reassignment because the RND data can only identify the *most recent* permanent disconnection.

49. Further, because Mr. Woolfson limited his analysis to the text messages that occurred more than 30 days after the telephone number was registered to the NDNCR, by identifying telephone numbers that were subsequently permanently disconnected, his analysis will only identify text message recipients that were not the individuals that registered the telephone number to the NDNCR.

50. Nonetheless, from this step in his analysis, Mr. Woolfson states that he identified 828,111 text messages to 5,781 telephone numbers.

51. Next, Mr. Woolfson states he queried the dates of every single text message to each of the remaining telephone numbers to identify the exact date on which a telephone number "transitioned from disconnected to active." I repeat, the RND *does not and cannot* identify whether a telephone number was made active after a permanent disconnection; it will only indicate whether the telephone number queried *was permanently disconnected* after the Associated Date and it does not report the date a telephone number was permanently disconnected, or whether and when a telephone number is reassigned. It is unclear how Mr. Woolfson is determining that a number became "active". Presumably it is through a combination of conducting hundreds, if not thousands, of individual manual searches, guesswork and speculation. Again, he did not document this step, produce the third-party RND lookup data or the script with which he performed his analysis, and there is no way for me to replicate it.

52. Further, it is important to note that nowhere in his methodology for applying RND data to his analysis does Mr. Woolfson account for the 45-day hold period required by the FCC after a telephone number is disconnected. The FCC requires that once a telephone number is permanently disconnected, it cannot be reassigned for at least 45 days, yet Mr. Woolfson does not mention this in his analysis at all.

53. Nonetheless, through this step, Mr. Woolfson states that he identified 315,320 text messages to 5,703 unique telephone numbers. With these 315,320 text messages, Mr. Woolfson states he then excluded 79 messages he determined were not within 365 days of another message. Mr. Woolfson states that this exclusion resulted in his final population of 315,241 text messages to 5,626 telephone numbers that were registered to the NDNCR for more than 30 days at the time

of the text messages, where the text messages were allegedly "sent after the number was reassigned" and were within 365 days of another text message.[36]

54. Mr. Woolfson also included a footnote stating that should he ever be in receipt of inbound text message data, he would be able to perform additional analysis pertaining to the results of the RND searches he performed.[37] It should be noted that available to me is a file BBQGUYS00061 which contains over 800,000 inbound text messages from consumers to BBQGuys. I have been advised by counsel that the files BBQGUYS00059 and BBQGUYS00060, upon which Mr. Woolfson relied for his analysis, were produced to Plaintiff's counsel on the same day that the inbound text message data contained in file BBQGUYS00061was produced, so it is unclear why he did not perform the analysis he alludes to in his footnote.

## VIII. ANALYSIS AND OPINIONS

### Opinion No. 1: Text Messages That Were Allegedly Sent In Violation Of The NDNCR Cannot Be Identified Absent An Individualized Investigation Of Records That Show That Text Message Recipients Consented To Be Contacted

55. It is my opinion that text messages sent to potential class members cannot be identified absent an individualized investigation by the trier of fact. Furthermore, for a substantial portion of the telephone numbers that may have received text messages from BBQGuys there is (1) indicia of consent to be contacted that exists within the BBQGuys records, (2) indicia of qualified Established Business Relationships ("EBR") that exist within the BBQGuys records, (3) the telephone number is associated with a business, or (4) the telephone number was permanently disconnected and/or reassigned after having been registered to the NDNCR indicating that the recipient of the BBQGuys text messages was not the person that registered the telephone number to the NDNCR.

[36] Declaration of Aaron Woolfson, ¶36.
[37] Declaration of Aaron Woolfson, ¶36.

56. I am offering no opinion relating to whether any individual gave legal "consent" or "permission" to receive text messages from BBQGuys, as those terms are defined under the TCPA, as such a determination is reserved for the trier of fact. It is instead my opinion, to a high degree of professional certainty, that my detailed factual review regarding the text messages at issue revealed indicia of consent in the records that, upon individual examination, a trier of fact could determine that legal permission or consent existed.

***Mr. Woolfson Ignores Historical Indicia Of Consent To be Contacted By Text Contained Within The Attentive Records***

57. Mr. Woolfson states in his declaration that there is a reliable and accurate methodology for identifying potential class claimants using "other records maintained by or on behalf of Defendant."[38] He also states that he can "tag each call or text record according to… any data field contained in any associated leads records."[39] However, in his description of his proposed methodology, he fails to make reference to any lead data or other data that is maintained by BBQGuys and provides no method by which he would analyze such data. He does not even take into consideration the indicia of consent that exists within the text message data he did analyze.

58. Given Mr. Woolfson's failure to take into consideration that consent to be contacted exists, his proposed class identification methodology unquestioningly results in a list of alleged class members that provided their telephone numbers to BBQGuys, agreed to be contacted and submitted their contact information along with express consent language.

***Random Sampling Identified Indicia Of Consent To Be Texted***

59. To thoroughly examine the data available related to the text messages at issue, I examined a statistically significant random sample of telephone numbers identified by Mr. Woolfson as

---

[38] Declaration of Aaron Woolfson, ¶4.
[39] Declaration of Aaron Woolfson, ¶28.

potential class members. From the 5,626 unique numbers identified in Exhibits 8 and 9 to Mr. Woolfson's Declaration, I extracted a statistically significant random sample of 361 unique telephone numbers which constitutes a confidence of 95% with a margin of error of +/- 5%.[40]

60. The objective of my analysis was to determine (1) whether indicia of consent to be texted exists, (2) whether indicia of an EBR is present, (3) if the telephone number may have been reassigned after being registered to the NDNCR, or (4) if the telephone number is associated with a business.

61. For my analysis, I requested from BBQGuys any data maintained by Attentive documenting how each telephone number entered the system to be texted, any account data associated with each telephone number detailing opt in and opt out statuses and change logs indicating changes to each account over time. For the telephone numbers contained in my sample, I received BBQGUYS00062 which contained limited information detailing the first and last recorded opt-in and opt-out. I understand that additional data, such as the records provided for the 5410 Number contained in BBQGUYS00001, is not readily available from Attentive and would require nearly two months of work to prepare for just my sample of 361 telephone numbers.

62. In addition, I received BBQGUYS00111–0482 which contained records from Attentive indicating a purchase was made on an account with one of the telephone numbers which was texted. Last, I received data from Attentive detailing instances where customers with accounts associated with the telephone numbers contained within Mr. Woolfson's Exhibit 9 either (1) added items to a cart or (2) clicked a link contained within a message.

[40] The sample was pulled using R, a statistical programming language. Combining R's set.seed() and sample() functions allows for pulling a seeded random sample, which in turn lets any user recreate the exact sample if they use the same population. The seed used for this sample was 20260519, which represents the day on which the sample was extracted. The resulting sample of 361 unique numbers is attached as Exhibit 3.

***Opt-In Text Messages***

63. To identify instances where an opt-in occurred prior to text messages being sent to the telephone numbers contained within my sample, I first examined the inbound text messages received by BBQGuys. As discussed in the background section of my report, text message recipients could opt-in to receiving text messages from BBQGuys by sending an Introductory Text Message. An example of this type of message is included below:[41]

> "Send this text to subscribe to recurring automated personalized marketing alerts (e.g. cart reminders) from BBQGuys (ref: cGxvd)"

64. In some instances, BBQGuys used a double opt-in mechanism requiring customers to respond to a message from BBQGuys with a text message, "Y" confirming their subscription to BBQGuys text messages. An example of this correspondence is included below:[42]

> "BBQGuys: Reply Y to subscribe to recurring automated personalized marketing alerts (e.g. cart reminders) from BBQGuys."

65. To examine opt-in text messages from the telephone numbers, I first searched for telephone numbers that initiated the text message exchange with an Introductory Text Message containing, "Send this text to subscribe to BBQGuys" or "Send this text to subscribe to recurring automated." Of the 361 telephone numbers contained within my sample, I found that 179 (49.6%) of telephone numbers initiated the text exchange with this subscription message prior to receiving any messages from BBQGuys.

66. Next, I searched for telephone numbers that responded affirmatively to the BBQGuys opt-in message, "BBQGuys: Reply Y to subscribe to recurring automated personalized marketing alerts (e.g. cart reminders) from BBQGuys.", by sending the text message "Y" to opt-in to

---

[41] While there are several versions of an Introductory Text Message, I considered any inbound message starting with either the phrase "Send this text to subscribe to recurring automated…" or "Send this text to subscribe to BBQGuys…" as an Introductory Text Message.
[42] BBQGUYS00060.

receiving further texts. Of the 361 telephone numbers contained within my sample, I found that an additional 169 (46.8%) of telephone numbers responded to BBQGuys message with "Y" confirming their subscription to BBQGuys text messages. In total, I found that of the 361 telephone numbers contained within my sample, 348 (96.3%) either sent the Introductory Text Message themselves or responded "Y" confirming their subscription to BBQGuys text message prior to receiving any messages from BBQGuys.




67. I manually reviewed the remaining 13 telephone numbers contained within my sample to determine whether there were any inbound messages that could have resulted in an opt-in to

receive messages from BBQGuys.[43] I found that 4 (30.7%) sent messages to BBQGuys indicating that they would like to opt-in to text messages from BBQGuys by responding with the text value "Yes" instead of "Y."

68. For example, telephone number [redacted] (the "1393 Number") responded with "Yes" to a text message from BBQGuys on November 11, 2020, consenting to receive recurring personalized marketing text messages. BBQGuys responded to this message welcoming the user of the 1393 Number and providing instructions to cancel the subscription to text messages.

| DIRECTION | PHONE | TEXT | TIMESTAMP_UTC |
|---|---|---|---|
| OUTBOUND | [redacted] | BBQGuys: Reply Y to subscribe to recurring automated personalized marketing alerts (e.g. cart reminders) from BBQGuys. | 2020-11-06 05:55:26.384 |
| INBOUND | [redacted] | Yes | 2020-11-06 20:08:08.508 |
| OUTBOUND | [redacted] | BBQGuys: Welcome! Msg & data rates may apply. Msg frequency varies. Reply HELP for help, STOP to cancel. Privacy: attnl.tv/p/6f0 | 2020-11-06 20:08:12.736 |

69. Of the nine remaining telephone numbers in my sample, I found that 8 had initiated a subscription to receive text messages from BBQGuys by responding to a promotion or contest. An example of this type of subscription text message from telephone number [redacted] is included below:

| DIRECTION | PHONE | TEXT | TIMESTAMP_UTC |
|---|---|---|---|
| INBOUND | [redacted] | Napoleon | 2020-05-07 19:50:06.790 |
| INBOUND | [redacted] | FRIDAY | 2020-11-05 16:31:58.236 |
| OUTBOUND | [redacted] | BBQGuys: You are already subscribed. Click here to shop now: https://bbqguys.attn.tv/cl/WYp . | 2020-11-05 16:31:58.933 |

[43] The inbound messages received from the 13 telephone numbers remaining in my sample are appended as Exhibit 4.

70. Last, I manually reviewed the inbound messages associated with telephone number [redacted] (the "6448 Number") and found that the user of the telephone number had initiated a subscription to receive text messages from BBQGuys, however the message that the user of the 6448 Number sent to BBQGuys contained a special character that was not recognized in my automated SQL queries. This message is included below:

> "Send this text to⁰ subscribe to recurring automated personalized marketing alerts (e.g. cart reminders) from BBQGuys (ref: eaOmn)"

71. As a result of my manual review of the inbound messages received by BBQGuys from the telephone numbers remaining within my sample, I was able to determine that indicia of consent via an inbound message exists for all 13 (100%) numbers. Consequently, indicia of *consent via an inbound message exists for all 361 (**<u>100%</u>**) of the telephone numbers* contained within my sample.



***Inbound Messages Enrolling In Promotions***

72. Next in my analysis, I further reviewed the inbound messages for instances where the telephone numbers contained within my sample responded to promotional campaigns and enrolled in contests with BBQGuys via text message, indicating existing and ongoing business relationships between the recipients of the text messages and BBQGuys. To identify promotional campaigns and contests for which customers could text BBQGuys to subscribe, I examined the text message correspondence for instances where customers sent key words or phrases to BBQGuys and BBQGuys responded confirming a contest entry and/or subscription.

73. For example, telephone number ([redacted] (the "7434 Number") texted BBQGuys on November 6, 2020 with a message saying, "Friday." BBQGuys responded to this message welcoming the user of the 7434 Number, thanking them for subscribing and confirming that they have been entered to win.

| DIRECTION[44] | PHONE | TEXT | TIMESTAMP_UTC |
|---|---|---|---|
| INBOUND | [redacted] | Friday | 2020-11-06 21:21:12.800 |
| OUTBOUND | [redacted] | BBQGuys: Welcome! Msg & data rates may apply. Msg frequency varies. Reply HELP for help, STOP to cancel. Privacy: attnl.tv/p/6f0 | 2020-11-06 21:21:15.838 |
| OUTBOUND | [redacted] | BBQGuys: Thanks for subscribing! You've been entered to win. The winner will be notified via email on the first day of next month. Click here to shop now: https://bbqguys.attn.tv/l/q6Y/SruKz | 2020-11-06 21:21:19.931 |

[44] Direction is a field derived through CRA analysis by denoting the population of data from which each record is sourced. Records contained in BBQGUYS00060 are denoted as inbound.

74. In my analysis of the text correspondence, I identified a total of 10 key words texted inbound by consumers to register for a subscription and/or contest. A complete listing of these key words and the associated responses from BBQGuys is included below:

| PROMOTIONAL TERMS |
|---|
| BBQ |
| BLAZE |
| Borntogrill |
| Friday |
| Napoleon |
| PIZZA |
| SUMMER |
| Traeger |
| Win |
| WINTER |

75. Using these key words, I examined the inbound text messages from the 361 telephone numbers contained within my sample and found that 28 (7.75%) had responded to promotional campaigns and enrolled in contests with BBQGuys via text message, indicating existing and ongoing business relationships between the recipients of the text messages and BBQGuys.[45]

***Purchases, Add to Cart, & Message Link Click Through***

76. In addition to the inbound text messages, I analyzed the data provided by Attentive detailing activity associated with several of the numbers contained within my sample. Attentive provided three categories of data: Purchase, Add to Cart and Message Link Click.

77. Of the 361 phone numbers in my sample, 43 telephone numbers (11.9%) made a purchase within 90 days prior to receiving messages from BBQGuys.

[45] A complete listing of the telephone numbers contained within my sample for which I identified inbound messages containing these keywords is attached as Exhibit 5.

78. For example, telephone number [redacted] (the "6751 Number") opted in on May 17, 2020, by sending a "Y" text message, consenting to receive recurring marketing text messages from BBQGuys.[46] Approximately one year later, on May 18, 2021, the 6751 Number made a purchase.[47] The 6751 Number remained subscribed to text messages from BBQGuys and did not submit an opt-out request.

79. Of the 361 phone numbers in my sample, 18 phone numbers (4.98%) added an item to their cart within 45 days before or after receiving messages from BBQGuys

80. For example, telephone number [redacted] (the "2251 Number") opted-in in November 11, 2020 by sending an Introductory Text Message to BBQGuys.[48] The 2251 Number subsequently received a confirmation text message confirming entry into a giveaway.[49] That same day, approximately 2 hours after opting-in, the 2251 Number adds an item to cart.[50] The 2251 Number remained subscribed to text messages from BBQGuys and did not submit an opt-out request.

81. Of the 361 phone numbers in my sample, 89 phone numbers (24.6%) clicked on a link contained within a message within 45 days before or after receiving messages from BBQGuys.

---

[46] BBQGUYS00061.
[47] BBQGUYS00111 – BBQGUYS00482.
[48] BBQGUYS00061.
[49] BBQGUYS00060.
[50] BBQGUYS00501.

82. For example, telephone number [redacted] (the "6135" Number) opted-in on April 16, 2020, by sending a "Y" text message, consenting to receive recurring marketing text messages from BBQGuys.[51] On December 11, 2020 the 6135 Number clicked on the link contained in the following message:[52]

> "BBQGuys: ⏳ Time's almost up! Sleigh your Christmas list and order gifts by December 16th to get them in time! Shop Now > https://bbqguys.attn.tv/l/yJR/ApBCN".

83. The 6751 Number remained subscribed to text messages from BBQGuys and did not submit an opt-out request.

84. In total, of the 361 unique telephone numbers contained within my sample, 121 (33.5%) have indicia of an existing business relationship based on a limited population of purchase, card and message link click data from Attentive. Of the 361 telephone numbers contained within the sample, *all 361 (**100%**) sent a text message to BBQGuys subscribing to receive text messages* and/or enrolling in a contest or promotion.

**Opinion No. 2: Mr. Woolfson's Unorthodox Use Of The RND To Identify Class Members Is Unreliable, Inaccurate And Impermissible**

85. Mr. Woolfson's unorthodox, proposed methodology for identifying class members is reliant on the use of the RND. For the purposes of this rebuttal, I reiterate that the RND provides only limited data and, despite its name, it does not identify whether a telephone number is reassigned or, if so, the date of that reassignment.

86. The unreliability of Mr. Woolfson's methodology is made plain when examining the purported violative text messages sent to the 5410 Number, which Plaintiff claims as his current telephone number. Plaintiff alleges that, after the 5410 Number was reassigned to him, Plaintiff

---

[51] BBQGUYS00061.
[52] BBQGUYS00502.

received 8 text messages in violation of the TCPA.[53] However, according to Mr. Woolfson's analysis, Declaration and Exhibits, the 5410 Number received 33 violative messages, reflecting an overestimation of more than 300%.[54]

87. Historically, TCPA Plaintiffs in other matters have attempted to use the RND to identify TCPA class members. Third-party data vendors who sell this data and the Director of the RND have made it clear that the RND cannot reliably identify when a telephone number was permanently disconnected or reassigned and that to use it as Mr. Woolfson proposed, he would need a waiver from the FCC, something which he apparently does not have.

88. It is for this reason that Mr. Woolfson is unable to identify any other expert who uses this methodology and cannot identify a single court who has approved this approach.

***The Declaration of Scott Rice***

89. The limitations of the RND are detailed in the "Declaration of Scott Rice On the Services Provided By PacificEast Research, Inc.," which was submitted in the matter *Davis v. Capital One, N.S.,* No. 1:22-cv-00903-AJT-IDD (E.D. Va.).[55] In that matter the plaintiff's petition for certification was denied and his expert witness was disqualified in part for her proposal that the RND be used to identify class members in a wrong number TCPA case.[56] That decision was held up on appeal by the Fourth Circuit.[57]

[53] Class Action Complaint, ¶14.
[54] Declaration of Aaron Woolfson, Exhibit 9.
[55] Declaration of Scott Rice On the Services Provided By PacificEast Research, Inc. attached as Exhibit 6.
[56] Davis v. Capital One, N.A. Memorandum Opinion and Order attached as Exhibit 7.
[57] A copy of that appellate decision is attached as Exhibit 8.

90. Both the trial and appellate courts relied upon the testimony of Scott Rice, the Chief Operations Officer of PacificEast, a reseller of the RND data. His declaration states in relevant part:

1) Telephone number and date submission queries to the RND yield only three possible responses "Yes," "No," or "No Data."[58]
2) A response of "No" indicates that the input telephone number exists within the RND and has not experienced a disconnection event after the input date. [59]
3) A response of "No Data" indicates that the input telephone number exists, but the RND has no data relating to the number.[60]
4) A response of "Yes" indicates that the telephone number exists within the RND and was disconnected at some date subsequent to the submitted date. A response of "Yes" does not provide any indicia, absent further individual inquiries *external* to the RND, that the telephone number was in fact reassigned, or was potentially or possibly reassigned, to another cellular subscriber.[61]
5) Queries run in hindsight obtain different answers than queries run in real-time. Queries performed daily, in real-time, provide more accurate information.[62]
6) The only way to use the RND to narrow down and plausibly identify the date of a particular disconnect event is to run daily, real-time queries for every subject telephone number.[63]

91. Mr. Scott further testified as follows:

> For this reason, RND queries that are run in hindsight and that return results of "Yes" are inherently ambiguous and indefinite with regard to identifying a date of disconnection.
>
> In the absence of daily, real-time queries there is no way to use the RND query service provided by PacificEast to clarify hindsight result of "Yes" to show that an input call was made after a particular unknown date of disconnection, because such dates are not provided in the RND's query results and are not otherwise identifiable using the database in hindsight.[64]

---

[58] Declaration of Scott Rice, ¶5. Declaration of Beth Sprague, ¶10, attached as Exhibit 9.
[59] Declaration of Scott Rice, ¶6.
[60] Declaration of Scott Rice, ¶7.
[61] Declaration of Scott Rice, ¶8.
[62] Declaration of Scott Rice, ¶¶9-12.
[63] Declaration of Scott Rice, ¶ 13
[64] Declaration of Scott Rice, ¶¶15-16.

***The Declaration of Beth Sprague***

92. In addition to the Declaration of Scott Rice, the court in *Davis v. Capital One* also relied upon the Declaration of Beth Sprague, the Director of the RND. Ms. Sprague works for SomosGov., Inc. with whom the FCC has contracted to manage the RND and its operations. In her Declaration, Ms. Sprague made clear that the RND data is only to be used by callers for the purpose of preventing unwanted calls. Callers may submit telephone numbers to the RND at any time to determine if they have been disconnected for the purpose of making lawful calls or sending lawful texts. To use the RND for any other reason, "callers" are required to seek a waiver from the FCC.

> The database is available to callers who agree in writing that the caller (and any agent acting on behalf of the caller) will use the database solely to determine whether a number has been permanently disconnected since a date provided by the caller for the purpose of making lawful calls or sending lawful texts. To access the database for other purposes, callers are required to seek a waiver from the FCC. [65]

93. Ms. Sprague's statements regarding the limited use of the RND reflect those issued by the FCC in its Order for the creation of the RND. FCC Order 18-177 limits RND access "only to callers who agree in writing that the caller (and any agent acting on behalf of the caller) will use the database solely to determine whether a number has been permanently disconnected. . . for the purpose of making lawful calls or sending lawful texts."[66] The Order provides no other access permission for the RND but indicated that any other lawful purpose could be addressed through the FCC's waiver process.

---

[65] Declaration of Beth Sprague, ¶5.

[66] *See* FCC 18-177, ¶26. Order appended as Exhibit 10.

94. The restrictions to uses of the RND are further reflected in the Terms of Use, which limit access and use of the RND to: [67]

a) "Service Providers," defined as reporting carriers as defined in the FCC's numbering rules . . . which include wireless, wireline, and interconnected VoIP providers that obtain numbers from the North American Numbering Plan Administrator (NANPA);
b) "Callers," defined as a person or entity that initiates any call, including text messages, using a wireless, wireline, or interconnected VoIP service;
c) "Agents" authorized in writing by the Service Providers or Callers to access the RND on their behalf;
d) The Toll-Free Number Administrator ("TFNA"), acting as agent for "Responsible Organizations," defined as entities chosen by toll-free subscribers to manage and administer the appropriate records in the toll-free Service Management System for the toll-free subscriber; or
e) A person or entity granted a waiver to access the RND for a "lawful purpose under section 1.3 of the FCC's rules."

95. No published FCC records indicate that Woolfson or his company TelSwitch applied for or have been granted any such waiver by the FCC.

96. Ms. Sprague further testified in that "although the RND contains all reported disconnect dates, the *disconnect dates are confidential and not publicly accessible through the RND public query interface*."[68] The court in *Davis v. Capital One* noted the unavailability of this disconnect data in finding the plaintiff's expert Anya Verkhovskaya's proposal to use it inappropriate:

> More specifically, using the public querying process described by Verkhovskaya, neither the RND nor Capital One's own records can reliably identify a specific date when a Capital One customer relinquished their cellular phone number or otherwise terminated their subscriber status.[69]

[67] See "Terms of Use Notice", REASSIGNED NUMBERS DATABASE (last updated Apr. 1, 2021) (https://www.reassigned.us/terms), Accessed June 15, 2026.
[68] Declaration of Beth Sprague, ¶15.
[69] *Davis v. Capital One* Memorandum Opinion and Order, pp. 17-18.

**Opinion No. 3: Mr. Woolfson Cannot Reliably Determine Which Telephone Numbers Are Associated With Businesses**

97. Under the TCPA, establishment and use of the NDNCR is described as, "a list of telephone numbers of ***residential*** subscribers who object to receiving telephone solicitations" (emphasis added).[70]

98. In my experience, plaintiff's TCPA experts have typically proposed a methodology for determining which telephone numbers contained in the records are business or residential lines with the objective of removing from consideration telephone numbers that are identified as being associated with businesses. Plaintiff's expert Aaron Woolfson offers no methodology for identifying business telephone numbers and as such any list of proposed class members based on the methodology outlined in his report will consequently be replete with telephone numbers associated with businesses which cannot be claimants.

***Third-Party Vendor Business Line Data Is Unreliable And Incomplete***

99. In my experience, plaintiff's TCPA experts frequently suggest the use of third-party reverse phone lookup data to identify business lines that should be removed from class notice lists. This is a highly inaccurate and inadequate strategy for identification of business lines that must be supplemented with extensive individualized and manual investigation.

100. For example, in my analysis for this case, I submitted Plaintiff's counsel's telephone number for business line identification to data vendor PacificEast. From the First Amended Class Action Complaint in this case filed October 25, 2025, I observed the following telephone numbers associated with the firm representing Plaintiff in this case:

| Attorney | Firm | Telephone Number |
|---|---|---|
| Anthony Paronich | Paronich Law, P.C. | (508) 221-1510 |

[70] Telephone Consumer Protection Act (47 U.S.C. § 227), Section (c)(3).

101. I submitted to third-party data vendor PacificEast a file containing this number and requested an output that contained (1) a reverse phone search which identifies individuals and business names associated with the telephone number including date associations as well as (2) the business line identification product offered by PacificEast which returns a coding of 'B' or 'R' indicating whether a line is associated with a business or a residence.

102. Although Mr. Paronich lists his telephone number ending in 1510 (the "1510 Number") with his business details in the complaint for this matter, PacificEast does not return an associated business name, and has a coding of 'R' indicating a residential line.

| Phone | FirstName | LastName | StartDate | EndDate | BizRes |
|---|---|---|---|---|---|
| 5082211510 | ANTHONY | PARONICH | 20070916 | 20251029 | R |

103. I also searched PacificEast for the telephone number (617) 485-0018 (the "0018 Number") which is listed on Mr. Paronich's website as the preferred contact line for Paronich Law. PacificEast does not provide a determination as to whether the 0018 Number is associated with a business or a residence. PacificEast returns two name associations, one on March 16, 2016 for a Linda Daniels, and another on August 1, 2010 for a Richard Davis. PacificEast does not associate Mr. Paronich with the 0018 Number in any records.

| Phone | FirstName | LastName | StartDate | EndDate | BizRes |
|---|---|---|---|---|---|
| 6174850018 | Linda | Daniels | 20160316 | 20160316 | |
| 6174850018 | Richard | Davis | 20100801 | 20100801 | |

104. I also submitted to PacificEast Plaintiff's 5410 Number which he claims is used exclusively for residential purposes. While PacificEast does not associate a business with the 5410 Number, it

also does not associate Mr. McGonigle. PacificEast associates only one individual, Michael Nettles of Richmond, VA with the 5410 Number from July 21, 2020 through January 3, 2025.

| Phone | FirstName | LastName | StartDate | EndDate | BizRes |
|---|---|---|---|---|---|
| 804[redacted]5410 | MICHAEL | NETTLES | 20200721 | 20250103 | R |

105. I also submitted to PacificEast numbers belonging to me personally and numbers belonging to my colleagues at Charles River Associates. Below is a list of these seven numbers:

| Name | Firm | Telephone Number | Description |
|---|---|---|---|
| Madelyn Moran | CRA | (330) 419-1285 | Cell Phone |
| Madelyn Moran | CRA | (312) 619-3346 | Business Phone |
| Lance Mathews | CRA | (317) 727-2052 | Cell Phone |
| Lance Mathews | CRA | (312) 377-2337 | Business Phone |
| Peggy Daley | CRA | (312) 933-3609 | Cell Phone |
| Peggy Daley | CRA | (312) 577-4160 | Business Phone |
| Peggy Daley | CRA | (312) 619-3387 | Fax Line |

106. I have had my cell phone number since 2007, but PacificEast only associated me with it from June 9, 2020 to July 1, 2022. I have used my cell phone for business purposes for over ten years, but PacificEast does not identify it as a business line. My colleague, Peggy Daley, has used her cell phone number for business purposes for over 20 years, yet PacificEast still identifies it as a residential number. While PacificEast did identify her as the name associated with the record, the address associated, 2200 Powell St., Emeryville, California does not belong to her. In fact, she has never resided in California. This is the business address of her prior employer, Berkeley Research Group.

107. Of these seven numbers, all of which are used for business purposes, PacificEast only identified two (28.6%) as business lines.

108. I undertook a manual internet search for the remaining five numbers and was unable to locate business associations for any of them although I am personally aware of their everyday business use.

109. Despite my experience working on cases alleging violations of the National Do Not Call Registry and Internal Do Not Call lists, I am unaware of any method that can reliably identify which telephone numbers were business lines at the time calls were made or text messages were sent absent an individualized, highly manual investigation.

110. Historically, Mr. Woolfson has agreed with this assessment, stating in an affidavit submitted in the case *Carroll v. SGS Automotive Services, Inc.*, C.A. No. 16-537-SDD-RLB (M.D. La. Oct. 25, 2019), "I know of no available database that could be used to factually indicate whether a number belonged to a business or residential subscriber."[71]

***Business And Residential Telephone Status Analysis***

111. To examine whether telephone numbers contained in my sample of 361 telephone numbers belonged to individuals or businesses, I compared both (a) third-party data vendors results and (b) individualized internet research.

112. I first submitted the telephone numbers to PacificEast for a reverse phone search which identifies individuals and business names associated with the telephone number. I also obtained the dates these names were associated with the telephone number as well as "business line" identification from PacificEast. This service returns a coding of 'B' or 'R' indicating whether a line is associated with a business or a residence.[72]

[71] Affidavit of Aaron Woolfson, ¶22. Attached as Exhibit 11.

[72] If PacificEast cannot determine whether the telephone number is a business or residence, it will not return a value.

113. Of the sample of 361 unique numbers, PacificEast identified 40 (11.1%) telephone numbers as business lines.[73] Some of the numbers identified by PacificEast as business lines did not return the businesses name. Below are some examples of the identifications returned by PacificEast:

| Phone | BusinessName | BizRes |
|---|---|---|
| 201705[redacted] | ROBERT YOUNG | B |
| 210325[redacted] | DONALD LITTLE | B |
| 317910[redacted] | BRADLEY MICHAELS INC | B |
| 660679[redacted] | CINDA GLASS | B |
| 704842[redacted] | TRACYDALE CBS | B |
| 817694[redacted] | NELSON SANCHEZ MD | B |
| 919464[redacted] | ELIZABETH RICE FINE ART ANTIQUES | B |

114. I further manually researched the remaining 321 telephone numbers. Using internet resources, I was able to locate 30 additional telephone numbers from my sample that are associated with businesses, resulting in a total of at least 70 (19.4%) of the sample of 361 unique telephone numbers that appear to be used for business purposes.[74]

115. Below are some examples of telephone numbers from the sample of 361 that through individualized research revealed an association to a business:

*Telephone Number (507) 461-2443*

Telephone number (507) 461-2443 (the "2443 Number") is associated with 80 text messages in Mr. Woolfson's Exhibit 9. When I manually researched the 2443 Number, I found that the number was associated with multiple businesses. The first of which is a company called New Richland Building Supply & Hardware LLC, whose USDOT status appears active as of January 2022.[75]

[73] PacificEast output attached as Exhibit 12.
[74] *See* a listing of these telephone numbers and accompanying workpapers attached as Exhibit 13.
[75] See https://safer.fmcsa.dot.gov/query.asp?searchtype=ANY&query_type=queryCarrierSnapshot&query_param=USDOT&query_string=3253136, accessed June 15, 2026.

| | | | |
|---|---|---|---|
| USDOT INFORMATION | | | |
| Entity Type: | CARRIER | | |
| USDOT Status: | ACTIVE | Out of Service Date: | None |
| USDOT Number: | 3253136 | State Carrier ID Number: | |
| MCS-150 Form Date: | 01/08/2022 | MCS-150 Mileage (Year): | |
| OPERATING AUTHORITY INFORMATION | | | |
| Operating Authority Status: | **NOT AUTHORIZED**<br>*Please Note: NOT AUTHORIZED does not apply to Private or Intrastate operations.<br>**For Licensing and Insurance details** click here. | | |
| MC/MX/FF Number(s): | | | |
| COMPANY INFORMATION | | | |
| Legal Name: | NEW RICHLAND BUILDING SUPPLY & HARDWARE LLC | | |
| DBA Name: | | | |
| Physical Address: | 118 ASH AVE S<br>NEW RICHLAND, MN 56072 | | |
| Phone: | (507) 461-2443 | | |
| Mailing Address: | PO BOX 7<br>NEW RICHLAND, MN 56072-0007 | | |

I also found through manual research that the 2443 Number is publicly listed for Snow Construction Services, LLC, which is a construction company that has been in operation for over 11 years, and has been BBB accredited since 2019.[76]

**BUSINESS PROFILE**

General Contractor

**Snow Construction Services, LLC**

BBB Accredited Business A+ Rated by BBB

(507) 461-2443

Email Business

Write a Review

*Telephone Number (912) 572-7500*

Telephone number (912) 572-7500 (the "7500 Number") is associated with 47 text messages in Mr. Woolfson's Exhibit 9. I manually researched this number with an internet search and found that it is associated with a towing business in Georgia titled Express Towing Inc. The business appears to have been in business since 2019.[77]

**Company Overview**

EXPRESS TOWING INC is an active carrier & broker registered with the FMCSA since January 2019. Based in RICHMOND HILL, GA, They are classified as Interstate and operate interstate (beyond 100 miles) and interstate (within 100 miles). Their inferred equipment specializations include Car Hauler and Box Truck.

**Contact Information**

PHYSICAL ADDRESS
55 CHANDLER STREET
RICHMOND HILL, GA 31324
View on Map →

(912) 572-7500

[76] See https://www.bbb.org/us/mn/waseca/profile/general-contractor/snow-construction-services-llc-0704-96591967, accessed June 15, 2026.

[77] See https://otrucking.com/carrier/express-towing-inc-dot-3238497/, accessed June 15, 2026.

*Telephone Number (850) 382-4566*

Another telephone number included in Mr. Woolfson's Exhibit 9 associated with 50 text messages is (850) 382-4566 (the "4566 Number"). When researching the number through a manual internet search, I found it to be associated with Two Diamonds Landscaping, LLC. According to the BBB website, Two Diamonds Landscaping, LLC was established in 2022, and the 4566 Number is listed as the entity's contact number.[78]




*Telephone Number (817) 341-2211*

Telephone number (817) 341-2211 (the "2211 Number") is associated with 6 text messages in Mr. Woolfson's Exhibit 9. Using a manual internet search, I researched the 2211 Number and found it to be associated with Ron's Mower Shop. The company provides lawn mower repair services.[79]




[78] See https://www.bbb.org/us/fl/pensacola/profile/landscape-contractors/two-diamonds-landscaping-llc-0683-90097332, accessed June 15, 2026.
[79] See https://www.bbb.org/us/tx/weatherford/profile/lawn-mower-repair/rons-mower-shop-0825-235979757, accessed June 15, 2026.

*Telephone Number (845) 463-3200*

Telephone number (845) 463-3200 (the "3200 Number") is associated with 197 text messages in Mr. Woolfson's Exhibit 9. To determine whether the number had an identifiable business association, I performed a manual internet search. The search results linked the 3200 Number to Timberwolf Contracting, a construction services company that has been in business for nearly 40 years.[80]




*Telephone Number (806) 283-5515*

Another number included in Mr. Woolfson's Exhibit 9 with 40 associated text messages is (806) 283-5515 (the "5515 Number"). I conducted a manual internet search for the 5515 Number and found that it was listed as the contact number for Donald Ray Elrod, who is a federal firearms license dealer and manufacturer located in Texas.[81]




[80] See https://www.bbb.org/us/ny/poughkeepsie/profile/construction-services/timberwolf-contracting-0121-149018, accessed June 15, 2026.
[81] See https://www.gunnook.com/ffl/dealer.php?id=15001, accessed June 15, 2026.

<u>*Telephone Number (417) 296-5992*</u>

Telephone number (417) 296-5992 (the "5992 Number") is associated with 79 text messages in Mr. Woolfson's Exhibit 9. Using a manual internet search, I researched the 5992 Number and found an association with a business called MidAg Drone Services.[82]




<u>*Telephone Number (770) 289-1747*</u>

Also included in Mr. Woolfson's Exhibit 9 with 63 associated text messages, is the telephone number (770) 289-1747 (the "1747 Number"). To determine whether the number had an identifiable business association, I conducted a manual internet search. The search indicated that the 1747 Number is the preferred contact number for James Walls, a broker for Masterpiece Realty, LLC.[83]




[82] See https://midagdrone.my.canva.site/services, accessed June 15, 2026.
[83] See https://www.georgiamls.com/real-estate-offices/MAST01, accessed June 15, 2026.

*Telephone Number (706) 499-6375*

Telephone number (706) 499-6375 (the "6375 Number") is associated with 224 text messages in Mr. Woolfson's Exhibit 9. I conducted a manual internet search for the 6375 Number and the search results indicated it is the emergency phone number for a business called Kandy Kane Learning Center.[84]

> **Address:**
>
> **1323 441 Historic Highway N**
>
> **Clarkesville GA 30523**
>
> **Emergency Phone Number: 706-499-6375**

*Telephone Number (360) 739-4404*

Another number included in Mr. Woolfson's Exhibit 9 with 8 associated text messages is (360) 739-4404 (the "4404 Number"). When researching the number through a manual internet search, I found it to be associated with Six Pack Aero, an aviation services company in business since 2018.[85]

> **About**
>
> At Six Pack Aero, we are passionate about helping Cessna owners upgrade their aircraft and keep them flying for decades to come. We are an FAA certified Part 145 Repair Station offering a wide range of airframe and avionics upgrades for your aircraft.
>
> Repair Station # JANR618E
>
> **Contact Us**
>
> (360) 739-4404
>
> avionics@sixpackaero.com
>
> 2010 W Bakerview, Bellingham WA
>
> AEA
>
> Proud Member of the Aircraft Electronics Association

[84] See https://kandykanelearningcenter.com/emergency-response-plan/, accessed June 15, 2026.
[85] See https://sixpackaero.com/, accessed June 15, 2026.

**Opinion No. 4: The List Of Telephone Numbers Plaintiff's Expert Aaron Woolfson Identified In His Analysis Contains Telephone Numbers Registered To The NDNCR By Persons Other Than The Recipient Of The BBQGuys Text Message**

116. As a part of his analysis, Mr. Woolfson searched the RND to identify telephone numbers that had been permanently disconnected during the timeframe in which they were sent texts by Defendant. He does not explicitly state the purpose of this analysis and simply identifies telephone numbers that were both permanently disconnected at some unknown point that are also registered to the NDNCR.

117. If his use of this data is meant to identify whether the registrant to the NDNCR was the same individual in receipt of text messages, not only does he fail to apply any logic to do so, but the RND is not a sufficient mechanism for this determination due to its relatively recent creation date. The RND only has data from carriers indicating permanent disconnections dating back to 2021 whereas the NDNCR was established in 2003. If a telephone number was registered to the NDNCR in 2016, the RND would only indicate whether a permanent disconnection occurred during just over four of the nine years it has been registered. During the five years the number was registered to the NDNCR prior to the advent of the RND, that number could have been permanently disconnected and reassigned over 24 times.[86] This is significant because not only does the RND only have the capability of showing the most recent permanent disconnection during the period in which it has been active, but it is possible that there were numerous other owners of any given telephone number during the years in which the NDNCR has been active and the RND has not. This means that it is possible that the individual in receipt of potentially violative messages is not the individual that registered the telephone number to the NDNCR and there is no way of

[86] This is based on a conservative estimate of a reassignment every 75 days, considering the FCC's required 45-day holding period required of carriers following a permanent disconnection.

determining that without an individualized investigation during the years in which the RND did not exist.

118. Further, the difference between current owners of telephone lines and those who registered telephone numbers to the NDNCR is largely indeterminable, requiring extensive and highly manual individualized investigation.

119. Due to restrictions placed on the data that is available for searching as well as methods by which the data is maintained, third-party data vendors with access to NDNCR data can only provide the date a telephone number was *first* registered to the NDNCR. Per a May 2020 email from Ryan Thurman of Contact Center Compliance, a third-party data vendor providing such searching capabilities:

> The FTC only removes disconnected and reassigned numbers if their service provider that they hired deems them as such. ***In looking at the data over all these years, we don't see a lot of numbers that actually come off the DNC***, however there are some amounts that do you get delisted but it is up to the FTC to remove these numbers from the national DNC itself… Early on in the do not call list when numbers are set to expire after five years in ***the FTC then made the numbers permanent on the DNC*** (***emphasis added***).[87]

120. This means that if a telephone number was reassigned after the number was *first* placed on the NDNCR, there is often no mechanism to (a) determine if any additional NDNCR registrations occurred after the initial registration of a telephone number or (b) determine if a reassigned subscriber or user of a telephone number registered or attempted to register their telephone number to the NDNCR at all. This is especially pertinent to the examination of call and text message records in the context of establishing potential class claimants considering the FCC states that *millions* of numbers are reassigned every single year.[88]

---

[87] *See* email from Ryan Thurman attached as Exhibit 14.
[88] https://docs.fcc.gov/public/attachments/DOC-355526A1.pdf, attached as Exhibit 15.

121. As stated in Opinion 2, the declaration of Beth Sprague clearly states that the RND is made available to callers and "any agent acting on behalf of the caller… solely to determine whether a telephone number has been permanently disconnected since a date provided by the caller for the purpose of making lawful calls or sending lawful texts."[89] As such, it is my understanding that any analysis responsive to litigation *after* calls or text messages have already taken place may not have a permissible purpose and therefore I have not conducted an analysis to determine whether telephone numbers contained within my sample have been reported as permanently disconnected since the date on which they were registered to the NDNCR using RND data. Should the court determine that this is a permissible purpose, I reserve the right to supplement my findings with an analysis incorporating RND data.

**Opinion No. 5: Mr. Woolfson's Use of Restricted Number Portability Administration Center ("NPAC") Data For Litigation Purposes Is Likely Impermissible And The Court May Need To Determine If His Proposed Class Identification Process Is Violating NPAC Licensing Restrictions**

122. In his Declaration, Mr. Woolfson states that he has access to third-party data resources such as the National Do Not Call Registry and the Reassigned Number Database. As stated in Opinion Two, Mr. Woolfson may not have a permissible purpose for his use of RND data, and he has not mentioned nor provided the FCC waiver Somos representative Beth Sprague states is required to access the data. This is a consistent theme in Mr. Woolfson's application of third-party data sources in his analysis as I have observed his attempted use of iconectiv NPAC User Data, otherwise referred to was WDNC data, in numerous other cases where his use of this data has been challenged as an impermissible use and a licensing violation.

123. Although he does not explicitly state that he will rely on iconectiv WDNC data for his analysis in the body of his Declaration, he does state in his CV, appended as Exhibit 1 to his report,

[89] Declaration of Beth Sprague, ¶5.

that he is an authorized reseller of iconectiv WDNC data. Further, he has failed to produce any of the third-party data upon which he relied for his analysis, and he has failed to produce the scripts with which he performed this analysis, making it unverifiable whether he used it or not.

124. As explained above, to access and use NPAC User Data provided by iconectiv, the user must (1) have a PTRS certification and (2) have a permissible purpose to use this restricted data.[90]

125. The legality of Mr. Woolfson's proposed use of this data has been raised in numerous cases including matters where I have served as an expert witness or as the lead data analyst supporting another expert witness, including *Smith v. Examworks, LLC et al.* No. 8:21-cv-02746 (D. Md), *Bayles v. The Hertz Corporation,* No. 1:22-cv-01092 (S.D. Ind.) and *Perrong v. Victory Phones*, No. 2:20-cv-05317-GEKP (D. Pa.). The issue of Mr. Woolfson's use of the data in the *Smith v. Examworks* case remains unresolved, but an iconectiv representative was deposed in Fall of 2025 regarding this issue. The *Bayles v. The Hertz Corporation* and *Perrong v. Victory Phones* matters settled prior to any adjudication regarding this issue. I note that Mr. Woolfson had been a certified reseller prior to the deposition of the iconectiv representative in *Smith v. Examworks* but he now no longer appears to have that status as his company's name has been removed from the list of resellers on the iconectiv website and it is no longer mentioned on his company website. This appears to have occurred in March 2026. If Mr. Woolfson was removed as a reseller and advised by iconectiv that his use of that data is inappropriate, he has ignored that directive and proposes to use restricted data in violation of the directives of the data administrator.

126. In *Bayles v. The Hertz Corporation*, where I served as lead analyst, Mr. Woolfson attempted to use NPAC User Data sold to him by a third-party data vendor Tel-Lingua with the purpose of identifying class members. Mr. Woolfson did not, and as far as I know, has never had

[90] *See* https://numberportability.com/about/permitted-use, accessed on June 15, 2026.

a PTRS certification. When informed of this violation, Tel-Lingua CEO, Andrew Mangold, issued a letter suspending Mr. Woolfson's use of Tel-Lingua data on the day of his scheduled deposition. The suspension letter stated that Mr. Woolfson had accessed NPAC User Data without a PTRS certification.[91]

127. In addition to these three cases, on October 7, 2025, Defendants in *Anthony v. Federal Savings Bank, et al,* 2025 WL 2712172 (N.D. Ill), a matter where I am not involved, filed a Motion for Reconsideration (ECF 177) stating that Mr. Woolfson's use of the iconectiv data was impermissible and that they intended to file a motion to decertify the class based on Mr. Woolfson's use of this data.[92] Mr. Woolfson filed a Declaration in the *Federal Savings* case wherein he attempted to justify his use of this data.[93] In that Declaration he claims he has not and will not produce any of this data to third-parties, such as opposing experts, per the restrictions set forth in its use:[94]

> My use of the WDNC data does not entail any disclosure to third parties. My use is purely for internal use to match phone numbers to the line types (wireless or wireline) and to identify the OCN, from which I tag the relevant carriers of record for purposes of issuing subpoenas.

128. It is important to note that his proposed class identification methodology is dependent upon his use of data which he is legally prohibited from disclosing to defendants, a production which he claims he will not make. His determination of whether a telephone number that was contacted by a TCPA defendant is cellular means that number is potentially eligible under the TCPA for compensation, but this conclusion is not subject to authentication or verification because he is prohibited from producing the data upon which his conclusion is based to third parties. Without

---

[91] Copy of suspension letter attached as Exhibit 16.
[92] Declaration Of Plaintiff's Expert Aaron Woolfson In Support Of Plaintiff's Opposition To Defendants' Motion For Reconsideration, ¶14. A copy of this affidavit is attached as Exhibit 17.
[93] *See* Exhibit 17.
[94] Declaration Of Plaintiff's Expert Aaron Woolfson In Support Of Plaintiff's Opposition To Defendants' Motion For Reconsideration, ¶5.

the production of the underlying data upon which his class identification methodology relies, no opposing expert can examine his work and attempt to replicate it. Presumably the court and defendants must just take his word for it.

129. Notably, Mr. Woolfson's statement in this *Federal Savings* Declaration that he does not disclose this data to third parties is untrue. Mr. Woolfson produced this data to defendants in the *Victory Phones* case and I personally examined it. It was from this examination that I learned that he was using this restricted data. Margaret Daley, the expert in that case, discussed this issue at great length in her expert report, which was issued on June 3, 2022. This date is significant as Mr. Woolfson's *Federal Savings* Declaration claims that the first time that he learned of any objections to his use of this data was when a data vendor Tel-Lingua suspended him from using their data because of his lack of a PTRS certification. That suspension occurred on August 22, 2023, one year *after* Ms. Daley's expert report in *Victory Phones* was filed. This report included a detailed discussion of his use of this data and specifically stated that Mr. Woolfson's use of it appeared to be impermissible.

130. In his CV appended as an exhibit to his Declaration in this matter, Mr. Woolfson states that he is a reseller of this restricted iconectiv data.[95] That also appears to be untrue as neither the iconectiv website nor his own website currently identify him as a reseller. If he lost his reseller status after the date of this report, he has failed to amend his Declaration and advise the court that his Declaration is no longer accurate and that he no longer has access to the data which he states he may use to identify potential class members.

131. Mr. Woolfson's affidavit in the *Anthony v. Federal Savings Bank* matter appears to claim that he may use the restricted data for "compliance" purposes, which is a limited exception to the

---

[95] Exhibit 1 to the Declaration of Aaron Woolfson, p. 5.

restrictions. Mr. Woolfson is employed by Plaintiff's counsel and he makes no claim that he is using the data prior to making calls to ensure they are compliant with the TCPA, which I understand to be the purpose of the exception. Mr. Woolfson's apparent loss of his reseller status may provide an answer to this claim.

132. To be clear, I am not providing a legal opinion that Mr. Woolfson is violating the licensing restrictions of the NPAC data, as that must be determined by iconectiv and the Court. It is however my opinion that such a determination must be made prior to Mr. Woolfson using this data as it appears his reseller status is no longer active and that he may have been violating the iconectiv licensing restrictions he agreed to by inappropriately using protected consumer data, making his proposed class identification dependent on accessing data to which he has no right to use.

**Opinion No. 5: Mr. Woolfson Purports To Be Able To Accurately And Reliably Identify Putative Class Members, Yet He Historically Has Been Unable To Do So**

133. Mr. Woolfson spends over four pages of his report discussing past case work where he claims courts in prior cases have approved of his proposed methodologies and findings and certified classes of TCPA claimants.[96]

134. I have worked on over a dozen TCPA cases opposed to Mr. Woolfson during the last four years, and I have studied his expert reports and underlying analysis in depth. I have attended his deposition in one other matter and am aware of his standard analytical procedures with respect to

[96] Although Mr. Woolfson states in paragraph 9 to his declaration that he has been qualified by both Federal and State courts, he fails to disclose that he has been disqualified by at least two federal courts. In the Central District of California, a motion excluding Mr. Woolfson's testimony in *Dueker v. Crst Expedited Inc,* No. 2:18-cv-08751-MCS-FFM and class certification was denied. Mr. Woolfson's declaration was also stricken in the Eastern District of California in the matter *Rojas et al. v. Zaninovich, Inc., et al.,* No. 1:09-cv-00705 AWI JLT for providing inaccurate analysis and his willingness to offer conclusions about ultimate issues without adequate foundation. The court concluded that it lacked "any confidence in the reliability of his findings." Opinion excluding Mr. Woolfson's testimony in *Rojas et al. v. Zaninovich, Inc., et al.* at p. 15, attached as Exhibit 18.

his analysis of dialer data, NPAC, NDNCR, iconectiv data and other data he receives from third-party sources which he uses in his TCPA work.

135. Like this case, where Mr. Woolfson has made numerous analytical errors affecting over one million text message records, in every matter in which I have analyzed Mr. Woolfson's analytical work he has failed to produce with his report all of the data he used to conduct his analysis and that supports his findings. In some cases, as he has done here, he produces no scripts at all. In other matters he produces incomplete or inaccurate scripts making replication of his work impossible. I found that in at least one instance he manually altered raw data received from third-party sources because of his subjective (and incorrect) opinion although he reported that the data was accurate.

136. Analytical errors are a hallmark of Mr. Woolfson's work:

a) In *Rivera v. Cabela's*, Mr. Woolfson inaccurately identified the date on which Plaintiff's telephone number was registered to the NDNCR for thirty days or more, adding an additional two months of TCPA eligibility that did not exist.

b) In *Smith v. Examworks, LLC et al.*, his work was irreconcilable because he did not produce the data upon which he relied in his analysis and he failed to produce call data relating to over 20,000 calls he claimed may have violated the TCPA. Despite his failure to produce the relevant data, Mr. Woolfson did produce some scripting wherein more inconsistencies and errors were revealed. For example, his scripting indicated that he likely did not deduplicate the records correctly, erroneously eliminating numerous potentially violative call records from consideration. Mr. Woolfson also stated in this report that he was a certified reseller of the porting data upon which he relied, when he referenced this data in his scripting, the naming convention for that data referred to a vendor named "TelLingua."

As noted above, Mr. Woolfson was previously suspended from using this exact type of data from Tel-Lingua.[97] His expert report did not disclose that he was using data from Tel-Lingua.

c) In *Perrong v. Victory Phones*, No. 2:20-cv-0517 (E.D. Pa.), Mr. Woolfson manually altered data he received from a third-party data reseller based on his personal judgment, using a mass update to designate all numbers attributed to carriers of his choosing as VOIP lines. His written report failed to disclose this alteration. Research I conducted revealed his categorization was incorrect and the data he changed was accurate.

d) In another case, *Bayles v. Hertz*, No. 1:22-cv-01092-JRS-MKK (S.D. Ind.), Mr. Woolfson claimed to have developed an automated name matching methodology for identifying recipients of calls using PacificEast reverse lookup data. A thorough review of the data and scripts which he finally produced revealed that Mr. Woolfson had devised no such methodology and had, in fact, personally reviewed over 10,000 unique combinations of names and determined based on his own subjective opinion whether the names "matched." He failed to produce any complete workpapers or SQL scripts associated with any of these identifications and instead produced a class list that contained thousands of Hertz customers who could not have been class members.

137. As a result of this documented lack of analytical rigor, it is my opinion that any claims made by Mr. Woolfson that he can accurately or reliably identify potential class members in the present case are untrue.

[97] *See* Exhibit 16.

## IX. CONCLUSION

138. Based upon my findings set forth above, it is my opinion that there is no reliable method by which to identify the purported class members as defined by Plaintiff, absent an individualized, manual investigation of each BBQGuys customer file. My thorough examination of a statistically significant sample of 361 telephone numbers revealed that well documented indicia of consent and existing business relationships are present in the produced text message logs for **<u>100%</u>** of telephone numbers. Further, business associations exist for at least **<u>19.4%</u>** of telephone numbers.

Respectfully submitted,

______________________________

DATED: June 15, 2026