# Transcript of Andrew James Mcgonigle

**Date:** July 2, 2026
**Case:** McGonigle -v- Shopperschoice.com, LLC

**Planet Depos**
**Phone:** 888.433.3767
**Email:** clientservices@planetdepos.com
**planetdepos.com**
**Michigan #8598 | Nevada #089F | New Mexico #566**

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA
- - - - - - - - - - - - - -
ANDREW JAMES MCGONIGLE, :
on behalf of himself :
and others similarly :
situated, :
:
Plaintiff, :
:
vs : CIVIL ACTION NO.
: 3:25-cv-00152-SDD-RLB
ShoppersChoice.com, :
L.L.C. d/b/a BBQGuys.com, :
:
Defendant. :
- - - - - - - - - - - - - -
Deposition of ANDREW JAMES MCGONIGLE
Thursday, July 2, 2026
10:07 a.m.

Job No.: 637697
Pages: 1-188
Recorded by: Steven Barry



Deposition of ANDREW JAMES MCGONIGLE, held pursuant to agreement, before Steven Barry, Notary Public in and for the District of Columbia.

A P P E A R A N C E S

ON BEHALF OF PLAINTIFF:
DANA OLIVER, ESQUIRE
OLIVER LAW CENTER, INC.
8780 19th Street, #559
Rancho Cucamonga, California 91701
(855) 384-3262

ON BEHALF OF DEFENDANT:
JESSICA C. ENGLER, ESQUIRE
KEAN MILLER, LLP
Two City Plaza
400 Convention Center, Suite 700
Baton Rouge, Louisiana 70802
(225) 387-0999



C O N T E N T S


| EXAMINATION OF ANDREW JAMES MCGONIGLE: | PAGE |
|---|---|
| By Ms. Engler | 5 |


E X H I B I T S

(Attached to the Transcript.)


| | | |
|---|---|---|
| No. 1 | (Prior Transcript of Plaintiff) | 11 |
| No. 2 | (First Facebook Profile Page) | 52 |
| No. 3 | (Second Facebook Profile Page) | 54 |
| No. 4 | (Facebook Profile Page Packet) | 54 |
| No. 5 | (First Instagram Profile Page) | 56 |
| No. 6 | (Second Instagram Profile Page) | 58 |
| No. 7 | (Third Instagram Profile Page) | 58 |
| No. 8 | (Fourth Instagram Profile Page) | 60 |
| No. 9 | (Responses to Interrogatories) | 63 |
| No. 10 | (Verizon Phone Bill) | 67 |
| No. 11 | (Do Not Call Confirmation E-mail) | 80 |
| No. 12 | (Class Action Authorization Document) | 86 |
| No. 13 | (BBQGuys Text Messages) | 102 |
| No. 14 | (Amended Responses to Interrogatories) | 118 |




P R O C E E D I N G S

THE REPORTER: And before we proceed would counsel please state your appearances for the record including whom you represent?
MR. OLIVER: Yes. Dana Oliver with Oliver Law Center representing the plaintiff, Andrew McGonigle.
MS. ENGLER: And Jessica Engler of Kean Miller here on behalf of ShoppersChoice.com, LLC doing business as BBQGuys.com.
THE REPORTER: And will the witness please state their full legal name for the record?
THE WITNESS: Andrew James McGonigle.
THE REPORTER: And to spell your name it is A-N-D-R-E-Y?
THE WITNESS: No. There's a W instead of a Y.
THE REPORTER: I'm sorry. That's right, I'm sorry. So just to confirm again, I'm sorry, it is A-N-D-R-E-W?
THE WITNESS: Correct.
THE REPORTER: And the middle name is J-A-M-E-S, last name is M-C capital G-O-N-I-G-L-E?
THE WITNESS: Yes, that's correct.
THE REPORTER: All right. Please raise

5

your right hand. Do you solemnly swear or affirm under the penalties of perjury that the testimony you shall give will be the truth, the whole truth, and nothing but the truth?

THE WITNESS: I do.

EXAMINATION BY COUNSEL ON BEHALF OF THE DEFENDANT

BY MS. ENGLER:

Q All right. Well, good morning. Could you go ahead and state your full name again for the record?

**A Andrew James McGonigle.**

Q Have you ever been known by any other name?

**A No.**

Q Any nicknames?

**A No.**

Q Okay. And as, you know, we just stated just a few minutes ago my name is Jessica. I'm here on behalf of ShoppersChoice.com doing business as BBQGuys. I'm probably going to for the most part refer to them as BBQGuys. Does that work for you during the depo?

**A That's fine.**

Q Perfect. Have you ever been deposed before?

6

**A I have.**

Q Okay. So some of this is going to be very familiar to you, but we're just going to kind of go over some of the just best practices before we get started to help ensure that the day goes smoothly and that we get a clean record.

So first of course is to, you know, answer verbally, not nods or head turns or anything just to make sure that we get your answer on the record and so that the court reporter can hear it. I'm also going to ask that you wait until I finish a question before you respond. Again this is for the benefit of the court reporter.

During the day I'm probably going to ask a bad question at some point or a question that's confusing, so if there's something where you don't understand what I asked you please just let me know and I'll restate it or withdraw it and try to find another way to phrase it so that it's clearer.

Can we make an agreement, though, that if you go ahead and give an answer you understood the question?

**A Yes.**

7

Q Okay. At some point during the day I'm sure your lawyer is going to have some objections. Unless it is something where he specifically instructs you not to respond such as in the question of attorney/client privilege, I'm going to ask that you please respond and provide the answer unless of course your attorney instructs you not to and then we'll deal with those as they come.

You're in control here. If you need a break just say so and we can take a break. I mean, it's hot. It's really hot and so I'm sure we're all pounding water these days to make sure we're all staying cool. Nobody needs to be a hero but if we need, you know, water, water break, need a break, you know, just let me know.

I'm going to try and take one about every hour, though, so you'll have some regularly paced. The only thing is that if, you know, you want to take a break and there's a question on the table I ask that you just respond to it before we take the break and then we can of course go.

If you have any concerns about confidentiality or whether you can provide an answer and you need to consult with your attorney

8

just please let me know. Generally if you need to consult with your attorney I'm going to ask that you answer the question that's on the table first before you break and consult unless it's of course a question of privilege or confidentiality.

Today you're answering questions under oath just like before a judge, and so just to confirm you understand that it's very important to provide truthful and accurate testimony today?

**A Yes.**

Q Okay. There may be times where I ask you a question and you may not have a full answer but you have a partial answer that you can provide. I'm entitled to whatever information you do have even if it's not a complete answer, so I ask that please if you need to qualify your answer you please do so but still answer the question. Is there any reason why you can't give testimony today?

**A No.**

Q There's no medication or anything that could cause a problem with memory or being able to provide testimony?

**A No.**

Q Okay. Cool. Now, you said you had

9

been deposed before. When was that?
**A I don't remember an exact date. The only thing I know, it was back in May.**
Q Back in May. Do you recall what case it was in connection with?
**A Office Depot.**
Q Office Depot. Okay. So you gave a deposition in Office Depot?
**A Yes.**
Q Okay. Is that the only deposition you've ever done?
**A No.**
Q How many other depositions have you done?
**A There was one for Value City Furniture.**
Q Okay. Any others?
**A Other than this one, no.**
Q Okay. Do you know why you were deposed for the Office Depot matter?
**A I don't recall exactly why I was deposed.**
Q Was it in connection also with a Telephone Consumer Protection Act case?
**A Yes, it was under the same terms, yeah.**
Q Okay. And that was also relating to

10

text messages?
**A Yes.**
Q Okay. Do you recall who the attorney was that deposed you?
**A I don't remember her full name offhand.**
Q Do you remember her first or last name?
**A I think it was -- like I said I don't want to guess, but from the best of my recollection I think it may have been Eve for the first name --**
Q Okay.
**A -- but I don't a hundred percent recall. I would have to look back in the records.**
Q Okay. And for Value City do you recall why you were deposed in that matter?
**A I -- it was a TCPA violation.**
Q Okay. And you were a plaintiff?
**A Yes.**
Q Okay. Do you recall the attorney that deposed you for that?
**A I remember -- yes, that was Brian** Callaveri (phonetic).
Q Brian Callaveri?
**A Yes. I don't remember how to spell his last name or first name.**

11

Q I wouldn't know how to guess it either, Callaveri. Okay. Any other depositions that you can recall?
**A No.**
Q Okay. Let me go ahead and just provide you with that which we're going to mark as Exhibit 1. Do you recall receiving a copy of this deposition transcript?
THE REPORTER: I'm sorry. Do you want to mark it?
MS. ENGLER: Yeah, we'll mark it as Exhibit 1, but yeah, we'll mark his copy.
(Whereupon, Deposition Exhibit Number 1 was marked for identification.)
THE WITNESS: I recall getting a paper copy. I didn't really, you know, look through it or anything.
BY MS. ENGLER:
Q Okay. So you didn't read it afterwards?
**A No.**
Q Okay. That's all we're going to do with that one for now. Did you do anything to prepare for your deposition today?
**A I had spoke with my attorney.**

12

Q Okay. Was that Mr. Oliver?
**A Yes.**
Q Okay. Did you speak with any of your other counsel?
**A No.**
Q Okay. Did you do -- did you review over any documents?
**A Yes, I believe we did, from the best of my recollection.**
Q Were these documents that your attorney gave -- identified that you should review or did you identify them on your own?
**A Something that he identified I should review.**
Q Okay. So other than documents that your attorney told you to review you didn't review any documents?
**A No.**
Q Okay. Did you discuss your deposition with anyone other than Mr. Oliver?
**A The only other person I may have spoken to was my girlfriend that drove me here, and the only thing I told her was I have a deposition in Washington, D.C. that I have to be at.**
Q Okay. That was nice of her to drive

you.
**A Yeah.**
Q I hope she has something fun to do while you're here.
**A Yeah.**
Q Are ya'll going to go to the fair afterwards?
**A No, I've got some business I've got to handle back in town, so I'll probably go deal with that.**
Q What kind of business?
**A I got to get some wood to fix a dock and, you know, fix a few things.**
Q Okay. Is that like a -- so is this kind of like a business that you own or you're a sole proprietor of?
**A No, it's just somewhere I've been given permission to do fishing at, and as a conservationist I try to take care of things if I mess them up, you know, out of respect for the property owner.**
Q Okay. So it's kind of like a quid pro quo. He allows you to fish on the property, in exchange you help him with fixing his dock?
**A Yeah.**



Q Okay. Does he know that you were coming for a deposition today?
**A No.**
Q Okay. Have you done anything like googling online about preparing for depositions --
**A No.**
Q -- anything like that? Okay. Now, when you were deposed for Value City did you do any kind of preparation before that deposition?
**A I do believe that I had spoken to Dana on the phone prior to that deposition and we had kind of prepared from the best of my recollection.**
Q And what about before the Office Depot deposition, did you do any preparation for that one?
**A Yes, we had spoken on the phone and Eve helped me kind of prepare.**
Q Okay. Is there anything that you did to prepare for Value City or Office Depot that is different than what you did to prepare for today?
**A From the best of my recollection I don't recall anything different that wasn't done as standardly done.**
Q What do you mean done as standardly done?



**A Well, however they normally do it, you know, like providing documents and kind of telling me, you know, what to remember to the best of my knowledge.**
Q Uh-huh.
**A Yeah.**
MR. OLIVER: I just want to --
THE WITNESS: They had been --
MS. ENGLER: Hold on a second.
MR. OLIVER: Just try to not get into any content of our conversations. So she's wanting to know, you know, your standard way of preparing is based on what you did, not based on what we told you to do, so if there's documents you looked at she wants to know is there anything unusual from one case to the next.
She's just comparing them, so yeah, if it's something you're thinking about communication we don't want to go ahead and get into that. That's not what she's asking.
BY MS. ENGLER:
Q Yeah, I'm not asking what your attorneys told you or asking you to identify documents that were specifically called out by your attorneys. I'm just wanting to know if you



did anything different for today than what you did for your prior depositions?
**A I don't believe there was anything done differently --**
Q Okay.
**A -- from the best of my recollection.**
Q Okay. How old are you?
**A I'm 30 years old I want to say.**
Q When is your birthday then?
**A In '96.**
Q Have you ever been married?
**A No.**
Q Okay. Any children?
**A I have a daughter.**
Q Okay. How old is your daughter?
**A Going on almost a year.**
Q Oh, wow. Congratulations. The first year is always the toughest so -- that's when the first birthday parties are more of a party for the parents.
**A Uh-huh.**
Q And you said you had a girlfriend. What's her name?
**A Carrie McCray.**
Q Okay. What is your current address?

17

**A 660 North Church Lane. That's the current mailing address I use.**
Q Do you live somewhere other than where your mailing address is?
**A Okay. So my current address would be 3166 Desha Road.**
Q You're going to have to spell that one for me.
**A D-E-S-H-A Road, Tappahannock, Virginia.**
Q And the Church Lane is also in Tappahannock?
**A Yes.**
Q Okay. So just to make sure I have it clear the 660 North Church Lane is your mailing address, but your residential address is 3166 Desha Road?
**A Yes.**
Q Okay. And how long have you lived at 3166 Desha Road?
**A Since like last May.**
Q So May of '25?
**A I couldn't give you an exact date because I don't recall off the top of my head.**
Q Where did you live before that?
**A 660 North Church Lane.**

18

Q Is it a friend or a family member that currently lives there now?
**A I had a roommate there. There's a new person that moved in there. I don't know the people.**
Q Does anyone live with you at 3166 Desha Road?
**A Yes.**
Q Who?
**A Benjamin Gathercole.**
Q Can you spell that last name for me?
**A G-A-T-H-E-R-C-O-L-E.**
Q Okay. Anyone else?
**A No.**
Q Okay. And who's at 660 North Church Lane?
**A Well, now there's different people there.**
Q Now there's different people. I figured that you may know them since you're using it as a mailing address.
**A Well, my girlfriend's mom -- there's two apartments there.**
Q Okay.
**A My girlfriend's mom lives in one of**

19

**them.**
Q Ah, I see.
**A When I had resided there there was a different person living there I was a roommate with at the apartment behind them.**
Q Okay. I see. And when you lived at 660 North Church Lane did you have a roommate?
**A Yes.**
Q Who was that?
**A Tyler Vires.**
Q Okay. And when did you move into 660 North Church Lane?
**A I want to say sometime in late July or sometime in August. I don't remember the exact month --**
Q Okay.
**A -- in the year of 2024.**
Q Okay. Where did you live before the North Church Lane address?
**A I was down in Florida at the time and I had lived in Interlachen at 260 Oakcrest Drive.**
Q And do you recall when you moved into that address in Florida?
**A I don't remember off the top of my head the exact date.**

20

Q That's okay. Do you think you were maybe living there for a year or two years, six months?
**A Probably a couple of months.**
Q A couple of months?
**A I don't know how many months right offhand.**
Q Okay. So not a full year?
**A No.**
Q Do you recall where you lived before the 260 Oakcrest Drive?
**A Before then I was kind of working on the road traveling with a carnival.**
Q Okay. How long were you working for the carnival?
**A A few months.**
Q So before you started working for the carnival where did you reside?
**A I was in Lake Mary, Florida.**
Q Do you recall the address?
**A I don't -- I know the name of the road but I don't remember the actual house number.**
Q That's fine. What's the name of the road?
**A West Charring Cross Circle.**

Q Is that C-H-A-R Circle?
**A No, I think there were two Rs.**
Q Okay. Do you recall how long you lived there?
**A It was like a few months. It wasn't very long.**
Q How about before West Charring Circle?
**A I don't remember.**
Q Do you remember any other prior addresses that you had?
**A Not off the top of my head, no. I've been so many places it's hard to recall.**
Q Understandable. I remember those days as well with the moving around a bunch. Do you currently have a landline at 3166 Desha Road?
**A No.**
Q Do you only use your cell phone?
**A Yes.**
Q Does your roommate Mr. Gathercole have a cell phone?
**A Yes.**
Q Do you ever allow him to use your cell phone?
**A Huh-uh.**
Q Do you ever allow your girlfriend to



use your cell phone?
**A If she needs to, yeah, I would allow her to use it. I don't --**
Q At 660 North Church Lane did you have a landline?
**A No.**
Q I forgot to ask about that. At 3166 Desha Road did you have internet, or do you have internet?
**A I do not have internet. My roommate does.**
Q Okay. So he won't share the Wi-Fi password?
**A He has. I just only use it if I need it, I mean.**
Q You primary access the internet on your phone through a data plan?
**A Yeah.**
Q Okay. Do you keep a passcode on your phone?
**A I do.**
Q Does your girlfriend have the passcode?
**A No.**
Q Okay. So if she wants to use your phone she has to bring the phone to you for you to



enter the passcode for her to then use it?
**A Yes.**
Q At 660 North Church Lane did you have internet?
**A Huh-uh.**
Q How about when you were in Interlachen at Oakcrest Drive did you have internet?
**A Yes.**
Q Do you recall if it was a -- like what kind of -- who it was through, like --
**A I don't remember who they had internet through off the top of my head.**
Q Did you have a landline at 260 Oakcrest Drive?
**A No.**
Q How about when you were in Lake Mary, Florida, did you have a landline?
**A No.**
Q And was there internet there in Lake Mary?
**A No.**
MR. OLIVER: By the way, if you could project a little bit louder he'd probably appreciate it.
THE WITNESS: All right.



MR. OLIVER: I would, too.
BY MS. ENGLER:
Q Did you attend high school?
**A Yes.**
Q Did you graduate?
**A Yes.**
Q Where did you graduate from?
**A Belleview High School.**
Q When did you graduate?
**A In the year of 2015.**
Q Did you attend college?
**A No.**
Q Any trade school?
**A I did go to a welding school in Newport News at their shipyard at one point.**
Q Did you say Newport News?
**A Yes.**
Q Where is that located?
**A It's within their shipyard. They're a defense contractor. I had gone down there and did some welding training. I don't remember the actual address off the top of my head.**
Q Is it in Virginia?
**A Yes.**
Q Oh, okay. Do you recall when you did

25

those classes?
**A Sometime back around like February, March-ish.**
Q Of this year?
**A Yes, yes, this year.**
Q Okay. So February, March, 2026. Why did you -- so actually scratch that. Did you complete any kind of certification program or do you have any kind of designations?
**A I didn't make it through any of that.**
Q Okay. Is -- you said you didn't make it through. Was it just that you chose to, you know, not complete or was there other reasons?
**A There were other reasons, but I just didn't --**
Q What were those reasons?
**A My instructor really wasn't taking the time to teach me the way he should have been.**
Q Are you currently employed?
**A Yes.**
Q Where are you employed?
**A Boschen Masonry.**
Q Can you spell that first word for me?
**A B-O-S-C-H-E-N.**
Q And what do you do at Boschen Masonry?

26

**A I'm a laborer.**
Q What kind of work would that entail?
**A Picking up block, moving it, putting mud in pans for the brick masons, moving pans around.**
Q Okay. So you do work that supports like the brick masons?
**A Yeah, cutting block with a saw.**
Q How long have you been working for Boschen Masonry?
**A Since last Monday to Wednesday.**
Q Okay. So this is a new position?
**A Yeah.**
Q Do you recall -- do you know what their address is?
**A Not off the top of my head I don't.**
Q Who is your direct supervisor?
**A I don't even remember their names because I'm new at it.**
Q Yeah, you're so new you're still learning everyone?
**A I'm still trying to figure everybody out I have to.**
Q How many hours a week are you expected to work?

27

**A Depending on the weather typically, you know, a regular Monday through Friday, a 40-hour week unless it rains or something.**
Q And what is your -- are you salary or is it an hourly rate?
**A Hourly.**
Q Okay. And what's the pay rate?
**A I don't actually know the pay rate. The only thing I know that he told me was that he was starting me right around 18 an hour, around 18 so that could be anywhere from 17 to 18.**
Q How did you find out about this job?
**A I found out through a friend of mine.**
Q Before Boschen Masonry were you employed anywhere else?
**A Yes, at the shipyard that I had told you about with the welding school.**
Q Okay. So you were working at the shipyard while you were also attending the welding school?
**A Well, I was being paid to attend the welding school. They give you paid training.**
Q Okay. So were you working at the same time as attending the welding school or was your job just to go to the welding school?

28

**A My job was to go to the welding school and receive classroom instructions as well as physical training.**
Q Okay. And was that training with the expectation that you would then be working at the shipyard afterwards?
**A Yes.**
Q Okay. Did you have to, you know -- were you penalized in any particular way for not finishing the program?
**A No, I mean, I wasn't penalized in any kind of way. It's just --**
Q Okay. So they didn't make you like pay for the classes or something that you attended?
**A Huh-uh.**
Q Okay. So you had said that you were doing those classes around February or March of '26. Were you employed before that date somewhere else?
**A I was doing some baby-sitting.**
Q Okay. And how long were you doing baby-sitting?
**A Saturday to Wednesday.**
Q And was it just for one person or were their multiple children you were caring for?

29

**A One person.**
Q One person?
**A Yeah.**
Q Who was that person?
**A I was also taking care of my girlfriend's mom at the time.**
Q So -- okay. So you're taking care of your girlfriend's mom, but you said you were also doing baby-sitting for one person?
**A Yeah.**
Q Who were you doing the baby-sitting for?
**A My girlfriend.**
Q Oh, your girlfriend. Okay. And that's not your daughter, that's another child that you were looking after?
**A No, that's our daughter.**
Q Okay. Are you still taking care of your girlfriend's mom?
**A No, not that I'm back to work now. No, I had to leave that.**
Q What kind of care did your girlfriend's mom need?
**A Just kind of help sweeping around the house, taking the trash out, little things here and there.**

30

Q Okay. And were you paid for this work?
**A Yes.**
Q Okay. What was your rate?
**A Like 500 every two weeks, anywhere from 4 to 500 every two weeks.**
Q Were you on a regular schedule or would they call you as they needed you?
**A Just kind of as they needed me.**
Q And how would they get in contact with you in order to ask you to help?
**A They would call my phone number.**
Q And how long were you doing this baby-sitting?
**A You know, I don't recall when it all started. I would have to look back in the records to give you a definite answer.**
Q Okay. Before doing the baby-sitting or in conjunction with it did you have any other jobs?
**A Yes.**
Q What were you doing?
**A I worked at Tappahannock/Essex County Animal Shelter.**
Q And what was your position at the animal shelter?

31

**A Animal care technician.**
Q What's that involve?
**A Taking dogs out, letting them run, use the bathroom, feeding and watering them.**
Q Okay. And who was your direct supervisor?
**A Ellen Shifflett.**
Q And how long were you working at the animal shelter?
**A I started on September 13th of 2024 and I was fired on October 15th of 2024 --**
Q I'm sorry to hear that.
**A -- because my schedule was changed without being notified, or October 15th of 2025. Let me --**
Q Of 2025, okay. Got it.
**A Let me correct that.**
Q So they fired you because of the schedule change?
**A Yeah, she never notified me that she changed the schedule because I took a picture of it every week.**
Q Uh-huh. So was it that she changed the schedule without you knowing, and so because of that you didn't come to work?

32

**A Well, I came to work but I didn't work the hours she changed it to.**
Q Oh, I see.
**A I was only originally scheduled four hours that day until she changed it without notifying me.**
Q And during that time between September 13th, 2024 and October 15th, 2025 did you have any other jobs you were doing, secondary employment?
**A Not that I can recall from my records.**
Q Do you recall what your rate was at the animal shelter?
**A It was like 12 something. I don't remember the exact number, you know, from the best of my recollection.**
Q And how many hours a week did you typically work?
**A I know it was under 40 -- I don't remember an average of exactly how many -- from the best of my recollection.**
Q Now, that would have been -- September 2024, from your prior testimony that would have been a couple of months after you moved to Virginia where you got that job. Did you have any

33

other jobs in Virginia?
**A Well, I did work at Advance Auto Parts.**
Q Advance Auto Parts. And when were you working at Advance Auto Parts?
**A I don't remember the exact hire date or any of the specific details.**
Q Do you know like a particular season, a year?
**A I want to say it was during the fall --**
Q Okay.
**A -- possibly from the best of my, you know, recollection.**
Q In 2024?
**A Yes.**
Q And how long were you working at Advance Auto Parts?
**A I don't remember exactly how long.**
Q Do you recall what your pay rate was?
**A Not off the top of my head, I don't recall.**
Q Do you have a particular range?
**A It was probably somewhere in between 10 to 15 dollars an hour. I don't know an exact number, you know, off the top of my head.**
Q Understood. And why did you stop

34

working at Advance Auto Parts?
**A I just couldn't get the hours I needed.**
Q So when you're not working what do you like to do for fun?
**A I go hunting. I shoot guns. I fish.**
Q How long have you hunted?
**A Since I was probably nine years old.**
Q Who got you into it?
**A My grandpa.**
Q Your grandpa?
**A Yeah.**
Q That's cool. Was he -- was it in Virginia or in Florida?
**A Virginia.**
Q Virginia. So are you originally from Virginia?
**A No.**
Q Where are you originally from?
**A Surprise -- not Surprise, but Sierra Vista, Arizona.**
Q Okay. Do you have to maintain a license in order to hunt in Virginia?
**A You do.**
Q Okay. Do you have a license?
**A I do.**

35

Q Okay. Have you ever been penalized for failure to maintain a license?
**A I did get cited once for not having a fishing license.**
Q I'm from New Orleans. It happens. Lots of fishing down there and lots of people. It happens. How often do you hunt?
**A Usually archery to muzzleloading in gun season if I have days off or whatnot.**
Q Which do you prefer, the early archery, gun season, rut?
**A I kind of like muzzleloader season because of deer, chasing does and bucks.**
Q So you're a pursuer versus just sit in the blind?
**A Well, no, I kind of just sit and wait. I don't like to make too much noise or spook anything.**
Q That makes a lot of sense. How was last season?
**A I didn't really -- didn't have too much luck.**
Q Oh, that's a bummer. Do you mostly hunt on like public land or like the friend you mentioned with the fishing dock, other people's

36

property?
**A I've hunt his property.**
Q Okay. Is there a particular -- so you mentioned shooting guns. What kind of rifle do you like to use for hunting?
**A I usually use a shotgun for hunting, but --**
Q What kind?
**A Remington 870 pump action 12-gauge.**
Q Nice. Nice. How often do you go hunting during the season like on a monthly or a weekly basis?
**A Normally two days a week.**
Q Two days a week. Okay. I know you didn't have much luck last season and hopefully better luck this season but, you know, typically how much do you find yourself bringing home?
**A Two or three a year if I do bag anything.**
Q Is it just -- so do you process in the field or do you have somebody else do it?
**A I do it myself.**
Q Very nice. Very nice. So what do you do with the meat when you process it?
**A Freeze it.**

Q Freeze it. Are you the cook or does your girlfriend like to cook?
**A She'll cook stuff like that but I normally just kind of cook it.**
Q Okay. What do you like to make?
**A Barbecue, jambalaya, hamburger.**
Q Okay.
**A Sausage.**
Q Uh-huh. Do you take trophies or is it just meat?
**A Meat.**
Q So you mentioned sausage and jambalaya, you're speaking my language of course from New Orleans, and also doing barbecue. You know, what do you do with the barbecue, like how do you make it?
**A I just put it in the crockpot with some beer and seasoning and the beer tenderizes the beef and just cook it down and add a little bit of -- I make like a Carolina style.**
Q Oh, nice. Do you ever do any grilling?
**A Sometimes.**
Q Sometimes?
**A Yeah.**
Q It's just not your preferred way?



**A No.**
Q Do you own a grill?
**A No.**
Q Do you ever sell any of the meat to others?
**A No, legally you can't sell --**
Q Oh.
**A -- game meat I don't think. I don't think you can.**
Q Okay.
**A So I don't try to get mixed up into any trouble.**
Q That makes a lot of sense, yeah. So it's just the stuff that you do and save for your family?
**A Yeah.**
Q And fishing, is there a particular type of fish you like to go after?
**A I kind of just go after whatever bites.**
Q What bites well around here?
**A Catfish, sometimes I'll get croaker, bass, I've caught a few gar.**
Q Anything else?
**A Bowfin.**
Q Okay. And what do you do with those?



**A Bowfin I just throw back.**
Q Uh-huh.
**A They say you're supposed to kill them because they're invasive, but I don't.**
Q Uh-huh.
**A I don't see no sense in killing them. I don't know how they're invasive.**
Q Could you speak up a little bit, I'm sorry?
**A They say you're supposed to kill them because they're invasive, but I just throw them back because they're fun to catch.**
Q Uh-huh. Yeah, it's tarpon down where I am, the ones that are fun to catch and throw back. Do you cook them or give them away?
**A No, not them.**
Q Well, just any of the fish that you catch.
**A Oh. The catfish sometimes I'll soak in a brine and I'll fry them up.**
Q Uh-huh. Any grilling or barbecuing of those?
**A No.**
Q Now, for the -- we were talking a little bit earlier about your employment for



Boschen Masonry. Do you know if you're an employee or you're considered a contractor?
**A Just an employee.**
Q Okay. So like you'll get a W-2 once tax season --
**A Yes.**
Q Okay. Okay. Is there any other work that you've done in the past, let's see -- since 2023 that we haven't talked about today?
**A Not that I can a hundred percent recall. I mean, there may have been but I just don't remember anything that far back.**
Q Have you ever done any gig work?
**A I mean, I may have done a few here and there but I don't -- it's hard to remember everything.**
Q Uh-huh. Did you ever do any Uber or Lyft?
**A No.**
Q I know we talked about your girlfriend, but who else would you say you spend time with most frequently?
**A I mean, other than her it's usually either her or my daughter, you know, whenever I got time, whenever I'm not working it's --**

41

Q Uh-huh. And then I think we also talked about your roommate. Do you talk to him or is it just kind of a live-in situation?
**A Normally I'll talk to him, but here lately when I get off work it's so hot that I just -- you know, I'll go and I'll have a shower and go to bed, you know, eat something and go to bed. I don't really -- I guess I'm not really feeling like talking or being too social with him, I don't know.**
Q Uh-huh, yeah, especially with this heat. Any friends or family of your girlfriend that you spend time with? Back in my day with my space we would call it who's your top eight of the people that you talk to most frequently.
**A Sometimes I'll be around my girlfriend's mom like if -- and I'll ride with them if she has to take her to therapy or something, but other than that --**
Q Have you told your roommate about this litigation?
**A No, I have not.**
Q How about the prior roommate, Tyler Vires I believe you said it was, did you tell him about this litigation?

42

**A I didn't tell him that I had any lawsuits coming. I did tell him that I had found out about the TCPA and had contacted an attorney and that was kind of as far as that went.**
Q So you told him you found out about the TCPA?
**A Yes.**
Q What did you tell him about what you had found out?
**A That it's 500 for text and I think like 1500 for calls per willful violation.**
Q Okay. Do you recall where you found out about the TCPA from?
**A I had looked it up on Google to try to see if it was legit because I -- I tried to get it from a valuable source. I don't remember the source that it exactly came from because I don't depend on AI to kind of -- they can steer you in the wrong direction from my experience.**
Q Oh, of course. Of course. But -- so there was -- so you heard about the TCPA from someone or was it a person, did you see an ad?
**A I think I just searched is this legal and I don't remember what exactly I searched, but --**

43

Q Okay. I mean, TCPA, it's kind of an interesting thing to search on its own. Was there something where you just heard about there's a law against, you know, things with telephone solicitations and you searched for what that was?
**A I don't remember like the context of exactly what I searched, but I know I searched something about whether it was legal or not for any company to text you without your consent. It was something I had searched. I don't remember -- like I said recollect exactly in terms of what I said, what it was, but I --**
Q Okay. So you don't remember exactly like what it was that you searched?
**A I do not.**
Q But you did search before you contacted an attorney; is that right?
**A Yes.**
Q Do you delete your internet search history?
**A Not normally, no. I mean, I may have, I may not. I don't recall whether I have or not.**
Q Okay. So if the -- you don't delete your internet search history and we requested your search history you would be able to provide it to

44

us concerning the TCPA?
**A Yeah, that's fine.**
Q Okay.
MR. OLIVER: I'm going to object to the form of the question, but just as a late objection. I just want it there.
MS. ENGLER: Okay. Understood.
BY MS. ENGLER:
Q Okay. Did you contact more than one attorney? Once you learned that it was -- you googled it and learned it was legit did you contact more than one?
**A I believe I may have, but I can't a hundred percent recollect how many I did contact or if it was more than one or not.**
Q Okay. When you were talking to your roommate and told him you found out about this what -- do you recall what your roommate said about it or if he had any commentary?
**A He told me that he thought it was a scam or it wasn't legit.**
Q Do you know if he further looked into it or did his own web searching?
**A I do not know whether he looked anything up or tried to find anything out about it**

45

**or not.**
Q Okay. Have you told your girlfriend about the TCPA?
**A I've told her the general basis of what it covers, yes.**
Q Does she know -- well, obviously she knows about this litigation, but does she know about the other litigations you've filed?
**A I don't go into full detail about anything that I feel may be privileged --**
Q Understood.
**A -- you know.**
Q Have you talked to your girlfriend's mom about this litigation or the TCPA?
**A I've told her about the TCPA, but I haven't went into any full scale detail of what I have, you know, going on casewise --**
Q Uh-huh.
**A -- in reference to that.**
Q Is there anybody else that you've told about the TCPA?
**A I may have told a few family members that it's a law, you know.**
Q Uh-huh.
**A Other than that I haven't gone into**

46

**full scale detail on anything that I can recall.**
Q Any coworkers?
**A Not that I can recall off the top of my head. I may have and I may not have.**
Q What was your girlfriend's -- did your girlfriend have any commentary when you told her about the TCPA?
**A She told me if you think that it's a legitimate thing then pursue it.**
Q Okay. Has your girlfriend considered filing her own TCPA case lawsuits?
**A She doesn't really have time, so no.**
Q How about your girlfriend's mom?
**A No.**
Q Have you encouraged anyone else to go and explore doing TCPA lawsuits?
**A My dad in Arizona was having a lot of those unsolicited calls or text messages or something of that sort. I don't know whether they were calls or text messages but he was getting something, and I did tell him to maybe look into finding an attorney that practiced in that general area.**
Q What's your dad's name?
**A James McGonigle.**

47

Q Do you know if your dad did end up talking to an attorney?
**A I do not know if he went forward a hundred percent or not.**
Q For when you talk to your girlfriend and your girlfriend's mom is it typically over the phone or in person?
**A I normally just have a phone conversation in person most of the time.**
Q How often would you say you talk to your girlfriend?
**A Every day.**
Q Good man. How about your girlfriend's mom?
**A Once a week not but every week, roughly.**
Q Is there anyone else that you call regularly?
**A Not regularly, no. I mean --**
Q Not your dad or anything like that?
**A No.**
MS. ENGLER: Okay. It's been about an hour, so do you want to go ahead and take a break?
MR. OLIVER: Sure, that's fine with me.
(Whereupon, a brief recess was taken in

48

the proceedings.)
THE REPORTER: We are back on the record.
BY MS. ENGLER:
Q Okay. Okay. Mr. McGonigle, before we took that break we were talking a bit about how you became aware of the TCPA and some of the Google searches you were doing and you don't recall exactly what you searched; was that right?
**A I don't remember exactly what I had typed in or searched.**
Q Uh-huh.
**A From the best of my memory all I know is I had done a little research to find out about the TCPA.**
Q And it was only on the internet or did you look elsewhere?
**A Only on the internet.**
Q Do you recall what the sites were that you looked at?
**A I do not.**
Q Does TCPAWorld.com ring a bell?
**A I don't recall --**
Q Okay.
**A -- going on that site. You know, maybe**

49

**at some point I may or may not have, but I -- from the best of my recollection I don't recall. I'd have to look back in the records or something of that nature.**
Q Any other websites that are specific to the TCPA and lawsuits about them?
**A Not that I can recall from the best of my recollection.**
Q Okay. How about Reddit?
**A I don't recall going on there. You know, like I said I may or may not have --**
Q Uh-huh.
**A -- but I'm not a hundred percent sure.**
Q Okay. Now, when you were looking for information about the TCPA and whether it's legal for companies to text you without your consent did you get -- did you find any other information about how to make the text messages stop?
**A You know, I may or may not have. I don't recall whether I really did or not off the top of my head. I would have to look back into my records.**
Q Do you recall seeing anything about texting back the word stop?
**A Not that I can recall at any point but,**

50

**you know, maybe there was, maybe there wasn't --**
Q Okay.
**A -- from the best of my recollection.**
Q Okay. Do you use E-mail?
**A Yes.**
Q What's your E-mail address?
**A Andrewmcgonigle714@gmail.com.**
Q Is that your only E-mail address?
**A I mean, I have others.**
Q Is that your primary E-mail address?
**A Yes.**
Q Okay. What other E-mail addresses do you have?
**A Mcgonigleandrew38@gmail.com, and then there's a couple others but I don't remember the name of them off the top of my head.**
Q So you don't use them anymore?
**A Some of them I use.**
Q Do you recall what the ones are that you do use?
**A Yeah.**
Q What are they?
**A Mcgonigleandrew38@gmail.com, and I don't recall the name of the other one off the top of my head. I think there might be another one**

51

**but I just don't a hundred percent recall.**
Q Do you use the E-mails for specific purposes or are they just all general use?
**A Pretty much general use for the most part.**
Q Okay. Is there a reason why you created multiple E-mail accounts if they're all general use?
**A Well, I didn't exactly create multiple E-mail accounts. I would sometimes forget the password into one of my old E-mails or the phone would break, before I had gotten to getting it repaired I'd get another phone.**
Q And so you weren't able to get into an old account and so you would make a new one?
**A Yeah.**
Q Do you use social media?
**A Yes.**
Q What do you use?
**A Facebook.**
Q Instagram?
**A I've only been on there maybe once or twice.**
Q TikTok?
**A No.**

52

Q Twitter or X?
**A No.**
Q Reddit?
**A No.**
Q I'm handing to you what we're going to mark as Exhibit 2.
(Whereupon, Deposition Exhibit Number 2 was marked for identification.)
Q Is that a Facebook account that you use?
**A It is.**
Q Okay. Did you create that account?
**A Yes.**
Q Okay. And are you the primary person who is in control of that account?
**A Yes.**
Q Does anyone else use the account?
**A No.**
Q Okay. And you're the person that posts and has control over all the content; is that right?
**A Yeah.**
Q Okay. I was looking at your byline of truth, common sense and logic always pisses people off. That's the goal. What do you mean by that?

53

**A I don't know. It was just something I put on Facebook. I guess I find it humorous when people are too gullible to catch onto things or have common sense.**
Q Okay. If you could take a look at that second page on the account. Is that a meme that you posted?
**A Yeah.**
Q Okay. And I believe it says you're entitled to nothing. Want it, earn it. What did you mean in posting that?
**A I guess what I meant was, you know, if you want something work for it.**
Q Uh-huh. So you believe that people should work for their keep?
**A Yeah.**
Q Okay. And people should support themselves rather than relying on others?
**A Uh-huh.**
MR. OLIVER: I'm going to object to the form of the question, but if you understand you can answer.
THE WITNESS: I believe people should work for themselves rather than relying on others. I do believe that, yeah.

54

MS. ENGLER: Uh-huh. I'm going to mark as Exhibit 3.
(Whereupon, Deposition Exhibit Number 3 was marked for identification.)
BY MS. ENGLER:
Q Is this also a Facebook account you've created?
**A Yes.**
MS. ENGLER: Okay. I'm just going to go and group all the rest of these together rather than having individual exhibits. I'll mark this as Exhibit 4.
(Whereupon, Deposition Exhibit Number 4 was marked for identification.)
MS. ENGLER: And I just want you to flip through those documents for me and confirm that all of those are profiles that at some point you created on Facebook?
MR. OLIVER: Take your time and look -- just check every page.
MS. ENGLER: Yeah. He's getting it --
MR. OLIVER: Oh.
MS. ENGLER: -- right there. It's at Exhibit 4.
MR. OLIVER: Is this going to be part

55

-- this is 4 and this is 3?
MS. ENGLER: That's 3 and that's 4, yes.
MR. OLIVER: Okay.
MS. ENGLER: So it's that stack there of ones that --
(Whereupon, there was a brief pause in the proceedings while the witness reviewed the documents.)
THE WITNESS: I don't recognize this --
MS. ENGLER: Let's see.
THE WITNESS: -- picture right here. I don't think I've seen that before, that picture that's way darker.
MR. OLIVER: He's pointing at that picture right there that --
BY MS. ENGLER:
Q Well, right. I'm just asking is this an account you would have created regardless of whether you recognize that picture. Are you testifying that this is not an account that you made?
**A No, I'm not testifying that it's not an account --**
Q Okay.

56

**A -- that I've made.**
Q All I want you to do is just let me know if there's any of those accounts that were not created by you at some point?
MR. OLIVER: And we're just talking about 4 at the moment, correct?
MS. ENGLER: Correct, only 4.
MR. OLIVER: Okay. I misunderstood that.
THE WITNESS: Yes, those are Facebook accounts.
BY MS. ENGLER:
Q Is there a reason why you have so many?
**A I just forget the password and can't log in and end up getting a new phone.**
MS. ENGLER: Okay. I'm going to have you mark this as Exhibit 5.
(Whereupon, Deposition Exhibit Number 5 was marked for identification.)
BY MS. ENGLER:
Q So looking at Exhibit 5 is this an Instagram account that you made?
**A I believe so. It probably may have been at some point.**
Q I see that there's a post about an app

57

that can make money for free. Do you recall what that was referring to?
**A I don't and I don't recall ever -- that -- if I even put that there or not. I mean, I may have. I may or may not have. I just -- I don't know what that's referring to off the top of my head.**
Q Okay. Do you know -- have you ever used apps to, you know, enter contests?
**A Not any kind of contest that I can recall from the best of my recollection.**
Q Have you ever provided your phone number to be entered into a contest?
**A You know, I may or may not have in the past. I don't recall whether I have or not, but off the top of my head I'd have to go back in the records.**
Q What records would show whether or not you've used your phone number for a contest?
**A I don't even recall what records. I would have to dig way back. Like I don't --**
Q Uh-huh. Is that something you would have kept a record of?
**A Unless I really needed it I probably wouldn't keep record of anything like that if I**

58

**did do whatever.**
MS. ENGLER: Let's mark this as Exhibit 6.
THE REPORTER: Did you say 6?
MS. ENGLER: 6, yes.
(Whereupon, Deposition Exhibit Number 6 was marked for identification.)
BY MS. ENGLER:
Q Is this also an Instagram account that you would make?
**A I don't recall if I made this account or not off the top of my head. You know, I may or may not have but possibly I may have.**
Q Is that a picture of you in the profile?
**A It looks like a picture of me.**
Q Have you ever had a person make an account using your pictures that was not you?
**A Not that I can recall from the best of my records, or recollection per se.**
(Whereupon, Deposition Exhibit Number 7 was marked for identification.)
Q Exhibit 7. This one is a little more recent saying it was created in 2023. Is this an account you created on Instagram?

59

**A You know, I may or may not have but I don't recall whether I did or not, but I have to look back in the records for something pertaining to that.**
Q Is that a picture of you in the profile?
**A That is a picture of me.**
Q Do you sitting here today have a reason to believe that you wouldn't have made this profile?
**A Maybe, maybe not. I don't recall whether I did or not, so I can't really say whether I would have a definite reason to believe. I may have possibly made this profile. You know, I may not have. I don't --**
Q Sitting here today do you have a reason to believe that someone other than you created that profile?
**A You know, somebody may or may not have. I don't recall whether I did or someone else did or what may have transpired off the top of my head from the best of my recollection.**
MS. ENGLER: Okay. Now, this one looks like it was created more recently so hopefully this one will have some memories. Mark this as

60

Exhibit -- are we on 8?
THE REPORTER: 8.
MS. ENGLER: 8.
MR. OLIVER: And please let's project a little more if we could.
THE WITNESS: All right.
MR. OLIVER: Thank you.
(Whereupon, Deposition Exhibit Number 8 was marked for identification.)
BY MS. ENGLER:
Q Looking at Exhibit 8 does that -- was that profile created by you?
**A Yes, I did create one recently.**
Q Okay. Is there a reason why you created one when you use Facebook as your primary social media?
**A Yeah, I think I was talking to somebody on there. I don't recall who it was, but off the top of my head.**
Q Do you use the DM function like for direct messaging on Instagram?
**A Yes.**
Q Who do you primarily talk to on Instagram?
**A There was only one person I was talking**

61

**to. I didn't really talk to anyone else on there.**
Q Who was that?
**A I don't remember the name off the top of my head to the best of my recollection.**
Q Is it somebody that you know that is an online friend or person or do you them in, you know, your day-to-day life?
**A It was somebody I had met online that I was speaking to.**
Q Okay. What were ya'll talking about?
MR. OLIVER: I'm just going to object to the form of the question. If you know the answer you can answer if you know the answer.
THE WITNESS: I don't really recall what exactly in terms we were speaking of off the top of my head. It couldn't anything. I just don't remember off the -- from the best of my recollection what our conversation may have entailed.
BY MS. ENGLER:
Q It didn't have anything to do with a TCPA, though, did it?
**A No, I do recall that it had nothing to do with that.**
Q Okay. You know it had nothing to do

62

with that, but you don't recall any of what ya'll did talk about?
**A No, I do not.**
Q Okay. How about Facebook, do you use the direct messaging functionality on Facebook?
**A I do use messenger, an app that you have to install --**
Q Uh-huh.
**A -- if that's what you're referring to.**
Q Yeah, either through your browser or on your phone.
**A Yes.**
Q Who do you talk to on Facebook?
**A Usually my girlfriend, certain friends that live around the area or friends that are down in Florida.**
Q Okay. And you only talk to them on Facebook?
**A Facebook or the few that I do have the numbers we'll talk on the phone.**
Q Do you primarily do phone calls or texting?
**A I try to primarily do phone calls because I'm not -- I don't really have time to text like that most of the time.**

63

Q So phone calls are more convenient for you than text messages?
**A For the most part, yes.**
Q Okay. Is there a reason why you would text someone versus over calling them?
**A I mean, if I'm in the middle of doing something I might text them versus call them if it's important. If it's not important then depending on the situation I just will leave it alone for the time being.**
MS. ENGLER: I'm going to mark this as Exhibit 9.
(Whereupon, Deposition Exhibit Number 9 was marked for identification.)
BY MS. ENGLER:
Q Do you recognize this document, Mr. McGonigle?
MR. OLIVER: Go ahead and look through it --
MS. ENGLER: Yeah, take your time to look through it if you need to.
MR. OLIVER: -- to see what it is.
(Whereupon, there was a brief pause in the proceedings while the witness reviewed the document.)

64

BY MS. ENGLER:
Q Whatever you're ready I'm going to direct you to interrogatory number 4.
**A All right.**
Q Okay. Do you know what this document is? Do you know -- I'm sorry. Did you hear?
**A This document, what this document is?**
Q Yeah, do you know what this is.
**A It's interrogatories of some sort.**
Q I'm going to represent to you that this is what your attorneys produced in response to our discovery requests. Did you review these before they were produced, like did your attorney send you a copy for you to review at any point if you recall?
**A I don't recall whether they sent them before they had actually produced them or not off the top of my head to the best of my recollection.**
Q But you participated in providing information to answer these requests, right?
**A Yes.**
Q Okay. So take a look at interrogatory number 4 which is where we had asked for -- from January 1, 2019 to present identify all telephones and then also telephone numbers and some

65

additional information regarding that and we've got a listing of one, two, three, four, five, five numbers and then a partial area code.
So we're going to talk about some of these phone numbers at the bottom. Starting with your current telephone number -- or actually scratch that. The 804-238-5410, is that your current telephone number?
**A Yes.**
Q And how did you acquire that number?
**A I moved to Heathsville, Virginia from Florida at the time and where I had moved to it wasn't very good cell service so I had switched from the previous number I had which was the 252 number which was an AT&T number, so I switched to the Verizon number because Verizon I figured I would have better cell reception where I was currently residing.**
Q Uh-huh. Is there a reason why you didn't want to keep the 25-51-3959 number?
**A Well, yeah, that's because I couldn't -- I didn't know how to transfer phone numbers to the other one and it seemed easier for me to just go buy another phone and get a Verizon number.**
Q Okay. So you didn't try to go and keep

66

that phone number?
**A No.**
Q So do you recall when exactly you acquired that phone?
**A Are you referring to the 252 number phone?**
Q Yeah, thanks for calling me out on that. The 804 number.
**A The 804 number, I got it on August 5th. I had activated service on that date.**
Q Okay. Where did you get it from?
**A The Dollar General in Heathsville, Virginia.**
Q Did the phone come with a SIM card or did you have to purchase that separately?
**A It came with one.**
Q Do you recall how much it was?
**A I don't recall the exact price off the top of my head. For the best of my recollection I would have to look back in the records.**
Q Do you have records that would show the exact price?
**A If I have records. I don't even recall if I have records or not, you know.**
Q Would you have a receipt?

67

**A From a year ago or over a year ago, probably not.**
Q Did you purchase it with cash or with debit or credit card?
**A I'm pretty sure I purchased it with cash but it may have been a debit card. It may have been either/or. I don't recall exactly what I had used to purchase it at the time.**
Q And you paid for the phone yourself?
**A That's correct.**
Q There was no one that paid for the phone for you?
**A No.**
Q Did you purchase anything else at that time in that same transaction?
**A Not that I can recall. You know, I may or may not have, but from the best of my recollection I don't think I did.**
MS. ENGLER: Let's make this Exhibit 10.
(Whereupon, Deposition Exhibit Number 10 was marked for identification.)
BY MS. ENGLER:
Q We'll come back to Exhibit 9 but I'm just showing you Exhibit 10. This is a Bates

68

number McGonigle-Shop 00025-27. This was produced to us by your attorneys. Can you tell me what this is?
**A It looks like a payment history of me paying my phone bill and something showing that, you know, I have Verizon with an account number with them and whatnot.**
Q Okay. So that's what it is, your payment history with Verizon?
**A Well, yeah, that and, you know, the other things I mentioned.**
Q What do you mean? Oh, the -- what do you mean the other things you mentioned?
**A The account number.**
Q Okay. So you're on a monthly plan?
**A Yes.**
Q Okay. What's included in that monthly plan?
**A Limited talk, text, and I think the data may be unlimited too from the best of my recollection. I may or may not be right on -- a hundred percent on all of that, but --**
Q Uh-huh. And so it's a month-to-month plan?
**A Yes.**

69

Q So you're not locked into like a year commitment or anything?
**A No.**
Q Since August 5th of 2024 have you purchased any other phones?
**A If one of my phones had broken I have went and got another phone and transferred the SIM so I could keep my own number --**
Q Uh-huh.
**A -- for my own personal convenience.**
Q So I guess -- so the question is have you purchased any other phones?
**A Yes.**
Q And when did you make other phone purchases?
**A I don't recall the exact dates of when I purchased other phones off the top of my head.**
Q Was it in 2024?
**A You know, it may have been, but I don't recall when -- what year I made purchases or haven't from the best of my recollection.**
Q How many additional phones would you say you have purchased since August 5th of 2024?
**A From the best of my recollection maybe five or six, possibly seven, but I don't recall an**

70

**exact number on, you know, how many off the top of my head.**
Q Would you have receipts of those purchases?
**A I don't normally save receipts.**
Q Okay. And those phones were paid for by you?
**A Yes.**
Q Okay. How does your phone usually break where you need to get a replacement?
**A You know, sometimes an accident may happen where I drop and crack it or something.**
Q Uh-huh.
**A So I would have to take it -- either get another phone or take it to a shop. In terms of busy life it's easier for me to just go buy another phone and transfer the SIM card.**
Q Uh-huh. About how much are these phones?
**A Anywhere from 40 to 70 dollars or more.**
Q Okay. Per phone?
**A Yes.**
Q Okay. And do you typically pay with cash or with a credit card or debit card?
**A That depends on what I have on me. I**

71

**mean, it -- either/or.**
Q Uh-huh. Would you say you more frequently use cash or more frequently use your debit card?
**A Probably more frequently my debit card.**
Q Okay. Let's go back to Exhibit 9. That's those interrogatories and request for production. Now, before you had the 804 number -- we're back to interrogatory number 4. I'm sorry. I should have directed you.
**A Yeah.**
Q Okay. So before you had the 804 number you had the 252-518-3959?
**A Yes.**
Q And if I understand your testimony correctly you stopped using this number and phone because the service wasn't very good?
**A That is correct.**
Q Okay. So it wasn't that the phone broke for the 252 number?
**A Yes.**
Q What did you do with the phone?
**A I believe I still have it. I just don't -- I don't use it because I don't really have any use for it if it's not going to give me**

72

**good cell service.**
Q Uh-huh. Have you lent it to anybody -- so you keep it yourself, it's like in a desk drawer or something?
**A In a desk drawer, yes.**
Q Okay. So you're not using this number at all?
**A No.**
Q You don't give this number out to anybody?
**A No.**
Q And you had the number from April until August of 2024?
**A From the best of my recollection --**
Q Okay.
**A -- yes, that may be accurate.**
Q Do you recall where you acquired that number from or the phone associated?
**A I was working on the road in New York and one of my coworkers that had his daughter working for the carnival --**
Q Uh-huh.
**A -- had that phone and it had a North Carolina number I think.**
Q So he gave it to you?

73

**A Yeah. I couldn't -- it was cheaper for me to just buy the phone off him --**
Q Uh-huh.
**A -- and pay him cash than do anything else really.**
Q Okay. So how did the payments work for the 252 number for the hours -- or not hours, sorry, just like for the plan to get your data and texting and calls if it was his number?
**A I don't know if it was really his number or not. I think it may have been.**
Q Uh-huh.
**A I think it may have been his number, but I don't remember how the plan worked or any of that.**
Q Do you recall if you paid him for the service or if you paid AT&T directly?
**A I paid AT&T directly.**
Q Okay. So at some point the number was transferred to you?
**A I think so. It may have been transferred to me --**
Q Okay. But you're not sure?
**A -- possibly. I'm not a hundred percent sure from -- I can't recall exactly.**

74

Q Uh-huh. Okay. And so before that you had a number of 352-763-0243; is that correct?
**A That's correct.**
Q And when did you get that number?
**A I want to say back in July of '23.**
Q And how did you get that phone?
**A I bought it from --**
Q Do you recall --
**A -- some store. I don't remember exactly where I had bought that one from off the top of my head.**
Q Uh-huh. Do you recall how much it was?
**A I do not recall the exact number on how much I had paid off the top of my head.**
Q So for Total Wireless was that also a month-to-month plan?
**A It was.**
Q Do you recall how much the plan was?
**A I do not recall an exact number on how much the plan had costed me.**
Q Uh-huh. And so you used that number from approximately July of 2023 to April of 2024; is that correct?
**A From the best of my recollection, yes. Possibly, you know, I think that may have been --**

75

Q I'm going off what the interrogatories say --
**A Okay. All right.**
Q -- so I'm just confirming. So what did -- what did you do with that phone or that number, the 352?
**A I don't even have the phone anymore. I think it had gotten damaged and I probably just threw it out or something along those lines.**
Q So that phone is no longer in your possession?
**A No.**
Q Do you recall the last time it would have been in your possession?
**A Not off the top of my head. I don't recall exactly when it would have been.**
Q Okay. Did you -- other than the 804 number did you register any of these numbers on the do-not-call list?
**A Not that I can recall.**
Q When did you first become aware of the do-not-call list?
**A When my attorney had informed me about it. I don't remember an exact date, but it was when my attorney informed me about it and had**

76

**assisted me in --**
MR. OLIVER: Don't talk about what your attorney or the firm told you.
THE WITNESS: Yeah.
MR. OLIVER: So if you're going to refer to a date refer to something objective independent of communications with counsel or the firm, so if you can independently find a basis to figure out when you did that that's fine.
THE WITNESS: Well, when the firm had told me about it technically.
BY MS. ENGLER:
Q So before you were informed by the firm of the do-not-call list you were not aware of it?
**A No.**
Q Do you recall when that date would have been that you found out about the do-not-call list?
**A I don't recall an exact date off the top of my head.**
Q Do you think it would have been -- would it have been before you purchased the phone?
**A I don't think it was before I purchased the phone, no.**
Q Okay.

77

MR. OLIVER: I don't want to necessarily object but I don't know what phone we're talking about at the moment, so --
MS. ENGLER: I apologize, the 804 number, the phone number that's at issue in this complaint.
MR. OLIVER: Okay, okay. Okay.
MS. ENGLER: Yeah, we can put Exhibit 9 to the side for the time being, but yeah, we're talking right now --
MR. OLIVER: Specifically about --
MS. ENGLER: Yeah, specifically about the 804 number, and please call me out if I mix these numbers up again because I certainly want the record to be clear.
MR. OLIVER: No, that's fine. I may just lose track of stuff, so I'm just trying to figure out -- I don't want to object for something that I don't need to object on.
MS. ENGLER: Absolutely.
BY MS. ENGLER:
Q So did you have an opportunity to review the petition in this case before it was filed.
**A Not that I, you know, can recall. I**

78

**may or may not have, but to the best of my recollection I don't remember ever doing such, but --**
Q What is the reason that you chose to register the 804 number on the do-not-call list?
MR. OLIVER: I'm going to object to the form of the question. If you can answer this without referring to communications with counsel independently of that that's fine.
If you can't then you can't, but see if you can answer the question with independent knowledge, not based on information obtained from counsel, and I might have confused him so you might have to ask it -- reread the question or something so it's clear.
MS. ENGLER: Yeah, that's fine.
BY MS. ENGLER:
Q What was your reason for registering the 804 number on the do-not-call list?
**A Because I felt like all these calls and texts were an overly broad, some intrusion of my privacy and it affected my daily life.**
Q How did it affect your daily life?
**A Well, you know, when I'm busy if I never gave anybody consent to text or call my**

79

**phone that I don't, you know, know or have any business or any connections of any kind with I feel like it's kind of an intrusion of my privacy when I -- you know, it's kind of -- I guess you could say it's just kind of annoying when you never gave them any, you know, consent to do such matters.**
Q Anything else?
**A No.**
Q So your reason for why you decided to register the 804 number on the do-not-call list is because it was intrusive in your daily life, it felt like an intrusion on your privacy and it's annoying. Is that -- are those all your reasons?
**A Overly broadsome (phonetic) and annoying.**
Q I'm sorry?
**A Overly broadsome and annoying.**
Q You're going to have to say that one again.
**A Overly broadsome and annoying.**
Q Overly broadsome and annoying. Okay. Thank you. Do you recall when you registered the number on the do-not-call list?
**A I don't recall off the top of my head.**

80

**I would have to look back in the interrogatories. I don't remember an exact date. It could have been any time between August and possibly October, but I don't recall an exact date that I had done -- had registered it.**
MS. ENGLER: Why don't we take another break.
MR. OLIVER: Okay.
(Whereupon, a brief recess was taken in the proceedings.)
THE REPORTER: We are back on the record.
BY MS. ENGLER:
Q Welcome back. Mr. McGonigle, when we were talking just before the break we were talking about registering the 804 number on the do-not-call list and you had previously testified that you didn't recall what exact date it was; is that correct?
**A That is correct.**
Q I'm going to hand you -- will this be 11? Okay. Exhibit 11. And this is McGonigle-Shop 00012.
(Whereupon, Deposition Exhibit Number 11 was marked for identification.)

81

BY MS. ENGLER:
Q Do you recognize this document?
**A Yes, I do.**
Q Okay. What is it?
**A It's confirmation that the number has been registered on the do-not-call registry.**
Q So that's the 804 number?
**A Yes.**
Q And then -- and that amcgonigle306@gmail.com, that's your E-mail address or one of your E-mail addresses?
**A That's one of my E-mail addresses, yes.**
Q So you personally didn't register the number on the do-not-call list, it was already registered?
MR. OLIVER: Objection to the form of the question. If you understand you can answer.
MS. ENGLER: I'll rephrase.
BY MS. ENGLER:
Q Did you personally register the phone number on the do-not-call list on January 10th, 2014?
**A No, it was already registered on January 10, 2014.**
Q So this E-mail -- so this E-mail would

82

have been your attempt to register it and only to get confirmation that it was already registered?
**A Yes.**
Q Okay. This E-mail is dated August 27th, 2024. Would that be the date that you attempted to register the number?
**A Yes.**
Q And we talked a little bit about that other phone number. I believe it was 252 but let me not misstate it. The 252-518-3959, you said you still had the phone; was that right?
**A Yes.**
Q Okay. Do you still -- like I presume you're not still paying for that number, though, correct?
**A No.**
Q Do you know if you still have use of that number if you were to start paying again or has it been reassigned?
MR. OLIVER: Objection to the form of the question, but if you know the answer you can answer.
MS. ENGLER: I'll rephrase.
BY MS. ENGLER:
Q Do you know if the number has been

83

reassigned since you stopped using the number?
**A I do not know what is going on with that number or whether I could reassign it or not to the best of my knowledge.**
Q So if somebody registered that number on the do-not-call list in February of 2026 that would not have been you?
**A It would not have been because I don't use that number.**
Q Okay. So you did not register that number on the do-not-call list?
**A The 252 number you're referring to?**
Q Correct, yes.
**A No, I did not.**
Q Before these TCPA suits had you previously filed any lawsuits?
**A No.**
Q Okay. Have you ever been sued yourself?
**A No.**
Q Have you ever been arrested?
**A No, I have not.**
Q Okay. So we were talking a bit about how you learned about the TCPA and kind of became involved in some of this. How did -- like once

84

you learned how did you find the Heidarpour Law Firm?
**A I think it was through just a Google search looking for attorneys that worked in that area.**
Q In the TCPA?
**A Yes.**
Q Okay. Did you consider any other attorneys?
**A I think I had checked two other attorneys but they weren't willing to take the case.**
Q Do you recall who those attorneys were?
**A I do not.**
Q Would you have reached out via phone or E-mail?
**A It would have been a regular phone call --**
Q Okay.
**A -- likely.**
Q So you wouldn't have E-mailed them?
**A I mean, I may have E-mailed them possibly --**
Q Okay.
**A -- if nobody answered, but from the**

85

**best of my recollection I think it may have been a phone call.**
Q Did you get a referral from anybody?
**A Not that I can recall.**
Q Did you look for reviews of attorneys online?
**A I don't believe I ever did anything of that nature from the best of my recollection.**
Q Okay. Without telling me anything about what like the Heidarpour Law Firm may have told you in the context of providing legal counsel what made you decide to proceed with the Heidarpour Law Firm?
MR. OLIVER: I'm going to object to the form of the question. It's a tough one. If you can answer that independently of any knowledge obtained through communications with counsel that's fine.
THE WITNESS: I -- what's the question again?
BY MS. ENGLER:
Q Basically why did you choose to go forward with the Heidarpour Law Firm for your TCPA claims?
**A Because I read online that that was**

86

**their practice area.**
Q Okay. That's it, just they practiced in it so that's why you called them?
**A Yes.**
Q Okay. Other than Mr. Oliver here and then also Mr. Heidarpour who else have you had as counsel in this matter?
**A Avi Kaufman and Anthony Paronich.**
MS. ENGLER: I'm going to mark Exhibit 12.
(Whereupon, Deposition Exhibit Number 12 was marked for identification.)
MS. ENGLER: Do you recognize this document?
MR. OLIVER: Take a look through it.
(Whereupon, there was a brief pause in the proceedings while the witness reviewed the document.)
THE WITNESS: Yes, I recognize the document.
BY MS. ENGLER:
Q Okay. What -- can you identify it for me?
**A This is a class action authorization.**
Q And what is the class action

87

authorization for?
**A Explaining my duties as a class representative.**
Q Okay. Anything else?
MR. OLIVER: Object to the form of the question. You can answer if you understand.
THE WITNESS: It tells me my rights as a client.
BY MS. ENGLER:
Q So an engagement letter to engage the attorneys for the class action?
**A Yes, something in that nature.**
Q Okay. If you could flip to the last page and can you confirm for me that that is your signature where it says Andrew James McGonigle?
**A Yes, that's my signature.**
Q Okay. Do you recall if you've signed any other engagement letters with attorneys associated with this suit?
**A I don't recall anything exactly off the top of my head. You know, I may have or may not have but I don't recall right off.**
Q Do you recall ever signing an engagement letter with the Andress Law Firm?
**A Not off the top of my head I don't**

88

**recall.**
Q Does the name David Andress sound familiar at all to you?
**A I don't recall that name being familiar. You know, if they're involved they may be involved, they may not be involved.**
Q Uh-huh. Are there any other attorneys to your knowledge that are working on this matter?
**A Not that I can recall from the best of my knowledge.**
Q So -- okay. So you proceeded with the class action authorization and the attorneys that you have retained have filed TCPA class action lawsuits -- you know what, scratch that. That's not a good question.
So let's go through this Exhibit 12. Like on page 1 that would be McGonigle-Shop 5. They list out some duties like you said of the class rep; is that correct?
**A That's correct.**
Q Okay. What does -- what do you understand represent the interest of all the class members to mean?
**A What would represent the interests of the members of the class would be me following up**

89

**with the counsel promptly --**
Q Uh-huh.
**A -- doing things in a timely fashion, participating in a discovery, being available if it were to go to trial and being available to testify --**
Q Okay.
**A -- in any nature.**
Q Anything else?
**A To be truthful and at the end of the day just try to do what's in the best interests of the class, not for myself but the class.**
Q Okay. If you could turn to the second page. It is number 8 where it says be generally knowledgeable with respect to the subject matter and progress of the lawsuit. What does that mean to you?
MR. OLIVER: I'm going to object to the form of the question, but you can answer.
THE WITNESS: That would be keep your memory and try to be informed and make the right decisions with what's going on because every decision you make could possibly affect the class. I think that's kind of where that -- or the progress of the class action suit, I think that's

90

kind of what that means.
BY MS. ENGLER:
Q How do you -- what kind of steps have you taken to be generally knowledgeable about the subject matter?
**A I have read through, you know, what's gone on in certain cases, communicated with counsel and done as they would want --**
Q What do you --
**A -- me to do to represent the class and do for the best interests of the class, what would be respectful for the class and the subject matter in itself.**
Q Now, by saying reading about what's going on with certain cases does that refer to reading just communications from your attorneys or referring to actual pleadings?
MR. OLIVER: I'm going to object to the form of the question. If you understand you can answer.
THE WITNESS: What do you mean by pleadings?
BY MS. ENGLER:
Q Like the petition, you know, discovery responses, discovery requests, any motions that

91

get filed.
**A I'm going to say pleadings probably on that for the most part.**
Q Pleadings?
**A Yes.**
Q Do you recall which pleadings you have reviewed in this case?
**A I have reviewed the allegations.**
Q Okay. Anything else?
**A That's the most that I can recall from the best of my knowledge off the top of my head.**
Q Do you recall ever reviewing any discovery responses from BBQGuys?
**A You know, I may have but I don't recall --**
Q Okay.
**A -- if I fully did or not off the top of my head.**
Q Do you recall any documents that BBQGuys produced in discovery?
**A I don't recall any exactly off the top of my head. I may or may not have to the best of my knowledge.**
Q Other than obviously the deposition we're taking today of you have any other

92

depositions been conducted in this case?
**A Not in this case particularly.**
Q Do you know if any motions have been filed in this case?
**A I don't recall if there have or haven't been any off the top of my head.**
Q Okay. Well, I'm going to represent to you that there was a motion to dismiss that was filed by BBQGuys in this matter. Do you know what the outcome of that motion was?
**A I think that -- but I'm not exactly a hundred percent sure. I may be wrong or I may be right, but I think that you guys had offered or --**
MR. OLIVER: She's asking about the motion, if you're aware if the motion was filed and if you know the outcome of the motion.
THE WITNESS: I don't recall the exact outcome.
BY MS. ENGLER:
Q Okay. How many cases under the TCPA have you filed since August of 2024?
**A You know, I don't recall an exact number off the top of my head.**
Q Can you give me a range?
**A I don't want to give you a wrong**

93

**answer. I just don't recall an exact number. I know there was some cases. There were a number of cases but I just don't recall.**

Q I mean is it 10, is it a hundred, like where exactly is the ballpark?

**A It's -- I don't remember exactly how many cases. Without looking at any kind of records I wouldn't be able to --**

Q So sitting here today you have no idea whether it be 10 or a thousand how many cases have been filed unless you can look at records?

**A I do not, no.**

Q Okay. You know, since we have so many suits, you know, that have been filed do you know how many of the lawsuits that have been filed have been since closed?

**A Not off the top of my head I don't recall how many have been closed or what has happened full-fledged.**

Q Do you know how many still remain open other than of course this case here today?

**A Not off the top of my head I do not.**

Q What, if anything, do you do to keep track of the lawsuits in your records?

MR. OLIVER: Objection to the form of

94

the question. You can answer.

THE WITNESS: I -- if it's something important at the time I try to look back into whatever I might have.

BY MS. ENGLER:

Q What do you mean something important at the time?

**A Like if it's something my -- if it's something counsel wants me to look at or something maybe I'll look at it and I'll refer back to it, but --**

Q Uh-huh.

**A -- I don't -- I mean, I don't memorize all this stuff in the midst of daily life.**

Q Oh, there's no way anybody could memorize all this stuff. Even for one case it's tough.

MR. OLIVER: Yeah.

BY MS. ENGLER:

Q So do you have any kind of record keeping that you do, a spreadsheet or something to just kind of stay on top of where the cases are at any particular time?

**A No.**

Q How many hours per month do you think

95

you spend managing the lawsuits you've filed?

MR. OLIVER: I'm going to object to the form of the question, but you can answer. You can also seek clarification if that helps you understand.

THE WITNESS: Maybe an hour.

BY MS. ENGLER:

Q About an hour a month?

**A If that, yeah, to the best of my knowledge, maybe more or maybe less. I don't recall the exact time. I don't usually keep track of the time.**

Q Is there a reason why you don't keep any kind of, you know, spreadsheet or something trying to keep track of the lawsuits?

**A I mean, I don't really have a reason to.**

Q Okay. Have you filed any TCPA suits on just -- on telephone calls in addition to texts?

**A I may or may not have. I don't recall if I have or not exactly what -- off the top of my head.**

Q Do you record any calls that you receive?

**A Not that I can recall from the best of**

96

**my recollection, I don't recall ever recording any calls. I'm not insisting that I have or I haven't, but I just don't recall.**

Q Have you ever recorded any calls for the purposes of preserving evidence in a TCPA lawsuit?

**A I may or may not have. I just don't recall whether I have or not off the best of my memory.**

Q Are you claiming that BBQGuys called you and did not -- instead of just texting?

MR. OLIVER: Objection to the form of the question.

MS. ENGLER: And actually I asked that a really terrible way. Let me rephrase.

BY MS. ENGLER:

Q For the claims that you are bringing are you claiming that BBQGuys both texted and called you without consent?

**A I'm not saying they did both. They did one or the other and I don't recall exactly which one. I think it was text messages that I had. They did text me without my consent that I know of.**

Q Okay.

97

**A But calls, I don't recall ever getting any calls from them from the best of my recollection.**
Q Okay. So --
**A I'm not insisting I have or haven't gotten calls. I may or may not have gotten calls but I just don't recall whether I did, but I know I have gotten text messages.**
Q Okay. So you know you got text messages but you can't say for sure whether or not BBQGuys called you. Is that your testimony?
**A Yes.**
Q Okay. For each BBQGuys text that you received did you look for any opt out language?
**A Well, no, because I didn't feel the need to because I didn't feel the need that they would be messaging me to begin with.**
Q You didn't look for any unsubscribe kind of language in the messages?
**A No.**
Q Did you ever reply stop or unsubscribe or cancel to any text messages you received?
**A Not that I can recall from the best of my recollection.**
Q Is there a reason why you didn't?

98

**A I was probably busy and then doing something and I don't text fast, so it takes me more than six seconds to send a text if I'm doing stuff.**
Q Okay. Have you ever asked any texters or callers to stop?
MR. OLIVER: I'm going to object to the form of the question. You can answer.
THE WITNESS: Not unless anyone in counsel had told me to say stop. Other than that I just kind of used my own judgment.
BY MS. ENGLER:
Q Okay. So unless you were told to do so you're not going to text back stop. Is that your testimony?
MR. OLIVER: Objection to the form of the question. If you understand the question you can answer.
THE WITNESS: Yes.
BY MS. ENGLER:
Q Are you aware that with most texting programs texting stop or cancel will stop the text messages you're receiving?
MR. OLIVER: Objection to the form of the question but you can answer.

99

THE WITNESS: Well, yeah, I'm aware of that, but I know that also if you reply stop they can text you from another number and it just ends up being a continuous vicious cycle at that point.
BY MS. ENGLER:
Q So you're contending that stop would not work because then the companies would just text you from a different number?
**A I wouldn't be surprised if they did and --**
MR. OLIVER: Hold on. I just want to object to the form of the question. A little pause just for me, but listen carefully to the question so that you don't answer something different than what she's asking.
MS. ENGLER: What I'm -- could you read back the question for me?
THE REPORTER: So you're contending that stopping would not work because then the companies would just text you from a different number and then he --
THE WITNESS: I don't think stop would work in every instance.
BY MS. ENGLER:
Q Sure, and maybe not in every single

100

instance, especially when you're talking about some of these, you know, overseas kind of things that are going on, but with a company that's based in the United States and is a legitimate company you don't think that stop would have worked?
**A I don't think it would work, no.**
Q Other than personal belief do you have any evidence as to why texting back BBQGuys stop would not have stopped the texts?
**A I do, actually.**
Q Okay.
**A I have known other people that have had that problem where their phone gets a message. They don't know who it is. It's some company and they reply stop but then they message from a different number.**
Q Are you saying in those messages the --
**A Or it happens in a phone call.**
Q Are you saying in those messages or phone calls that the company does not identify who they are?
**A Well, I think they identify who they are. I just think that they're using a different number because maybe they think well, if we use a different number it doesn't matter, we can still**

101

**get away with it or whatever. I don't know what -- maybe that's what they're thinking, I don't know.**
Q And is it your contention that you've had friends that have been texted specifically by BBQGuys, not just anybody but specifically BBQGuys and that they texted back stop and it didn't work?
**A Well, I'm not insisting that it's BBQGuys, but who's to say that if it's with someone -- another company that BBQGuys wouldn't do it? How do you know? How can you predict the future?**
Q So you have no specific evidence today that if you texted back stop to BBQGuys specifically that it would not have worked and BBQGuys would have continued sending messages?
**A I can't have any direct evidence if it's something that I didn't try so you're probably correct about that.**
Q Okay. So you didn't try texting stop or cancel?
**A No.**
Q Okay. Is there a reason why you didn't try?
MR. OLIVER: Objection to the form of

102

the question. You can answer.
THE WITNESS: I didn't believe that the words would do any good, and to me I shouldn't have to reply anything if I never opted into receiving any messages at the -- you know, to begin with in my opinion.
BY MS. ENGLER:
Q Have you ever tried blocking numbers?
**A No.**
Q Reporting them as spam with your phone carrier?
**A I may or may not have. I don't recall whether I reported them or not or if anything was filtered as spam. You know, I may or may not have. I'm not a hundred percent sure on that.**
Q Have you ever tried to adjust the notification settings in your phone prior to filing the lawsuit to receive less -- like less text messages?
**A Not that I can recall from the best of my, you know, recollection.**
MS. ENGLER: Let's mark this as Exhibit 13, and this is McGonigle-Shop 00020.
(Whereupon, Deposition Exhibit Number 13 was marked for identification.)

103

BY MS. ENGLER:
Q On the subject of the text messages are these text messages in Exhibit 13 the text messages you contend you received?
**A They may have been from the best of my recollection.**
Q Okay. These were what your attorneys produced. That's why they have the Bates stamp on the bottom. So the first text message you would have received was September 9th; is that correct?
**A From the best of my recollection, yes, it may have been, yes.**
Q But you're not sure the September 9th was the first?
**A I'm not a hundred percent sure. I'm not a hundred percent sure.**
Q So the first message could have been received later than September 9th?
**A I don't remember exact dates. If this is what they gave you then it more than likely should be correct.**
Q Okay. And you did not -- and if this was a text message that you received you did not reply stop to it?
**A No.**

104

Q Go to the next page. This looks to be on September 26th.
**A Yes.**
Q Is this a text message that you received?
MR. OLIVER: I'm going to object to the form of the question but go ahead. If you understand go ahead.
THE WITNESS: Yes.
BY MS. ENGLER:
Q Okay. And did you respond stop or cancel to this text message?
**A I don't recall whether I did or not exactly off the top of my head. It's been over a year, a year or more since I received these text messages, so I can't tell you whether I did or not off the best of my memory.**
Q So my prior -- your prior testimony as I understood it is that you generally don't text back stop or cancel?
**A Generally speaking, no, I don't.**
Q Okay. If BBQGuys has no -- like has no documentation and no evidence of you responding with stop or cancel would you have any reason to dispute that you didn't text that?

105

**A No, not if there's no record I wouldn't have any reason.**
Q Then looking at the remaining text messages we have October 3rd, October 6th, October 10th, October 13th and Wednesday, whichever day that is, so I'm presuming it must have been the same week.
**A Yeah.**
Q So that's from October 3rd. One, two, three, four -- do you agree with me that's five text messages?
MR. OLIVER: I'm going to object to the form of the question. Listen carefully and look closely and make sure you answer accurately.
MS. ENGLER: Yeah, be sure to review over these closely because I think one of them got captured twice, but just I'm trying to see how many -- I'm just asking you if you could confirm how many text messages there are from October 3 through the final message.
(Whereupon, there was a brief pause in the proceedings while the witness reviewed the document.)
THE WITNESS: You know, some of these are kind of big font, you know, the deep size so

106

--
BY MS. ENGLER:
Q Yeah, it's -- that says September 9th. I'm asking for you to look at the ones from October 3rd onward that starts with Bates number McGonigle-Shop 00022.
**A Okay.**
(Whereupon, there was a brief pause in the proceedings while the witness reviewed the document.)
**A And you're wanting from the 3rd to the 10th of October?**
Q From the 3rd through the final message which I believe may have been on like the 16th or something. It just says Wednesday on the final page.
**A Okay. It looks as if all together there's about --**
MR. OLIVER: Could you repeat that question? I think he lost the question.
BY MS. ENGLER:
Q Sure. From October 3rd through the final message, just October 3rd going forward how many messages were sent?
**A I am seeing a total of six on here.**

107

Q Can you take a look at McGonigle-Shop 00023 and 24, the message at the bottom of 23 and then the message at the top of 24?
**A Yes.**
Q Those are the same message, correct?
**A They may be. I can only see a date on one of them so I can't confirm if they're the exact same message.**
Q This is how it was produced from -- you know, from your attorneys. Is there a reason to believe that there were messages that were not captured that were not produced between those two times?
**A No, they're the same message it looks like possibly. Yeah, the text is the same.**
Q Okay. So those are the same message, correct?
MR. OLIVER: I'm going to object to the form of the question but do your best.
THE WITNESS: Yes.
BY MS. ENGLER:
Q Okay. So a total of five were sent from August -- from October 3rd?
**A If those two are the same, then yeah, that would be a total of five.**

108

Q Okay. And to the best of your knowledge or recollection you never messaged back stop to any text message BBQGuys sent to you?
**A To the best of my recollection I don't recall saying no.**
Q Do you know who BBQGuys is?
**A I do not.**
MR. OLIVER: Objection to the form of the question.
THE WITNESS: Sorry about that.
MR. OLIVER: That's okay.
BY MS. ENGLER:
Q Have you ever been to their website?
**A No, I have not.**
Q Do you know what kinds of goods and services that BBQGuys offers?
**A Not off the top of my head I don't. I've never ordered anything from them so I don't know much about them per se.**
Q Before filing suit against BBQGuys did you do any kind of investigation about who they were?
MR. OLIVER: I'm going to object to the form of the question. If you understand you can answer.

109

BY MS. ENGLER:
Q Like googling them, for example?
**A No.**
Q So you've never been to a showroom either?
**A I don't believe so.**
Q Did these messages annoy you anymore than the messages in the other lawsuits you filed?
MR. OLIVER: I'm going to object to the form of the question, but you can answer.
THE WITNESS: I don't believe any of the messages annoyed me anymore than the other ones. They've all -- they're all kind of equal burdens.
BY MS. ENGLER:
Q Was it the message content itself or the quantity that bothered you?
MR. OLIVER: Objection to the form of the question. You can answer if you know.
THE WITNESS: Neither/or.
BY MS. ENGLER:
Q Neither bothered you or did you say either/or?
**A I said neither/or.**
Q Neither/or.

110

**A It was more of the principle that bothered me.**
Q So you filed the claims on the principal of the matter?
MR. OLIVER: Objection to the form of the question. If you can answer you can answer.
THE WITNESS: No, the claims were filed on behalf of the class to do what's in the best interests of the class.
BY MS. ENGLER:
Q Sure, I understand that but you are a member of the class and, you know, the claims were filed under your name so again I'll ask. Is -- are you making these claims on behalf of yourself and the class just on the principle of the matter?
MR. OLIVER: Still objection to the form, but you can answer if you know.
THE WITNESS: To the best of my recollection that may be how I'm approaching it possibly.
BY MS. ENGLER:
Q Well, who else would know but yourself as to how you're approaching it?
MR. OLIVER: Objection. You can answer if you know.

111

THE WITNESS: I don't know how -- I mean, I'm just doing what's in the best interests of the class.
BY MS. ENGLER:
Q Okay.
**A It's not for myself. It's not -- you know, the principle I'm getting at is for what's in the best interest of the class and whatnot.**
Q What do you know, if anything, about class certification?
MR. OLIVER: I'm going to object to the form of the question. If you understand you can answer.
THE WITNESS: I don't know a whole lot about class certification other than what you have to do as a class representative.
BY MS. ENGLER:
Q Are you aware that a class action has to be certified in order to proceed as a class?
**A Yes.**
Q Okay. To your knowledge has that certification happened in this matter yet?
**A I believe so.**
Q Okay.
**A I don't recall whether it has or not exactly.**

112

Q Okay. What exactly are the claims that you are making against BBQGuys?
MR. OLIVER: Objection to the form of the question. You can answer if you know.
THE WITNESS: They have sent me and other members of the class numerous messages, one or more messages that are an intrusion into daily life and an invasion of privacy.
BY MS. ENGLER:
Q How did they invade your privacy?
**A They took up my time and they messaged my number when they shouldn't have had my number.**
Q Why shouldn't they have had your number?
**A Well, I mean, I never gave it to them so I can't really see why they would have a reason to text me if I never gave them, you know, any of my information.**
Q Have you ever received a wrong call before?
**A I have received wrong calls, yes.**
Q Uh-huh. Such as possibly from someone who was calling the person that previously had the number that you now possessed?

113

**A Yes.**
Q Okay. So you understand how a person that may have had your number before could have provided the number to BBQGuys?
**A Yes.**
Q Okay. Did you do any kind of review of your records or evaluation to be sure that you didn't provide consent to BBQGuys?
**A I mean, I was sure enough that I never had provided them consent so I never went through that I can recall. I don't recall ever going through and doing any kind of review or anything from the best of my knowledge.**
Q Okay. Can you describe your damages in this matter?
MR. OLIVER: Objection to the form of the question. If you know the answer you can answer. Don't guess or speculate. If you need clarification you can ask for that, too.
THE WITNESS: Well, the damage would be an invasion of privacy because they texted me assuming that I was someone else when I'm not, so it's kind of a damage to my privacy and it intrudes into my daily life when it gets into my privacy. I have a busy life in general.

114

BY MS. ENGLER:
Q Have you ever called a number accidentally before that you didn't mean to call?
**A You know, I may have done that at some point possibly. I don't recall whether I did or not, but I may have.**
Q It's a simple question. Have you ever made a mistake in dialing a number and had to tell the person oops, sorry, wrong number?
**A I mean, I possibly may have. I don't recall whether I have a hundred percent or not.**
Q Uh-huh.
**A I'm not saying I have or haven't because I don't recall whether I specifically have or not.**
Q And let's just assume for the sake of argument understanding that you are not admitting that you have or you haven't made a wrong number call at some point, when you did make that call presuming the caveat provided did you consider that you had invaded that person's privacy?
MR. OLIVER: Objection to the form of the question, but go ahead.
THE WITNESS: Well, yes, I may have, but I don't -- you know, if I did make a call

115

obviously I don't recall whether I did or not.
BY MS. ENGLER:
Q Uh-huh.
**A But if I did, yeah, maybe I may have intruded that person's privacy, but I didn't do it repeatedly at the same time.**
Q Fair. But it was a honest mistake, right?
MR. OLIVER: Objection to the form of the question. You can answer.
THE WITNESS: No, I don't really think I could say it was so much an honest mistake to put a wrong number in.
BY MS. ENGLER:
Q Why do you say that?
**A Well, it would be like in comparison if I'm hunting and I shoot a round and it hits somebody's house I'm liable.**
Q Sure.
**A All right. I'm liable for what I type on that phone on the dial pad.**
Q Uh-huh.
**A I see what I'm doing so it's not like I don't know what I'm doing.**
Q Yeah, and to be clear I didn't -- I

116

wasn't asking whether or not a person has liability or no liability for a mistake. I'm asking if just, you know, dialing the wrong number is a mistake.
**A Well, yeah, it's a mistake, yeah.**
Q Do you think people deserve to be punished for mistakes?
MR. OLIVER: Objection to the form of the question. If you can answer that you can answer it.
THE WITNESS: I believe -- I believe people should know that there's an action for a reaction.
BY MS. ENGLER:
Q Uh-huh.
**A And if you make a mistake, well, you know, if you do something wrong you have to deal with the consequences. That's anything.**
Q Uh-huh.
**A So yeah, I do believe that -- I don't believe they should be punished, but I believe that it should be handled in some sort of way --**
Q Okay.
**A -- per se.**
Q So just, you know, take responsibility

117

but not necessarily, you know, put through the ringer per se?

MR. OLIVER: I'm going to object to the form of the question, but if you understand the question you can answer it.

THE WITNESS: I think if it's a repetitive thing that they should be liable.

BY MS. ENGLER:

Q Okay. Have you made any effort on your own and not with your attorneys, on your own to try to find out if anybody else has been harmed by BBQGuys text messages in the ways you've described in the petition?

**A No, I have not.**

Q Okay. Going back to the suits that you filed if I represented to you that 26 of the cases that you've filed so far are considered closed would you have any reason to dispute that?

**A You know, I don't want to -- unless I've seen what you're talking about I don't want to say yes or no. I don't want to give you a wrong answer on that.**

Q Okay. Other than BBQGuys can you identify who else you've sued under the TCPA since August of 2024?

118

**A I can name a few companies I know.**

Q Yeah, I want you to name them.

**A Omaha Steaks, Office Depot. I'm not going to remember all of them, but there's --**

Q Just name as many as you can, and take as much time as you need.

**A Value City Furniture, Teleflora, Pure Green.**

Q What was that one?

**A Pure Green.**

Q Pure Green?

**A Yeah.**

Q Okay.

**A BBQGuys.**

Q Other than BBQGuys.

**A Yeah, I don't remember anymore than that off the top of my head.**

MS. ENGLER: Okay. Make this Exhibit 14.

(Whereupon, Deposition Exhibit Number 14 was marked for identification.)

MS. ENGLER: I'm going to represent to you that this is the amended responses to the discovery requests that were provided by your attorneys, so you can take a minute to familiarize

119

yourself with the document and whenever you're ready we're going to look at interrogatory number 6.

(Whereupon, there was a brief pause in the proceedings while the witness reviewed the document.)

THE WITNESS: Okay.

BY MS. ENGLER:

Q Okay. So if you take a look at interrogatory number 6 which starts on page 6 and there's the response, but I want to take a look at this list starting on page 7. Now, according to this response you've been paid $81,185.57 as of the date that this response was sent. Have you received any further funding -- scratch that.

Have you received any additional settlement payments since this was -- April 24th, 2026?

**A Since April 24th, 2026?**

Q Yes.

**A Yes.**

Q How much additional payments have you received to date?

**A There were two payments.**

Q There were two payments since April?

120

**A Yes.**

Q Do you recall what they were?

**A I don't think I can -- that's privileged information. I can't --**

Q The amounts are not, and as you can see they previously produced that information before on other matters.

MR. OLIVER: If you know the exact amount that you received and you know what they are right now without looking at anything, I mean if you know, then you can give that information.

THE WITNESS: From the best of my recollection I believe there were two checks for $2500.

BY MS. ENGLER:

Q Each?

**A Yes.**

Q Okay. So we're going to go through some of these matters that have been closed so far and also some that are listing. You filed suit against Laurice El Badry Rahme, Limited, also known as Bond Number Nine and the response states that you received $8,000. Is that confirmed?

MR. OLIVER: Where are we looking? I'm sorry.

121

MS. ENGLER: We're still looking at the list. It's bullet number 2.
THE WITNESS: Page number 7.
MS. ENGLER: Yeah.
MR. OLIVER: Oh, okay.
THE WITNESS: From the best of my recollection that may be right.
BY MS. ENGLER:
Q Okay. Well, that's what is on -- what your attorney stated on here.
**A Yeah.**
Q Did you help provide this information as part of the response?
**A Not that I can recall.**
Q Okay. But you have no reason to dispute that you received $8,000 from the settlement with Bond Number 9?
**A No.**
Q Did you file suit against Zales?
**A Yes.**
Q Okay. I'm going to represent to you that the court records show that the matter was closed on June 30th, 2025. Do you recall when you received payment for that matter?
**A I don't remember exactly when I was**

122

**paid for that.**
Q Do you recall how much it was?
**A I do not off the top of my head.**
Q You don't have an idea of a range?
**A Not off the top of my head I don't recall.**
Q The listing provided by your counsel identifies a payment of $4,000 for Filters Fast. Do you have any reason to dispute that you received a different amount from Filters Fast?
MR. OLIVER: I'm going to object to the form of the question, but you can answer if you understand.
THE WITNESS: No.
BY MS. ENGLER:
Q When you receive the payments from the various settlements do the checks or, you know, some other kind of communication state which matter the settlement check is for?
**A I mean, there's usually a breakdown that tells you like how much you get and how much goes to attorney fees or --**
Q Uh-huh.
**A -- whatnot.**
Q Okay. So there's some form of

123

identifier as to which matter has been settled and that's what the check is for?
**A Typically.**
Q Okay. Do you recall filing suit against the Home Shopping Network?
**A Not that I can recall. Off the best of my recollection I don't recall.**
Q Okay. Well, there was a suit that was filed under your name that purportedly closed in August of 2025. Do you recall receiving a settlement for that matter?
**A Not off the top of my head I don't recall receiving anything from them.**
Q Okay.
**A I'm not saying I have or haven't. I just don't recall ever --**
Q Sure. How about for Midwest Catalog Brands. Do you recall filing suit against them?
**A I do.**
Q Okay. Do you know what the current status of that matter is?
**A I don't recall exactly what's going on with that off the top of my head.**
Q Okay. Well, I'll represent to you that the matter closed January 15th, 2026. Do you know

124

if you have received payment for that?
**A I may or may not have. I don't recall whether I have or have not.**
Q Okay. How about for Alliance Entertainment, do you recall filing suit against them?
**A I do.**
Q Okay. Do you know the current status of that matter?
**A I believe, and I could be wrong -- you know, I'm not a hundred percent, but I believe that we had come to a settlement --**
Q Okay.
**A -- to the best of my knowledge. I may be wrong, I may be right.**
Q Do you know -- have you received payment as part of that settlement?
**A I think that may have been one of the checks I received from the best of my recollection. I could be wrong, I could be wrong. I'm not a hundred percent sure, though.**
Q The response to interrogatory number 6 identifies $4,000 paid to you as part of the settlement with Everyday Dose; is that correct?
**A It may be to the best of my**

125

**recollection.**
Q But you don't have any reason that you can think of today to dispute that you received an amount different than $4,000?
**A Not to the best of my recollection.**
MS. ENGLER: Okay. We're about at 12:30. Do you all want to break for lunch?
MR. OLIVER: Sure. How long would you like? How much time do you think we need to finish?
MS. ENGLER: I'm trying to see how much time we've got left. It's probably going to be maybe another two hours.
MR. OLIVER: About two hours. Okay. Well, then we'll --
MS. ENGLER: I'm going to try to shorten it up, but --
MR. OLIVER: Okay.
MS. ENGLER: But, you know --
MR. OLIVER: All right. Well, then we probably should do lunch then.
MS. ENGLER: Uh-huh.
MR. OLIVER: Is 30 good, is that enough time?
MS. ENGLER: What did you say?

126

MR. OLIVER: Is 30 enough time to have lunch?
MS. ENGLER: I think so.
MR. OLIVER: If you need a little extra just let me know and we'll just do it now.
MS. ENGLER: Yeah, no, I think that that's fine.
(Whereupon, a luncheon recess was taken in the proceedings.)
THE REPORTER: We are back on the record.
BY MS. ENGLER:
Q Okay. All right. Now, before we broke we were going through some different matters where suits have been filed and settled so we're going to kind of continue with doing that. Do you recall a suit against D'Artagnan?
**A Yes.**
Q Okay. Do you know what D'Artagnan does?
**A I don't recall what they do off the top of my head.**
Q Okay. In the responses that we received your attorneys identified $10,000 -- $10,015 as the amount of the settlement in that

127

case. Is that how much you received for the D'Artagnan settlement?
**A Yes.**
Q Okay. Do you recall a suit against Perpay?
**A Yes.**
Q Okay. Your attorneys identified that you received $3,000 out of the settlement with Perpay. Is that amount correct as to how much you actually received?
**A Yes.**
Q Now, you can totally look at the document. I just want to make sure that that is consistent with your recollection, so is that your recollection or are you just confirming what's on the paper?
**A That's my best recollection.**
Q Okay. Do you recall a suit against Richmond Fitness?
**A Yes.**
Q Okay. Your attorney has reported that you received $3,000 out of the settlement for Richmond Fitness. Is that the amount you actually received?
**A Yes.**

128

Q Do you recall a suit against SR Holdings Management?
**A Not that I can recall off the top of my head.**
Q Do you know the current status of that suit with SR Holdings Management?
**A I do not recall what the status would be off the top of my head.**
Q I'm going to represent to you that court records state that it was closed and settled out by October 13th of 2025. Do you recall receiving any payment associated with SR Holdings Management?
**A You know, I may or may not have. I don't recall whether I did or not.**
Q Do you recall a suit against Skull Shaver?
**A Yes.**
Q What is Skull Shaver?
**A I have no idea.**
Q Okay. Is that case still going or is it settled?
**A I don't recall whether it's still going or settled. I'm not a hundred percent sure.**
Q I'm going to represent to you that the

129

court records reflect a closing date of October 8th, 2025. Do you recall receiving any money associated with Skull Shaver?

**A I may have or may not have. I don't recall whether I had received a settlement or not from the best of my recollection.**

Q Do you recall a suit with LG Electronics?

**A Yes.**

Q Okay. Do you know where that suit was filed?

**A I do not recall where it was filed.**

Q Okay. Do you know if that one is still going or if it's closed?

**A I'm not sure if it's still going or closed or not off the top of my head.**

Q Do you know if you've received any kind of money associated with that matter out of a settlement?

**A I may or may not have. I don't recall whether I have or not from the best of my recollection.**

Q Do you recall a suit against Walker & Co Brands?

**A Yes.**

130

Q What is Walker & Co Brands, do you know what they do?

**A I do not.**

Q Okay. Do you know if that suit is still going on or if it's closed?

**A I do not recall if it's still going on or closed or not.**

Q Do you know if you received any funds from a settlement associated with Walker & Co Brands?

**A Not that I can recall.**

Q Okay.

**A But I may or may not have. I'm not a hundred percent sure from the best of my recollection.**

Q Do you recall a suit against Robbins Research International?

**A Yes.**

Q Is that the company associated with like Tommy Robbins, or Tony Robbins, yeah?

**A I do not know anything about that company.**

Q Okay. Do you know if that one is still going or if that one is closed out?

**A I'm not really sure if it's still going**

131

**or closed out or what the status of --**

Q Okay.

**A -- that would be from the best of my recollection.**

Q And you wouldn't also know whether you've received any funds associated with a settlement in that matter?

**A You know, I may or may not have received settlements, but I don't recall whether I have or haven't.**

Q Okay. What about Telescents, do you recall filing suit with them?

**A Yes.**

Q Okay. Is that like a perfume company?

**A I have no idea who they are.**

Q Okay. Do you know if that one is still going?

**A I'm not sure if it still is or not. I don't recall --**

Q Okay.

**A -- the current status from the best of my recollection.**

Q Do you have any recollection about receiving any funds associated with a settlement in that matter?

132

**A Not that I, you know, could remember from the best of my knowledge.**

Q I know you said --

**A You know, maybe, maybe not.**

Q Maybe, maybe not?

**A Yeah.**

Q Okay. I know you said you remembered filing suit against Pure Green franchise group. Do you know the status of that case?

**A I do not.**

Q Can you say one way or another if you've received any settlement funds in that matter?

**A I don't recall whether I have or not from the best of my knowledge.**

Q How about Freedom Debt Relief, do you recall them?

**A Yes.**

Q Okay be. Do you know if that matter is still pending or it has been closed?

**A I'm not a hundred percent sure of the current status.**

Q Okay. Can you say one way or another based on your recollection whether you received any settlement funds for that matter?

133

**A I don't recall receiving any, but I may or may not have. I'm not a hundred percent sure to the best of my knowledge.**
Q Do you recall a suit against Moriarty Gem Corporation?
**A Who?**
Q Moriarty Gem Corporation.
**A Not off the top of my head I don't recall from the best of my recollection whether we had a suit for them or not.**
Q So you wouldn't know whether or not it's closed or not?
**A No.**
Q Okay. I know you said you recalled a suit against Omaha Steaks as well. Do you have any knowledge about whether that one is still ongoing or if that one's been closed?
**A I don't recall exactly what has happened with that from the best of my knowledge.**
Q So you can't say for certain based on your recollection if you've received settlement funds associated with that matter?
**A Not for certain. I mean, I may or may not have.**
Q Okay. Do you recall a suit against Why

134

Direct?
**A Yes.**
Q Who are they?
**A I have no idea.**
Q Do you know the current status of that matter?
**A Not off the top of my head I do not.**
Q Okay. Based on the court's records I can represent to you that that matter was closed on June 22nd, 2026. You previously referenced two payments of $2,500. Would one of those payments be related to Why Direct?
**A I mean, one of them may or may not have been. I don't recall exactly --**
Q Okay.
**A -- if it was or not.**
Q How about do you recall a suit against Freebird?
**A Yes.**
Q Do you know the current status of that matter?
**A Not off the top of my head. I'm not sure what would be going on with them.**
Q So you can't say for certain whether you've received any funds in settlement based on

135

that matter?
**A No.**
Q Okay. How about Maxim Lending Corp?
**A Yeah, that sounds familiar.**
Q Do you know what the current status of that matter is?
**A Not off the top of my head.**
Q I'm going to represent to you that the court records reflect a closing date of May 1, 2026. Is it possible that the -- one of the $2500 payments you received was in relation to a settlement with Maxim Lending Corp?
**A You know, it may or may not have been, but I don't recall exactly whether it was or not.**
Q Okay. How about Bridgecrest Acceptance Corp, do you recall a suit against them?
**A I -- you know, there may or may not have been a suit against them. I don't recall one off the top of my, you know, head but --**
Q Uh-huh.
**A -- I'm not saying there is or isn't, but there may or may not have been.**
Q Yeah, and all I'm asking for is your recollection. If, you know, you don't have enough of a recollection to say one way or another that's

136

okay. So if -- so you wouldn't know whether or not if there is a suit whether it's still pending or it's closed?
**A No, not exactly.**
Q Okay. And you wouldn't be able to recall whether any payment you've received would be in relation to Bridgecrest Acceptance Corp?
**A Not right off.**
Q Okay. On average if you know what has been the value of the settlements you've received -- well, settlement payments to you on average?
**A I'm not a hundred percent sure of an exact number.**
Q Do you recall what is the lowest settlement amount you've received for one matter?
**A It would be hard for me to actually remember those numbers off the top of my head.**
Q Do you know -- can you recall what would have been the highest individual settlement that you had received?
**A Not off the top of my head I wouldn't be able to recall anything that specific.**
Q Based on the numbers that your attorneys provided us $10,015 from D'Artagnan was the highest one listed. Do you think that the

137

highest amount you've received is higher than that number?
**A I don't believe so from the best of my recollection, but I'm not going to say yes or no.**
Q Sure. Is it fair to say, though, that the D'Artagnan settlement is one of the higher amounts you've received for an individual settlement?
**A Yes.**
Q Okay. Do you keep any records or like, you know, a list or a spreadsheet of the settlement payments that you've received?
MR. OLIVER: I'm going to object to the form of the question. You can answer.
THE WITNESS: No.
BY MS. ENGLER:
Q Okay. Have you filed your tax returns for this year?
**A Yes.**
Q Okay. Did you report the settlement payments as income on your tax returns?
**A Well, I filed before the tax deadline which is in April, and I didn't receive the -- I don't believe that I received any 1099s for the firm until like later on after I had already filed**

138

**so it was kind of too late, so I'm just going to have to amend it next year.**
Q Do you recall when you received the 1099?
**A Not off the top of my head I do not.**
Q Do you recall when you filed your taxes?
**A Not off the top of my head, I do not.**
Q Well, you had said that the tax deadline was in April.
**A Yeah.**
Q Did you file before the April 15th deadline?
**A I filed, yeah, long before that.**
Q Okay. Did you request a 1099 from your attorneys before you filed your taxes?
**A No, they kind of just sent it in the mail after I had already filed.**
Q Prior to filing your taxes were you aware of any obligation to your court settlement payments in your tax return?
**A Yes, but I was also aware that I can amend that at any point if need be.**
Q Have you received your tax reimbursement yet for the year if you are entitled

139

to receive one?
**A My income taxes?**
Q Correct.
**A Yes.**
Q When did you receive that?
**A I don't remember an exact date off the top of my head.**
Q Do you have a month that you can recall?
**A I don't recall an actual month off the top of my head, so I don't want to give you anything that ain't the best of my recollection.**
Q Sure. Now, if we need to pull out a calculator we can. When I add up the numbers that your attorney has listed I get -- what's that number? I get $35,015 for seven cases, so of that $81,185.57 there's a total of $46,170.57.
Do you have any sense -- I know you can't remember the specific amounts, but do you have any sense of whether that 46 -- like scratch that. Do you have any -- if not an exact number an estimation of how many cases account for the $46,170.57 that you've been paid in settlement according to your attorneys?
**A Not --**

140

MR. OLIVER: I'm -- I'm sorry. My fault. I'm going to object to the form of the question but you can answer.
THE WITNESS: Not off the top of my head I don't recall an exact number from the best of my knowledge.
BY MS. ENGLER:
Q Okay. Now, you had said since April of 2026 when your attorneys returned these discovery responses you had received two additional checks each of 2,500; is that correct?
**A It wasn't in April.**
Q Well, right. Your attorneys returned these responses to us in April, and so if I understood your prior testimony correctly after April 24th of 2026 you received two additional settlement checks each of $2500. Is that not correct?
**A Yes.**
Q So it is correct that you received those two after April 24th, 2026?
**A Yes.**
Q Okay.
**A They were after it, yes.**
Q Did you receive any other settlement

141

checks after April 24, 2026?
**A Not that I can recall. I'm not implying yes or no, but not that I can recall.**
Q Okay. So 2500 times two, 5,000 plus the $81,185.75 (sic). Unless I did my math wrong that gives me $86,185.57; is that correct? I'm just checking my math here.
**A It may or may not be correct. I'm not no math person like that, but --**
Q If we need to bust out a calculator we can do it.
**A That might be a better idea.**
Q You can use your phone if you want to.
MR. OLIVER: Are we stipulating that two numbers added equals a certain number?
MS. ENGLER: Yeah, that's just what I'm asking.
MR. OLIVER: Okay. Well, let's -- tell me the two numbers and we'll add them up and I'll stipulate that those two numbers equal the number and that --
MS. ENGLER: Okay.
MR. OLIVER: -- might save us some --
MS. ENGLER: Yeah.
MR. OLIVER: -- time. So we're adding

142

--
MS. ENGLER: 5,000.
MR. OLIVER: Okay. 5,000.
MS. ENGLER: To 81,185.57.
MR. OLIVER: Okay. And then we can stipulate that that equals $86,185.57.
MS. ENGLER: That works for me.
MR. OLIVER: Yeah, that'll work.
THE WITNESS: That sounds correct, yeah.
BY MS. ENGLER:
Q Okay. Is -- to the best of your knowledge is $86,185.57 the total amount you have received in settlement to date?
**A Yes.**
Q Okay. So -- now, we've talked earlier this morning about the different phone numbers you've had and if you need to refer back to the interrogatory you certainly can, but it looks to me that you had at least six phone numbers in the past four years; is that correct?
MR. OLIVER: I'm sorry. What are we looking back at?
MS. ENGLER: I mean, if he can't recall he can refresh his memory --

143

MR. OLIVER: Okay.
MS. ENGLER: -- with the responses which would be the response to interrogatory number 4.
MR. OLIVER: Is this the amended? I'm sorry.
MS. ENGLER: I believe the answer is the same in the amended and the original.
THE WITNESS: So you were saying -- say your question again.
BY MS. ENGLER:
Q Sure. From the -- like from the answers to the discovery and your testimony this morning is it correct that you have had at least six phone numbers in the past four years -- or the past five years, excuse me, the past five years?
**A Yes.**
Q Okay. So you're no stranger to having to get another phone number and let the people you know, family, that you have a new phone number?
**A No.**
Q How do you usually inform them that you have a new phone number?
**A Depending on what I'm doing during the day either I'll text or I'll call --**

144

Q Okay.
**A -- depending on the circumstances.**
Q What circumstances would determine whether you would do a text or a call?
**A I mean, whether I'm busy or not.**
Q Okay. If you're busy would you do a phone call or a text message?
**A Probably a quick text.**
Q Okay. And we have looked at some of your social media previously and so you frequently have recreated Facebook pages as well, correct?
**A Yes.**
Q And frequently create new E-mails?
MR. OLIVER: I'm going to object to the form of the question. If you're able to answer that you can answer that if you understand it.
THE WITNESS: Yes.
BY MS. ENGLER:
Q Yes. Okay. So I guess my question for that is, you know, since you frequently change numbers and Facebook pages and E-mails if the texts were so bothersome, enough to file suit, why not just change your number?
MR. OLIVER: I'll object to the form of the question, but you can answer it.

145

THE WITNESS: Well, because I never should have had my privacy invaded or any of that messaging me to begin with. That's why I just didn't change my number, you know, on top of the fact that I was busy at the time I got the number. I'm working and doing things.

BY MS. ENGLER:

Q So you objected to changing your number because you felt like they invaded your privacy and you were busy at the time you received messages?

MR. OLIVER: I'm going to object to the form of the question. You can answer it if you --

THE WITNESS: Reword that question for me.

BY MS. ENGLER:

Q Sure. So I'm just trying to understand what your testimony is because I had asked why not change your number if the texts were so bothersome, and from what I understand you testified to is that you were busy at the time you got the text messages and you believe the texts were an invasion of your privacy; is that correct?

**A Yes.**

Q If you believed that the text messages

146

were invading your privacy wouldn't changing your number solve that issue?

**A Well, no, because it would actually take more work because then I have to notify other people that I have a new phone number, and I shouldn't have to do all that if I never consented to receiving any messages to begin with.**

Q When you get a new phone number how many individuals do you usually notify?

**A Usually just immediate family, girlfriend, a few friends over time.**

Q How many people in your immediate family would you notify?

**A Three. I take that back. Two actually.**

Q And then your girlfriend?

**A My girlfriend, my mom and my other sister.**

Q Okay. And you said a few friends?

**A Yeah.**

Q Do you have a ball park number as to how many friends that would be?

**A Probably two right off.**

Q Okay. So you listed two immediate family members, your girlfriend, her mom, her

147

sister and two friends?

**A Well, I'm not actually saying my girlfriend.**

Q Oh, you're saying your mom and your sister?

**A Yeah.**

Q Okay.

**A I'm not saying my girlfriend's mom. I'm just saying her, my mom, my sister --**

Q Okay. So the --

**A -- two friends.**

Q So the mom and sister that you mentioned, those are the two immediate family members?

**A Yeah.**

Q Okay. So with mom, sister, girlfriend and two friends that's a total of five individuals, correct?

MR. OLIVER: I'm going to object to this line of questioning but you're welcome to answer if you please.

THE WITNESS: Yes.

BY MS. ENGLER:

Q Okay. And so it's your testimony today that notifying the five individuals would be more

148

burdensome than changing your number?

MR. OLIVER: Objection to the form of the question. You can answer if you know the answer.

THE WITNESS: It would be burdensome because it would take up my time --

BY MS. ENGLER:

Q Okay.

**A -- that I shouldn't have to sacrifice.**

Q You previously testified today that you bought additional -- that you bought additional phones. Did you buy additional numbers or SIM cards with the phones that you purchased?

**A No.**

MR. OLIVER: Hold on. Just objection to the form of the question. You offered an answer, if you know the answer.

THE WITNESS: No, I have not.

BY MS. ENGLER:

Q Where did you purchase those phones?

**A Most of them were purchased at Walmart.**

Q Okay. When you purchased them at Walmart you were buying them one at a time?

**A Yes, but only if my current phone I was using had broke --**

149

Q Okay.
**A -- or I wasn't able to use it.**
Q We talked a bit this morning as well about your understanding of your role as a class representative and obligations that you have. What have you personally done to meet your obligations as a class representative?
**A I've followed up with counsel promptly. I've done -- I've signed a client services agreement.**
Q What do you mean a client services agreement?
**A An agreement between me and counsel of what I'm supposed to do which kind of -- kind of as a class representative as well as a client in a way.**
Q Is that particular -- that agreement that you're speaking of, is that the class action authorization that we looked at earlier today?
**A I think that's what I was referring to.**
Q Okay. And just to confirm, you haven't signed to your recollection any other engagements or authorizations with other attorneys associated with the TCPA actions?
**A Not that I can recall at all.**

150

Q Okay.
MR. OLIVER: I'm going to object, a late objection to the form of that last question, but you answered it so if you're okay with that that's fine.
BY MS. ENGLER:
Q Now, we went through a number of the different other defendants that you have sued in these various TCPA class actions. Do you ever have any concern -- do you have any concerns that the other disputes could distract you from your duties to the class in this matter?
**A What are you referring to by other disputes?**
Q The other TCPA class actions that you've filed.
**A No, not really. I don't believe that being that they had nothing -- they don't have every bit of context to do with this in particular I don't think they should have any immediate effect on that or any at all foregoing.**
Q So just so I understand your testimony, are you saying you don't believe the other litigations are a distraction because they don't have the same fact pattern or parties involved?

151

MR. OLIVER: I'm going to object to the form of the question, but if you understand you can answer.
THE WITNESS: I'm not saying that exactly. What I'm saying is I don't believe that it's going to be -- there's any distraction in general.
BY MS. ENGLER:
Q Okay. Why do you feel that way?
**A Well, I mean, other cases are other cases. This is a different scenario I guess to me.**
Q How is it different?
**A It's a different defendant, different company --**
Q Uh-huh.
**A -- so I mean --**
Q Okay. Do you believe you've met your obligations to date as the class representative?
**A I do.**
Q Okay. What is your understanding -- assuming that either litigation -- well, scratch that. Do you have an understanding of what's the maximum amount of settlement funds you could receive from either a settlement or a judgment

152

against BBQGuys?
MR. OLIVER: I'm going to object to the form of the question, but if you -- you can answer if you know.
THE WITNESS: You know, I don't recall or know if there is an exact amount that you can or can't get to settle from BBQGuys off the top of my head.
BY MS. ENGLER:
Q I'm not talking about the overall settlement. I'm talking about what would be paid to you. Like do you have a sense on what would be the maximum amount that you could receive?
**A I don't know a number off the top of my head --**
Q Okay.
**A -- from the best of my knowledge.**
Q Okay. Do you understand whether there's any differences in settlement payment you could receive based on whether the matter is settled as a class versus individual?
**A Repeat that question again.**
Q Sure. Is there any difference in the amount of settlement funds you could receive for your claim if the settlement is on a class basis

153

versus an individual basis?
MR. OLIVER: Hold on a moment. I'm going to object to the form of the question. If you can answer this without referring to knowledge gained by communications with counsel, if you have some sort of independent basis to know the answer to the question you can answer it.
If you have to refer to knowledge obtained through communications with counsel you can't answer it, so you can determine whether you're able to answer that question apart from that.
MS. ENGLER: Dana, we can dig into that a bit more if we need to --
MR. OLIVER: Okay.
MS. ENGLER: -- but this is stuff that's all in this agreement that's been produced and so --
MR. OLIVER: Oh, I understand. Yeah, but that's a matter of interpretation --
MS. ENGLER: Sure.
MR. OLIVER: -- but I'll lodge the objection just to --
THE WITNESS: I don't believe that I'm entitled to more than other plaintiffs or --

154

BY MS. ENGLER:
Q Uh-huh.
**A -- less. I just believe it's about doing what's right for the class, and if I do receive any monetary value or anything about it then whatever comes about comes about.**
Q Do you know if any of the settlement payments you've received are from class-based settlements?
**A I don't recall if they were or weren't off the top of my head.**
Q Uh-huh. Okay. Can you take a look back at I believe it's Exhibit 12, the engagement letter for the class action authorization? Actually, let's see. Is it 12?
MR. OLIVER: Yeah.
MS. ENGLER: Okay. Just making sure.
BY MS. ENGLER:
Q If you could turn to the second page that's going to be McGonigle-Shop 00006. It says in the event that this case is settled on an individual basis and not settled on a class action basis we'll attempt to negotiate settlement for full statutory damages in the maximum amount of 500 for negligent violations and up to 1500 for

155

willful violations and independently negotiate our fees and costs.
However, a negotiated settlement may range anywhere up to 1500 per violation which is the maximum amount you may be entitled to recover under the statute. Do you see that?
**A Yeah.**
Q So if a matter would be settled on a individual basis the maximum you could receive is 1500 per violation?
**A I'm not a lawyer. I can't interpret the law so, you know, that may be the case or that may not be the case, but I can't recollect whether that's how it is or not.**
Q I'm just -- I'm not asking that you necessarily give a legal interpretation. Just what is your understanding about if there's an individual settlement what you would be entitled to receive?
MR. OLIVER: I'm still going to object to the form of the question, but you can answer.
THE WITNESS: I mean, I don't know exactly what I would be entitled to the best of my knowledge to receive.
BY MS. ENGLER:

156

Q Do you know how a violation is counted?
**A Well, from what I've read and my interpretation it depends on --**
MR. OLIVER: Hold on. The question is do you know, so if you know the answer is yes. If you don't know the answer is no or I don't know, but don't explain.
MS. ENGLER: Well --
MR. OLIVER: Let her ask a question.
MS. ENGLER: I think that if he wants to explain his answer he's entitled to.
MR. OLIVER: Well --
THE WITNESS: What's the question again?
BY MS. ENGLER:
Q What do you understand to be a violation?
**A A violation of the TCPA would be a text or a call without my consent or anyone's consent --**
Q Okay.
**A -- foregoing.**
Q So when they say per violation, you know, presuming there would be multiple violations how -- what constitutes multiple violations of the

157

TCPA?
**A Multiple calls or texts.**
Q Okay. So for each text it's a violation?
MR. OLIVER: I'm going to object to the form of the question. If you understand.
MS. ENGLER: In your understanding. I'm not asking for a legal interpretation.
MR. OLIVER: No, that's fine.
MS. ENGLER: Just for your understanding.
THE WITNESS: Yeah. I mean, if they're texts and they're not text and you didn't consent to receive the text it would be considered a violation.
BY MS. ENGLER:
Q Okay. Okay. And then --
THE REPORTER: Hold on one second. Can we go off the record for a second?
MS. ENGLER: Sure.
(Whereupon, there was a brief pause in the proceedings.)
THE REPORTER: We are back on the record.
BY MS. ENGLER:

158

Q So taking what we -- what, you know, you've talked about with what constitutes a violation and multiple violations isn't your agreement that the maximum you can receive for an individual settlement is $1500 per text or phone call?
**A To the best of my knowledge, yes.**
Q Okay. So if we just say hypothetically, you know, there was two violations it would be $3,000 as the maximum; is that correct?
**A Yes.**
Q Okay. So if the settlement, however, would be higher than that the remainder gets kept by your counsel as costs and fees; is that correct?
MR. OLIVER: I would advise that you look at the language so that you're answering the question instead of guessing.
THE WITNESS: Okay.
MR. OLIVER: As best you understand it.
THE WITNESS: Yes, that's correct.
BY MS. ENGLER:
Q Okay. To your knowledge has BBQGuys made any offers to settle this matter prior to

159

today?
**A There were a few offers I believe that may have been made.**
Q Do you recall what they were?
**A Not off the top of my head I don't remember exact numbers.**
Q Do you have a ball park idea?
MR. OLIVER: Answer the question to the best of your knowledge.
THE WITNESS: I remember the biggest amount that they offered.
BY MS. ENGLER:
Q And what was the biggest amount?
**A From the best of my recollection it was like I want to say 300,000. That may or may not be right. That's the best that I can remember.**
Q Were you in communication with your counsel on May 19th of 2026 concerning the mediation between BBQGuys and your counsel?
**A No.**
Q Do you know anything about how that mediation went?
**A The only thing I know is that there was -- they were trying to come to an agreement and come to a settlement. Other than that that's, you**

160

**know, just the basis of what I know.**
Q Do you know what was the final number that BBQGuys had offered during that mediation?
**A Not off the top of my head I don't recall the final number.**
Q Just so I have it clear were you communicating with your counsel during the mediation on May 19th of 2026 or were you just given a report of the mediation afterwards?
MR. OLIVER: I'm going to object to the form of the question, but if you know the answer, answer it.
THE WITNESS: I was given a report afterwards, after all that.
BY MS. ENGLER:
Q And then as you testified, which you recalled correctly, after that mediation but before this deposition BBQGuys did offer $300,000, correct?
MR. OLIVER: Objection to the form of the question. If you know the answer you can answer.
THE WITNESS: Yes.
BY MS. ENGLER:
Q Okay. Are you aware about whether the

161

offers were on a class or individual basis?
**A I don't recall whether they were class or individual off the top of my head. They may have been class, they may have been individual. I just don't a hundred percent recall.**
Q Okay. So we looked previously at some of these messages that have been sent back and forth and it looks like there's been seven messages in total or six -- let me see, six or seven in total.
MR. OLIVER: Let me get back to this.
MS. ENGLER: Let me see. Actually -- yeah, scratch that. Actually nevermind.
BY MS. ENGLER:
Q So I believe that there's between six or seven text messages there. I'm going to go ahead and for ease just say eight just to -- actually no, scratch that. I'm sorry. I keep on start and stopping.
Let's just count all the text messages in the stack, and this is McGonigle-Shop 0020 that we're looking at again, which can you tell me what exhibit number that is down there?
**A 13.**
MS. ENGLER: Thank you.

162

MR. OLIVER: Exhibit Number 13.
MS. ENGLER: Thank you.
BY MS. ENGLER:
Q Okay. How many do you count?
MR. OLIVER: Objection to the form of the question. If you understand the question.
MS. ENGLER: I'll rephrase -- yeah, I'll rephrase. How many messages are there --
MR. OLIVER: Objection to the --
MS. ENGLER: -- in the exhibit?
MR. OLIVER: Okay. In the exhibit. Okay.
THE WITNESS: How many text messages are there?
BY MS. ENGLER:
Q Yes.
**A Unless these are the same text messages, the get your yard game ready for touchdown --**
Q Uh-huh.
**A -- I want to say four that I can see totally unless, I mean --**
MR. OLIVER: Look at the exhibit. Make sure you're looking at the full exhibit.
MS. ENGLER: Yeah, for --

163

MR. OLIVER: How many pages are there?
MS. ENGLER: It's four pages total.
THE WITNESS: It's four pages. Okay.
MS. ENGLER: Yeah.
MR. OLIVER: Wait. There's four pages total in the exhibit or are there five?
MS. ENGLER: I think there's --
THE WITNESS: I think there's four, I think.
MS. ENGLER: Oh, five, you're correct.
THE WITNESS: There's five, okay. Sorry. I'm missing one. All right. If these two are the same that I was referring to --
BY MS. ENGLER:
Q Uh-huh.
**A -- which they look to be the same messages based on the text, it should be a total of six messages.**
MR. OLIVER: I'd just advise you to look at the exhibit closer and check the dates.
THE WITNESS: Hang on.
(Whereupon, there was a brief pause in the proceedings while the witness reviewed the document.)
MR. OLIVER: Just look at the dates and

164

just, you know, just look closely before you put something on the record. These are going to be texts that are in this exhibit, correct?
MS. ENGLER: Uh-huh.
THE WITNESS: I can't tell if this was a text or if this is the same as this. It looks to be almost the same date, but --
MS. ENGLER: Okay. Well, let's go through --
THE WITNESS: -- I can't tell if it's 6:25 or 6:35 p.m.
MS. ENGLER: Okay. So we have --
MR. OLIVER: I see what you're looking at here.
THE WITNESS: There may be more than what I was saying, but I'm counting what I can physically read all of.
MS. ENGLER: Uh-huh.
THE WITNESS: There could be more, there could be less.
MR. OLIVER: Do you recall, just so -- you guys talked about this earlier, this particular one.
THE WITNESS: Yeah.
MR. OLIVER: Because there's no date on

165

this one. She had mentioned that earlier. There's no date showing on this one, but you can look at the dates. That's probably your best reference when you're counting. When it's on the record I just want you to do your best.

BY MS. ENGLER:

Q Based on your review how many text messages are there?

**A Anywhere from six to seven roughly.**

Q Okay. So it's either six or seven. Okay. So we'll assume just seven for the sake of argument. If seven messages are alleged as being violations multiply that times 1500 and I get 10,500. From that math would you agree that the most you could recover in an individual settlement in this matter is $10,500?

MR. OLIVER: I'm going to object to the form of the question, but you can answer if you know the answer.

THE WITNESS: What were you saying again?

BY MS. ENGLER:

Q So I asked if you would agree that assuming there are seven violations that the most you personally would be able to recover as part of

166

your portion of an individual settlement is $10,500?

**A That's correct, yes.**

Q Okay. So were BBQGuys $300,000 offer accepted the remaining $289,500 would go to counsel?

MR. OLIVER: Objection to the form of the question. You can answer.

THE WITNESS: I -- I believe so. I'm not a hundred percent sure but I believe so.

MS. ENGLER: Okay. If we could go back to the first set of interrogatories and request for production of documents and request for admissions, the original nonamended.

MR. OLIVER: Is that 9?

MS. ENGLER: I believe so.

THE WITNESS: Okay.

BY MS. ENGLER:

Q When you have that I'm going to ask you to flip to page 29, and at the top it'll say request for admissions. Okay. Do you have those in front of you?

**A Yes.**

Q Okay. Did you have an opportunity to review these responses?

167

**A Yes.**

Q Okay. I'm going to direct you to request for admission number 2. We requested that you admit you had not suffered any financial damages because of receipt of the text messages from BBQGuys to the phone number, and in the response this request for admission was denied. What financial damages have you received because of the receipt of the text messages from BBQGuys?

MR. OLIVER: I will object to the form of the question, but go ahead and answer.

THE WITNESS: Well, there's been times I've had to -- I've had to call out of work to deal with the deposition, which is in regards to that so I'm losing work, I'm losing money because somebody willfully violated the TCPA.

BY MS. ENGLER:

Q Okay. That's answering a different question than what I asked. What I asked is what financial damages have you incurred because of the receipt of the text messages, not litigation that came afterwards.

MR. OLIVER: Okay. I'm going to object to the form of this question, but do your best on that.

168

THE WITNESS: Well, the text messages dug into my time. When I was receiving these text messages I was trying to work and do productive things.

BY MS. ENGLER:

Q Okay. And was your pay docked because you received a text message from BBQGuys?

**A No, but it could have been.**

Q Okay. But it was not, correct?

MR. OLIVER: I'm going to object to the form of the question again. Answer the best you can.

THE WITNESS: It wasn't docked that I can recall or that I know about.

BY MS. ENGLER:

Q Uh-huh.

**A But I'm not saying it was or wasn't because I don't recall whether it was docked or not off the top of my head.**

Q Well, and also please remember right now I'm only asking about the text messages that BBQGuys sent, not any other defendant. I understand you may have received a lot of other messages from other people. I'm only asking about the no more than seven as we agreed text messages

169

you received from BBQGuys. Was the receipt of those text messages -- what are the financial damages?
A **The financial damages are the $1500 per willful violation.**
Q That's a statutory damage. I'm asking about what you have personally incurred because you received the seven text messages from BBQGuys that harmed you financially.
A **Well, the text messages took up a lot of my time.**
Q Again, I didn't ask if they took up your time. I'm asking about financial harm that you suffered because of the receipt of text messages.
MR. OLIVER: I'm going to object again to the form of the question. You can answer if you know.
THE WITNESS: There are standard message and data rates that apply to text messages like that.
BY MS. ENGLER:
Q You have an unlimited plan, though, right?
A **Yes.**

170

Q So those don't apply the same way to an unlimited plan as they would to a per text plan, correct?
A **But I don't pay $60 to receive text messages from them --**
Q Correct, you --
A **-- so it is kind of a -- that is kind of where I'm spending money for something I shouldn't be spending money for.**
Q Are you arguing that you would be charged less money if you didn't receive the text messages from BBQGuys?
A **No, I'm not exactly implying that.**
Q Okay. And you would be paying the $60 regardless to receive the services from your provider, correct?
A **Yes.**
Q So even if you never received a single text message from BBQGuys you would still be paying $60?
A **At the time that I had received these messages I was either trying to work or do something protective and make money and it was cutting into my time, which did kind of cause me a little bit of financial damages.**

171

Q What financial damages specifically?
A **Well, I mean --**
Q And again remember we're talking about seven text messages --
A **I mean --**
Q -- between September and October.
A **-- I didn't receive all the texts while I was working, but while I was looking for work or trying to find work, so it cuts into my time which I'm visually putting money into.**
Q But that's -- okay. So you're visually putting money to that but that's not showing up on like a run sheet or any documentation, though, right?
A **Well, I don't keep record of everything so no, not exactly. It doesn't mean that I haven't done whatever.**
Q I'm just trying to understand if there is a dollar figure you have that is documented that you have suffered financial damages specifically because you received seven text messages that you didn't want from BBQGuys over the course of about a month and a half. If the answer is no we can move on, but if you have financial damages --

172

MR. OLIVER: That's your question that you just -- that's a good clarification that you just gave, so you should be able to answer the question she just asked you.
THE WITNESS: Yes, there are financial damages.
BY MS. ENGLER:
Q What are they?
MR. OLIVER: If I might she clarified what she was asking, is there any -- if I misstate correct me. Okay?
MS. ENGLER: Okay.
MR. OLIVER: She said -- she wanted to know if there's any documented financial damages that you can show --
THE WITNESS: I don't have anything --
MR. OLIVER: -- for these texts that you received. That's --
THE WITNESS: I don't have anything that's documented, but I'm not implying that there isn't financial damages, though, either.
BY MS. ENGLER:
Q What's the dollar amount of those financial damages?
A **At least, I mean, anywhere from 75 to a**

173

**hundred dollars.**
Q So 75 to a hundred dollars you're attributing to seven text messages over the course of two months?
**A That cut into my, you know, general time where I'm out either looking for work or trying to do something productive --**
Q And how --
**A -- and spending money while trying to do it.**
Q And how did you get to that number of 75 to a hundred dollars?
**A I'm just throwing a rough estimate out there.**
Q Okay. So you have no accounting or anything to back this up, this is just feelings?
MR. OLIVER: Well, I object to the form of the question, but --
THE WITNESS: No. I'm accounting for what -- the money I'm spending with the time I'm -- you know, while my time is being kind of intruded on and my privacy as well.
BY MS. ENGLER:
Q Well, but that's a completely different deal of any kind of damages relating to a invasion

174

of privacy or something. I'm just asking about the hard costs, financial costs that you incurred because of the texts from BBQGuys.
MR. OLIVER: If I might, I mean, I don't think we have difficulty stipulating that he has no stated documentation for specific damages based on these texts. I thought that was kind of the clarity that we were getting. I feel like we're kind of going around, which is fine to keep going around.
MS. ENGLER: Uh-huh.
MR. OLIVER: I just don't want him answering the same question multiple times because at some point it might be argumentative and I don't -- I just want to move things along.
MS. ENGLER: No, and I understand that and I know it's been a long day so far but, you know, typically when we have financial damages we have a quantum.
We have receipts, we have things we can back them up with or at least some kind of mathematical evaluation we can look at. We have not received anything indicating there are any financial damages, but our request for admission was denied. I'm trying to understand why.

175

MR. OLIVER: I think he's done his best. I think there's a lot of clarity that's happened in the exchange put forth, so we can try again but I'm afraid he's going to be answering the same question multiple times so if there's a way to --
MS. ENGLER: Yeah, I'll take it from another direction.
BY MS. ENGLER:
Q When you received the text messages from BBQGuys how long -- how much time did it genuinely take you to look at the text message, see that it was a text message you didn't want and go back to what you were doing?
**A Well, depending on what I was doing if I was super busy it would have been, you know, 25, 30 minutes before I decided to glance at it or look at it in full detail.**
Q Well, I thought you previously testified that you wouldn't necessarily look at the full detail of the text messages because you weren't interested in them?
**A Well, I'm not referring to the context of the text messages. I'm just referring to see what was sent to me. I mean, it's my phone. I**

176

**got a right to see what's sent to me.**
Q Of course, of course. So how much time does it take you to upon receipt of a message look at it? And I'm not talking about you heard your phone chime and then you went and looked at it later. I'm talking about when you went and picked up your phone and looked at it.
**A Like a minute.**
Q Okay. So is that consistent with other messages similar to the marketing ones that BBQGuys sent?
**A I mean, I guess so.**
Q Is there a reason to believe that you spent more time looking at one of the seven text messages that BBQGuys sent you than the one minute you estimated?
**A I -- to the best of my recollection I don't think so.**
Q Okay. So we're talking about an interruption of seven minutes maximum?
MR. OLIVER: Object to the form of the question, but you can answer.
THE WITNESS: Yes.
BY MS. ENGLER:
Q Okay.

177

**A If there are, you know, obviously seven text messages that would be the claim.**
Q That would be what, I'm sorry?
**A If there are obviously seven text messages then yes, that would be the claim.**
Q Okay. If I understood your testimony correctly earlier you said six or seven so I'm just using --
**A Okay.**
Q -- seven for the sake of, you know, being cleaner and setting a maximum. And your current salary is $18 an hour?
**A Around 18.**
Q Around 18 an hour. Okay. So why is your calculation of your time not based on your current salary versus this other estimation you provided?
**A I'm not really sure. I can't recall actually.**
Q You can't recall why you offered 75 to a hundred previously as your financial damages?
**A Not off the top of my head. I mean --**
Q Okay. Let's take a look at request for admission number 3. The request was admit that your largest source of income for 2024 was

178

settlement payments received in TCPA litigation and this request was denied. What was your largest source of income for 2024?
**A You know, I don't really recall what the largest source of income was right off the top of my head. To the best of my knowledge I don't remember exactly.**
Q But you say it wasn't the TCPA litigation settlements?
**A I'm not implying that it was or wasn't because I don't recall what was the biggest amount I did make in 2024.**
Q Okay. Let's look at request for admission number 4, admit that your largest source of income for 2025 at present is settlement payments received in TCPA litigation and this was admitted. Is that confirmed?
MR. OLIVER: Oh, yes, yes.
BY MS. ENGLER:
Q Do you consider these cases to be a job?
**A I don't look at this to be a job. I'm not in it for the money. I just try to do what's best for the class at the end of the day.**
Q If you're not in it for the money then

179

what are -- like what are you in it for?
MR. OLIVER: Objection to the form of the question. It was asked and answered, but --
MS. ENGLER: It's a little bit of a different question --
MR. OLIVER: Yeah.
MS. ENGLER: -- based on his answer, so I'd like to hear what he has to say.
THE WITNESS: I'm in here to do what's best for the class that represent the best interest for going for the class, nothing more, nothing less.
BY MS. ENGLER:
Q Well, I guess the question then I have is, you know, as we were just talking about with the burden, of course taking time out of litigation and coming to depos and everything takes, you know, why is this something that you feel passionately about?
**A I wouldn't say that I feel passionate about it. I feel that I have a moral sense about it. I just want to do what's right and what would benefit the class at the end of the day.**
Q If you can go to request number 9 on page 31 we had asked to admit -- asked you to

180

admit that you did not submit or attempt to submit any instruction of any client to BBQGuys to stop sending you text messages and that request was denied. Can you explain the basis for that? It should be on page 31.
**A Thirty-one?**
Q Uh-huh, of Exhibit 9.
MR. OLIVER: I'm going to object to the form of the question and just instruct him that if you can answer this question without referring to knowledge obtained from discussions with counsel, if you have some independent basis to answer the question go ahead and answer the question.
MS. ENGLER: Well, and even if he discussed with counsel whether he sent a message to BBQGuys wouldn't BBQGuys know that?
MR. OLIVER: Do you want me to respond to you?
MS. ENGLER: I'm just trying to understand the objection.
MR. OLIVER: Oh, I'll tell you the objection.
MS. ENGLER: Yeah, I'm just trying to understand --
MR. OLIVER: Oh, okay.

181

MS. ENGLER: -- what would be the basis for there being stuff with counsel. I would think he would be able to independently answer this without --

MR. OLIVER: Well, he might, but he might not know the answer without talking to counsel and learning something about something.

MS. ENGLER: Okay.

MR. OLIVER: That's -- there may be a basis for denying this --

MS. ENGLER: Okay.

MR. OLIVER: -- that he's not fully in a position to answer, but he's welcome to do his best.

MS. ENGLER: Sure. Okay.

MR. OLIVER: So if you can answer that independent of communications with -- or knowledge obtained from communication with counsel then go ahead.

THE WITNESS: Is this request for admission number 9?

BY MS. ENGLER:

Q Yeah. It had stated admit that you did not submit or attempt to submit any instructions of any kind to BBQGuys to stop sending you text

182

messages and the request was denied, so I was wondering what instructions are you contending were sent to BBQGuys?

**A I don't recall whether I sent any instructions to them or not from the best of my recollection.**

Q Okay. Now, your counsel may have done something different but you just personally -- like we talked a lot earlier this morning about texting back stop and stuff like that. You don't have any knowledge of you personally sending any kind of message to stop getting text messages from BBQGuys?

**A You know, I'm not going to say that I have or haven't. I may have, I may haven't, but I don't recall ever replying with stop from the best of my, you know, recollection and memory.**

Q Okay. If you could go to request number 12 we had asked -- basically asked for request for admission concerning use of AI tools or large language models, and the response was plaintiff states the request calls for information outside of his personal knowledge and therefore cannot be admitted or denied.

I'm not asking what your attorneys have

183

told you or anything like that, but just confirming that you have no personal knowledge of the use of AI or LLM?

**A I don't recall ever using it --**

Q Okay.

**A -- that I know of. I'm not implying that it was or wasn't used.**

Q Yeah. Have you ever used like ChatGPT or anything like that?

**A Not that I, you know, can recall.**

Q Uh-huh.

**A Again I'm not implying that I have or haven't, but not that I can recall.**

Q I'm just meaning currently today like --

**A No.**

Q Okay. We were talking much earlier today about your roommates. Is Tyler Vires still at the North Church address, the 660 I think, or is he at a different address?

**A I don't recall where he's at. I've heard he's moved, but I don't know where he's at.**

Q Do you have an idea about a city or anything?

**A Not off the top of my head I don't.**

184

MS. ENGLER: Okay. Okay. I think I'm done. I'll need a minute or two to review through my notes. I didn't know if you had any follow-ups.

MR. OLIVER: No, I'm okay.

MS. ENGLER: Okay. So do you mind if we take a five just so that I can check on my notes and make sure that --

MR. OLIVER: Yes, that's fine.

MS. ENGLER: -- there's nothing else?

MR. OLIVER: Yeah, I'm good with that.

(Whereupon, a brief recess was taken in the proceedings.)

THE REPORTER: We are back on the record.

MS. ENGLER: Okay. Thank you, Mr. McGonigle. I have no further questions for you today so --

MR. OLIVER: Okay. No problem.

MS. ENGLER: I was able to confirm I have no more.

MR. OLIVER: And so what's the process on this? They're going to want a read and sign for him so --

MS. ENGLER: Uh-huh. Yeah, certainly

185

do a read and sign since that's what they want. I requested an expedited to get it by the 8th.

MR. OLIVER: Okay.

MS. ENGLER: So I presume ya'll want a transcript as well?

MR. OLIVER: Here's the thing. You need to ask Anthony or Avi because I'm not going to stick them with a bill, so do you have Anthony or Avi's -- they should be on some of the documents. I just want to make sure you have it.

MS. ENGLER: They're saying standard turnaround is five business days so that would probably be the end of next week otherwise.

MR. OLIVER: Yeah, so just let them know because they might -- so they can order what they need and I don't have to --

THE REPORTER: Okay. And so you --

MR. OLIVER: When the --

THE REPORTER: You don't want to order?

MR. OLIVER: That's correct, but they definitely might. I'm assuming they will, but I just want to let them decide.

THE REPORTER: All right. And just -- do you want to say your order on the record?

MS. ENGLER: Yeah, an electronic only,

186

I do not need a paper copy, and expedite to July 8th.

THE REPORTER: And you want exhibits attached?

MS. ENGLER: My copy does not need exhibits. Yeah, actually I don't need exhibits attached for my copy I don't believe -- oh, wait. Yes, attach exhibits, I'm sorry. I'm spacing already today.

(Whereupon, the Deposition of ANDREW JAMES MCGONIGLE was concluded at 3:52 p.m.)

187

CERTIFICATE OF TRANSCRIBER

I, Bonnie K. Panek, do hereby certify that the foregoing transcript is a true and correct record of the recorded proceedings; that said proceedings were transcribed to the best of my ability from the audio recording and supporting information; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

BONNIE K. PANEK

188

CERTIFICATE OF DIGITAL REPORTER - NOTARY PUBLIC

I, Steven Barry, a Notary Public in and for the District of Columbia, the officer before whom the foregoing proceedings were taken, do hereby certify that the foregoing transcript is a true and correct record of the proceedings; that said proceedings were recorded by me digitally and thereafter reduced to typewriting under my supervision; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 8th day of July, 2026.

*Steven Barry*

NOTARY PUBLIC IN AND FOR
THE DISTRICT OF COLUMBIA