IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| CLARENCE DAVIS,<br><br>Plaintiff,<br><br>v.<br><br>CAPITAL ONE, N.A.,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. 1:22-cv-00903 (AJT/IDD) |

**MEMORANDUM OPINION AND ORDER**

As part of its customer agreements, Defendant Capital One, N.A. ("Defendant," "Capital One," or the "Company") obtains consent from its customers to call them on an identified number. In May of 2022, Capital One placed a call to a cellular phone number listed in its records as belonging to a Capital One customer who had given consent for such a call and who was delinquent on his Capital One account. As it turned out, the number called had been reassigned to the Plaintiff Clarence Davis ("Plaintiff," or "Davis"), who was not a Capital One customer. When the call was not answered by Davis, a pre-recorded message was triggered. In this putative class action, Davis seeks certification of a class consisting of those persons, who, like him, received a pre-recorded message from Capital One after the number for which it had received consent to call had been reassigned to someone who had not given consent to be called. Davis, on behalf of the putative class, alleges that such phone calls violate the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227(b).

Currently pending are (1) Defendant's Motion to Exclude Expert Testimony, [Doc. No. 76]; (2) Defendant's Motion to Exclude the Testimony of Plaintiff, [Doc. No. 78]; (3) Plaintiff's Motion to Certify the Class, [Doc. No. 84]; and (4) Defendant's Motion to Strike a Supplemental

Declaration of Plaintiff's Expert [Doc. No. 104]. The Motions have been fully briefed, and a hearing was held on July 12, 2023, following which the Court took the Motions under advisement.

For the reasons discussed below, the motions to exclude the testimony of Plaintiff's expert, [Doc. No. 76]; [Doc. No. 104], are **GRANTED**, and the motions for class certification and to exclude the testimony of Davis, [Doc. No. 84]; [Doc. No. 78], are **DENIED**.

## I. Background

The TCPA is a statutory scheme enacted by Congress to combat intrusive automated marketing communications. *See Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 649 (4th Cir. 2019). Section 227(b) of the TCPA states "[i]t shall be unlawful for any person within the United States…to make any call…using any automatic telephone dialing system or an artificial or prerecorded voice…to any telephone number assigned to a…cellular telephone service." 47 U.S.C. § 227(b)(1). The TCPA also provides for statutory damages of $500 per violation, 47 U.S.C. § 227(b)(3), and treble damages for willful violations. *Id.* While unsolicited automated calls are prohibited by the statute, pre-recorded voice calls to cellular phones with prior express consent are permitted. 47 U.S.C. §§ 277(b)(1)(A), (B). Because courts have consistently interpreted the TCPA to be a strict liability statute, however, consent must be active for the then-current phone number subscriber. In order to verify active consent, those initiating calls with pre-recorded messages can check the Reassigned Number Database ("RND"), a database created by the Federal Communications Commission ("FCC") to determine whether the number of a consenting customer has been reassigned to a new subscriber. The RND is "a single, comprehensive database which collects disconnected number data from each provider that obtains…U.S. geographic numbers[.]" [Doc. No. 85-2] at 2.

Davis alleges that he received several pre-recorded phone calls from Capital One in May of 2022, despite not having been a Capital One customer. *See* [Doc. No. 11] ¶¶ 15–21. Davis's cellular phone number initially belonged to Capital One customer "E.T.," who had consented to Capital One's messages and who had previously been contacted using that phone number. [Doc. No. 166-1] at 7. After E.T. relinquished that phone number, it was assigned to Davis under a pseudonym chosen by Davis, "Kyle Devon." *Id*. at 6. Plaintiff argues that Capital One should have checked the RND and known that E.T. had not been the subscriber for that phone number since March 16, 2022. [Doc. No. 85] at 7.

Capital One contends that it places outbound calls to its consenting customers and may, depending on the connection, leave messages regarding any delinquent accounts. [Doc. No. 166-4] ¶¶ 8–9. According to Capital One, the call system it uses does not leave a pre-recorded message if the system detects that a person answers the phone, but the system will attempt to leave a pre-recorded message if a voicemail system is detected. *Id*. at ¶ 10. When the system detects a voicemail, the record of the call entry is reflected in Capital One's records with the code "AMDML," which stands for "Answering Machine Detected, Message Left." *Id.* at ¶ 12. By contrast, when a person answers the call, a Capital One representative actually speaks to that person, and if that person states the call was placed to a wrong number, the number is supposed to be marked in Capital One's records with the code "INVALID" or "RNWP" for "Right Number Wrong Person" and that number should not be contacted again. *Id*. at ¶ 14.

Capital One's records indicate that Capital One attempted to call Davis's number several times in May of 2022. [Doc. No. 166-7] at 87; *see also* [Doc. No. 166-3] at 8–9. Included in the call records for Davis is the code "AMDML," which means that an answering machine was detected. [Doc. No. 166-5] (J. Heidotting Dep. Tr.), 35:18–36:20. The records of T-Mobile

(Davis's cellular phone service provider in May of 2022) also show that Davis received calls at the same time the Capital One records indicate it called Davis. [Doc. No. 166-7] ⁋ 47. However, Capital One contends that the AMDML code, despite the plain meaning of the words, does not necessarily mean that a voice message was left because, for example, the answering machine could have been full. [Doc. No. 79] at 3 (arguing that the AMDML could be probative but not conclusive evidence that a message was left in voicemail); [Doc. No. 116-1] at 15, 18 (similar); *see also* [Doc. No. 166-5], 35:18–36:20..

On May 13, 2022, Davis called Capital One to inform it that he was not a customer and the company had been calling the wrong number. [Doc. No. 166-1] at 7. Although Davis asked Capital One to stop calling, the Capital One representative apparently entered the wrong number in the Capital One database associated with code RNWP, *id*. at 7–8, and Capital One subsequently placed two more calls to Davis's number. However, those calls did not result in Capital One leaving pre-recorded messages. *Id*. at 8. On May 18, 2022, Davis answered a Capital One call and again told the Capital One representative that the Company was calling the wrong number, following which the representative properly placed Davis on the RNWP list. *Id.*

Based on receiving the phone calls that allegedly resulted in pre-recorded messages from Capital One, Davis filed this lawsuit on August 9, 2022. The Amended Complaint alleges that there are numerous putative class members who, like him, were not Capital One customers and who received unsolicited pre-recorded messages from Capital One. [Doc. No. 11] ⁋⁋ 22, 29. Plaintiff has moved to certify a class of

> [a]ll persons or entities throughout the United States (1) to whom Capital One initiated a call (2) directed to a number assigned to a cellular telephone service, but not assigned to a current account holder of Capital One (3) in connection with which Capital One used an artificial or prerecorded voice (4) from four years before the filing of certification.

[Doc. No. 85] at 4. Plaintiff proposes to identify class members through the class notice methodology described by his expert, Anya Verkhovskaya ("Verkhovskaya"). *See* [Doc. No. 77-2] (Verkhovskaya's initial expert report); [Doc. No.77-3] (Verkhovskaya's second expert report). Capital One opposes class certification principally on the grounds that the members of the class cannot be sufficiently ascertained, as required by the Fourth Circuit as a threshold showing for Rule 23. Capital One further argues that in adjudicating the merits of any class member's TCPA claim, individual issues predominate over common issues.

In connection with its positions on class certification, Capital One has filed a motion to exclude Verkhovskaya's expert opinions, which Davis relies on for ascertainability, and a motion to exclude as untimely Verkhovskaya's supplemental declaration, which Capital One contends improperly expands upon and adds new expert opinions. [Doc. No. 76]; [Doc. No. 104]. Capital One has also moved to exclude the testimony of Davis on the grounds that after he contemplated bringing litigation against Capital One, he deleted the pre-recorded messages that are the subject of his claims. [Doc. No. 78].

The Court first considers, as a preliminary matter, the appropriate scope of the class and whether to narrow Plaintiff's proposed class definition, as the Court must ascertain for itself that "every class member … have Article III standing for each claim that they press." *Alig v. Rocket Mortg., LLC*, 52 F.4th 167, 168 (4th Cir. 2022) (quoting *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2208 (2021)) (internal quotations omitted).[1] After determining the appropriate scope of class membership, the Court considers, for the purposes of Capital One's motion to exclude expert testimony, [Doc. No. 76], whether Verkhovskaya's methodology for noticing, and Davis's use of

[1] *See Doe v. Chao*, 306 F.3d 170, 185 n.1 (4th Cir. 2002), *aff'd*, 540 U.S. 614, 124 S. Ct. 1204 (2004) (observing that when the proposed class definition contains a defect, a district court may narrow the class definition on its own initiative); *see also Reno v. Cath. Soc. Servs., Inc.*, 509 U.S. 43, 48 (1993) (district court redefined the class).

that methodology for ascertaining class membership, is reliable. Finally, the Court considers whether Davis has satisfied the requirements for certifying the class, including that the class is ascertainable and whether common issues predominate over questions affecting only individual members.

## II. Discussion

### A. Class Member Standing Under the TCPA

Davis's proposed class includes "all persons or entities throughout the United States (1) to whom Capital One initiated a call (2) directed to a number assigned to a cellular telephone service, but not assigned to a current account holder of Capital One (3) in connection with which Capital One used an artificial or prerecorded voice (4) from four years before the filing of certification." [Doc. No. 85] at 4. The definition does not distinguish between the subscribers of called numbers and the actual recipients of calls and is presumably intended to include both.

Capital One contends that only the actual recipients of the pre-recorded message have standing to bring a TCPA claim.[2] But most courts that have considered the issue have found that a subscriber has statutory standing to bring the claim under Section 227(b) because "called party" as used in the TCPA means the subscriber who is assigned (and pays for) the cell phone number. *See Soppet v. Enhanced Recovery Co., LLC*, 679 F.3d 637, 643 (7th Cir. 2012) ("'called party' in § 227(b)(1) means the person subscribing to the called number at the time the call is made"); *N. L. by Lemos v. Credit One Bank, N.A.*, 960 F.3d 1164, 1167 (9th Cir. 2020) (expressly adopting the *Soppet* interpretation of § 227(b)(1)); *Osorio v. State Farm Bank, F.S.B.*, 746 F.3d 1242, 1251

[2] To the extent that Capital One makes a standing argument, it does so within the context of ascertainability, [Doc. No. 118] at 25, and in support of its position, Capital One relies on the Fourth Circuit's decision in *Krakauer*. But *Krakauer* only held that a TCPA action "[wa]s *not limited to* telephone subscribers." *Krakauer*, 925 F.3d at 657 (emphasis added). Indeed, the Fourth Circuit explicitly noted that "[i]f a wife, *as the subscriber*, lists a home telephone number on the Do-Not-Call registry, but her husband happens to be the one who receives the improper calls… *[b]oth* the wife and the husband can suffer the harm that Congress sought to deter." *Id*. (emphasis added).

(11th Cir. 2014) (same); *see also ACA Int'l v. Fed. Commc'ns Comm'n*, 885 F.3d 687, 706 (D.C. Cir. 2018) (deferring on the interpretation of "called party" but citing *Soppet* approvingly); *Leyse v. Bank of Am. Nat. Ass'n*, 804 F.3d 316, 325 n.13 (3d Cir. 2015) (similar).

Nevertheless, every proposed class member must have Article III standing in addition to statutory standing, *see Alig*, 52 F.4th at 168, and the standing issue here has become more complicated by the United States Supreme Court's decision in *Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016), *as revised* (May 24, 2016). Prior to *Spokeo*, many courts, including the Fourth Circuit, found that Article III standing can be established merely by the invasion of a legally protected interest. *See Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 156 (4th Cir. 2000) ("[I]t is well established that the injury required by Article III may exist solely by virtue of statutes creating legal rights, the invasion of which creates standing") (internal quotations omitted). But in *Spokeo*, the Supreme Court rejected that view (albeit outside of the TCPA context). *Spokeo*, 578 U.S. at 341 ("Congress' role in identifying and elevating intangible harms does not mean that a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right."). Accordingly, after *Spokeo*, it would appear that Article III restricts class membership to persons who have sustained a *de facto* concrete injury from the pre-recorded voice messages at issue here.

The Fourth Circuit has not expressly considered who has standing to sue for a violation of Section 227(b)(1)(A)(iii) of the TCPA. In *Krakauer,* the issue of concrete injury was embedded within the specific TCPA provision allegedly violated, § 227(c)(5), which limits its application to "[a] person *who has received* more than one telephone call[,]" 47 U.S.C. § 227(c)(5) (emphasis added), and therefore limits its application to persons who would have sustained a concrete injury.

By contrast, § 227(b)(1)(A)(iii) attaches liability to a procedural violation of the statute, *i.e.*, the placement of a call with a pre-recorded message, absent prior consent from the "called party," which, as noted above, has been repeatedly interpreted by courts to mean the phone number subscriber. Thus, unlike Section 227(c)(5), there is no concrete injury facially apparent from a violation of Section 227(b).[3]

Since *Spokeo*, other courts that have considered Article III standing in the context of Section 227(b) have found that plaintiffs who actually receive a qualifying pre-recorded call or message have standing. *See, e.g.*, *Susinno v. Work Out World Inc.*, 862 F.3d 346, 351 (3d Cir. 2017) (finding concrete injury where the Section 227(b) plaintiff actually received a single call); *Van Patten v. Vertical Fitness Grp.*, LLC, 847 F.3d 1037, 1042 (9th Cir. 2017) (unsolicited contact in the context of the TCPA is a concrete injury); *Golan v. FreeEats.com, Inc*., 930 F.3d 950, 959 (8th Cir. 2019) (similar). The courts are less clear on whether *subscribers* who have not actually received the message have Article III standing, *see Leyse v. Lifetime Ent. Servs., LLC*, 679 F. App'x 44, 46 (2d Cir. 2017) ("We need not here decide whether the alleged violation of 47 U.S.C. § 227(b)(1)(B) would, by itself, be sufficient to establish injury in fact because…Lifetime left a prerecorded voicemail message, to which Leyse later listened"), but at least one court has recognized standing for subscribers who incur costs from the calls. *Mey v. Got Warranty, Inc.*, 193

[3] At least one court has found that a subscriber has Article III standing irrespective of whether the subscriber paid for or listened to the pre-recorded message because "cell phone lines unavailable for legitimate use" during the unwanted pre-recorded calls is a concrete injury sufficient to confer Article III standing, relying on TCPA fax cases. *Rogers v. Capital One Bank (USA), N.A.*, 2016 WL 3162592, at *2 (N.D. Ga. June 7, 2016); *see also Palm Beach Golf Ctr.-Boca, Inc. v. John G. Sarris, D.D.S., P.A.*, 781 F.3d 1245, 1251 (11th Cir. 2015) (finding that the occupation of a fax machine for the electronic transmission of the unsolicited message was a sufficient injury, whether or not the fax was reviewed). But utilization of a fax capability is different from cellular phone usage because an incoming fax cannot be declined by the recipient, which is not the case for a cellular phone call, and the fax line is not otherwise usable while there is an incoming fax, unlike the call waiting functionality of most cellular phones. Moreover, the use of a fax machine expends finite resources, such as ink and paper. *See Arnold Chapman & Paldo Sign & Display Co. v. Wagener Equities Inc.*, 747 F.3d 489, 491 (7th Cir. 2014) ("he may be annoyed, distracted, or otherwise inconvenienced if his use of the machine is interrupted by unsolicited faxes to it, or if the machine wears out prematurely because of overuse"). This material distinction operates on the facts here, where Capital One only used the prohibited pre-recorded messages if the call was not answered.

F. Supp. 3d 641, 644–45 (N.D. W. Va. 2016) (holding that plaintiffs "with prepaid cell phones or limited-minute plans" have Article III standing for TCPA violations because the "unwanted calls cause direct, concrete, monetary injury by depleting limited minutes that the consumer has paid for or by causing the consumer to incur charges for calls.").

Having considered the impact of *Spokeo*, the Court concludes that the putative class should not be restricted to only those who have actually received the pre-recorded message from Capital One, as Capital One argues. Rather, a class member can have a concrete injury sufficient to establish Article III standing by *either* (1) actually receiving (listening to, reading a transcription of, and/or deleting) the pre-recorded voice message, or (2) paying for the pre-recorded message as the subscriber of a "pay as you go" cellular phone plan or a cellular phone plan that is otherwise restricted in terms of call minutes (including voicemail messages);[4] and the Court redefines the class accordingly.

**B. Motion to Exclude Expert Testimony [Doc. No. 76]**

Rule 702 of the Federal Rules of Civil Procedure enumerates criteria for the admissibility of expert testimony.[5] As relevant here, the testimony must be specialized knowledge that will help

---

[4] Although a class member could, in theory, be both a pay-as-you-go subscriber and an actual recipient of the same pre-recorded message, it would not appear that Defendant's potential liability would separately attach to each basis for liability, or "stacked," since the statute provides for statutory damages *per violation*, *i.e.*, per single call. For the same reason, two plaintiffs—the subscriber and the recipient of the message—would not each recover the full amount of statutory damages for the same call. *See Spine & Sports Chiropractic, Inc. v. ZirMed, Inc*., 2014 WL 2946421, at *6 (W.D. Ky. June 30, 2014) ("Responding to concerns of potential liability to multiple parties…the TCPA sets statutory damages at $500 for each such violation, not per person") (internal quotations omitted).

[5] Although Rule 702 governs trial testimony and Davis appears to intend to rely on Verkhovskaya's testimony only for class certification, not trial, the Supreme Court has suggested in dicta that it is appropriate to engage in a Rule 702 reliability analysis when evaluating expert testimony at the class certification stage. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 354 (2011) ("The parties dispute whether Bielby's testimony even met the standards for the admission of expert testimony under Federal Rule of Evidence 702 and our *Daubert* case[.] The District Court concluded that *Daubert* did not apply to expert testimony at the certification stage of class-action proceedings. We doubt that is so[.]") (internal citations omitted); *see also In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*, 2019 WL 1569294, at *2 (D. Kan. Apr. 11, 2019) ("The trend of authority in favor of applying *Daubert* at the class certification stage is in accord with suggestions from the Supreme Court") (collecting cases). The Third, Seventh, and Eleventh Circuits have held that where the testimony of an expert is deemed critical to the class certification determination, the district court must resolve expert challenges by performing a full *Daubert* analysis before deciding whether to certify the class, rejecting the theory that a thorough expert review can be postponed until

a factfinder to determine a fact in issue, Fed. R. Civ. P. 702(a), and it must be the product of reliable methods, Fed. R. Civ. P. 702(c). Therefore, an admissible expert opinion must be both relevant to a fact in issue and reliable. *Id*. at 281. The Fourth Circuit has explained that

> [r]eliability is a flexible inquiry that focuses on the principles and methodology employed by the expert. Specifically, district courts must ensure that an expert's opinion is based on scientific, technical, or other specialized knowledge and not on belief or speculation. And to the extent an expert makes inferences based on the facts presented to him, the court must ensure that those inferences were derived using scientific or other valid methods.

*Id*. (internal citations and quotation marks omitted).

Where the admissibility of expert testimony is specifically questioned, Rule 702 "require[s] that the district court make explicit findings, whether by written opinion or orally on the record, as to the challenged preconditions to admissibility." *Sardis v. Overhead Door. Corp.*, 10 F.4th 268, 283 (4th Cir. 2021) (citation omitted). There are several guideposts to help determine the reliability of an expert opinion in conjunction with those factual findings: (1) whether the opinion can be tested, (2) "whether the theory or technique has been subjected to peer review and publication[,]" (3) "the known or potential rate of error" and (4) general acceptance of the methodology used. *Nease v. Ford Motor Co.*, 848 F.3d 219, 229 (4th Cir. 2017) (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 593 (1993)); *see also* Fed. R. Civ. P. 702(b)–(d). These factors are flexible and ultimately the Court has "broad latitude" to determine whether an expert's testimony is reliable. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999).[6]

---

later in the litigation. *See In re Blood Reagents Antitrust Litig.*, 783 F.3d 183, 187–88;  (3d Cir. 2015); *Am. Honda Motor Co. v. Allen*, 600 F.3d 813, 815–17 (7th Cir. 2010); *Sher v. Raytheon Co.*, 419 F. App'x 887, 890–91 (11th Cir. 2011); see also In re Carpenter Co., No. 14-0302, 2014 WL 12809636, at *3 (6th Cir. Sept. 29, 2014) (observing that this is an open issue, but finding that the district court did not abuse its discretion in applying *Daubert* to critical expert witnesses at the class certification stage); Campbell v. Nat'l R.R. Passenger Corp., 311 F. Supp. 3d 281, 294 (D.D.C. 2018) (collecting cases and finding that the "heavy weight of authority" is in favor of the district court conducting a *Daubert* analysis at the class certification stage). Here, Plaintiff's expert opinion are central and critical to his class certification motion and the Court therefore engages in the *Daubert*/Rule 702 analysis at this stage in the proceedings.

[6] An expert opinion can also be challenged for reliability based on the credentials of the testifying witness. *Copeland v. Bieber*, 2016 WL 7079569, at *5 (E.D. Va. Sept. 8, 2016) ("As part of a court's inquiry about the reliability of an

***1. Verkhovskaya's methodology cannot be used to identify class members.***

Verkhovskaya offers two primary expert opinions. *See* [Doc. No. 77-2] at 2. The first opinion pertains to a methodology for determining if a phone number is assigned to a cellular phone, *id.* at 13–14, and this opinion is not challenged by Capital One. The second opinion is that

> [u]sing the telephone call data of prerecorded telephone calls expected to be provided in this matter, there is a reliable and efficient method to identify numbers to which Capital One initiated a telephone call that occurred after the telephone number had been reassigned based upon information available from the Reassigned Number Database ('RND') and call codes, and to identify the telephone numbers' subscribers and/or users' names and addresses for purposes of efficiently and effectively notifying the proposed class while comporting with the requirements of Federal Rule of Civil Procedure 23 and due process.

*Id.* at 19. Capital One has moved to exclude this opinion as unreliable pursuant to Federal Rule of Evidence 702.[7] [Doc. No. 77] at 8–17.

As outlined in her expert report, Verkhovskaya proposes the following methodology for identifying class members for the purpose of providing notice: first, Verkhovskaya starts with a data set provided by Capital One that contains unique phone numbers identified by Capital One as numbers that received calls that potentially resulted in pre-recorded messages during the class period. [Doc. No. 77-2] ¶ 65. From this initial dataset, Verkhovskaya would identify those telephone calls that were made to wireless cellular telephone numbers using information provided

---

expert's testimony, the court should inquire about an expert's experience, why this experience helped the expert reach his conclusion."). Verkhovskaya's expert report explains her background and experience, including her extensive experience as an expert witness with respect to identifying class members for the purpose of providing notice in TCPA cases. [Doc. No. 77-2] ¶¶ 11–35. The Court finds no deficiencies in her credentials that would disqualify her as an expert in this case.

[7] Capital One also contends that Verkovsakaya's expert opinion should be excluded as irrelevant since she conceded in her deposition that she was only giving an opinion on notice and had no opinion on ascertainability. [Doc. No. 77] at 8; *see also* [Doc. No. 77-4] at 8–9 ("[I]t is my opinion that it's important for the Court to know that class notice could be efficiently and effectively provided, and there is a method of how it can be done reliably. And that should be taken into consideration by the Court when making a decision on class certification."). While specifically directed to address notice rather than ascertainability, Davis presents Verkhovskaya's methodology in support of ascertainability, and the Court will therefore not exclude her testimony on the basis of relevance.

by Interactive Marketing Solutions, thereby excluding non-cellular numbers from further review. [Doc. No. 77-2] ¶¶ 49–56.

In the second step of her analysis, Verkhovskaya would determine if these unique remaining numbers had been disconnected at some point during the class period, relying on (1) the RND[8] to identify telephone numbers that were disconnected at some point in the class period (the "RND Output"),[9] *id*. at ¶¶ 66–67, and (2) Capital One's "INVALID" code for numbers in the RND with "No Data," thereby using the "INVALID" code, which Verkhovskaya says means "wrong number," as an alternative proxy for disconnected, *id.* at ¶¶ 69–70.[10]

In the final step that Verkhovskaya proposes for ascertaining the identity of the new subscribers of this population of numbers, Verkhovskaya would supplement the data purportedly showing that calls were made after a period of disconnection with name and address information using (1) a "historical reverse append methodology," which uses unique identifiers to merge datasets with different information associated with the same identifier, and (2) cellular service

[8] The RND is a database of all cellular phone numbers that have been disconnected and information for those numbers is provided by different carriers. [Doc. No. 77] at 11–13. The database was completed on January 27, 2021. *Id*. at 11. Verkhovskaya states in her initial report that she will query the database by providing an input file that contains the identified phone numbers associated with the date of the earliest telephone call to each of those numbers during the class period. [Doc. No. 77-2] ¶ 63. A query to the RND yields one of three results, either (1) yes - the number has been disconnected since the input date, (2) no - the number has not been disconnected since the input date, or (3) no data. *Id*. at ¶¶ 66–67. In response to Capital One's criticism that the RND data was not available for cross-checking reassigned numbers until nearly two years after the start of Plaintiff's class period, Verkhovskaya states that "many" carriers provided the RND with information dating back to July 27, 2020. However, even if true, Verkhovskaya has not accounted for the missing data for the previous year that is within the proposed class period. *Id*. at ¶ 61.

[9] While Verkhovskaya claims that a "yes" result will indicate that the number has been disconnected after the date of the first call to that number, she does not explain how that result indicates that the phone number was not associated with a Capital One customer at the date of the earliest call.

[10] Verkhovskaya concedes in her second expert report that in her initial report she described a process that "could be utilized to review telephone numbers with the telephone call code 'INVALID[,]'" but that she was not even sure if a complete data set for the "INVALID" coding existed at the time. [Doc. No. 77-3] ¶¶ 38–40 (emphasis added). Never mind that she relied on it in her initial report, Verkhovskaya says that alternative sources of information are sufficient to identify class members. *Id*. at ¶ 40. Specifically, and departing from the process described in her initial report, Verkhovskaya says that the subpoena process would be used to identify disconnected numbers that return a "no data" result in the RND. *Compare id*. at ¶ 36, *with* [Doc. No. 77-2] ¶ 104. She offers no information about how she would use subpoenas to identify the date of disconnect associated with particular accountholders, as opposed to—and as described in her original report—using the subpoenas to supplement name and address information for disconnected numbers where needed. [Doc. No. 77-3] ¶ 37. The Court can make no administrability findings about the subpoena process without those details.

carrier subpoenas for any gaps in the reverse append database. [Doc. No. 77-2] ¶¶ 71, 104–105. Verkhovskaya does not explain the reverse append methodology in detail but does submit that it is commonly used in litigation, and identifies PacificEast as the database that she would use to supplement the Capital One data for this "historical reverse append methodology." *Id.* at ¶¶ 101–102.

It appears that Verkhovskaya has not actually tested whether her proposed methodology reliably identifies class members. Rather, sidestepping the possibility of *over*inclusiveness, she concludes that her methodology is reliable based on her ability to identify Davis as a class member using her methodology from a sample dataset consisting of the 5,000 phone numbers, provided by Capital One, that had been assigned certain coding during the proposed class period. [Doc. No. 77-3] ¶¶ 19–22. In that regard, Verkhovskaya concluded that 666 of the 5,000 identified phone numbers would be flagged as "potential" class members, or approximately 13 percent of that sample. [Doc. No. 77-3] ¶ 30. But Verkhovskaya has not explained how she would further refine this group of 666 numbers to eliminate non-class members,[11] and the Court is left with merely her *ipse dixit* testimony that the additional methodology that she proposes could potentially be employed at some point in the future, but with no objective measure of its accuracy in identifying class members. *See Sardis*, 10 F.4th at 289 (holding "vague *ipse dixit* testimony" is inadmissible pursuant to Federal Rule of Evidence 702); *Small v. WellDyne, Inc.*, 927 F.3d 169, 177 (4th Cir. 2019) ("Without testing, supporting literature in the pertinent field, peer reviewed publications or some basis to assess the level of reliability, expert testimony can easily, but improperly, devolve into nothing more than proclaiming an opinion is true 'because I say so.'"); *Nease*, 848 F.3d at 233

---

[11] Such non-class members included within Verkhovskaya's group of potential class member would include new subscribers who were also consenting customers or non-class members who may or may not have received a number reassignment but for whom there is no available data in the RND to confirm disconnection.

(excluding the proffered expert's testimony as unreliable because his "process merely identifies conceivable design failures; it does not produce them via testing").

In its motion to exclude Verkhovskaya's testimony, Capital One contends that its call coding does not reliably indicate, as Verkhovskaya simply assumes, that a pre-recorded message was in fact left or retrieved, or that a non-Capital One customer who had not otherwise provided consent received a call.[12] It has also presented the declaration of its expert, David Kalat ("Kalat"), who attacks the reliability of Plaintiff's methodology on multiple fronts, both conceptually and as applied.

According to Kalat, the most significant flaw in Verkhovskaya's methodology is that the public RND does not actually provide a date on which a phone number was disconnected, therefore an actual date of disconnection cannot be identified from the public querying methodology described by Verkhovskaya.[13] [Doc. No. 77-5] ¶ 29. Kalat explains that a call received by a Capital One customer *before* the actual date that customer's phone was disconnected and reassigned would still return a "yes" value from the RND, indicating that the phone number had been disconnected *at some point*, but not necessarily before the call made by Capital One. *Id.* As a result, under Verkhovskaya's proposed methodology, the Capital One customer who received that call would

---

[12] Capital One has introduced evidence that its coding should not be used as a proxy for a phone call made to a wrong phone number in violation of the TCPA and also challenges, for several reasons, Verkhovskaya's assumption that certain coding means a pre-recorded message was actually left on a subscriber's voice mailbox. In short, Capital One argues that its own codes are not an accurate reflection of when a number was disconnected or when a pre-recorded message was left. The Court does not have to resolve these issues, however, because the record before the Court unequivocally reflects that even if the internal codes yielded reliable results, the methodology described in Verkhovskaya's expert report still cannot be used on a class-wide basis to identify class members without significant individualized fact finding, as discussed in greater detail below.

[13] Davis contends that the RND does contain a *nonpublic* date of disconnection. [Doc. No. 90] at 12–14. However, as Capital One points out, the methodology relied upon by Davis's expert for querying the database would only give it access to the public information, [Doc. No. 107] at 12, therefore, even if the data exists, Davis has failed to provide any information about how he or his expert would actually obtain the data. *See* [Doc. No. 90-2] (Declaration of Beth Sprague, Director of the RND) ⁋ 14 ("[T]he disconnect dates are confidential and not publicly accessible through the RND public query interface"). If this process required, for example, further subpoenas, it would bear on the administrability of the methodology.

be included as a potential class member under the proposed methodology. *Id.* at ¶ 34. Based on this aspect of the RND, he concludes that "[t]his 'YES' result, therefore, does not clarify when any disconnection occurred, does not identify that more than one disconnection occurred, and does not distinguish between calls Capital One made to their customer prior to the first disconnection and calls made afterwards." *Id.* at ¶ 41.

A related issue in the proposed methodology, according to Kalat, is that data generated by a "reverse append" methodology does not reliably provide the missing disconnection date in the RND database. Specifically, Kalat explains that the database that Verkhovskaya intends to rely on only reflects information that consumers have voluntarily given to third parties who subsequently provide that data to brokers (*i.e.*, a retail store sells a consumer's information to a data broker) and is therefore underinclusive. *Id.* at ¶ 60. In fact, the operators of the PacificEast database, the database Verkhovskaya intends to use for her "reverse append" process, has stated in a declaration in this case that they consider that database unreliable for the purposes of the "reverse append" aspect of her methodology.[14]

Kalat has also tested the reliability of Verkhovskaya's methodology by analyzing the same sample data of 5,000 unique phone numbers provided by Capital One that Verkhovskaya used in her second report analysis.[15] Kalat estimated that of the 666 numbers Verkhovskaya identified as potential class members, call records for those numbers indicated that 89.5 percent of the calls

---

[14] The third-party database PacificEast, which Verkhovskaya proposes be utilized for the reverse-append process, provided a declaration which states, "Reverse Phone Append data provided by PacificEast demonstrates only a possibility that the names identified by the service subscribed to a provided telephone number for a given date range." [Doc. No. 77-6] ¶ 22. The declaration also states, "[a]s a factual and practical matter, determining definitively whether, and the dates, a particular person subscribed and/or stopped subscribing to or using an input telephone number, cannot reliably be achieved using the Reverse Phone Append service PacificEast provides." *Id.* at ¶ 23. Other district courts have recognized similar "shortcomings" with reverse-lookup database providers. *See Hunter v. Time Warner Cable Inc.* 2019 WL 3812063 at *11 (S.D.N.Y. Aug. 14, 2019) ("the FCC has expressly recognized that commercial databases that track phone number assignment are not comprehensive.") (citation omitted).

[15] Kalat states that he utilized a name-matching algorithm to compare the list of names generated by the reverse append process to the names of Capital One customers. [Doc. No. 77-5] ¶ 71.

initiated to these numbers occurred before January 27, 2021, which was before the RND database was completed and available for use as a reassignment-checking resource. *Id*. at ¶ 54. As such, for the proposed class period, Kalat says the database cannot be used to identify when a call was made to a number that had been disconnected. *Id*.

Kalat also points out that Verkhovskaya has not explained how she plans to compare any reverse append data to Capital One's records to eliminate Capital One customers from the group identified as class members. *Id*. ¶ 70. Of the 666 numbers identified as potential class members by Verkhovskaya's methodology, Kalat found that over 75 percent of those persons were in fact Capital One customers. *Id*. at ¶ 76. He also points out that even if the proposed use of subpoenas would facilitate the collection of some additional information, which he disputes would be sufficient, the administration of the process would require a highly individualized and inefficient effort. *Id*. at ¶¶ 47-48. His findings underscore that Verkhovskaya's methodology is based on at least two assumptions which have been shown to likely lead to significantly inaccurate results: (1) that a phone number of a Capital One customer was not reassigned to another Capital One customer, and (2) that the person who received the pre-recorded message was the person who was assigned the number in the RND database (or, alternatively, that the person assigned the number paid for the call).[16]

With the exception of the disconnection data available from the RND, both Capital One's and Kalat's critiques of the methodology proposed by Verkhovskaya are largely unchallenged. Instead, Davis essentially argues that because Verkhovskaya's expert testimony was admitted in

[16] As noted above, the Court takes no position on the accuracy of the AMDML coding as a potential flaw in the methodology. Though the Court appreciates that false positives are possible when a subscriber's voicemail is full, the Court would not find the methodology unreliable if the effect or rate of error was *de minimis*. Moreover, and more fundamentally, if the courts permit defendants to claim that their own call data is inaccurate as a defense to TCPA liability, it would produce perverse data integrity incentives, and it seems unlikely that any class would ever be certified.

*Krakauer*, 925 F.3d 643. [Doc. No. 90] at 16–17, the Court should admit her methodology in this case when applied to the Capital One call data. [Doc. No. 90] at 16–17. In *Krakauer*, the defendant was alleged to have placed telemarketing calls to individuals on the Do-Not-Call Registry, 925 F.3d at 650, and although the reliability of the expert testimony was not directly addressed by either the district court or the Fourth Circuit, both the found that the class was ascertainable, relying in part on Verkhovskaya's expert testimony. *Id*. at 658 ("The records in this case clearly showed when calls were placed and whether the call went through. The court was presented with data showing whether a number was residential and connecting the number to particular names and addresses."); *see also Krakauer v. Dish Network L.L.C.*, 311 F.R.D. 384, 396 (M.D.N.C. 2015), *aff'd*, 925 F.3d 643 (rejecting the defendant's argument that Verkhovskaya's methodology could not be used to establish ascertainability where the defendant only cited a handful of issues with Verkhovskaya's data). But *Krakauer* involved claims brought under a different section of the TCPA, Section 227(c)(5), and under that Section, it was only necessary to identify that (1) a call from the defendant was placed to a number on the Do-Not-Call Registry and "went through," (*i.e.*, connected) and (2) the number received more than one call after it was placed on the registry. *Krakauer*, 311 F.R.D. at 391. This data was clearly available using just the defendant's call records and the data in the Do-Not-Call Registry. As such, the proposed methodology in *Krakauer* reliably identified class members by comparing the defendant's call records to the Do-Not-Call Registry, 925 F.3d at 649, all of which allowed the Fourth Circuit to conclude that "all of the major issues in the case could be shown *through aggregate records*." *Id.* at 658 (emphasis added).

Identifying class members in this case, by contrast, requires a much more complicated and individualized undertaking and analysis than in *Krakauer* because the temporal data required to identify the class is not available for all class members. More specifically, using the public

querying process described by Verkhovskaya, neither the RND nor Capital One's own records can reliably identify a specific date when a Capital One customer relinquished their cellular phone number or otherwise terminated their subscriber status. And even if Verkhovskaya's methodology enabled her to access that temporal data, the RND was only made available starting in 2021, and the class period that Davis proposes begins in May of 2019. Nor by PacificEast's own account can the PacificEast database be reliably used for that purpose.

Reflecting the differences between this case and *Krakauer* are several cases in which courts have, in fact, excluded Verkhovskaya's opinions and methodology as unreliable under Rule 702. Many of these cases were "wrong-number" dialing cases, and Verkhovskaya's testimony was excluded based on the same concerns and criticisms that Kalat has raised with her proposed methodology in this case. *See, e.g.*, *Carroll v. SGS Automotive Servs.*, 2020 WL 7024477, at *7 (M.D. La. Nov. 30, 2020) ("[Verkhovskaya's] testimony is based on facts and data from databases including LexisNexis, which may be generally reliable, but has been expressly designated by the creator of the database as unsuitable for Verkhovskaya's purposes."); *Wilson v. Badcock Home Furniture*, 329 F.R.D. 454, 457–458 (M.D. Fla. 2018) (noting "despite her stated ability to ascertain the plaintiff as a class member, an individualized inquiry based on Ms. Verkhovskaya's own knowledge about the case was necessary to identify the plaintiff as the called party."); *Sandoe v. Boston Scientific Corp.*, 333 F.R.D. 4, 8–9 (D. Mass. 2019) (criticizing Verkhovskaya's methodology related to ascertainability and predominance).[17]

[17] The Court finds particularly persuasive the District Court's analysis of Verkhovskaya's proposed methodology in *Sandoe*, which was generally, although not precisely, identical to that proposed in this case. 333 F.R.D. 4. Notably, the district court found that Verkhovskaya's methodology could not resolve questions of predominance under Rule 23(b) because the methodology identified proposed class members that were actually the defendant's customers 59 percent of the time. *Id*. at 8. Also like the present case, the reverse append process could not identify the named class representative without individual inquiry, a fact which the district court found reflected on the reliability of Verkhovskaya's testimony. *Id*. ("Plaintiff is identified as the individual actually called by Boston Scientific only by application of the six-month fuzzy period and by virtue of individual testimony or analysis of plaintiff's phone records."). The *Sandoe* court ultimately found that administrative difficulties resulting from Verkhovskaya's proposed

Finally, Verkhovskaya's proposed methodology has not been peer reviewed, other than by Kalat, who has sufficiently called into question whether the methodology yields reliable results with respect to class membership. While there is no requirement that an expert's proposed class methodology results in exact certainty, the extremely high potential rate of error that Kalat's testing demonstrated weighs heavily against the admissibility of Verkhovskaya's expert opinion. *See Nease*, 848 F.3d at 229 (observing that under established Fourth Circuit precedent, the court ordinarily should consider the known or potential rate of error). In sum, Verkhovskaya has not demonstrated that use of the RND, Capital One's internal database codes, the PacificEast database, or subpoenas, or some combination of those resources, will reliably identify those persons who are class members using her proposed methodology.

For all of the above reasons, the Court concludes that the proposed methodology has not been shown to identify members of the proposed class with a sufficient—or any—degree of reliability or feasibility. Verkhovskaya's expert testimony is therefore not admissible under Rule 702.

***2. Verkhovskaya's Supplemental Declaration is untimely and otherwise not admissible.***

After the close of discovery, Plaintiff filed a declaration by Verkhovskaya attached to both his Opposition to the Motion to Exclude Expert Testimony and also his Motion for Class Certification. [Doc. No. 85-4]; [Doc. No. 90-3]. Capital One objects to any consideration of her declaration on the grounds that it constitutes new, untimely expert opinions that utilize new data and a new methodology without any explanation for why these new opinions are necessary or

---

methodology indicated that class certification was improper for failure to meet the requirement of predominance. *Id.* at 9. The district court also noted that Verkhovskaya's proposed methodology could not establish that the proposed class was ascertainable. *Id.*

proper, and which suffer from the same inadequacies as her earlier expert opinions. [Doc. No. 105] at 3; [Doc. No. 126] at 2–3.

The Court agrees. Verkhovskaya's declaration is clearly untimely under the Court's Scheduling orders.[18] The supplemental declaration will be excluded on the basis of timeliness and, for the reasons outlined above, also as unreliable under Rule 702.

**C. Motion to Certify the Proposed Class [Doc. No. 84]**

Federal Rule of Civil Procedure 23 requires that "[a]t an early practicable time after a person sues…as a class representative, the [district] court must determine by order whether to certify the action as a class action." Fed. R. Civ. P. 23(c)(1)(A). For this purpose, "[a] district court has broad discretion in deciding whether to certify a class, but that discretion must be exercised within the framework of Rule 23." *Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 317 (4th Cir. 2006) (quoting *Lienhart v. Dryvit Sys. Inc.*, 255 F.3d 138, 146 (4th Cir. 2001)). Additionally, in assessing whether the requirements of the Rule have been met, the Court is obligated to employ a "rigorous analysis," particularly with respect to the predominance requirement for Rule 23(b)(3) classes. *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013) ("If anything, Rule 23(b)(3)'s predominance criterion is even more demanding than Rule 23(a).").

To obtain certification, a movant must first satisfy the enumerated threshold requirements of Rule 23(a): (1) "numerosity"—that the class is so numerous that joinder of all members would be impracticable; (2) "commonality"—that questions of law or fact are common to the class; (3) "typicality"—that the claims or defenses of the representative party are typical of those of the

[18] The Court's November 29, 2022 Scheduling Order set a deadline for plaintiff's expert report of February 10, 2023, which was extended to March 17, 2023 by the Court's February 15, 2023 Amended Scheduling Order, which also ordered that all discovery would close by May 12, 2023. [Doc. No. 20]; [Doc. No. 22]; [Doc. No. 45]. Verkhovskaya was deposed on April 27, 2023. On May 10, 2023, Capital One moved to exclude Verkhovskaya's opinions under Federal Rule of Evidence 702, [Doc. No. 76], and on May 26, 2023, following the close of discovery on May 12, 2023, Plaintiff filed his motion to certify a class in this action, [Doc. No. 84], supported with the supplemental declaration from Verkhovskaya. [Doc. No. 85-4].

class; and (4) "adequacy"—that the representative party fairly and adequately protect the interests of the class. *See* Fed. R. Civ. P. 23(a); *EQT Prod. Co. v. Adair*, 764 F.3d 347, 357 (4th Cir. 2014). If the preliminary requirements of Rule 23(a) are satisfied, class certification may be granted if the requirements of of the relevant class type under Rule 23(b) are met. Plaintiff here seeks to obtain class certification under subdivision (b)(3), which requires, in pertinent part, that "the questions of law or fact common to the class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3).

The Court finds that Davis has met the numerosity requirement of Rule 23(a) based solely on the likely size of the proposed class as indicated by the Capital One's business records, and as Capital One indirectly concedes in arguing the administrative burden of ascertainability.[19] *Gibbs v. Stinson*, 2021 WL 4812451, at *13 (E.D. Va. Oct. 14, 2021) ("Although there is no minimum number of potential class members needed to fulfill the numerosity requirement… joinder usually becomes impracticable where the class exceeds forty members") (citing *Holsey v. Armour & Co.*, 743 F.2d 199, 217 (4th Cir. 1984)). And while Capital One has raised substantial arguments as to commonality, adequacy, and superiority, the Court finds that Davis can satisfy these enumerated threshold requirements.[20] The remaining certification issues, then, are (1) whether the class is ascertainable, and if so, (2) whether common issues predominate such that this case can be certified under Rule 23(b)(3).

---

[19] *See* [Doc. No. 114] at 22 (arguing that ascertainability through subpoena is infeasible for a potential class of at least 14,900).

[20] Capital One's only colorable attack on Davis's ability to satisfy the Rule 23(a) requirements pertains to typicality based on Davis's use of a pseudonym for his cellular phone service subscription. *See* [Doc. No. 84] at 2–3, 27–28. But at its core, that use of a pseudonym does not materially relate to Capital One's potential liability in this case.

***1. The class is not ascertainable***

Like many of its sister circuits, in addition to the requirements enumerated in Rule 23, the Fourth Circuit has "repeatedly recognized that Rule 23 contains an implicit threshold requirement that the numbers of a proposed class be 'readily identifiable.'" *EQT Prod. Co.*, 764 F.3d at 358 (quoting *Hammond v. Powell,* 462 F.2d 1053, 1055 (4th Cir. 1972). In order to satisfy this ascertainability requirement, a court must be able to "readily identify the class members in reference to objective criteria," *id.*, and it must also be "administratively feasible" for the Court to do so. *Id.* ("A class cannot be certified unless a court can readily identify the class members in reference to objective criteria"); *see also Thomas v. FTS USA, LLC*, 312 F.R.D. 407, 416 (E.D. Va. 2016) ("The court should not certify a class unless the class description is sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member") (quoting *Solo v. Bausch & Lomb Inc.*, 2009 WL 4287706, at *4 (D.S.C. Sept. 25, 2009)). Although "plaintiffs need not be able to identify every class member at the time of certification," if "class members are impossible to identify without extensive individualized fact-finding or 'mini-trials,' then a class action is inappropriate." *EQT Prod. Co.*, 764 F.3d at 358 (internal citations omitted).

Capital One's main challenge to ascertainability is that class members are not readily identifiable through any aggregate records or any other reliable methodology, nor would it be administratively feasible to do so if a reliable method were identified. [Doc. No. 114] at 14–19. Capital One also contends that if the methodology proposed by Verkhovskaya were actually used, the resulting group of individuals would contain so many non-class members that common issues would no longer predominate over the multiple individual questions such as (1) who actually received the prohibited pre-recorded message, *i.e.,* was the class member the person who actually

received the prohibited phone call as opposed to the person to whom the called number had been reassigned; (2) was the class member someone who had not provided consent; and (3) was a pre-recorded message actually received and listened to.[21]

Davis contends that he can satisfy the ascertainability requirement through essentially the same methodology that Verkhovskaya proposes for identifying potential class members for the purpose of notice, and therefore fails to establish ascertainability for essentially the same reasons that require the exclusion of Verkhovskaya's expert opinions. Rather than addressing the specific attacks upon Verkhovskaya's methodology raised in Capital One's opposition, including its unreliability in identifying class members who actually have standing to bring their claims, Davis simply concludes that the proposed class is ascertainable because "TCPA claims are subject to common issues and the class can be ascertained through aggregate records." [Doc. No. 85] at 20 (citing *Krakauer*, 925 F.3d at 658).

Given the Court's ruling as to his proposed expert testimony, Davis has failed to propose a reliable method for identifying class members with aggregate records (*i.e.*, Capital One's call data and the RND database) or any other valid methodology and has therefore failed sufficiently to proffer how he would satisfy the ascertainability requirements of Rule 23. *See Hunter*, 2019 WL 3812063, at *11 (discussing the inaccuracies and flaws of reverse lookup databases that failed to meet the requirements for ascertainability.). As discussed in connection with Defendant's *Daubert* motion, Plaintiff's methodology gives no assurance that the resulting group of individuals

---

[21] In framing the issue of ascertainability in this fashion, Capital One essentially conflates the issue of ascertainability with that of predominance under Rule 23(b). Individualized inquiry for determining class membership is *ascertainability*. *See, e.g.,* [Doc. No. 114] at 19 (arguing under predominance that "each and every putative class member would have to demonstrate – through individual testimony, evidence of recordings, etc. – that they received a prerecorded message from Capital One."). Whether common issues predominate *among those actually determined to be within the class* is the inquiry under the enumerated requirements of Rule 23(b).

identified would not be comprised of a large number of Capital One customers.[22] *See* [Doc. No. 77-5] at 28 ¶ 76. Davis has therefore not established that class members can be "readily identified" according to objective criteria in an "administratively feasible" manner.

***2. Common issues do not predominate***

Under Rule 23, a class action may be maintained if Rule 23(a) is satisfied and if "the court finds that the questions of any law or fact common to class members predominate over any questions affecting only individual members[.]" *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (quoting Fed. R. Civ. P. 23(b)(3)) (to determine whether a class meets the predominance prong of Rule 23(b)(3), a "court must find that questions of law or fact common to class members predominate over any questions affecting only individual members."). In *Tysons Foods*, the Supreme Court went onto explain the contours of this analysis:

> This calls upon courts to give careful scrutiny to the relation between common and individual questions in a case. An individual question is one where members of a proposed class will need to present evidence that varies from member to member, while a common question is one where the same evidence will suffice for each member to make a *prima facie* showing or the issue is susceptible to generalized, class-wide proof. The predominance inquiry asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues.

*Id*. (internal citations and quotation marks omitted) (quoting 2 W. Rubenstein, *Newberg on Class Actions* § 4:50, pp. 196-197 (5th ed. 2012)).

---

[22] Because Davis in his proposed class definition includes only recipients of calls to numbers not assigned to a *current* Capital One customer, *i.e.*, aiming to exclude those who have provided consent to be contacted, the Court has considered whether the members of the class can be adequately identified as an issue of ascertainability. But whether analyzed under ascertainability or predominance, Davis has failed to point to an efficient mechanism to identify consenting call recipients. And while Kalat, on the other hand, appears to have identified from the Capital One sample set the customers who should be excluded, *see* [Doc. No. 77-5] ¶ 76, Davis carries the burden to establish ascertainability, and neither Davis nor his expert has proposed a methodology to exclude Capital One customers from the class. It should be noted, in this regard, that this case is not one where a plaintiff may properly argue that no individualized inquiry is necessary under either ascertainability or predominance because the potential TCPA violator has no evidence to support its affirmative defense of consent. Accordingly, the Court's rulings on ascertainability and predominance do not incentivize potential TCPA violators to fail to engage in proper recordkeeping.

There are clearly common questions pertaining to this class, and if the issue of consent could actually be resolved through class definition that excludes Capital One customers, the Court would see no meaningful individualized inquiry and therefore no predominance issue. However, as discussed above, Davis has failed to show that ascertaining class membership for a class definition that excludes Capital One customers is possible, and if the Court were to change the class definition to potentially include Capital One customers in order to address the issue of ascertainability, the individualized consent inquiry would clearly predominate over the common questions. In that regard, and problematic for class certification, is that the large data set from which class members would be determined contains *only* cellular phone numbers for which Capital One had obtained, at one point in time, consent from a Capital One customer to place calls. *See* [Doc. No. 166-3] at 17, 31 (Capital One database only contains numbers for which it has received prior consent to call); *see also* [Doc. No. 77-2] ⁋⁋ 40–42 (Plaintiff's expert noting that the data relied upon is the Capital One call data). Largely because the affirmative defense of consent is likely to be involved with respect to a significant number of the putative class members' claims, and Davis has shown no method for efficiently resolving who has provided consent,[23] the merits of the claims would be dominated by an individualized inquiry as to each class member. *See* *Wilson*, 329 F.R.D. at 460 ("it is important to note any inquiry's starting point: Rather than engage in random robocalling, Defendant only calls numbers in its records and its intent was to call actual known customers in arrears."); *Hunter*, 2019 WL 3812063 at *16 (finding that individualized consent would predominate at trial "is particularly apt given the starting point for the calls in this case: an assumption of consent.").

[23] *See* [Doc. No. 77-5] ¶ 76.

In support of their respective positions, both parties have cited to multiple district court decisions on class certification in cases involving the TCPA. Davis relies primarily on the district court's holdings in *Krakauer*, 311 F.R.D. 384, and the Fourth Circuit's observation in affirming the holdings that the TCPA's legislative purpose to curb unsolicited prerecorded phone messages "make[s] TCPA claims amenable to class action resolution." *Krakauer*, 925 F.3d at 663. But as the Court observed with respect the admissibility of Verkhovskaya's expert opinions, *Krakauer* was a "Do-Not Call" case, not a "wrong number" case, and cannot be read for the view that class certification is appropriate in every type of TCPA case irrespective of the call data available. *See id*. ("Class adjudication is complicated, and getting it right requires a careful parsing of the claims and the evidence from the start."). Davis has also cited "wrong-number" cases where class certification was granted, but there were findings in those cases, not present here, and in some of those cases, reserved on whether the issue of consent would justify de-certification. For instance, in *Knapper*, the district court certified a "wrong-number" class under Rule 23(b)(3), but only after finding that the methodology relied on by the plaintiff made the class ascertainable. 329 F.R.D. at 246 ("the Court is unconvinced that Plaintiff's methods and Defendant's records should not be relied upon to provide phone numbers that can be gathered and analyzed on a class-wide, efficient, and likely accurate basis."). The *Knapper* court also found that the plaintiff's expert could reliably identify customers of the defendant who were to be excluded from the class, but explicitly left open the option to decertify the class "[s]hould issues of consent arise." *Id*.

Capital One, by contrast, has pointed to numerous district court decisions where a "wrong-number" class was not certified for class treatment. Courts in these cases generally all found that class certification was inappropriate because of a lack of ascertainability and the predominance of individualized issues over common issues. *See Wilson*, 329 F.R.D. at 459 (denying class

certification after finding the inquiry into whether individuals consented to receive the calls "is likely to dwarf the much simpler question of whether Defendant called a given class member with a prohibited system."); *Hunter*, 2019 WL 3812063, at *17 ("Any common issues regarding how class members were called…are overshadowed by the individual inquiries that would be required to determine whether the alleged wrong-number recipients identified by Plaintiffs were eligible for class membership or ineligible on grounds of consent."); *Sandoe*, 333 F.R.D. at 9 (declining to certify a class because Verkhovskaya's testimony did not demonstrate that the class was ascertainable or demonstrate that common issues would predominate); *Ung v. Universal Acceptance Corp.*, 319 F.R.D. 537, 540–41 (D. Minn. 2017) (declining to certify a class because "the issue of consent is unique to each individual class member."); *Shamblin v. Obama for America*, 2015 WL 1909765, at *13 (M.D. Fla. Apr. 27, 2015) (denying certification after finding plaintiff did not satisfy the commonality prong of Rule 23(a)(2) or the predominance requirement of Rule 23(b)); *see also Newhart v. Quicken Loans Inc.*, 2016 WL 7118998, at *5 (S.D. Fla. Oct. 12, 2016) ("[T]his Court thus joins the chorus of other courts faced with TCPA class actions that have found such individualized inquiries on the consent issue would predominate over any common issues.") (citation omitted).

A reconciliation of these divergent outcomes on the issue of class certification in "wrong number" case would appear to revolve around a court's assessment of whether the proffered expert testimony with respect to available information would allow the reliable identification of class members and the efficient resolution of any necessary individualized inquiries. *See Lavigne v. First Cmty. Bancshares, Inc.*, 2018 WL 2694457, at *7 (D.N.M. June 5, 2018) ("[T]he Court concludes that common issues predominate, and Plaintiff's proposed methodology eliminates individualized inquiries or mini-trials."); *West v. Cal. Servs. Bureau*, 323 F.R.D. 295, 302 (N.D.

Cal. 2017) (finding that the proposed use of a "reverse-lookup service" would resolve "whether consent was given with respect to each class member."); *Johnson v. Navient Solutions, Inc.*, 315 F.R.D. 501, 503 (S.D. Ind. 2016) ("The Court finds that, at this point in the litigation…the Plaintiff's proposed method of identifying potential class members is adequate for class certification.") (footnote omitted); *see also Wesley v. Snap. Fin. LLC*, 339 F.R.D. 277, 285–86, 302 (D. Utah. 2021) (certifying a class after finding an expert's testimony was reliable and common evidence could resolve individual questions under the predominance analysis of Rule 23(b)); *cf. Hunter*, 2019 WL 3812063, at *16 (pointing to an expert's testimony that "86% of the wrong-number call recipients identified by Plaintiff's methodology were actually associated" with individuals "who may have consented to be called"). Based on the Court's assessment of the proposed expert methodology to identify class members and resolve any necessary individualized inquires, this Court joins those courts that have denied class certification in "wrong number" cases where plaintiffs have failed to show class membership and individualized inquiries can be efficiently disposed of through common proof or aggregate data.

For the above reasons, the proposed class cannot meet the ascertainability or, alternatively, the predominance requirements of Rule 23 and the case is therefore not suitable for class-wide disposition.

**D. The exclusion of Clarence Davis's testimony is not warranted.**

Capital One has also moved to exclude the testimony of Davis on the basis that he did not retain the pre-recorded messages that were left on his phone by Capital One. *See* [Doc. No. 78]; [Doc. No. 79] at 2 ("Since Plaintiff destroyed this purported evidence, he should be precluded from offering other evidence, including his unsubstantiated testimony, that he received

prerecorded messages from Capital One."). Capital One argues that spoliation sanctions are the proper remedy for Davis's actions pursuant to Federal Rule of Civil Procedure 37(e).

Spoliation is "the destruction or material alteration of evidence or to the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *Silvestri v. GMC*, 271 F.3d 583, 590 (4th Cir. 2001) (citations omitted). A party has a duty to preserve potential evidence during both litigation and when "a party reasonably should know that the evidence may be relevant to anticipated litigation." *Id*. at 591 (citing *Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir. 1998)). For a motion brought under Rule 37(e), the Court must determine whether (1) the electronically stored information is lost, (2) the information is the type that should be preserved during litigation, (3) the information was lost because a party "did not take reasonable steps to preserve it," and (4) the evidence cannot be replaced with more discovery. *Butler v. Kroger Limited Partnership*, 2020 WL 7483447, at *4 (E.D. Va. Nov. 30, 2020). In this District, a movant must demonstrate that sanctions are appropriate under Rule 37(e) by a clear and convincing standard of proof. *See Jenkins v. Woody*, 2017 WL 362475, at *12 (E.D. Va. Jan. 21, 2017). Thus, even if the Court finds that spoliation has occurred, the Court has the discretion to fashion appropriate sanctions if there is a finding of prejudice or if there is a finding a party intentionally acted to deprive the opposing party of information. Fed. R. Civ. P. 37(e).

Capital One argues that Davis spoliated evidence and that it has been prejudiced as a result, since to prevail on his claim Davis must show that he actually listened to a pre-recorded message and there is no other evidence to establish that Davis received the message. [Doc. No. 79] at 6. In support of this proposition, Capital One relies on the Fifth Circuit's holding in *Ybarra v. Dish Network, L.L.C.*, 807 F.3d 635 (5th Cir. 2015). In *Ybarra*, the Appellate Court held that in order to establish a TCPA violation, a "prerecorded voice must 'speak' during the call[,]" *Id*. at 641, and

Capital One argues that under this holding, Davis must show that he actually listened to a voice message that contained a pre-recorded automatic voice message. Accordingly, Capital One contends they are "unquestionably prejudiced by Plaintiff's destruction of evidence because Plaintiff's testimony that he received alleged prerecorded messages is grounded in those purported recordings and the only evidence that would unequivocally disprove his claim was destroyed by him." [Doc. No. 108] at 5.

Without resolving whether Capital One is correct about the limitation of TCPA liability to those who have actually listened to the voice message,[24] the Court finds that Capital One's contention is undercut by substantial evidence from which a reasonable juror could infer that Davis did, in fact, receive and listen to a pre-recorded voice message from Capital One. For instance, Capital One's corporate representative has stated in a declaration that "[i]f Capital One's outbound dialing telephone system believes it detects a voicemail or answering machine, the system may attempt to leave a rerecorded message." [Doc. No. 166-4] ¶ 10; *see also* [Doc. No. 166-5], 35:18–36:20. Further, while Capital One disputes that its own codes and records and those of T-Mobile necessarily establish whether a pre-recorded message played, these records are unquestionably probative, and to a certain extent corroborative, of Davis's receipt of a pre-recorded phone message, as is the undisputed fact that Davis called Capital One in order to tell Capital One to stop calling. *See* [Doc. No. 166-1] at 7. Given this other evidence, Capital One has only demonstrated minimal, if any, prejudice from the deletion of the pre-recorded messages. *Compare Steves & Sons, Inc. v. Jeld-Wen, Inc.*, 327 F.R.D. 96, 110 (E.D. Va. 2018) (finding sanctions were not appropriate when the evidence did not have a "unique and vital" role in the litigation), *with Jenkins*, 2017 WL

[24] Indeed, another case cited by Capital One reflected on the holding in *Ybarra* and reached a somewhat broader conclusion that "it is sufficient under the TCPA for Plaintiff to demonstrate that a message containing a pre-recorded voice was successfully delivered to his voice mailbox." *Lenorowitz v. Mosquito Squad of Fairfield and Westchester Cnty.*, 2022 WL 4367596, at *5 (D. Conn. Sept. 21, 2022) (citations omitted).

362475, at *18 (finding Rule 37 sanctions were appropriate when a defendant made the undisputedly "best and most compelling evidence of what happened" unavailable). The minimal showing of prejudice here is not sufficient to warrant the severe sanction of prohibiting the Plaintiff from testifying at trial.

## III. Conclusion

For the above reasons, it is hereby

**ORDERED** that the Motion to Exclude Expert Testimony, [Doc. No. 76], be, and the same hereby is, **GRANTED**; and it is further

**ORDERED** that the Motion to Strike the Supplemental Declaration, [Doc. No. 104], be, and the same hereby is, **GRANTED**; and it is further

**ORDERED** that the Motion to Exclude the Testimony of Clarence Davis, [Doc. No. 78], be, and the same hereby is, **DENIED**; and it is further

**ORDERED** that the Motion to Certify the Class, [Doc. No. 84], be, and the same hereby is, **DENIED**.

The Clerk is directed to forward copies of this Order to all counsel of record.

Alexandria, Virginia
October 20, 2023

Anthony J. Trenga
Senior U.S. District Judge